ACCEPTED
03-15-00226-CV
5697644
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/16/2015 2:49:54 PM
JEFFREY D. KYLE
CLERK

CASE NO. 03-15-00226-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/16/2015 2:49:54 PM
JEFFREY D. KYLE
Clerk

Texas Health & Human Services Commission,
Appellant,
v.
Linda Puglisi,
Appellee.

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas
Honorable Judge Gisela D. Triana Presiding.

APPELLANT'S BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division

EUGENE A. CLAYBORN
State Bar No.: 00785767
Assistant Attorney General
Deputy Chief, Administrative Law Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-3204
Facsimile: (512) 320-0167
eugene.clayborn@texasattorneygeneral.gov

*Attorneys for Texas Health and Human Services Commission*

ORAL ARGUMENT REQUESTED                June 12, 2015

# IDENTITIES OF PARTIES AND COUNSEL

Defendants/Appellant: Texas Health & Human Services Commission

COUNSEL:

EUGENE A. CLAYBORN
State Bar No. 00785767
Assistant Attorney General
Deputy Chief, ADMINISTRATIVE LAW DIVISION
OFFICE OF THE TEXAS ATTORNEY GENERAL
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-3204
Facsimile:   (512) 320-0167
eugene.clayborn@texasattorneygeneral.gov

Plaintiffs/Appellee:     Linda Puglisi

COUNSEL:

MAUREEN O'CONNELL
State Bar No.: 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
moconnell458@gmail.com

# ORAL ARGUMENT REQUESTED

Pursuant to Rule 39, Texas Rules of Appellate Procedure, Appellant requests oral argument in this case.   Appellant believes that oral argument will be beneficial to the court, given the complexity and novelty of the legal issues identified herein.

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL ......................................................... ii

TABLE OF CONTENTS ...................................................................................... iii

INDEX OF AUTHORITIES ................................................................................ vi

I. STATEMENT OF THE CASE ...................................................................... 1

II. ISSUES PRESENTED ................................................................................... 2

III. STANDARD OF REVIEW ........................................................................... 3

IV. JUDICIAL DEFERENCE TO AGENCY INTERPRETATION ....................... 4

V. FACTS OF THE CASE ................................................................................. 7

VI. SUMMARY OF THE ARGUMENT ............................................................. 8

VII. ARGUMENT AND AUTHORITIES ........................................................... 9

    A. Since Medicaid is the payor of last resort and Medicare is the payor of first resort, Puglisi's dual eligible status requires her to seek prior authorization via the CMS Medicare DME process before seeking prior authorization for Medicaid services. Therefore, this suit is no longer ripe for adjudication..... 9

        1. This suit is not ripe because of Puglisi's dual eligibility status ........ 10

        2. Medicare has its own preauthorization process .............................. 11

    B. The trial court erred in failing to remand pursuant to Tex. Gov't Code §2001.175 based on Puglisi's dual eligible status ...................................... 12

    C. Puglisi's suit for judicial review is not meritorious and HHSC's decision affirming Molina Healthcare's decision should not have been reversed..... 13

    D. HHSC's decision affirming Molina Healthcare's decision complies with applicable state and federal Medicaid regulations, therefore, the decisions are not arbitrary, capricious, or unreasonable. ........................................... 15

    E. Substantial evidence supports HHSC's decisions because Puglisi failed to meet her burden to show that the Group 4 power wheelchair, integrated standing feature, and power seat elevation system are medically necessary, that their appropriateness has been properly documented, or that Puglisi has obtained prior authorization pursuant to 1 TAC §§ 354.1035(b), .1039(a)(4), and .1040(d). .............................................................................. 16

        1. Although the Group 4 custom power wheelchair is a covered DME Medicaid home health benefit, it is not medically necessary, its appropriateness has not been properly documented, or Puglisi has not obtained prior authorization in this case .................................... 18

a. A Group 4 PMD is not medically necessary to correct or ameliorate Puglisi's medical need for mobility and independence. .................20

b. Puglisi's documentation failed to satisfy the prior authorization criteria described in TMPPM § 2.2.14.12.5....................................22

c. Exceptional circumstances review of Puglisi's request for a group 4 power wheel chair is not required because it is listed DME..........23

2. The integrated standing feature is not a covered reimbursable benefit, therefore, it should not be considered medically necessary, appropriate, or prior authorized. ....................................................23

a. Mobile power standing systems are not a covered benefit pursuant to TMPPM § 2.2.14.26................................................................24

b. Puglisi did not request exceptional circumstances review of her request for an integrated standing feature.....................................256

c. *Koenning v. Suehs* was vacated and dismissed as moot, therefore Puglisi's reliance on this case is misplaced. ..................................27

d. CMS policy letters and recent federal case law support exclusion of mobile power standers..................................................................29

e. Puglisi's Texas Government Code § 2001.038 rule challenge lacks merit. ...........................................................................................30

i. Puglisi cannot maintain an action for declaratory relief.............30

ii. Section 2001.038 allows suits for declaratory relief only before a final order issues in a contested case.......................................31

iii. Legal precedent confirms that declaratory relief is available to challenge a rule in general but unavailable to alter the application of a rule after the fact..........................................37

iv. The redundant remedies and separation-of-powers doctrines negate Puglisi's ability to bring a § 2001.038 claim in this suit..............................................................................................38

3. In this case, a power seat elevation system is not medically necessary, appropriately documented, or prior authorized...............41

a. Puglisi failed to satisfy the requirements of medical necessity and prior authorization for the requested power seat elevation system..........................................................................................43

b. Exceptional circumstances review for the requested power seat elevation system is not required in this case.................................44

iv

F. Puglisi received adequate due process relating to Molina Healthcare's denial of her request for Group 4 power wheelchair, integrated standing feature, and power seat elevation system. ......................................................44

    1. Puglisi has no protected due process right to Home Health Services program services because the program's existing rules do not confer a protected interest in Medicaid benefits to her. ...............................45

    2. Molina Healthcare's denial notice is sufficient. ..............................46

    3. The Reviewing Attorney fulfilled his statutory duties. ...................46

VIII. CONCLUSION & PRAYER ........................................................................47

CERTIFICATE OF COMPLIANCE ....................................................................49

CERTIFICATE OF SERVICE ............................................................................49

ACRONYMS ........................................................................................................50

APPENDICES ......................................................................................................52

# INDEX OF AUTHORITIES

**Cases**

*20801, Inc. v. Parker*,
249 S.W. 3d 392 (Tex. 2008) ...............................................................................6

*All Saints Health Sys. v. Tex. Workers' Comp. Comm'n*,
125 S.W.3d 96 (Tex. App.—Austin 2003, pet. denied)......................................36

*Atmos Energy Corp. v. Cities of Allen*,
353 S.W.3d 156, 160 (Tex. 2011) ........................................................................6

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ...........................................................................................45

*Beacon Nat'l Ins. Co. v. Montemayor*,
86 S.W.3d 260 (Tex. App.—Austin 2002, no pet.)............................................38

*BFI Waste Sys. v. Martinez Envtl. Grp.*,
93 S.W.3d 570 (Tex. App.—Austin 2002, pet. denied).....................................14

*Charlie Thomas Ford v. A.C. Collins Ford*,
912 S.W.2d 271 (Tex. App.—Austin 1995, writ dism'd)............................ 34, 37

*Chocolate Bayou Water Co. & Sand Supply v. Tex. Natural Res. Conservation Comm'n*, 124 S.W.3d 844 (Tex. App.—Austin 2003, pet. denied) ...............................................................................................................37

*City of El Paso v. Pub. Util. Comm'n*,
883 S.W.2d 179, at 185 ....................................................................................3, 4

*Dep't of Pub. Safety v. Latimer*,
939 S.W.2d 240 (Tex. App.—Austin 1997, no writ)............................................3

*Detgen ex. rel. v. Janek*,
752 F.3d 627 (5th Cir. 2014) .............................................................................25

*Detgen v. Janek*,
945 F.Supp.2d 746, 759 (N. D. Tex. 2013)........................................................30

*Envoy Med. Systems, v. State*,
108 S.W.3d 333, 337 (Tex. App.—Austin 2003, no pet.) .................................14

*Friends of Canyon Lake v. Guadalupe-Blanco River Auth.*,
96 S.W.3d 519, 529 (Tex. App.—Austin 2002, pet. Denied)....................... 32, 37

*Galbraith Eng'g Consultants, Inc. v. Texas Citizens for a Safe Future & Clean Water*,
336 S.W.3d 619 (Tex. 2011) ...............................................................................6

*HHSC v. El Paso County Hospital District*,
351 S.W.3d 460 (Tex. App.—Austin, 2011), *aff'd*, 400 S.W.3d 72 (Tex.2013) ..........................................................................................................36

*Johnson v. Guhl*,
91 F.Supp.2d 754 (D.N.J. 2000)........................................................................46

*Keeter v. Tex. Dep't of Agric.*,
844 S.W.2d 901 (Tex. App.—Austin 1992, writ denied) ....................................31

*KEM Tex. Ltd. v. Tex. Dep't of Transp.*,
No. 03-08-00468-CV, 2009 WL 1811102, at *6 n.6 (Tex. App.—Austin
June 26, 2009, no pet.) (mem. op.)..................................................................37

*Koenning v. Janek*,
539 Fed.Appx. 353, (5th Cir. 2013) ...............................................................28

*Koenning v. Suehs*,
897 F.Supp.2d 528 (S.D. 2012)............................................................... 27, 28

*Koenning v. Suehs*,
Civil Action No. V-11-5, 2013 WL 6491075, at *1 (S.D. Tex. Dec. 9,
2013)................................................................................................................28

*Liberty Mut. Ins. Co. v. Texas Dep't of Ins.*,
187 S.W.3d 808, 827 (Tex. App.—Austin 2006, pet. denied)...........................45

*Lopez v. Pub. Util. Comm'n*,
816 S.W.2d 776, 782 (Tex. App.—Austin 1991, writ denied) ..................... 35, 38

*Marks v. St. Luke's Episcopal Hosp.*,
319 S.W.3d 658 (Tex. 2010) ...............................................................................4, 6

*McMillan v. Tex. Natural Res. Conservation Comm'n*,
983 S.W.2d 359 (Tex. App.—Austin 1998, pet. denied)...................................14

*Meier Infinity Co. v. Motor Vehicle Bd.*,
918 S.W. 2d 95 (Tex. App.—Austin 1996, writ denied) .....................................4

*Neuwirth v. La. State Bd. of Dentistry*,
845 F.2d 553 (5th Cir.1988)...............................................................................45

*Northwestern Nal't Cnty. Mut. Ins. Co. v. Rodriguez*,
18 S.W.3d 718 (Tex.App.—San Antonio 2000, pet denied) ...............................6

*Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*,
971 S.W.2d 439 (Tex. 1998) ........................................................................ 10, 11

*Perry v. Del Rio*,
66 S.W.3d 239 (Tex. 2001) ................................................................................11

*Public Util. Comm'n v. Gulf States Utils. Co.*,
809 S.W.2d 201 (Tex. 1991) ................................................................................7

*R.R. Comm'n of Tex. v. Centerpoint Energy Res. Corp., et al.*,
Nos. 03-13-00533-CV, 03-13-00534-CV, 03-13-00535-CV, 2014 WL
4058727, at *2 (Tex.App.—Austin Aug. 14, 2014, no pet.)...............................10

*Rutherford Oil Corp. v. Gen. Land Office*,
776 S.W.2d 232 (Tex. App.—Austin 1989, no writ)........................................33

*Star Houston, Inc. v. Tex. Dep't of Transp.*,
957 S.W.2d 103 (Tex. App.—Austin 1997, pet. denied)..................................32

*State Bd. of Ins. v. Deffebach*,
  631 S.W.2d 794 (Tex. App.—Austin 1982, writ ref'd n.r.e.) ..............................33
*Sw. Pharm. Solutions, Inc. v. THHSC*,
  408 S.W.3d 549 (Tex. App.—Austin 2013, pet. denied) .......................................6
*SWEPI LP v. R.R. Comm'n*,
  314 S.W.3d 253, 269-270 (Tex.App.—Austin 2010, pet. Denied) .....................39
*TAMU v. Hole*,
  194 S.W.3d 591 (Tex. App.—Waco, 2006, pet. denied) ....................................10
*Tarrant Appraisal Dist. v. Moore*,
  845 S.W.2d 820 (Tex. 1993) ...............................................................................13
*Tenn. Gas Pipeline v. Rylander*,
  80 S.W.3d 200 (Tex. App.—Austin 2002, pet. denied)......................................14
*Tex. Comm'n of Licensing & Regulation v. Model Search Am., Inc.*,
  953 S.W.2d 289 (Tex. App.—Austin 1997, no writ)...........................................40
*Tex. Dep't of Licensing & Regulation v. Roosters MGC, LLC*,
  No. 03-09-00253-CV, 2010 WL 2354064, at * 6 (Tex. App.—Austin
  June 10, 2010, no pet.) (mem. op.)................................................................ 34, 40
*Tex. Gen. Indem. v. Tex. Workers' Comp. Comm'n*,
  36 S.W.3d 635 (Tex. App.—Austin 2000, no pet.).............................................14
*Tex. Health Facilities Comm'n v. Charter Med.-Dall.*,
  665 S.W.2d 446 (Tex. 1984) .................................................................................4
*Tex. Mun. Power Agency v. Pub. Util. Comm'n,*
  253 S.W.3d 184 (Tex. 2007) .................................................................................4
*Tex. Rivers Prot. Ass'n v. TNRCC*,
  910 S.W.2d 147 (Tex. App.—Austin 1995, writ denied) .....................................4
*Tex. State Bd. of Med. Exam'rs v. Scheffey*,
  949 S.W.2d 431 (Tex. App.—Austin 1997, writ denied) .....................................3
*Tex. Water Comm'n v. Dellana*,
  849 S.W.2d 808 (Tex. 1993) (per curiam) .........................................................34
*Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*,
  375 S.W.3d 464 (Tex. App.--Austin 2012, pet. denied) .......................................7
*TGS-NOPEC Geophysical Co. v. Combs*,
  340 S.W.3d 432 (Tex. 2011) .................................................................................7
*Tobias v. Univ. of Tex. at Arlington*,
  824 S.W.2d 201 (Tex.App.—Fort Worth 1991, writ denied)..............................46
*Weyth v. Levine*,
  555 U.S. 555 S. Ct. 1187, 173 L.Ed.2d 51 (2009) ...............................................7
*Woody v. Dallas*,
  809 F.Supp. 466 (N.D.Tex. 1992) ................................................................. 45, 46

**Statutes**

Tex. Gov't Code § 311.021(2) ..................................................................6, 33
Tex. Gov't Code § 311.023(1)-(5) .................................................................6
Tex. Gov't Code § 531.019 ............................................................ 31, 35, 37
Tex. Gov't Code § 531.019(c) (West 2004 and Supp. 2009) ..........................47
Tex. Gov't Code § 531.019(e)(2) (West 2004 and Supp. 2009) ......................47
Tex. Gov't Code § 531.019(g) (West 2000 & Supp. 2008) .............................3
Tex. Gov't Code § 531.021(a) ..................................................................5, 6
Tex. Gov't Code § 531.021(b)(2) (West 2012) ..............................................5
Tex. Gov't Code § 531.021(d)(1) (West 2012) ..............................................5
Tex. Gov't Code § 531.021(d)(2) (West 2012) ..............................................5
Tex. Gov't Code § 2001.003(1) ...................................................................33
Tex. Gov't Code § 2001.003(6)(A) ..............................................................33
Tex. Gov't Code § 2001.038 .................................................................. passim
Tex. Gov't Code § 2001.038(d) ...................................................................34
Tex. Gov't Code § 2001.038(e) ...................................................................36
Tex. Gov't Code § 2001.054 ........................................................................32
Tex. Gov't Code § 2001.171 .................................................................. passim
Tex. Gov't Code § 2001.174 ........................................................................39
Tex. Gov't Code § 2001.174(2)(D) ..............................................................39
Tex. Gov't Code § 2001.174(D) ...................................................................34
Tex. Gov't Code § 2001.175 .................................................................. passim
Tex. Hum. Res. Code § 32.021(a) .............................................................5, 6
Tex. Hum. Res. Code § 32.021(c) (West 2001) .............................................5
Tex. Hum. Res. Code § 32.050(b) .............................................................2, 9
Texas Human Resources Code, Chapter 32 ....................................................5

**Other Authorities**

42 C.F.R. § 430.10 .......................................................................................5
42 U.S.C. § 1396 .........................................................................................5
42 U.S.C. § 1396a(a) ...................................................................................5
42 U.S.C. § 1396b(a) ...................................................................................5
42 U.S.C. § 1396c ........................................................................................5
42 U.S.C. § 1396d(b) ...................................................................................5
42 U.S.C. § 13896(b) ...................................................................................5
TMPPM § 2.2.2 ......................................................................... 20, 21, 43
TMPPM § 2.2.14.12 ....................................................................................19
TMPPM § 2.2.14.12.1 .................................................................................19
TMPPM § 2.2.14.12.5 ................................................................. 19, 22, 23, 44
TMPPM § 2.2.14.15.1 .................................................................................42

TMPPM § 2.2.14.15.2..........................................................................42
TMPPM § 2.2.14.22................................................................... 24, 25
TMPPM § 2.2.14.26.................................................................. passim
TMPPM § 2.2.14.6.............................................................................28
TMPPM § 2.2.14.6.2.........................................................................19

**Rules**

1 Tex. Admin. Code § 354.1031.................................................... passim
1 Tex. Admin. Code § 354.1031(12) ...................................................28
1 Tex. Admin. Code § 354.1035.................................................... passim
1 Tex. Admin. Code § 354.1035(b) ................................................3, 16
1 Tex. Admin. Code § 354.1039.................................................... passim
1 Tex. Admin. Code § 354.1039(a) ...................................... 14, 17, 24
1 Tex. Admin. Code § 354.1039(a)(4)............................................3, 16
1 Tex. Admin. Code § 354.1039(a)(4)(A) ................................. 15, 18, 41
1 Tex. Admin. Code § 354.1039(a)(4)(D) ................................. 23, 26, 44
1 Tex. Admin. Code § 354.1040.................................................... passim
1 Tex. Admin. Code § 354.1040(d) .......................................... 3, 16, 18
1 Tex. Admin. Code § 354.1040(e) .....................................................18
1 Tex. Admin. Code § 354.1041..........................................................2, 9
1 Tex. Admin. Code § 357.19(e) ........................................................47
1 Tex. Admin. Code § 357.703(5) ......................................................47

**Other Authorities**

13 *Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper*, Federal
 Practice & Procedure § 3532.1 at 136–37 (2d ed. 1984) ....................................11
DME MAC Jurisdiction C Supplier Manual, CGS: A Celerian Group
 Company (Apr. 01, 2015)..............................................................9, 11

CASE NO. 03-15-00226-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

Texas Health & Human Services Commission,
Appellant,
v.
Linda Puglisi,
Appellee.

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas,
Honorable Judge Gisela D. Triana Presiding.

APPELLANT'S BRIEF

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW the Texas Health and Human Services Commission (HHSC)

and submits Appellant's Brief.

## I. STATEMENT OF THE CASE

United Seating & Mobility, Puglisi's Durable Medical Equipment (DME)

provider, requested prior authorization for a Group 4 power wheelchair, an

integrated standing feature, and power seat elevation system. A.R. at 47–161.

Molina Healthcare of Texas (Molina Healthcare), Puglisi's Medicaid Managed Care

Organization (MCO), denied her request for a Group 4 power wheelchair because it

was not medically necessary. A.R. at 42–46, Appendix 1. In addition, Molina

Healthcare denied Puglisi's request for a mobile stander or integrated standing

feature because it was not a covered benefit and not medically necessary. A.R. at 27–46. Also, Molina Healthcare denied Puglisi's request for a power seat elevation system because it was not medically necessary.

Thereafter, Puglisi requested a fair hearing to contest the denial of United Seating & Mobility's request for prior authorization of DME. However, HHSC's Hearing Officer sustained Molina Healthcare's decision to deny Puglisi's request. A.R. at 330–36, Appendix 2. After administrative review, the Reviewing Attorney sustained the Hearings Officer's order. A.R. at 339–47, Appendix 3. Also, the Hearing Officer adopted the Reviewing Officer's findings and conclusions. A.R. at 339–47. Thereafter, on February 7, 2014, Puglisi sought judicial review of the decisions. However, on May 1, 2014, Puglisi's eligibility status changed and she became qualified for Medicare services. C.R. at 261–262. Nevertheless, the trial court denied HHSC's Motion to Dismiss and issued its final judgment reversing and remanding the case to HHSC. C.R. at 314, 348–49, Appendix 9 and Appendix 10.

## II. ISSUES PRESENTED

1. Whether the case should be dismissed for lack of subject matter jurisdiction because Medicare is the payor of first resort and Medicaid is the payor of last resort pursuant to Tex. Hum. Res. Code § 32.050(b) and 1 TAC § 354.1041.

2. Whether the trial court should have remanded the Medicare eligibility issue to HHSC to take additional evidence and hold an appropriate hearing pursuant to Texas Gov't Code § 2001.175.

3. Whether HHSC's interpretation and application of Texas' Medicaid regulations and policies are entitled to more deference from the trial court.

2

4. Whether the Hearing Officer's and the Reviewing Attorney's decisions are consistent with federal and state law.

5. Whether substantial evidence supports the Hearing Officer's Order and the Reviewing Attorney's Decision affirming Molina Healthcare's denial of Puglisi's request because she failed to meet her burden to show that the Group 4 power wheelchair, integrated standing feature, and power seat elevation system are medically necessary, appropriate, and prior authorized pursuant to 1 Tex. Admin. Code §§ 354.1035(b), .1039(a)(4), .1040(d).

6. Whether Puglisi received adequate due process relating to Molina Healthcare's denial of her request for a Group 4 power wheelchair, integrated standing feature, and power seat elevation system.

### III. STANDARD OF REVIEW

"Judicial review of a decision made by a hearing officer for the commission or a health and human services agency related to public assistance benefits is under the substantial evidence rule and is instituted by filing a petition with a district court in Travis County, as provided by Subchapter G, Chapter 2001." Tex. Gov't Code Ann. § 531.019(g) (West 2000 & Supp. 2008). Under this standard, the reviewing court is concerned only with the reasonableness of the administrative order, not the correctness of the order. The test for review of an agency decision is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action. *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Tex. State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, writ denied); *Dep't of Pub. Safety v. Latimer*, 939 S.W.2d 240, 244 (Tex. App.—Austin 1997, no writ); *Meier Infinity*

3

*Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 98 (Tex. App.—Austin 1996, writ denied).

Puglisi has the burden of proof in her suit for judicial review. "[F]indings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise." *Pub. Util. Comm'n*, 883 S.W.2d at 185 (*citing Tex. Health Facilities Comm'n v. Charter Med.-Dall.*, 665 S.W.2d 446, 452–53 (Tex. 1984)). As long as a properly supported finding given in the order supports an agency's action, the court will uphold the action despite the existence of other findings that are irrelevant or unsupported by the record. *Tex. Rivers Prot. Ass'n v. TNRCC*, 910 S.W.2d 147, 155 (Tex. App.—Austin 1995, writ denied).

In addition, matters of statutory construction are reviewed de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n,* 253 S.W.3d 184, 192 (Tex. 2007). In construing a statute, a court applies the plain meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context or the plain meaning leads to absurd results. *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010).

## IV. JUDICIAL DEFERENCE TO AGENCY INTERPRETATION

Medicaid Home Health Services is a part of the Texas Medicaid program. The Texas Legislature has given HHSC broad discretion to "establish methods of administration and adopt necessary rules for the proper and efficient operation of the

program." Tex. Hum. Res. Code § 32.021(c) (West 2001). Additionally, the Texas Legislature has given HHSC broad discretion to "adopt reasonable rules and standards governing the determination of fees, charges, and rates for medical assistance payments under Chapter 32, Human Resources Code, in consultation with the agencies that operate the Medicaid program." Tex. Gov't Code § 531.021(b)(2) (West 2012). Further, "[i]n adopting rules and standards required by Subsection (b)(2), the commission may provide for payment of fees, charges, and rates in accordance with: (1) formulas, procedures, or methodologies prescribed by the commission rules; (2) applicable state or federal law, policies, rules, regulations, or guidelines." Tex. Gov't Code § 531.021(d)(1), .021(d)(2) (West 2012). In a recent opinion, the Third Court of Appeals described the cooperative nature of the Texas Medicaid program as follows:

> Medicaid is a cooperative federal-state program that provides health care to needy individuals. *See generally* 42 U.S.C. §§ 1396–96w (Grants to States for Medical Assistance Programs). While federal law establishes Medicaid's basic parameters, each state decides the nature and scope of its Medicaid program and submits a State plan describing its program to the federal Center for Medicare and Medicaid Services, which must approve the plan and any amendments. *See* 42 U.S.C. § 1396a(a), 13896(b); 42 C.F.R. § 430.10. The federal government agrees to pay a specified percentage of a state's expenditures for covered services provided by the state under an approved State plan. *See* 42 U.S.C. §§ 1396b(a), 1396c, 1396d(b). . . . In Texas, HHSC is the agency designated to administer federal medical assistance programs, including Medicaid. *See* Tex. Hum. Res. Code § 32.021(a); Tex. Gov't Code § 531.021(a).

*See Sw. Pharm. Solutions, Inc. v. THHSC,* 408 S.W.3d 549, 552 (Tex. App.—Austin

2013, pet. denied). Like the plaintiff in *Southwest Pharmacy*, Puglisi is asking this

Court to construe the Medicaid statutes, rules, policies, and procedures that HHSC

is responsible for implementing in Texas.

Furthermore, the Third Court of Appeals described the "rules of construction"

as follows:

> Of primary concern is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). We apply the plain meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context of the plain meaning leads to absurd results. *Marks v. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 663 (Tex. 2010). "We generally avoid construing individual provisions of a statute in isolation from the statute as a whole [,]" *Texas Citizens*, 336 S.W.3d at 628, we must consider a provisions' role in the broader statutory scheme, *see 20801, Inc. v. Parker*, 249 S.W. 3d 392, 396 (Tex. 2008), and we presume that "the entire statute is intended to be effective[,]" Tex. Gov't Code § 311.021(2). A court may consider the law's objective; the circumstances under which the statute was enacted; legislative history; former statutory provisions; and the consequences of a particular construction when construing statutes, whether or not the statute is ambiguous. Tex. Gov't Code § 311.023(1)-(5); *Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 160 (Tex. 2011). "Construction of a statute must be consistent with its underlying purpose and the policies it promotes." *Northwestern Nal't Cnty. Mut. Ins. Co. v. Rodriguez*, 18 S.W.3d 718, 721 (Tex.App.—San Antonio 2000, pet denied).
>
> Here, we must construe statutes and rules that HHSC is charged with administering. *See* Tex. Hum. Res. Code § 32.021(a); Tex. Gov't Code § 531.021(a). "[A]n agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language." *Texas Citizens*, 336 S.W.3d at 624. When a statutory

scheme is subject to multiple interpretations, we must uphold an enforcing agency's construction if it is reasonable and in harmony with the statute. *Id.* at 629 (observing that "governmental agencies have a 'unique understanding' of the statutes they administer") (*quoting Weyth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 173 L.Ed.2d 51 (2009)). This deference is particularly important in construing a complex statutory scheme like that governing Texas Medicaid. *See id.* at 629-30. We construe administrative rules in the same manner as statutes. *TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex. 2011). We defer to an agency's interpretation of its own rules unless it is plainly erroneous or contradicts the text of the rule or underlying statute. *Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex. 1991); *Texas Bd. of Chiropractic Exam'rs v. Texas Med. Ass'n*, 375 S.W.3d 464, 475 (Tex. App.--Austin 2012, pet. denied).

*See Sw. Pharm. Solutions,* 408 S.W.3d at 557–58. In this instance, HHSC's interpretation of 1 Tex. Admin. Code (TAC) §§ 354.1035, .1039, and .1040, as expressed in the Texas Medicaid Providers Procedures Manual (TMPPM), should be upheld because its interpretation is reasonable and does not conflict with state and federal statutes, regulations, policies and guidance. Appendix 4 and Appendix 5.

## V. FACTS OF THE CASE

Appellant adopts the Findings of Fact as set forth in the Hearings Officer's Order and the Reviewing Attorney's Decision. A.R. at 333–34, 344–46, Appendix 2 and Appendix 3. Essentially, Molina Healthcare denied Puglisi's request for a Group 4 power wheelchair because it was not medically necessary. In addition, the Hearing Officer concluded that the integrated standing feature was not medically necessary and was not a covered benefit. Also, the Hearing Officer determined that the power seat elevation system was not medically necessary. After considering the

7

evidence in the record, the factual findings, and applicable law, the Hearing Officer decided that "therefore, Molina Healthcare's action to deny a group 4 power wheelchair with an integrated standing feature is **SUSTAINED**."  A.R. at 334, 346, Appendix 3.  In addition, the Reviewing Attorney determined that "[t]he record reflects that Molina properly denied Appellant's request for a Group 4 custom power wheelchair with an integrated standing feature and power seat elevation system in accordance with applicable law and policy."  A.R. at 347, Appendix 4.

## VI. SUMMARY OF THE ARGUMENT

This case should have been dismissed for lack of subject matter jurisdiction or remanded to the agency to take and adjudicate additional evidence regarding Puglisi's dual eligibility status.  Regardless, the Hearing Officer and Reviewing Attorney correctly affirmed Molina Healthcare's denial of Puglisi's request for a Group 4 power wheelchair, the integrated standing feature, and the power seat elevation system based on substantial evidence in the record as well as the proper interpretation and application of applicable agency rules, policies, and procedures. In total, Puglisi has received all the process that she was due.  Therefore, the trial court's judgment should be: (a) reversed because the trial court lacks subject matter jurisdiction, (b) reversed because Molina Healthcare's and HHSC's decisions are supported by substantial evidence, or (c) remanded to Molina Healthcare and HHSC to take additional evidence pursuant to Tex. Gov't Code § 2001.175.

## VII. ARGUMENT AND AUTHORITIES

**A.     Since Medicaid is the payor of last resort and Medicare is the payor of first resort, Puglisi's dual eligible status requires her to seek prior authorization via the CMS Medicare DME process before seeking prior authorization for Medicaid services. Therefore, this suit is no longer ripe for adjudication.**

The Court erred in concluding "this DME item" must receive prior authorization from Texas Medicaid.  C.R. at 348–49.  Since Puglisi has acquired dual eligible status, she must present her request for DME through the Centers for Medicare and Medical Services (CMS) Medicare DME preauthorization process. *See* Affidavit of Daneen Machicek, C.R. at 269–70.  Specifically, Texas law requires HHSC to analyze claims submitted under Medicaid to ensure claims are submitted first under Medicare to the extent allowed by law.   Tex. Hum. Res. Code § 32.050(b) (West 2013), C.R. at 271.   Medicare is the primary payor when a person is eligible for both Medicaid and Medicare.   1 TAC § 354.1041, C.R. at 273.   The CMS Medicare DME preauthorization process is described in the Durable Medical Equipment Medicare Administrative Contractor (DME MAC) Jurisdiction C Supplier Manual.   C.R. at 285–313, Appendix 11.   The Celerian Group Company (CGC) is the DME MAC for Jurisdiction C, which includes Texas, that was selected by CMS to process Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) claims for the Medicare program. C.R. at 292.

**1. This suit is not ripe because of Puglisi's dual eligibility status.**

Puglisi affirms that her new Medicare-Medicaid status is Medicaid Qualified Medicare Beneficiary (MQMB). For MQMB recipients, Medicare is the primary payor for DME authorized via the CMS Medicare prior authorization process. *See* Affidavit of Daneen Machicek, C.R. at 269–70. In this instance, Puglisi's new dual eligible status requires her to seek assistance under Medicare before seeking assistance under Medicaid. Puglisi's new dual eligible status is a significant intervening event that renders the underlying issues of this suit unfit for judicial review and also alleviates any contingent or hypothetical hardship that Puglisi may experience in the absence of a judicial decision at this time.

The ripeness doctrine should be applied to the post-filing circumstances or intervening events that have occurred in this case. "Ripeness is a threshold issue that implicates subject-matter jurisdiction and emphasizes the need for a concrete injury." *TAMU v. Hole*, 194 S.W.3d 591, 593 (Tex. App.—Waco, 2006, pet. denied)(citing *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998)). In this case, the ripeness issue must account for significant "intervening events" or "post-filing circumstances" that have occurred after the initial suit was filed. *See R.R. Comm'n of Tex. v. Centerpoint Energy Res. Corp., et al.*, Nos. 03-13-00533-CV, 03-13-00534-CV, 03-13-00535-CV, 2014 WL 4058727, at *2 (Tex.App.—Austin Aug. 14, 2014, no pet.) ("Ripeness should be

10

decided on the basis of all the information available to the court, and we may consider intervening events that occur after the decision in the lower court.")(citing *Perry v. Del Rio*, 66 S.W.3d 239, 250 (Tex. 2001)); 13 *Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper*, Federal Practice & Procedure § 3532.1 at 136–37 (2d ed. 1984); *Patterson*, 971 S.W.2d at 442.

### 2. Medicare has its own preauthorization process.

Puglisi declared that "Medicare does not require prior authorization for DME." See Plaintiff's Response In Opposition To Defendant's Motion To Dismiss, FN6, p.8, C.R. at 254. However, the CMS Medicare DME preauthorization process is described in the DME MAC Jurisdiction C Supplier Manual. C.R. at 285–313, Appendix 11. The CGC is the DME MAC for Jurisdiction C, which includes Texas, which was selected by CMS to process DMEPOS claims for the Medicare program. C.R. at 285–313; DME MAC Jurisdiction C Supplier Manual, CGS: A Celerian Group Company (Apr. 01, 2015), http://cgsmedicare.com/jc/pubs/supman/. Since Puglisi has acquired dual eligible status, she is required to avail herself to the CMS Medicare prior authorization process and procedure in the first instance.

**B.** **The trial court erred in failing to remand pursuant to Tex. Gov't Code §2001.175 based on Puglisi's dual eligible status.**

The trial court's order states that "this matter is hereby REVERSED and REMANDED back to the Texas Health and Human Services for further proceedings consistent with [this] decision, including any other required determinations related to Medicare and Medicaid issues not currently before the Court." C.R. at 348. The "REVERSAL" component of the order, however, is in conflict with the "REMAND" component. Specifically, the court's order does account for the undisputed fact Puglisi is now dually eligible for both Medicare and Medicaid. Even though the undisputed evidence of Puglisi's dual eligible status was presented to the trial court during the hearing on the motion to dismiss and was presented in our objections to the trial court's letter ruling in the trial on the merits, the trial court failed to consider Puglisi's dual eligible status in the context of the suit for judicial review. At a minimum, the trial court's rulings should include a determination as to whether Puglisi's dual eligibility status is material to the determination of whether she is required to request the DME from CMS's Medicare DME MAC in the first instance. If the trial court had properly considered the significance of Puglisi's dual eligibility, the trial court should have simply remanded the case to HHSC without adjudicating unripe issues relating to coverage, reimbursement, medical necessity, appropriateness, and prior authorization.

12

Since the dual eligibility issue is material to this case and occurred after the administrative review, the trial court should "order that the additional evidence be taken before the agency on conditions determined by the court" pursuant to Tex. Gov't Code § 2001.175. In summary, Molina Healthcare, the entity that made the initial determination, and the administrative tribunal, in its appellate role, should have been given the opportunity to "change its findings and decision by reason of the additional evidence" relating to dual eligibility pursuant to Tex. Gov't Code § 2001.175. The issue of dual eligibility is material and good reasons exist to explain why the evidence of dual eligibility was not presented to the administrative tribunal.

C.     **Puglisi's suit for judicial review is not meritorious and HHSC's decision affirming Molina Healthcare's decision should not have been reversed.**

The trial court's judgment states that "Plaintiff's appeal is meritorious and Defendant's administrative decision should be reversed." C.R. at 348. This statement, however, is erroneous because the trial court has not given any deference to HHSC's interpretation of Texas Medicaid DME regulations that HHSC has the responsibility to administer on behalf of the truly needy individuals in Texas. It has long been the rule that "[c]onstruction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute." *See Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993); *see also*

13

*Envoy Med. Systems, v. State*, 108 S.W.3d 333, 337 (Tex. App.—Austin 2003, no pet.) (explaining that an -administrative agency has the power to interpret its own rules and that interpretation is entitled to deference by a court called upon to interpret or apply such rules); *BFI Waste Sys. v. Martinez Envtl. Grp.*, 93 S.W.3d 570, 575 (Tex. App.—Austin 2002, pet. denied)(finding that because an agency's interpretation represents the view of the regulatory body that drafted and administers the rule, the interpretation actually becomes a part of the rule itself); *Tenn. Gas Pipeline v. Rylander*, 80 S.W.3d 200, 203 (Tex. App.—Austin 2002, pet. denied)(illustrating greater deference given to an interpretation that is longstanding and applied uniformly); *Tex. Gen. Indem. v. Tex. Workers' Comp. Comm'n*, 36 S.W.3d 635, 641 (Tex. App.—Austin 2000, no pet.)(stating that an agency's construction of its rule is controlling unless it is plainly erroneous or inconsistent); *McMillan v. Tex. Natural Res. Conservation Comm'n*, 983 S.W.2d 359, 362 (Tex. App.—Austin 1998, pet. denied)(stating that the agency interpretation becomes part of the rule itself and represents the view of a regulatory body that must deal with the practicalities of administering the rule).

Instead of giving due deference, the trial court's final judgment essentially negates or nullifies HHSC's interpretation and application of the Texas Medicaid DME regulations, including but not limited to the following:

> 1 TAC § 354.1039(a) . . . Home Health Services Benefits and Limitations - "*The State determines authorization requirements* and

*limitations* for covered home health service benefits.   The home health agency is responsible for obtaining prior authorization where specified for the healthcare service, supply, equipment, or appliance. [Emphasis Added];

1 TAC § 354.1039(a)(4)(A) . . . DME must (i) be *medically necessary* and the *appropriateness* of the . . . equipment, or appliance prescribed by the physician for the treatment of the individual recipient and delivered in his place of residence must be *documented* in the plan of care and/or the request form.   (ii) be *prior authorized* unless otherwise specified by the department; . . . [Emphasis Added].

**D.     HHSC's decision affirming Molina Healthcare's decision complies with applicable state and federal Medicaid regulations, therefore, the decisions are not arbitrary, capricious, or unreasonable.**

The trial court erred in finding "that the Commissions' decision fails to comply with the controlling and applicable federal and state law, and thus is arbitrary, capricious, and unreasonable."   C.R. at 348.   In this case, Molina Healthcare and HHSC's decisions comply with 1 TAC §§ 354.1031, .1035, .1039, and .1040 as well as applicable Texas Medicaid Provider Procedures, which establish and explain the "authorization requirements" and "limitations" for Group 4 power wheelchairs, mobile standers, and power seat elevation systems.   In fact, Puglisi failed to satisfy the requirements of applicable agency regulations, which unequivocally provide that covered and reimbursable DME must be medically necessary, that the appropriateness of the DME must be documented in the request form, and that the home health agency must obtain prior authorization.   1 TAC § 354.1039(a)(4)(A).

15

**E.    Substantial evidence supports HHSC's decisions because Puglisi failed to meet her burden to show that the Group 4 power wheelchair, integrated standing feature, and power seat elevation system are medically necessary, that their appropriateness has been properly documented, or that Puglisi has obtained prior authorization pursuant to 1 TAC §§ 354.1035(b), .1039(a)(4), and .1040(d).**

In its judgment, the trial court "finds that the Commission's decision to deny Medicaid coverage for the DME custom power wheelchair with an integrated standing feature as recommended by her treating medical providers, because Plaintiff has not demonstrated medical necessity, is also not supported by substantial evidence and Plaintiff has established her entitlement based on medical necessity under that applicable law."  C.R. at 348.  The trial court's finding shows that it utilized a truncated one-part test to determine Puglisi's eligibility for the requested DME.  However, Medicaid rules and provider procedures require application of a multi-part test.  Specifically, the applicable rules and procedures provide: (a) that the DME must be *covered* DME, (b) that the DME must be *reimbursable* DME, (c) that the DME must be *medically necessary*, (d) that the *appropriateness* of the DME must be properly documented in the request form, and (e) that the DME must receive *prior authorization*.  In this case, the trial court discarded crucial parts of the correct multi-part test.  In other words, the trial court failed to consider whether the requested DME was *covered*, *reimbursable*, *appropriate*, and *prior authorized*.

Puglisi asserts that "an individualized determination of DME coverage must be made by ascertaining whether the requested item of medical equipment meets the

16

state's definition of DME."   C.R. at 57.   However, Puglisi's definition of the scope of DME coverage is truncated and otherwise inconsistent with the much broader scope of coverage for DME described in 1 TAC §§ 354.1031, .1035, .1039, and .1040 as well as applicable Texas Medicaid Provider Procedures.   Appendix 4 and Appendix 5.   Hence, the salient question is whether Puglisi is required to satisfy all or only part of the regulatory prerequisites necessary to acquire the requested DME. In this case, Puglisi is required to satisfy all of the necessary prerequisites.   As such, the trial court should have applied the correct multi-part test but failed to do so.

Accordingly, 1 TAC § 354.1039(a) provides that "[t]he State determines *authorization requirements and limitations* for covered home health service benefits." (emphasis added).   All of HHSC's DME rules and procedures are consistent with Centers for Medicare and Medicaid Service (CMS) policy on DME coverage as articulated in the May 21, 2013 letter from CMS to HHSC.   A.R. at 303.   HHSC's DME rules and procedures are also consistent with CMS policy on DME coverage that is described in the *Desario Letter* dated September 4, 1998. Appendix 6.   As a result, a plain reading of applicable agency rules and provider procedures show that just because a given item meets the Puglisi's narrowly defined scope of coverage for DME does not also mean: (a) that the item is covered DME, (b) that the item is reimbursable DME, (c) that the item is medically necessary, (d) that the appropriateness of the item is properly documented in the request form, or

17

(e) that the item has received prior authorization.

**1. Although the Group 4 custom power wheelchair is a covered DME Medicaid home health benefit, it is not medically necessary, its appropriateness has not been properly documented, or Puglisi has not obtained prior authorization in this case.**

There is no dispute that a Group 4 power wheelchair is a covered Medicaid home health benefit in Texas. Specifically, 1 TAC §§ 354.1031, .1035, .1039, and .1040 as well as applicable Texas Medicaid Provider Procedures establish and explain the "authorization requirements" and "limitations" for Group 4 power wheelchairs. Accordingly, applicable agency rules unequivocally provide that covered and reimbursable DME must be medically necessary, that the appropriateness of the DME must be documented in the request form, and that the requestor must obtain prior authorization. 1 TAC § 354.1039(a)(4)(A). In addition, the DME supplier must receive prior authorization from HHSC. 1 TAC § 354.1040(d). Furthermore, prior authorization requires that the DME supplier submit documentation, "in a manner approved by HHSC or its designee" for a Group 4 power wheelchair that consists of the physician's prescription, documentation of medical need, a clinical assessment, and "[a]ny other documentation deemed necessary by HHSC or its designee to adequately explain the medical necessity of the requested equipment." 1 TAC § 354.1040(e).

18

Moreover, the Texas Medicaid Provider Procedures Manual (TMPPM), consistent with the dictates of the "Desario Letter," describes "reasonable and specific criteria" for medical necessity, proper documentation, and prior authorization of power wheelchairs. Specifically, TMPPM § 2.2.14.6.2 shows that prior authorization for a power wheelchair is predicated on "proper documentation supporting medical necessity and an assessment of the accessibility of the client's residence." Appendix 5, DM-62. In addition, TMPPM § 2.2.14.6.2 describes the documentation necessary to demonstrate medical necessity for a power wheelchair. Appendix 5, DM-62. Also, TMPPM § 2.2.14.12 describes the power wheelchair and its standard components. Appendix 5, DM-68. Furthermore, the prior authorization requirements specified in TMPPM § 2.2.14.12.1 describe the additional documentation required to demonstrate that the client can operate and care for a custom power wheelchair. Appendix 5, DM-69. And, TMPPM § 2.2.14.12.5 lists more requirements for Group 4 power wheelchairs, as well as additional prior authorization and documentation criteria. Appendix 5, DM-71. In particular, TMPPM § 2.2.14.12.5 requires Puglisi to show when, where, and how she will be using the Group 4 power wheelchair to perform certain Mobility Related Activities of Daily Living (MRADLs) outside her home on a routine basis. Appendix 5, DM-71.

Based on the evidence presented by Molina Healthcare and Puglisi in the

administrative record, the Hearing Officer determined that "Appellant was able to maneuver a power wheelchair group 3 independently during the hearing." A.R. at 334. In addition, the Reviewing Attorney determined that "Appellant presented insufficient evidence that she would (a) routinely use the requested Group 4 power wheelchair for mobility-related activities of daily living outside her home, (b) routinely use the requested Group 4 wheelchair on rough or uneven surfaces, and (c) encounter obstacles in excess of 2.25 inches." A.R. at 345-46.

### a. A Group 4 PMD is not medically necessary to correct or ameliorate Puglisi's medical need for mobility and independence.

"Texas Medicaid defines DME as: *Medical equipment or appliances that are manufactured to withstand repeated use, ordered by a physician for use in the home, and required to correct or ameliorate a client's disability, condition, or illness.*" TMPPM § 2.2.2., Appendix 5, DM-13. Additionally, the TMPPM states the following:

> Since there is not single authority, such as a federal agency, that confers the official status of "DME" on any device or product, HHSC retains the right to make such determinations with regard to DME benefits of Texas Medicaid. DME benefits of Texas Medicaid must have either a well-established history of efficacy or, in the case of novel or unique equipment, valid, peer-reviewed evidence that the equipment corrects or ameliorates a covered medical condition or functional disability.

TMPPM § 2.2.2., Appendix 5, DM-13. This section of the TMPPM appears to

20

define medical necessity to mean that requested DME is "required to correct or ameliorate a client's disability, condition, or illness." In other words, the requested DME cannot be requested as matter of convenience.

In contrast, Puglisi's description of medical necessity for the mobility base is that it is "required to enable functions of the wheelchair as a whole and thus allow Linda to maneuver within her home independently in a safe and reliable manner." A.R. at 190. However, a review of the administrative record shows that Molina Healthcare determined that Puglisi failed to satisfy criteria to demonstrate medical necessity for the Group 4 power wheelchair. Specifically, the record shows that Molina Healthcare made a determination as follows:

> This request for a Group 4 custom power wheelchair cannot be approved. The group 4 power chair is requested in order to accommodate the Power Stand and Drive function; E2301 Power stand and drive feature is not considered medically necessary because driving standing up is not a medical necessity. In addition, HCPC code E2301 is not a TMHP payable code/covered benefit. A dynamic stander can be requested with submission of appropriate clinical information. A group 4 power wheelchair cannot be approved because a Group 3 power wheelchair will meet the member's needs for mobility and independence.

A.R. at 27. Also, Molina Healthcare stated that "[t]his request of a custom power wheelchair cannot be approved because criteria for Medical Necessity are not met." A.R. at 57. Molina Healthcare's Rehab Review notes state the following:

> The difference between the grp 3 & 4 are very specifically for rugged

21

outdoor use and not necessarily a medical necessity. They have additional capabilities that are not necessary for in home use. The requested power stander only comes with a group 4 PMD. But if the specific advantages of the group 4 are not a medical necessity it is recommended that this be down coded to a group 3 K0861.

A.R. at 140. Additionally, Molina Healthcare states that the "Group 4 Power Mobility Device (PMD) K0884 cannot be approved because a Group 3 power wheelchair will meet the member's needs for mobility and independence; . . . ." A.R. at 167. Moreover, Molina Healthcare asked Puglisi to "[p]lease replace the group4 PMD with a group3 PMD. As the group 3 PMD will accommodate all the listed medical needs for Linda." A.R. at 201.

### b. Puglisi's documentation failed to satisfy the prior authorization criteria described in TMPPM § 2.2.14.12.5.

When asked to describe the medical necessity for the Group 4 power wheelchair and power seat elevation system, Puglisi responded that "Permobile C500 VS Stander power mobility base, required to enable functions of the wheelchair as a whole and thus allow Linda to maneuver *within her home* independently in a safe and reliable manner." (Emphasis added) A.R. at 190. In addition, when asked to describe the medical necessity for the Group 4 power wheelchair versus a manual wheelchair, Puglisi replied that "[w]ith a power seating system of this kind, Linda will be able to provide for her mobility and functional needs to access items and perform ADL and *household tasks* in a safe and effective manner." (Emphasis added) A.R. at 193. In short, Puglisi's documentation failed

to address the prior authorization criteria described in TMPPM § 2.2.14.12.5. Appendix 5, DM-71. As a result, Molina Healthcare could not approve Puglisi's request for a Group 4 power wheelchair.

### c. Exceptional circumstances review of Puglisi's request for a group 4 power wheel chair is not required because it is listed DME.

Exceptional circumstances review applies to unlisted DME. *See* 1 TAC § 354.1039(a)(4)(D). Specifically, power wheelchairs (code number K0884) are listed. *See* TMPPM § 2.2.14.26, Appendix 5, DM-84. Exceptional circumstances review, therefore, was not warranted in this case because power wheelchairs are listed as covered DME.

### 2. The integrated standing feature is not a covered reimbursable benefit, therefore, it should not be considered medically necessary, appropriate, or prior authorized.

Puglisi asserts that certain "state definitions of wheeled mobility systems establish the scope of Medicaid coverage of custom power wheelchairs and do not authorize the exclusion of custom wheelchair components that may be medically necessary for individuals with certain disabilities or medical conditions." C.R. at 59. Puglisi's assertion is based on two significant assumptions. Specifically, Puglisi incorrectly assumes that the integrated standing feature is a covered and reimbursable benefit. In addition, Puglisi erroneously assumes that, even if it were deemed a covered reimbursable benefit, the integrated standing feature would be

23

medically necessary, appropriate, and prior authorized.

Regardless, TMPPM § 2.2.14.22 provides a less costly, yet equally effective, alternative to the excluded mobile power stander. Appendix 5, DM-78. TMPPM § 2.2.14.22 provides as follows:

> A stander is a device used by a client with neuromuscular conditions who is unable to stand alone. Standers and standing programs can improve digestion, increase muscle strength, decrease contractures, increase bone density, and minimize decalcification (this list is not all inclusive).

Appendix 5, DM-78. It is no small coincidence that the fact that the benefits associated with the stand-alone dynamic stander are similar to the alleged benefits associated with the mobile stander. The significant difference, however, is that the stand-alone dynamic stander is on the list for covered DME whereas the mobile stander is on the list of DME excluded from coverage. Therefore, Puglisi should have requested the stand-alone dynamic stander to meet her medical mobility needs.

### a. Mobile power standing systems are not a covered benefit pursuant to TMPPM § 2.2.14.26.

Pursuant to its regulatory authority under 1 TAC § 354.1039(a), HHSC has determined that mobile standers are not a covered benefit. Specifically, TMPPM § 2.2.14.26 provides that ". . . [m]obile standers, power standing systems on a wheeled mobility . . ." are not a benefit of Home Health Services. Appendix 5, DM-89. Accordingly, Molina Healthcare denied Puglisi's request for the integrated standing feature. A.R. at 27. In addition, the Hearing Officer adopted the

24

Reviewing Attorney's conclusion that "[b]ecause power standers on wheeled mobility systems are specifically excluded from coverage under Texas Medicaid Home Health Services, Molina's decision to deny the requested Group 4 power wheelchair with an integrated standing feature was supported by the facts and applicable laws, procedures, and program rules."  A.R. at 349.

Regardless, TMPPM § 2.2.14.22 provides a less costly, yet equally effective alternative to the excluded mobile power stander.  Appendix 5, DM-78.  As to the reasonableness of HHSSC's categorical exclusion of certain DME (i.e. ceiling lifts), the Fifth Circuit recently stated the following:

> It is hardly unreasonable for a state to exclude—even categorically—any medical device whose purpose can be served by a more cost-effective method.  Not only has Texas not violated the plain language of the statute, but also the reasonableness standard in the text likely supports its imposition of *reasonable* categorical exclusions. The plaintiffs' notion that it would be unreasonable for a state not to provide particular equipment *within its definition of DME* sounds plausible, except that the state can choose *by definition* to exclude ceiling lifts. FN6.  Moreover, a categorical exclusion based on the availability of cost-effective alternatives cannot mean that the state has denied a medically necessary device, even if the statute did impose such a standard.

*Detgen ex. rel. v. Janek*, 752 F.3d 627, 632 (5th Cir. 2014) (Medicaid recipient brought suit against HHSC challenging the denial of their request for the installation of ceiling lifts to transfer the recipient to and from bed, bath, etc.). See Appendix 8.

**b.  Puglisi did not request exceptional circumstances review of her**

**request for an integrated standing feature.**

Exceptional circumstances review applies to unlisted DME. *See* 1 TAC § 354.1039(a)(4)(D). Arguably, mobile power standers are listed as excluded from DME coverage. *See* TMPPM § 2.2.14.26, Appendix 5, DM-89. Hence, exceptional circumstances review may not be warranted in this case because mobile power standers are listed as excluded non-reimbursable DME.

On the other hand, even if mobile power standers are considered to be unlisted DME, the record shows that Molina Healthcare determined that the mobile stander was not medically necessary. Specifically, Molina Healthcare's Rehab Reviewer states the following:

> The provider has offered very detailed benefits of standing. They note that the member is unable to reap these benefits unless they have the stander on their chair to go with them everywhere. Having a separate stander would provide great benefits in standing as would its inclusion on the power chair Most plans will provide the least costly alternative and that would be to provide a separate standing device. This final decision is up to Molina to interpret.

A.R. at 140. Accordingly, Molina Healthcare's Nurse Review states the following interpretation:

> Request for E2301 should be denied as this is not a tmhp payable code, the vendor should possibly resubmit for an independent stander if deemed necessary. As the standing feature with code e2301 is not available mbr could be downgraded to the group 3 pwc instead of the group 4 as requested.

A.R. at 141. Hence, Molina Healthcare's Medical Doctor concluded as follows:

26

> The group 4 power chair is requested in order to accommodate the Power Stand and Drive function; E2301 Power stand and drive feature is not considered medically necessary because driving standing up is not a medical necessity. In addition, HCPC code E2301 is not a TMHP payable code/covered benefit.

A.R. at 144. Based on statements of Molina Healthcare's Rehab Review, Nurse Review, and Medical Doctor Review, the Hearing Officer determined the following:

> On or about June 4, 2013, Molina Healthcare forwarded the DME request to Rehab Review for a third party review for medical necessity of the DME requested. Rehab Review is a Rehabilitation Engineering and Assistive Technology Society (RESNA) certified entity contracted to conduct independent reviews for medical necessity of DME.
>
> . . .
>
> Appellant requires maximum assistance with all activities of daily living including transfers. Appellant requires caregiver assistance to transfer in and out of her bed and wheelchair.
>
> Molina healthcare recommended approval of a group 3 power wheelchair with a stand-alone dynamic stander to meet the Appellant's needs; however Appellant is unable to transfer independently and would require assistance from one or two caregivers to transfer to the dynamic stander.

A.R. at 334. Puglisi needs maximum assistance from her caregivers for all MRADLs. Therefore, a mobile stander is not medically necessary to correct or ameliorate Puglisi's disability, condition, or illness, given that her caregivers are already assisting her with all transfers and standing.

### c. *Koenning v. Suehs* **was vacated and dismissed as moot, therefore Puglisi's reliance on this case is misplaced.**

Nevertheless, Puglisi asserts that the integrated standing feature should be a covered benefit merely because its meets the general definitions of DME described in 1 TAC § 354.1031(12) and TMPPM § 2.2.14.6. But, Puglisi relies on a vacated opinion and judgment to support her erroneous proposition. *See Koenning v. Suehs*, 897 F.Supp.2d 528, 549 (S.D. 2012), *vacated and dismissed as moot*, *Koenning v. Janek*, 539 Fed.Appx. 353, (5th Cir. 2013). Appendix 7. In *Koenning v. Suehs*, the Court states the following:

> The district court opinion and judgment contain meaningful errors. For example, the district court opinion incorrectly states that Texas law does not provide for state court review of adverse administrative hearing decisions. The district court opinion and judgment also purport to 'remand' the case to a non-state, non-party entity (namely, THMP [sic]) however, the parties agree that such a remand is improper. Finally, although the district court opinion orders declaratory and injunctive relief, its judgment does not. Thus, uncertainty exists about the relief that is in effect. For these reasons, we conclude that the public interest supports vacating the district court's opinion and judgment.

*Id.* In subsequent litigation, the trial court stated that "[d]espite Plaintiff's assertions to the contrary, the Fifth Circuit did not vacate the Court's Opinion and Judgment because they were moot." *See Koenning v. Suehs*, Civil Action No. V-11-5, 2013 WL 6491075, at *1 (S.D. Tex. Dec. 9, 2013). "The Fifth Circuit vacated the Court's Opinion and Judgment because they were erroneous." *Id.* Appendix 7. Therefore, Puglisi's reliance on *Koenning v. Suehs* is misplaced and has no merit.

28

### d. CMS policy letters and recent federal case law support exclusion of mobile power standers.

Puglisi alleges that "THHSC erred in concluding that the standing feature of the recommended wheelchair is not covered by Medicaid by relying on unlawful TMHP policy that violate both federal and state Medicaid requirements and the Texas APA." C.R. at 54, 60. TMPPM § 2.2.14.26, however, does not violate federal and state Medicaid requirements because "[a] State may develop a list of pre-approved items of ME [Medical Equipment] as an administrative convenience because such a list eliminates the need to administer an extensive application process for each ME request submitted." *See* CMS letter dated September 4, 1998, Appendix 6. Moreover, CMS guidance provides that:

> . . . [A] State will be in compliance with federal Medicaid requirements only if, with respect to an individual applicant's request for an item of ME, the following conditions are met:

- The process is timely and employs reasonable and specific criteria by which an individual item of ME will be judged for coverage under the State's home health services benefit. These criteria must be sufficiently specific to permit a determination of whether an item of ME that does not appear on a State's pre-approved list has been arbitrarily excluded from coverage based solely on a diagnosis, type of illness, or condition.

- The State's process and criteria, as well as the State's pre-approved list of items, are made available to beneficiaries and the public.

- Beneficiaries are informed of their right under 42 C.F.R. Part 431 Subpart E, to a fair hearing to determine whether an adverse decision is contrary to the law cited above.

29

*See* CMS letter dated September 4, 1998, Appendix 6.  In addition to the federal guidance described in the *Desario Letter*, *Detgen v. Janek* provides that: "[t]he rule the court employs is this:   where a State has explicit guidance from CMS that FFP will not be available for an item of DME, that State acts reasonably when it categorically excludes such an item from coverage in its Medicaid policies." *Detgen v. Janek*, 945 F.Supp.2d 746, 759 (N. D. Tex. 2013) ("The court finds that Texas Medicaid's policy categorically excluding ceiling lifts from coverage does not conflict with the Medicaid Act's 'reasonable standards' requirement, the 'amount, duration, and scope' regulation, or the *Desario* letter's guidance.").  Appendix 12. Furthermore, recent CMS guidance provides that "items of DME meeting the state's definition of coverage is to be provided to individuals (of any age) meeting the State's medical necessity criteria."  *See* CMS letter dated May 21, 2013 ("This means that medically necessary ceiling lifts will be reimbursed by CMS as part of the Texas home health benefit *if these lifts meet the state's definition of DME [coverage].*" (Emphasis added).  A.R. at 303.  HHSC's exclusion of mobile standers, therefore, is consistent with state and federal statutes, rules, and guidance.

### e. Puglisi's Texas Government Code § 2001.038 rule challenge lacks merit.

#### i. Puglisi cannot maintain an action for declaratory relief.

Contrary to Puglisi's assertions, 1 TAC §§ 354.1031, .1035, .1039, .1040 and TMPPM § 2.2.14.26 do not violate the Texas Administrative Procedure Act (APA).

30

Puglisi's request that the trial court declare 1 TAC §§ 354.1031, .1035, .1039, .1040 and TMPPM § 2.2.14.26 invalid is in essence a request for declaratory relief under Tex. Gov't Code § 2001.038 to modify the Medicaid Home Health Services program. C.R. at 60-63. Bringing a § 2001.038 challenge in this judicial review action under Tex. Gov't Code §§ 531.019 and 2001.171 fails because the claim has been brought after HHSC entered its final administrative orders in the underlying administrative proceeding. Puglisi's remedy, if any, should be limited to remand or reversal of the administrative orders denying her request for Home Health Services program services.

A § 2001.038 challenge brought after the entry of a final agency order in a § 2001.171 proceeding must be dismissed unless the party seeks to foreclose separate, future administrative proceedings by obtaining declaratory relief. This result is mandated by (1) the text of § 2001.038, (2) the Court's precedent governing the justiciability of § 2001.038 claims, and (3) the redundant-remedies and separation-of-powers doctrines.

### ii. Section 2001.038 allows suits for declaratory relief only before a final order issues in a contested case.

The text of Tex. Gov't Code § 2001.038 limits the subject matter of any declaration, but it places no additional procedural limitations on suit. *E.g., Keeter v. Tex. Dep't of Agric.*, 844 S.W.2d 901, 902 (Tex. App.—Austin 1992, writ denied) (contrasting the APA procedural requirements for declaratory-judgment with the

31

exhaustion requirement in a suit for judicial review). The plain language of this section demonstrates that the legislature intended to restrict the scope of declaratory relief to a limited set of legal questions, with few procedural requirements. If a contested-case proceeding is involved, a § 2001.038 declaratory relief must be sought before the final administrative order issues.

Section 2001.038 provides:

> The *validity or applicability* of a rule . . . may be determined in an action for declaratory judgment if it is alleged that *the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair*, a legal right or privilege of the plaintiff.

Tex. Gov't Code § 2001.038 (emphasis added). Section 2001.038 allows challenges based only on the "validity or applicability" of a "rule." Thus, a § 2001.038 claim is limited to legal issues regarding an administrative –rule—it is not a mechanism for reviewing an agency's compliance with the APA. *Friends of Canyon Lake v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 529 (Tex. App.— Austin 2002, pet. Denied); *see also Star Houston, Inc. v. Tex. Dep't of Transp.*, 957 S.W.2d 103, 111 (Tex. App.—Austin 1997, pet. denied) (illustrating that section 2001.038 does not allow courts to enforce § 2001.054 of the APA). And this challenge must both (1) relate to a "rule or its threatened application" and (2) be limited to "validity or applicability" rather than the rule's application. This language emphasizes that § 2001.038 is focused on pre-enforcement legal questions. If the statute were designed to review the outcome of a particular contested-case

32

proceeding, the legislature would have used the word application, rather than the word applicability.   A court has power to determine only the applicability of a rule whose application is threatened, not to issue a declaration regarding the impact of a rule on a particular, already-complete contested-case proceeding.

Section 2001.038 must also be read in line with the APA's statutory definitions.   *See* Tex. Gov't Code § 311.021(2).   The statutory definition of the term "rule" defines the scope of a rule in terms of "applicability."   *See* Tex. Gov't Code § 2001.003(6)(A) (rule is a "statement of general applicability.").   This language further confirms that "applicability" refers to the prospective scope of a rule's effect, not to its application in a particular contested-case proceeding.   *See id.* § 2001.003(1).

The Third Court of Appeals has recognized that § 2001.038 allows a rule challenge before the rule is applied.   *E.g., Rutherford Oil Corp. v. Gen. Land Office*, 776 S.W.2d 232, 235 (Tex. App.—Austin 1989, no writ) ("The purpose of this statute is to obtain a final declaration of a rule's validity before the rule is applied."). The statute removes any need to wait until a rule is actually applied before challenging it—thus it addresses applicability, not application, of rules.   *See State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 797 (Tex. App.—Austin 1982, writ ref'd n.r.e.).   But apart from these limits on subject matter, the provision has no strict procedural requirements and does not require exhaustion of administrative remedies.

Tex. Gov't Code § 2001.038(d) (allowing declaration regardless of whether plaintiff asked the state agency to rule on the rule's validity or applicability); *see, e.g.*, *Tex. Dep't of Licensing & Regulation v. Roosters MGC, LLC*, No. 03-09-00253-CV, 2010 WL 2354064, at * 6 (Tex. App.—Austin June 10, 2010, no pet.) (mem. op.) (Correctly finding jurisdiction absent exhaustion of administrative remedies where plaintiff was not a party to pending or concluded administrative proceedings). Allowing declaratory judgments regarding the application of a rule in a particular case would frustrate the Legislature's intent in both adopting § 2001.038 and placing a strict exhaustion requirement on § 2001.171 suits, because a § 2001.038 claim would be available to reverse the application of a rule in a particular contested-case proceeding.

By contrast to § 2001.038's low procedural hurdles and narrow legal scope, § 2001.171 includes a strict, jurisdictional exhaustion requirement, but allows a plaintiff to raise "any" legal error related to a particular administrative order. Tex. Gov't Code §§ 2001.171 and 2001.174(D); *e.g.*, *Tex. Water Comm'n v. Dellana*, 849 S.W.2d 808, 810 (Tex. 1993) (per curiam). If a plaintiff seeks only to change the outcome of a particular administrative proceeding, therefore, he cannot do so in a § 2001.038 challenge to the rules underlying the decision because the only object he can challenge is the agency's application of the rule. *Charlie Thomas Ford v. A.C. Collins Ford*, 912 S.W.2d 271, 275 (Tex. App.—Austin 1995, writ dism'd) ("A

declaratory judgment, as to the validity or applicability of the rule in question, cannot have legal effect outside the context of Collins's contested case and its suit for judicial review of the Commission's final order in the case. That case has been decided . . . ." (internal citations omitted)); *see also Lopez v. Pub. Util. Comm'n*, 816 S.W.2d 776, 782 (Tex. App.—Austin 1991, writ denied) (concluding that administrative rule applying only in the context of a contested-case proceeding cannot be challenged after a final order is entered). This makes practical sense because the agency retains jurisdiction to change the outcome of an administrative proceeding until the final order issues.

Taken together, the text of the two provisions confirms that a § 2001.038 claim must be brought before a party's claims become subject to a final administrative order. A rule cannot be challenged under § 2001.038 unless, on its face, its threatened application impairs a protected right or privilege. By contrast, once a final contested-case order is entered, the proper review mechanism is a § 2001.171 claim, which Puglisi has brought in this instance through Tex. Gov't Code § 531.019. This relationship is useful because § 2001.038 provides a mechanism to avoid contested-case proceedings entirely, or to obtain legal guidance on pure issues of law before an administrative proceeding on particularized facts. It is, thus, appropriate in some cases to abate a contested-case proceeding—or an entire category of proceedings—while waiting for final resolution of a § 2001.038

35

suit.  *See, e.g.*, *All Saints Health Sys. v. Tex. Workers' Comp. Comm'n*, 125 S.W.3d 96, 101–02 (Tex. App.—Austin 2003, pet. denied), *abrogated on other grounds* by *HHSC v. El Paso County Hospital District*, 351 S.W.3d 460 (Tex. App.—Austin, 2011), *aff'd*, 400 S.W.3d 72 (Tex. 2013).

But the legislature did not intend for § 2001.038 claims to serve as a basis for delaying or abating all contested-case proceedings.  Subsection (e) provides that a declaratory-judgment action may not be "used to delay or stay a hearing in which a suspension, revocation, or cancellation of a license by a state agency is at issue before the agency after notice of the hearing has been given." Tex. Gov't Code § 2001.038(e).  Subsection (e) thus recognizes that, in administrative proceedings that do not involve license revocation, it is entirely appropriate to file a § 2001.038 suit before a final order is entered, and the administrative body has discretion to abate the proceeding.  If the two procedures were intended to run simultaneously, subsection (e) would not limit the availability of pre-final-order declaratory-judgment claims for licensing proceedings.

Section 2001.038 limits the immunity waiver for validity or applicability claims to those brought before a rule is applied because application of the rule must be threatened—not actual.  An administrative body has authority to abate a pending proceeding that involves a rule until a court resolves a simultaneous § 2001.038 action, except in license-revocation proceedings.  But, absent abatement, the

36

agency has authority to resolve a particular contested case and moot a pending rule challenge. Once a party's interest is reduced to a final administrative order, any legal challenge to that –order—including a challenge to the rules applied in the order—must be contained within the procedural mechanism for challenging the application of administrative rules: a suit for judicial review under § 2001.171 or, in this case, under Tex. Gov't Code § 531.019.

### iii. Legal precedent confirms that declaratory relief is available to challenge a rule in general but unavailable to alter the application of a rule after the fact.

Section 2001.038 justiciability precedent confirms HHSC's plain-text argument. A plaintiff cannot participate in a contested case until its conclusion, then use § 2001.038 to circumvent the APA's procedural requirements, even to raise a pure question of law. *E.g.*, *Chocolate Bayou Water Co. & Sand Supply v. Tex. Natural Res. Conservation Comm'n*, 124 S.W.3d 844, 852–53 (Tex. App.—Austin 2003, pet. denied) (holding that exceptions to exhaustion-of-administrative-remedies doctrine do not apply when a party waits until after the issuance of a final order following a long contested-case proceeding in which the claim could have been raised). This is because the entry of a final administrative order, in most cases, moots the claim for declaratory relief. *E.g.*, *KEM Tex. Ltd. v. Tex. Dep't of Transp.*, No. 03-08-00468-CV, 2009 WL 1811102, at *6 n.6 (Tex. App.—Austin June 26, 2009, no pet.) (mem. op.); *Friends of Canyon Lake*, 96 S.W.3d at 529; *Charlie*

*Thomas Ford*, 912 S.W.2d at 275. Section 2001.038 gives courts authority to make declarations about administrative rules, but not to raise unexhausted issues parallel to a suit for judicial review. *Lopez*, 816 S.W.2d at 782 ("Even if the district court should declare the validity or applicability of [the administrative rule] that court would be powerless to revive in some manner the plaintiffs' appeal [from final administrative order], the only context in which the court's declaratory judgment could have legal effect."). The entry of a particularized order allows a challenge under § 2001.171, while § 2001.038 is limited to rule challenges before a particularized order is entered or when an agency decision is governed by an administrative rule, but does not proceed through a contested-case proceeding. Precedent on mootness follows the same trajectory as the limits set on § 2001.038 by its own text -- declaratory relief is available to attack a rule in general, but not to change the application of a rule in a particular administrative proceeding.

### iv. The redundant remedies and separation-of-powers doctrines negate Puglisi's ability to bring a § 2001.038 claim in this suit.

The Third Court of Appeals has long recognized the "redundant remedies" doctrine, under which a declaratory judgment action "will not lie" if it is redundant to another statutory cause of action. *E.g.*, *Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 267 (Tex. App.—Austin 2002, no pet.). The Court applies this doctrine to the relationship between § 2001.038 and § 2001.171 claims. *SWEPI LP*

38

*v. R.R. Comm'n*, 314 S.W.3d 253, 269-270 (Tex.App.—Austin 2010, pet. Denied) ("A declaratory judgment claim 'will not lie' when it is 'redundant' of a parallel administrative appeal and the 'remedy under APA is same as that provided under the [Act]'--reversal of the agency's final order."). A § 2001.038 claim is redundant to a § 2001.171 claim that could address the same legal argument and, therefore, will not lie.

Application of the redundant remedies rule to § 2001.038 claims makes sense. Because a § 2001.171 proceeding provides the appropriate mechanism for vindicating a plaintiff's legal issues with regard to a particular administrative dispute, any § 2001.038 claim is redundant to the § 2001.171 proceeding from the time the agency enters its final administrative order. The standard of review set out in § 2001.174 encompasses every legal error that could be challenged in a § 2001.038 hearing because that standard allows reversal based on any legal error. *See* Tex. Gov't Code § 2001.174(2)(D). Thus, a § 2001.171 suit necessarily includes any issue regarding the validity or applicability of a relevant administrative rule—rendering a § 2001.038 claim redundant to such a challenge to the outcome of a particular contested-case proceeding.

The rule that judicial interference in administrative proceedings is limited to a suit for judicial review once a final administrative order has been entered derives, likewise, from the background separation-of-powers principles undergirding Texas

administrative practice. *See Roosters*, 2010 WL 2354064, * 4 (citing *Tex. Comm'n of Licensing & Regulation v. Model Search Am., Inc.*, 953 S.W.2d 289, 291-293 (Tex. App.—Austin 1997, no writ) (distinguishing a suit for declaration regarding the scope (applicability) of a rule from a judicial attack on a final contested-case order). With a few exceptions, there is no background right to judicial review of particular administrative orders for the very reason that executive-branch determinations should not be determined by the courts de novo. *See Model Search*, 953 S.W.2d at 291–92. ("The separation of government powers mandated in the State constitution forbids a court to review the actions of an administrative agency unless the legislature has, in a proper statute, authorized a cause of action for that purpose or the plaintiff complains the agency action is ultra vires or unconstitutional in its effect upon the plaintiff or his property."). Stretching § 2001.038 to encompass any and all claims a plaintiff might bring parallel to his contested-case suit for judicial review would ignore this background principle.

Put another way, the only mechanism the Legislature has provided for a court to reverse an agency's actions in a particular case is § 2001.171. Section 2001.171 provides a judicial mechanism for changing a particular administrative outcome. Section 2001.038, by contrast, does not confer jurisdiction to challenge the outcome of an agency proceeding or to determine whether its order comports with the APA. It allows a declaratory judgment regarding only the validity or applicability of a rule.

Once a final administrative order is in place, therefore, § 2001.038's text does not give a court authority to change the result of an already-final contested-case proceeding because a declaratory judgment about a rule has nothing to do with the outcome of a contested-case proceeding.

For the foregoing reasons, to the extent that Puglisi is seeking declaratory relief under Tex. Gov't Code § 2001.038 by asking the Court to declare the DME requirements unconstitutional and to modify the Home Health Services program eligibility requirements, such relief must fail.

**3. In this case, a power seat elevation system is not medically necessary, appropriately documented, or prior authorized.**

There is no dispute that a power seat elevation system is a covered Medicaid home health benefit in Texas. Specifically, 1 TAC §§ 354.1031, .1035, and .1039 as well as applicable Texas Medicaid Provider Procedures establish and explain the "authorization requirements" and "limitations" for power seat elevation system. Accordingly, applicable agency rules unequivocally provide that covered and reimbursable DME must be medically necessary, that the appropriateness of the DME must be documented in the request form, and that the requestor must obtain prior authorization. 1 TAC § 354.1039(a)(4)(A).

Moreover, the Texas Medicaid Provider Procedures Manual (TMPPM) consistent with the dictates of the *Desario Letter*, describes "reasonable and specific criteria" for medical necessity, proper documentation, and prior authorization of

41

power seat elevation systems.   TMPPM § 2.2.14.15.1 shows the following:

- A power seat elevation system may be prior authorized to promote independence in a client who meets all of the following criteria:

- The client does not have the ability to stand or pivot transfer independently.
- The client requires assistance only with transfers across unequal seat heights, and as a result of having the power seat elevation system, the client will be able to transfer across unequal seat heights unassisted.

- The client has limited reach and range of motion in the shoulder or hand that prohibits independent performance of MRADLs (such as, dressing, feeding, grooming, hygiene, meal preparation, and toileting).

Appendix 5, DM-75.   In addition, TMPPM § 2.2.14.15.2 describes the documentation necessary to demonstrate "how the power seat elevation system will improve the client's function."   Appendix 5, DM-75.

Based on the evidence presented by Molina Healthcare and Puglisi in the administrated record, the Hearing Officer determined the following:

Appellant requires maximum assistance with all activities of daily living including transfers.
 . . .
Appellant requires caregiver assistance to transfer in and out of her bed and wheelchair.
 . . .
Appellant would not be able to transfer across unequal seat heights unassisted by using a power seat elevation system.

A.R. at 334.   In addition, the Reviewing Attorney determined that "[a]ppellant is unable to transfer independently even with the assistance of a power seat elevation system."   A.R. at 345.

### a. Puglisi failed to satisfy the requirements of medical necessity and prior authorization for the requested power seat elevation system.

As stated previously, "Texas Medicaid defines DME as: Medical equipment or appliances that are . . .   required to correct or ameliorate a client's disability, condition, or illness." TMPPM § 2.2.2, Appendix 5, DM-13.   In contrast, Puglisi's description of medical necessity for the power seat elevation system is as follows:

> . . . required when using the standing feature.   Power seat elevator will also decrease caregiver burden when assisting the patient with lateral transfers by adjusting the seat height to make transfer downhill. The seat elevator allows for Linda to access items in upper cabinets and countertops that she would otherwise be unable to reach.   Patient may also use seat elevator to improve independence with and functional reach activities as her neurological function continues to improve.

A.R. at 191.   However, a review of administrative record shows that Molina Healthcare determined that Puglisi failed to satisfy criteria to demonstrate medical necessity for the power seat elevation system.   Specifically, the record shows that Molina Healthcare made the following determination:

> A E2300/power seat elevator cannot be approved as medical necessity cannot be established. According to the Texas Medicaid Provider Procedure Manual Section 2.2.14.15 regarding the power seat elevator system, a power seat elevator may be approved when it will facilitate independent transfers, particularly uphill transfers, to and from the wheelchair and augment the client's reach to facilitate independent

performance of mobility related activities of daily living in the home. The clinical information submitted indicates that you require maximum assistance in all activities of daily living and you are unable to perform

mobility related activities of daily living independently. The documentation submitted did not indicate how the power seat elevator system would promote independence. Therefore, the guidelines for coverage of this equipment are not met.

A.R. at 27. Also, Molina's Rehab Review notes state the following:

The vendor has listed out the specific reasons that a seat elevator is needed but has not provided specific activities that this member will encounter that require this function. The generic information is good but we still do not see how it applies directly to the member.

A.R. at 140. In short, Puglisi's documentation failed to address the medical necessity and prior authorization requirements authorized in 1 TAC §§ 354.1035, .1039, and described in TMPPM § 2.2.14.12.5. As a result, Molina Healthcare could not approve Puglisi's request for a power seat elevation system.

### b. Exceptional circumstances review for the requested power seat elevation system is not required in this case.

Exceptional circumstances review applies to unlisted DME. *See* 1 TAC § 354.1039(a)(4)(D). Specifically, power seat elevation systems (code number E2300) is listed. *See* TMPPM § 2.2.14.26, Appendix 5, DM-86. Exceptional circumstances review, therefore, was not warranted in this case because power seat elevation systems are listed as covered DME.

### F. Puglisi received adequate due process relating to Molina Healthcare's

**denial of her request for Group 4 power wheelchair, integrated standing feature, and power seat elevation system.**

Puglisi alleges that the "denial notice issued by Molina did not comport with federal Medicaid requirements because it failed to include the required specificity as to the reasons Molina contended that the standing feature was not a covered benefit and why the recommended wheelchair was not medically necessary for Linda." C.R. at 75. In addition, Puglisi alleges that "THHSC's attorney cannot supplement Molina's bases for denial after the hearing to further bolster the agency's decision." C.R. at 76. These claims are not meritorious because Puglisi lacks a protected property interest in the DME she was denied, and she received all the process that she was due.

### 1. Puglisi has no protected due process right to Home Health Services program services because the program's existing rules do not confer a protected interest in Medicaid benefits to her.

To have a substantive due process right, an individual must show they have a protected interest. *Liberty Mut. Ins. Co. v. Texas Dep't of Ins.*, 187 S.W.3d 808, 827 (Tex. App.—Austin 2006, pet. denied); citing *Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 558 (5th Cir.1988), *Woody v. Dallas*, 809 F.Supp. 466, 473 (N.D.Tex. 1992). To have a protected interest, the individual must have a legitimate claim of entitlement, which is more than a unilateral expectation. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Further, property interests are created and defined by existing rules or from independent sources like state law. *Id.* Importantly, to have

45

an interest in a specific state created benefit, the individual must have already acquired the benefit. *Woody* 809 F.Supp. at 473; *Tobias v. Univ. of Tex. at Arlington*, 824 S.W.2d 201, 208 (Tex.App.—Fort Worth 1991, writ denied).

Here, Puglisi could not have acquired a protected interest in the requested DME prior to satisfying all the necessary prerequisites for obtaining the requested DME. Thus, Puglisi has no protected interest in Home Health Services program services and her claim of a substantive due process right must fail. *See Johnson v. Guhl*, 91 F.Supp.2d 754, 772 (D.N.J. 2000) (Plaintiffs who had never been granted Medicaid benefits had no protected property interest in benefits they had never been deemed qualified to receive.).

### 2. Molina Healthcare's denial notice is sufficient.

Molina Healthcare's denial notice sufficiently notified Puglisi of why her request was denied, how much time she had to appeal the denial, who to call for help understanding the denial, and who to call for low cost legal services. A.R. at 27–29. Specifically, Molina Healthcare's notice of denial lists "Molina Member Appeal Rights," which include "You have the right to obtain a copy of the guidelines used by MHT to decide the outcome." A.R. at 28.

### 3. The Reviewing Attorney fulfilled his statutory duties.

Additionally, "[b]efore an applicant for or recipient of public assistance benefits may appeal a decision of a hearing for the commission . . . , the applicant or

recipient must request an administrative review by an appropriate attorney of the commission or a health and human services agency, as applicable." Tex. Gov't Code § 531.019(c) (West 2004 and Supp. 2009). Also, the Reviewing Attorney has a statutory duty to complete "an administrative review of the decision and notify the applicant or recipient in writing of the results of that review." Tex. Gov't Code § 531.019(e)(2) (West 2004 and Supp. 2009). Further, "[a]n administrative review of a hearing decision is provided as set forth in §§ 357.701 – 357.703 of this chapter (relating to Purpose and Application, Definitions and Process and Timeframes)." 1 TAC § 357.19(e). Next, "[w]hen an administrative review is conducted, the attorney makes the final decision for the HHS system agency and its designees." 1 TAC § 357.703(5).

## VIII. CONCLUSION & PRAYER

The evidence supporting Molina Healthcare's and HHSC's decisions is not only substantial but also probative and reliable because it is based upon indisputable facts. In short, there is more than a mere scintilla of evidence in the record to support the Hearing Officer's and the Reviewing Attorney's findings and conclusions. After reviewing the whole record, reasonable minds can reach the same factual and legal conclusions as the Hearing Officer and Reviewing Attorney.

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully asks that this Court: a) reverse the trial court and dismiss this suit for lack of subject matter

47

jurisdiction, b) reverse the trial court because Molina Healthcare and HHSC's decisions are supported by substantial evidence, or c) reverse and remand the case to Molina Healthcare and HHSC to take additional evidence pursuant to Texas Government Code § 2001.175.

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division

*/s/ Eugene A. Clayborn*
EUGENE A. CLAYBORN
State Bar No.: 00785767
Assistant Attorney General
Deputy Chief, Administrative Law Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas   78711-2548
Telephone:   (512) 475-3204
Facsimile:    (512) 320-0167
eugene.clayborn@texasattorneygeneral.gov

*Attorneys for Texas Health & Human Services Commission*

## CERTIFICATE OF COMPLIANCE

I certify that the brief submitted complies with Texas Rule of Appellate Procedure 9 and the word count of this document is <u>11,159</u>.   The word processing software used to prepare this filing and calculate the word count of the document was Microsoft Word 97-2003.

Dated: June 16, 2015

*/s/ Eugene A. Clayborn*
EUGENE A. CLAYBORN
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on this the 12th day of June, 2015 on the following:

Maureen O'Connell                    Via: *Electronic Service*
State Bar No.: 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
moconnell458@gmail.com
*Attorneys for Appellee*

*/s/ Eugene A. Clayborn*
EUGENE A. CLAYBORN
Assistant Attorney General

CASE NO. 03-15-00226-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

Texas Health & Human Services Commission,
Appellant,
v.
Linda Puglisi,
Appellee.

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas
Honorable Judge Gisela D. Triana Presiding.

APPELLANTS' BRIEF

## ACRONYMS

| | |
|---|---|
| ADL | Activity of Daily Living |
| APA | Administrative Procedure Act |
| A.R. | Administrative Record |
| CCP | Comprehensive Care Program |
| CGC | Celerian Group Company |
| CMS | Centers for Medicare and Medicaid Services |
| C.R. | Clerk's Record |
| DME | Durable Medical Equipment |
| DME MAC | Durable Medical Equipment Medicare Administrative Contractor |
| DMEPOS | Durable Medical Equipment, Prosthetics, Orthotics, and Supplies |
| DOS | Date of Service |
| FFP | Federal Financial Participation |

| | |
|---|---|
| grp | Group |
| mbr | Member |
| MCO | Managed Care Organization |
| ME | Medical Equipment |
| MHT | Molina Healthcare of Texas |
| MRADL | Mobility Related Activities and Daily Living |
| MQMB | Medicaid Qualified Medicare Beneficiary |
| PMD | Power Mobility Device and/or Power Wheeled Mobility System |
| pwc | Power Wheel Chair |
| QRP | Qualified Rehabilitation Professional |
| THHSC / HHSC | Texas Health and Human Services Commission |
| THMP | ([sic]) |
| TMHP / tmhp | Texas Medical Health Partnership |
| TMPPM | Texas Medicaid Providers Procedures Manual |

CASE NO. 03-15-00226-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

_____

Texas Health & Human Services Commission,
Appellant,

v.

Linda Puglisi,
Appellee.

_____

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas
Honorable Judge Gisela D. Triana Presiding.

_____

APPELLANT'S BRIEF

_____

## APPENDICES

No. 1.    Molina Healthcare's Decision
No. 2     Fair Hearing Decision
No. 3     Reviewing Officer's Decision
No. 4     Relevant Texas Administrative Code Provisions
No. 5     Relevant Texas Medicaid Provider Procedure Manual Provisions
No. 6     *Desario* Letter
No. 7     *Koenning v. Suehs* Case
No. 8     *Detgen v. Janek* 5th Cir. Case
No. 9     Order Denying Motion To Dismiss
No. 10    Final Judgment
No. 11    DME Medicare Administration Contractor
No. 12    *Detgen v. Janek* U.S.D.C. – N.D., Texas Case

APPENDIX 1



**MOLINA**
**HEALTHCARE**
84 NE Loop 410, Suite 200
San Antonio, TX 78216
(877) 665-4622

Date: 6/6/2013

LISA R WENZEL MD
Po Box 200903
Houston, TX 77216

Member Name: LINDA MYSTINE PUGLISI
DOB: ███████
Member Identification Number: ██████████
Primary Care Physician: ANUSUYA N SENDOS MD
Requested Service(s): Group 4 custom power wheelchair, sliding backrest and leg rest, batteries, footplates, joystick and mounting hardware, power seat elevator
Denied Date(s) of Service: 5/20/2013 & Forward
Request Date: 05/20/2013
Response to request : Denied Notification for Reduction of Services not Medically Necessary
Date of Denial: 6/5/2013

Dear LISA R WENZEL:

This letter is to let you know that we received a request for the service(s) listed above. After careful review of your request, a decision was made to deny the request due to the reasons listed below:

> F. Gardner, M.D. reviewed request and clinical information. This request for a Group 4 custom power wheelchair cannot be approved. The group 4 power chair is requested in order to accommodate the Power Stand and Drive function; a E2301 Power stand and drive feature is not considered medically necessary because driving standing up is not a medical necessity. In addition, HCPC code E2301 is not a TMHP payable code/covered benefit. A dynamic stander can be requested with submission of appropriate clinical information. A group 4 power wheelchair cannot be approved because a Group 3 power wheelchair will meet the member's needs for mobility and independence. A group 3 Power wheelchair can be requested. In addition, since the stand and drive function is not approved, the request for K0108/sliding backrest and K0108/leg rest cannot be approved as medically necessary. The request can be approved for the E1007 tilt and recline feature. Leg rests are considered to be a part of the basic equipment package for a powered mobility device and cannot be billed separately. Approval of the K0108/center mount articulating leg rests can be approved. In addition, K0108/ toggle switch cannot be approved as an additional charge because it should be included as part of the E2377/expandable electronic controller package which can be approved if requested.Also, E2363 batteries, K0108/footplates, K0108/joystick and E1028/mounting hardware are cannot be approved. These components are considered part of the basic equipment package and cannot be billed separately.A E2300/power seat elevator cannot be approved as medical necessity cannot be established. According to the Texas Medicaid Provider Procedure Manual Section 2.2.14.15 regarding the power seat elevator system, a power seat elevator may be approved when it will facilitate independent transfers, particularly uphill transfers, to and from the wheelchair, and augment the client's reach to facilitate independent performance of mobility related activities of daily living in the home. The clinical information submitted indicates that you require maximum assistance in all activities of daily living and you are unable to perform mobility related activities of daily living independently. The documentation submitted did not indicate how the power seat elevator system would promote independence. Therefore, the guidelines for coverage of this equipment are not met. Please discuss this notification with your doctor and vendor.

This letter follows the Molina Healthcare of Texas -Healthcare Services - (HCS) department policy and procedure.

Your provider has been sent a copy of this letter. You may want to discuss this decision with your provider to make sure your provider submitted all of the documents necessary to support your request.

MHTAttachB-FAIRHRNG.10252012                                    9819TX0312

23

000042



**MOLINA HEALTHCARE**
84 NE Loop 410, Suite 200
San Antonio, TX 78216
(877) 665-4622

If you need help understanding this notice or if you want to learn more, you or your representative can call Molina Healthcare at 1-877-665-4622, Extension 201050, or write to:

Molina Healthcare of Texas
6999 McPherson Ave., Suite 212
Laredo, TX 78041
Attn: Healthcare Services Appeals

**Fair hearing:** See attached document (attachment B) to find out how to ask for a fair hearing.
**Additional Assistance:** If you need assistance in obtaining medical care, you may be eligible for medical case management services. For more information about medical case management, you may contact THSteps Outreach and Information Hotline, free of charge at 1-877-THSTEPS (1-877-847-8377).

If you want to appeal this decision, you need to do so within 30 days of the day that you received this letter. A fair hearing must be filed within 90 days of the date that you received this notice.

Molina Member Appeal Rights:

1. You have the right to appear in person and/or appoint someone to act and speak on your behalf. This person can represent you at any level of the appeal.
2. You have the right to speak with Molina Healthcare of Texas (MHT). This can be in person, by phone, by email, by mail, by fax or by any other means.
3. You have the right to send comments, documents or other information about the appeal in writing.
4. You have the right to obtain a copy of the guidelines used by MHT to decide the outcome. To receive a copy, please call the Healthcare Services (HCS) department at 1-877-665-4622. You can also fax a request to 1-866-420-3639.
5. You or your Doctor or your Representative, including your lawyer, have the right to talk with us about the denial. You or your Doctor can call the HCS Department at the number listed above.
6. You have the right to ask for copies of all documents about your appeal. You can send the request to the Appeals Coordinator.
7. You have the right to contact the Appeals Coordinator. You can also request help from a Member Advocate. You can call in or write to them at:

Molina Healthcare of Texas
6999 McPherson Ave., Suite 212
Laredo, Texas 78041
Attention: Healthcare Services Appeals

8. If you ask for an appeal within 10 days of the date of this letter, you may be able to keep the services being denied.
9. We will give you an answer within 30 days of asking for an appeal.
10. If you or your doctor think that waiting up to 30 days is too long and could hurt your health, please let us know why you think this. If we agree, we will let you know within 1 working days of your appeal. To start this process, call Molina Healthcare of Texas at 1-877-665-4622, Extension 201050 and ask for a member advocate. In cases of urgent care or ongoing treatment, the expedited process may be requested at the same time as the regular process. In an expedited process, we will send your appeal request to an outside reviewer.

You may qualify for free or low cost legal services. A list of legal aid providers that may be able to help you is included in Attachment A.

If you need someone to help you manage your health this is called Medical Case Management. To receive this type of help, please call 1-877-665-4622 and ask to speak to a Healthcare Services Case Manager.

Sincerely,

MHTNMNLTR610 .10252012                                        9816T

24

000043



**MOLINA HEALTHCARE**

84 NE Loop 410, Suite 200
San Antonio, TX 78216
(877) 665-4622

Freda Gardner, MD
Medical Director

Molina Healthcare of Texas
Encl: Attachment A-Low Cost Legal, Attachment B- Fair Hearing

MIITNMNLTR610.10252012                                    9816T

000044

# Low Cost Legal Service Directory
www.texaslawhelp.org.

| Abilene | Amarillo | Austin |
|---|---|---|
| **Legal Aid of Northwest Texas - Abilene** ᕁ LSC 500 Chestnut, Suite 901 Abilene, TX 79602 325-677-8591 http://www.lanwt.org | **Legal Aid of Northwest Texas - Amarillo** ᕁ LSC 203 W. 8th St., Suite 600 Amarillo, TX 79101 806-373-6808 http://www.lanwt.org | **American Civil Liberties Union of Texas (ACLU)** P.O. Box 12905 Austin, TX 78711 512-478-7300 http://www.aclutx.org/ |
| **Austin** | **Corpus Christi** | **Dallas** |
| **Texas Legal Services Center** 815 Brazos St. Suite 1100 Austin, TX 78701 512-477-6000 http://www.tlsc.org | **Texas RioGrande Legal Aid - Corpus Christi Courthouse** ᕁ LSC 901 Leopard Street, room 105 Corpus Christi, TX 78401 361-888-0282 http://www.trla.org | **Legal Aid of Northwest Texas - Dallas** ᕁ LSC 1515 Main Street Dallas, TX 75201 214-748-1234 http://www.lanwt.org |
| **El Paso** | **Harlingen** | **Houston** |
| **Texas RioGrande Legal Aid - El Paso** ᕁ LSC 1331 Texas Avenue El Paso, TX 79901 915-585-5100 http://www.trla.org | **Texas RioGrande Legal Aid - Harlingen** ᕁ LSC 308 E Harrison Adams Gardens, TX 78550 956-364-3800 http://www.trla.org | **Lone Star Legal Aid (Houston Office)** ᕁ LSC 1415 Fannin St. Clutch City, TX 77002 713-652-0077 http://www.lonestarlegal.org |
| **Laredo** | **Longview** | **Lubbock** |
| **Texas RioGrande Legal Aid - Laredo** ᕁ LSC 1702 Convent Avenue Laredo, TX 78040 956-718-4600 http://www.trla.org | **Lone Star Legal Aid (Longview Office)** ᕁ LSC 140 East Tyler, Ste. 150 Longview, TX 75601 903-758-9123 http://www.lonestarlegal.org | **Legal Aid of Northwest Texas - Lubbock** ᕁ LSC 1711 Avenue J Lubbock, TX 79401 806-763-4557 http://www.lanwt.org |
| **San Antonio** | **Texarkana** | **Wichita Falls** |
| **Texas RioGrande Legal Aid - San Antonio** ᕁ LSC 1111 N Main Olmos Park, TX 78212 210-212-3700 http://www.trla.org | **Lone Star Legal Aid (Texarkana Office)** ᕁ LSC 1425 College Drive Ste. 100 Red River Army Depot, TX 75501 903-793-7661 or 903-793-7665 http://www.lonestarlegal.org | **Legal Aid of Northwest Texas - Wichita Falls** ᕁ LSC 703 Scott, Ste. 100 Wichita Falls, TX 76301 940-723-5542 http://www.lanwt.org |

000045



**MOLINA HEALTHCARE**

84 NE Loop 410, Suite 200
San Antonio, TX 78216
(877) 665-4622

Attachment B – Fair Hearing Rights
YOU HAVE A RIGHT TO A FAIR HEARING
IF YOU DO NOT AGREE WITH THIS DECISION

You must ask for a fair hearing within 90 days from the date of this letter. If you do not ask for a fair hearing before 9/4/2013 , you will lose your right to a fair hearing.

Your rights in a fair hearing are:

- The right to represent yourself, or have a lawyer, relative, friend, or other person represent you by writing a letter to Molina telling us the name of the person that you want to represent you.
- If you ask for a fair hearing within 10 days of the date of this letter or, 5/20/2013, you may be able to keep getting any service or benefit that is being terminated, suspended, or reduced by Molina, at least until the final hearing decision is made.
- If you do not request a fair hearing by this date, the service or benefit will be terminated, suspended, or reduced.
- If you lose your fair hearing appeal, Molina may be able to recover the costs of providing the service or benefit to you while the appeal was pending.
- If you ask for a fair hearing, you will get a packet of information letting you know the date, time and location of the hearing. Most hearings are held by telephone.
- You can also contact the HHSC hearings officer if you would like the hearing to be held in-person.
- During the hearing, you or your representative can tell why you need the service or why you disagree with Molina's action.
- Before the date of the hearing, you have the right to see your case file and all of the documents that are to be used by Molina at the hearing.
- The right to accommodations for a disability, including interpreter services.
- The right to request a language interpreter.

You can call us to talk about this letter, even if you are not sure you want a fair hearing. You can call us free of charge at 1-866-449-6849 Extension 201050, Monday through Friday, 8:00 a.m. to 5:00 p.m. to speak with a Member Advocate. This is the same telephone number you should call if you want to ask for a fair hearing, and if you need to request an accommodation for a disability, or interpreter services. You can also write us at Molina Healthcare of Texas at:

Molina Healthcare of Texas
6999 McPherson Ave Suite 212
Laredo, TX 78041
Attention: Healthcare Service Appeals

HHSC will give you a final decision within 90 days from the date you asked for the hearing.

MHTAttachB-FAIRHRNG.10252012                                         9819TX0312

27

000046



# APPENDIX 2

| | | |
|---|---|---|
| **IN THE MATTER** | § | **ORDER OF THE** |
| **OF** | § | **TEXAS HEALTH AND HUMAN** |
| **LINDA PUGLISI** | § | **SERVICES COMMISSION** |
| | § | |
| | § | |

## ORDER

The undersigned designee of the Executive Commissioner, having received and considered the evidence submitted in this matter, is of the opinion that the preponderance of the evidence establishes that the agency's action **IS** in accordance with applicable law and policy. Therefore, that action is **SUSTAINED.**

FINDINGS OF FACT AND CONCLUSIONS OF LAW ARE ATTACHED.

Signed on this 22nd day of November, 2013

Javier Contreras, Hearings Officer
Health and Human Services Commission

000330

**Before the
Texas Health and Human Services Commission (HHSC)
Appeals Division**

|                    | §  |                |
|--------------------|----|----------------|
| IN THE MATTER      | §  | FAIR HEARING   |
| OF                 | §  | DECISION       |
| LINDA PUGLISI      | §  |                |

## I. INTRODUCTION

**Appellant: Linda Puglisi**

A face to face hearing was convened October 30, 2013 at 1459 E. 40th Street in Houston, Texas and the hearing record closed the same day.

**Appearances:**

| | |
|---|---|
| Linda Puglisi, | Appellant |
| Maureen O'Connell, | Attorney at Law with Southern Disability Law Center |
| Michael Duenas, | New Motion representative and Appellant's witness |
| Susie Castilleja, Rn | Molina Healthcare representative |
| Yvette Kuntscher, Rn | Molina Healthcare representative |
| Caren Zysk, | Molina Healthcare representative |
| Wendy Tseng, | Legal counsel for Molina Healthcare |

**Purpose of Fair Hearing**

The purpose of the fair hearing was to determine whether the action taken by Molina Healthcare to deny Appellant's request for a group 4 power wheelchair with an integrated standing feature was in accordance with applicable law and policies.

**Legal Authority**

The fair hearing was conducted under the authority provided by Title 1, Section 357.1 through 357.25 of the Texas Administrative Code (TAC) and related law.

## II. PROCEDURAL HISTORY

1. On June 6, 2013, Molina Healthcare notified Appellant of the denial of a group 4 power wheelchair with an integrated standing feature because it was not medically necessary.

2. Appellant disagreed with the agency's decision and requested an appeal June 26, 2013.

3. A notice of the fair hearing was mailed to Appellant July 22, 2013, by first class mail for a teleconference hearing scheduled for September 24, 2013.

4. On or about July 24, 2013, Appellant requested a face to face hearing therefore the appeal was reassigned to area 4 for a reset.

000331

5. A notice of fair hearing was mailed to Appellant and her legal representative on July 25, 2013, by first class mail for the face to face hearing scheduled for September 5, 2013.

6. On September 3, 2013, the hearing was reassigned to this hearing officer.

7. A notice of the fair hearing was mailed to Appellant and her legal representative on September 9, 2013, by first class mail for the face to face hearing scheduled for October 30, 2013.

8. A face to face hearing was convened October 30, 2013 at 1459 E. 40th Street, Houston, TX 77022.

## III. RELEVANT AUTHORITIES

**Texas Medicaid Providers Procedures Manual:**

Policy section 2.2.14.15 titled Power Seat Elevation System states that a power seat elevation system is used to raise and lower the client in their seated position without changing the seat angles to provide varying amounts of added vertical access. The use of a power seat elevation system will:

- Facilitate independent transfers, particularly uphill transfers, to and from the wheelchair, and
- Augment the client's reach to facilitate independent performance of MRADLs in the home.

Policy section 2.2.14.15.1 titled Prior Authorization indicates a power seat elevation system may be prior authorized to promote independence in a client who meets all of the following criteria:

- The client does not have the ability to stand or pivot transfer independently.
- The client requires assistance only with transfers across unequal seat heights, and as a result of having the power seat elevation system, the client will be able to transfer across unequal seat heights unassisted.
- The client has limited reach and range of motion in the shoulder or hand that prohibits independent performance of MRADLs (such as, dressing, feeding, grooming, hygiene, meal preparation, and toileting).

Policy section 2.2.14.15.2 titled Documentation Requirements indicates that the submitted documentation must include an assessment completed, signed, and dated by a physician or a licensed occupational or physical therapist that includes the following:

- A description of the client's current level of function without the device
- Documentation that identifies how the power seat elevation system will improve the client's function
- A list of MRADLs the client will be able to perform with the power seat elevation system that the client is unable to perform without the power seat elevation system and how the device will increase independence
- The duration of time the client is alone during the day without assistance
- The client's goals for use of the power seat elevation system

Note: A power seat elevation system option will not be authorized for the convenience of a caregiver, or if the device will not allow the client to become independent with MRADLs and transfers.

000332

Policy section 2.2.14.26 titled Procedure Codes and Limitations for Mobility Aids indicates: The following mobility aids are not a benefit of Home Health Services:

- Feeder seats, floor sitters, corner chairs, and travel chairs are not considered medically necessary devices

- Items including but not limited to tire pumps, a color for a wheelchair, gloves, back packs, and flags are not considered medically necessary

- Mobile standers, power standing system on a wheeled mobility device

- Vehicle lifts and modifications

- Permanent ramps, vehicle ramps, and home modifications

- Stairwell lifts of any type

- Elevators or platform lifts of any type

- Patient lifts requiring attachment to walls, ceilings, or floors

- Chairs with incorporated seat lifts

- An attendant control, for safety, all power chairs are to include a stop switch

- Powered mobility device for use only outside the home

Texas Medicaid does not reimburse separately for associated DME charges, including battery disposal fees or state taxes. Reimbursement for associated charges is included in the reimbursement for the specific piece of equipment. White canes for the blind are considered self help adaptive aids and are not a benefit of Home Health Services.

Note: THSteps-eligible clients who have a medical need for services beyond the limits of this Home Health Services benefit may be considered under CCP.

## IV. SUMMARY OF EVIDENCE

The hearing officer has carefully considered the evidence contained in the hearing record and makes findings of fact and conclusions of law based on the weight of the evidence presented and in accordance with the burdens of proof explained in 1 TAC 357.9.

## V. FINDINGS OF FACT

**Finding of Fact No. 1**: Appellant is a member of Molina Health managed care organization.

000333

**Finding of Fact No. 2:** Appellant is a twenty six year old female diagnosed with quadriplegia due to a spinal cord injury caused by surgery completed November 3, 2011.

**Finding of Fact No. 3:** On February 13, 2013, Appellant was admitted to Texas Institute for Research and Rehabilitation (TIRR) hospital where she was evaluated for DME. During her stay at TIRR Appellant was able to maneuver and operate a custom power wheelchair C500VS which included an integrated standing feature. Appellant was able to stand five times for approximately 5 to 10 minutes each time.

**Finding of Fact No. 4:** On or about May 21, 2013, Molina Healthcare received a request for prior authorization of a custom power wheelchair group 4 with an integrated standing feature and seat elevation system.

**Finding of Fact No. 5:** On or about June 4, 2013, Molina Healthcare forwarded the DME request to Rehab Review for a third party review for medical necessity of the DME requested. Rehab Review is a Rehabilitation Engineering and Assistive Technology Society (RESNA) certified entity contracted by Molina Healthcare to conduct independent reviews for medical necessity of DME.

**Finding of Fact No. 6:** Appellant was able to maneuver a power wheelchair group 3 independently during hearing.

**Finding of Fact No. 7:** A group 3 power wheelchair differs from the group 4 power wheelchair in that it does not include a seat elevation system and the stand alone feature.

**Finding of Fact No. 8:** Appellant requires maximum assistance with all activities of daily living including transfers. Appellant requires caregiver assistance to transfer in and out of her bed and wheelchair.

**Finding of Fact No. 9:** Appellant is able to move her hands and fingers and requires the use of sling arm supports to facilitate some ADL's.

**Finding of Fact No. 10:** Molina healthcare recommended approval of a group 3 power wheelchair with a stand-alone dynamic stander to meet the Appellant's needs; however Appellant is unable to transfer independently and would require assistance from one or two caregivers to transfer to the dynamic stander.

**Finding of Fact No. 11:** Appellant would not be able to transfer across unequal seat heights unassisted by using a power seat elevation system.

## VI. CONCLUSIONS OF LAW

Based on the findings of fact and applicable authority, the hearing officer concludes that:

The decision made by Molina Healthcare on June 6, 2013 to deny Appellant a group 4 power wheelchair with an integrated standing feature **WAS** in accordance with applicable law and policy. Appellant requires total assistance with all transfers and is not limited to transfers across unequal seat heights. A seat elevation system will not facilitate independent transfers to and from the wheelchair for the Appellant. All the criteria noted in Texas Medicaid Providers Procedures Manual section 2.2.14.15.1 were not met. Mobile standers, power standing system on a wheeled mobility device are not a benefit of Home Health Services; therefore Molina Healthcare's action to deny a group 4 power wheelchair with an integrated standing feature is **SUSTAINED.**

000334

# VII. EXHIBITS

**Exhibit 1 admitted on behalf of Molina Healthcare:**

Page 1-7: Notice of Hearing dated July 22, 2013 and Fair Hearing Summary form 4800.
Page 8-27: Denial Notice from Molina Healthcare to Appellant dated June 6, 2013.
Page 27-30: United Seating and Mobility request for DME dated May 20, 2013.
Page 31-33: Letter from Lisa Wenzel, M.D. submitted May 20, 2013 to Molina Healthcare.
Page 34-36: Prior Authorization request submitted May 20, 2013.
Page 37-41: Prior Authorization request submitted to Molina Healthcare April 4, 2013.
Page 40-98: Physicians order for DME, DME assessment, and DME literature.
Page 99-122: Rehab Review report dated May 30, 2013.
Page 123-131: Texas Medicaid Providers Procedures Manual policy.
Page 132-142: Molina Healthcare Policy and Procedure.

**Exhibit 2 admitted on behalf of Molina Healthcare:**

Page 1: Fair Hearing Request Summary form 4800.
Page 2: Procedure code E2301 search results.
Page 3: Texas Medicaid Providers Procedures Manual policy.
Page 4-9: Molina Healthcare Interrogatory responses.

**Exhibit 3 admitted on behalf of Molina Healthcare:**

Page 1-2: Molina Healthcare Member Handbook.
Page 3-14: Needs Assessment Questionnaire and Task/Hour Guide form 2060 completed September 20, 2013.

**Exhibit 4 admitted on behalf of Appellant:**

Page 1-13: Wheelchair/Scooter/Stroller Seating Assessment.
Page 14-16: United Seating and Mobility request for DME dated May 20, 2013.
Page 17-19: Letter from Lisa Wenzel, M.D. submitted May 20, 2013 to TMHP.
Page 20-22: Prior Authorization request submitted May 20, 2013.
Page 23-25: Prior Authorization request submitted to Molina Healthcare April 4, 2013.
Page 26-84: Physicians order for DME, DME assessment, and DME literature.
Page 85-88: Denial Notice to Appellant from Molina Healthcare to Appellant dated June 6, 2013.
Page 89: Letter of legal counsel representation dated June 24, 2013.
Page 90-97: Petition of Interrogatories dated July 18, 2013.
Page 98-99: Letter from Southern Disability Law Center dated August 14, 2013.
Page 100: Letter from Southern Disability Law Center to the hearing officer dated August 14, 2013.
Page 101: Letter from Southern Disability Law Center to Molina Healthcare dated August 14, 2013.
Page 102-104: Texas Medicaid Providers Procedures Manual policy.
Page 105: Letter from Southern Disability Law Center to the hearing officer dated August 19, 2013.
Page 106: Letter from Southern Disability Law Center to the hearing officer dated August 26, 2013.
Page 107-108: Letter from Southern Disability Law Center to the hearing officer dated August 26, 2013.
Page 109-110: Letter of Medical Necessity from Lisa Wenzel, M.D. dated September 26, 2013.
Page 111-114: Declarations of Assistive Technology Professionals.
Page 115-117: Affidavit of Assistive Technology Professional.

000335

Page 118-126: Notice of Hearing dated September 9, 2013 and Fair Hearing Summary form 4800.

Page 127-128: Centers for Medicare & Medicaid Services policy clarification regarding DME dated May 21, 2013.

Page 129-132: Exceptional Circumstances policy.

Page 133-147: Petitioner's Memorandum for appeal 1639469.

Page 148-152: Molina Healthcare's response to interrogatories.

Signed on this 22nd day of November, 2013

Javier Contreras, Hearings Officer
Health and Human Services Commission

000336



APPENDIX 3

## TEXAS HEALTH AND HUMAN SERVICES COMMISSION
## APPEALS DIVISION

| | | |
|---|---|---|
| IN THE MATTER | § | |
| | § | |
| OF | § | APPEAL No. 1639469 |
| | § | |
| LINDA PUGLISI | § | |

### ADMINISTRATIVE REVIEW OF FAIR HEARING DECISION

#### Jurisdiction

This administrative review is conducted pursuant to the authority of the Texas

Government Code § 531.019, 1 Texas Administrative Code §§ 357.1–357.25, and 1 Texas

Administrative Code §§ 357.701–357.703, and pursuant to Appellant's timely written request

for an administrative review postmarked on December 19, 2013.

#### Purpose of the Administrative Review

The purpose of this administrative review is to determine whether or not the hearings

officer followed the applicable laws, procedures, and program rules in the above-referenced-

and-numbered hearing decision rendered on November 22, 2013.

#### Procedural History

On June 6, 2013, Molina Healthcare of Texas sent Appellant a notice denying her

request for a Group 4 custom power wheelchair with an integrated standing feature and

power seat elevation system because it was not medically necessary and it was not a covered

benefit. Appellant requested an appeal on June 26, 2013. On July 22, 2013, a hearings

officer sent a notice to Appellant scheduling a telephone hearing for September 24, 2013. On

or about July 24, 2013, Appellant requested a face-to-face hearing. On September 9, 2013,

000340

the hearings officer sent a notice to Appellant scheduling a telephone hearing for October 30, 2013. The hearings officer convened the hearing in Houston, Texas, on October 30, 2013. On November 22, 2013, the hearings officer issued an order sustaining Molina Healthcare's decision to deny the request for a Group 4 custom power wheelchair with an integrated standing feature and power seat elevation system in accordance with applicable law and policy. Appellant submitted a timely request for an administrative review by letter postmarked on December 19, 2013.

## Relevant Authorities

**Excerpts from Texas Medicaid Provider Procedures Manual: Vol. 2, Durable Medical Equipment, Medical Supplies, and Nutritional Products Handbook (Jan. 2012).**

### 2.2.14.6 Wheeled Mobility Systems

### 2.2.14.6.1 Definitions and Responsibilities

• MRADL - An activity of daily living requiring the use of mobility aids (*i.e.* toileting, feeding, dressing, grooming, and bathing).

### 2.2.14.12 Power Wheeled Mobility Systems -- Group 1 through Group 5

A power wheeled mobility system or powered mobility device (PMD) is a professionally manufactured device that provides motorized wheeled mobility and body support specifically for individuals with impaired mobility. PMDs are four- or six-wheeled motorized vehicles whose steering is operated by an electronic device or joystick to control direction, turning, and alternative electronic functions, such as seat controls.

### 2.2.14.12.5 Group 4 PMDs

All Group 4 PMDs must have all the specified basic components and meet all the following requirements:

• Standard integrated or remote proportional joystick
• Nonexpandable controller

2

000341

- Capable of upgrade to expandable controller
- Capable of upgrade to alternative control devices
- May not have cross brace construction
- Accommodates seating and positioning items (e.g., seat and back cushions, headrests, lateral trunk supports, lateral hip supports, medial thigh supports [except captains chairs])
- Drive wheel suspension to reduce vibration
- Length - less than or equal to 48 inches
- Width - less than or equal to 34 inches
- Minimum top end speed - 6 mph
- Minimum range - 16 miles
- Minimum obstacle climb - 75 mm
- Dynamic stability incline - 9 degrees

## Prior Authorization Requirements

A Group 4 PMD may be considered for prior authorization for rental or purchase when all the following criteria are met:

- In addition to using the PMD in the home, the client will routinely use the PMD for MRADLs outside the home.
- The client will routinely use the PMD on rough, unpaved or uneven surfaces.
- The client will encounter obstacles in excess of 2.25 inches.
- The client has a documented medical need for a feature that is not available on a lower level PMD.

## Documentation Requirements

The submitted documentation for a Group 4 PMD must include a completed assessment that is signed and dated by a physician or a licensed occupational or physical therapist and includes the following:

- A description of the environment where the PMD will be used in the routine performance of MRADLs.
- A listing of the MRADLs that would be possible with the use of a Group 4 PMD that would not be possible without the Group 4 PMD.
- The distance the client is expected to routinely travel on a daily basis with the Group 4 PMD.

*Note: The enhanced features found on a Group 4 PMD must be medically necessary to meet the client's routine MRADL and will not be approved for leisure or recreational activities.*

000342

In addition to meeting criteria for Group 2 through Group 4 PMDs, the submitted documentation of medical necessity must demonstrate that the client requires the requested power option (*e.g.*, the need for a power recline or tilt in space, or a combination power tilt and power recline), the no-power option, single-power option, or multiple-power option as defined in subsection 2.2.14.12, "Power Wheeled Mobility Systems- Group 1 through Group 5" in this handbook.

### 2.2.14.15 Power Seat Elevation System

A power seat elevation system is used to raise and lower the client in their seated position without changing the seat angles to provide varying amounts of added vertical access.

The use of a power seat elevation system will:

• Facilitate independent transfers, particularly uphill transfers, to and from the wheelchair, and
• Augment the client's reach to facilitate independent performance of MRADLs in the home.

### 2.2.14.15.1 Prior Authorization

A power seat elevation system may be prior authorized to promote independence in a client who meets all of the following criteria:

• The client does not have the ability to stand or pivot transfer independently.
• The client requires assistance only with transfers across unequal seat heights, and as a result of having the power seat elevation system, the client will be able to transfer across unequal seat heights unassisted.
• The client has limited reach and range of motion in the shoulder or hand that prohibits independent performance of MRADLs (such as, dressing, feeding, grooming, hygiene, meal preparation, and toileting).

### 2.2.14.15.2 Documentation Requirements

The submitted documentation must include an assessment completed, signed, and dated by a physician or a licensed occupational or physical therapist that includes the following:

• A description of the client's current level of function without the device
• Documentation that identifies how the power seat elevation system will improve the client's function

4

000343

- A list of MRADLs the client will be able to perform with the power seat elevation system that the client is unable to perform without the power seat elevation system and how the device will increase independence
- The duration of time the client is alone during the day without assistance
- The client's goals for use of the power seat elevation system

*Note: A power seat elevation system option will not be authorized for the convenience of a caregiver, or if the device will not allow the client to become independent with MRADLs and transfers.*

### 2.2.14.26 Procedure Codes and Limitations for Mobility Aids

The following mobility aids are not a benefit of Home Health Services:

- . . .
- Mobile standers, power standing system on a wheeled mobility device
- . . . .

### Findings of Fact

1. Appellant received Home Health Services from Molina Healthcare, a Medicaid managed-care organization.

2. Appellant is a 26-year-old female who has quadriplegia due to a spinal-cord injury caused by a surgical procedure in November, 2011, to remove a tumor near her spine.

3. Due to the nature of her injury, Appellant depends on a power wheelchair for independent mobility. Appellant requires assistance to transfer in and out of her bed and wheelchair.

4. On February 13, 2013, Appellant was admitted to Texas Institute for Research and Rehabilitation (TIRR) hospital where she was evaluated for DME. During her stay at TIRR, Appellant was able to maneuver and operate a Permobil C500 VS power wheelchair, which included an integrated standing feature. Appellant was able to stand five times within an hour, approximately 5 to 10 minutes each time.

5. Molina Healthcare received a request for prior authorization of a Permobil C500 VS Group 4 custom power wheelchair with an integrated standing feature and power seat elevation system.

6. Molina Healthcare reviewed the request and determined that the requested Group 4 custom power wheelchair with an integrated standing feature and power seat elevation system was not covered because it was not medically necessary and it was a not a covered benefit. Molina Healthcare recommended that Appellant request a Group 3 power wheelchair and a stand-alone dynamic stander to meet her needs.

7. The primary difference between a Group 3 custom power wheelchair and a Group 4 custom power wheelchair is that a Group 4 custom power wheelchair may be used routinely outside the home and on rough or uneven surfaces. Also, the integrated standing feature and seat-elevation system are not available with the Group 3 custom power wheelchair.

8. Appellant was able to maneuver a Group 3 power wheelchair independently during the hearing.

9. Appellant is unable to transfer independently and would require assistance from one or two caregivers to transfer to a dynamic stander.

10. Appellant is unable to transfer independently even with the assistance of a power seat elevation system.

11. Appellant presented insufficient evidence that she would (a) routinely use the requested Group 4 custom power wheelchair for mobility-related activities of daily living

6

000345

outside her home, (b) routinely use the requested Group 4 wheelchair on rough or uneven surfaces, and (c) encounter obstacles in excess of 2.25 inches.

## Conclusions of Law

1. Because there was insufficient evidence that Appellant would (a) routinely use the requested Group 4 custom power wheelchair for mobility-related activities of daily living outside her home, (b) routinely use the requested Group 4 wheelchair on rough or uneven surfaces, and (c) encounter obstacles in excess of 2.25 inches, Molina's decision to deny the requested Group 4 custom power wheelchair was supported by the facts and policy the facts and applicable laws, procedures, and program rules.

2. Because Appellant is unable to transfer independently, even with the assistance of a power seat elevation system, Molina's decision to deny the requested Group 4 custom power wheelchair with power seat elevation system was supported by the facts and applicable laws, procedures, and program rules.

3. Because power standers on wheeled mobility systems are specifically excluded from coverage under Texas Medicaid Home Health Services, Molina's decision to deny the requested Group 4 power wheelchair with an integrated standing feature was supported by the facts and applicable laws, procedures, and program rules.

4. The hearings officer followed applicable laws, procedures, and program rules in the appeal hearing and the final decision rendered on November 22, 2013.

## Order

Based on my review of this matter, I have determined that the hearings officer developed the record appropriately and followed applicable laws, procedures, and program

000346

rules. The record reflects that Molina properly denied Appellant's request for a Group 4 custom power wheelchair with an integrated standing feature and power seat elevation system in accordance with applicable law and policy. It is therefore ordered that the hearings officer's decision in this matter is SUSTAINED.

Signed: January 14, 2014.

Edwin J. Cook
Reviewing Attorney
Texas Health and Human Services
Commission

ADOPTED:

Javier Contreras, Hearings Officer
Texas Health and Human Services Commission

8

000347

# APPENDIX 4

<<Prev Rule **Texas Administrative Code** Next Rule>>

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 354** | MEDICAID HEALTH SERVICES |
| **SUBCHAPTER A** | PURCHASED HEALTH SERVICES |
| **DIVISION 3** | **MEDICAID HOME HEALTH SERVICES** |
| **RULE §354.1031** | **General** |

(a) Purpose. The purpose of this subchapter is to establish rules for the Title XIX (Medicaid) home health benefits.

(b) Definitions. The following words and terms when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Home health services--Covered services, equipment, appliances and supplies which are provided to qualified Medicaid recipients at their place of residence by home health agency staff, providers of durable medical equipment, or expendable medical supplies under federal regulations 42 CFR §440.70 and §354.1037 of this title (relating to Written Plan of Care) and §354.1039 of this title (relating to Home Health Benefits and Limitations).

(2) Home health agency--A public or private agency or organization, licensed by the state to provide home health services and qualified to participate as a Medicare home health agency under 42 CFR, Part 484, §§484.1-484.52 (Conditions for Participation of Home Health Agencies).

(3) Plan of care--A written regimen established and periodically reviewed by a physician in consultation with home health agency staff, which meets the plan of care standards at 42 CFR §484.18 and §354.1037 of this title.

(4) Home health aide--An individual who meets the Medicare home health agency personnel qualifications and training requirements established for home health aides at 42 CFR §484.4 and §484.36.

(5) Home health aide services--Services which can be provided by a qualified home health aide, including those listed at 42 CFR §484.36.

(6) Department--The Texas Department of Health and or its designee.

(7) Part-time--Home health aide or skilled nursing services provided any number of days per week less than eight hours per day.

(8) Intermittent--Home health aide or skilled nursing services provided less than on a daily basis less than eight hours per day.

(9) Medicare fee schedule--The fee schedule established by the Medicare program for expendable medical supplies and durable medical equipment.

(10) Expendable medical supply acquisition fee--The fee determined by the department or its designee

by periodic sampling of suppliers or from information provided in manufacturer's publications, whichever is lesser.

(11) Expendable medical supplies--Medical supplies which meet one or both of the following criteria:

(A) the typical term of use is within one year of purchase; or

(B) reimbursement is made at a cost of $1,000 or less.

(12) Durable medical equipment--Machinery and/or equipment which meets one or both of the following criteria:

(A) the projected term of use is more than one year; or

(B) reimbursement is made at a cost more than $1,000.

**Source Note:** The provisions of this §354.1031 adopted to be effective June 26, 1997, 22 TexReg 5826; transferred effective September 1, 2001, as published in the Texas Register May 24, 2002, 27 TexReg 4561; amended to be effective November 14, 2002, 27 TexReg 10588

Next Page        Previous Page

List of Titles        Back to List

<<Prev Rule

# Texas Administrative Code

Next Rule>>

**TITLE 1**    ADMINISTRATION

**PART 15**    TEXAS HEALTH AND HUMAN SERVICES COMMISSION

**CHAPTER 354**    MEDICAID HEALTH SERVICES

**SUBCHAPTER A**    PURCHASED HEALTH SERVICES

**DIVISION 3**    **MEDICAID HOME HEALTH SERVICES**

**RULE §354.1035**    **Recipient Qualifications for Home Health Services**

(a) An eligible Medicaid recipient must meet the following requirements to qualify for Medicaid home health services:

(1) be under the continuing care and medical supervision of a physician who has established a plan of care or request form for the recipient in accordance with §354.1037 or §354.1039 of this title (relating to Written Plan of Care and Home Health Services Benefits and Limitations). Recipients must be seen by their physician within 30 days prior to the start of home health services. This physician visit may be waived when a diagnosis has already been established by the physician and the recipient is under the continuing care and medical supervision of the physician. Any waiver must be based on the physician's statement that an additional evaluation visit is not medically necessary;

(2) have a medical need for covered home health services as documented in the recipient's plan of care or request form for the recipient in accordance with §354.1037 or §354.1039 (of this title (relating to Written Plan of Care and Home Health Services Benefits and Limitations); and

(3) receive services that meet the recipient's existing medical needs, subject to §354.1039, of this title (relating to Home Health Services Benefits and Limitations) and that can be safely provided in the recipient's home.

(b) The home health service, supply, equipment, or appliance must:

(1) be prior authorized by the department, unless otherwise specified by the department;

(2) be prescribed by a physician who is currently licensed;

(3) be medically necessary, as documented in the plan of care and/or the request form, in accordance with §354.1037 and §354.1039 (of this title (relating to Written Plan of Care and Home Health Services Benefits and Limitations);

(4) be provided to a recipient in their place of residence; and

(5) meet accepted industry standards for safety where applicable.

**Source Note:** The provisions of this §354.1035 adopted to be effective June 26, 1997, 22 TexReg 5826; amended to be effective July 1, 1999, 24 TexReg 4365; transferred effective September 1, 2001, as published in the Texas Register May 24, 2002, 27 TexReg 4561; amended to be effective November 14, 2002, 27 TexReg 10588

Next Page      Previous Page

List of Titles | Back to List

**Texas Administrative Code**

TITLE 1      ADMINISTRATION
PART 15      TEXAS HEALTH AND HUMAN SERVICES COMMISSION
CHAPTER 354      MEDICAID HEALTH SERVICES
SUBCHAPTER A      PURCHASED HEALTH SERVICES
DIVISION 3      **MEDICAID HOME HEALTH SERVICES**
RULE §354.1037      **Written Plan of Care**

(a) A plan of care must be recommended, signed and dated by the recipient's attending physician.

(b) The plan of care must contain the following information:

(1) all pertinent diagnoses;

(2) mental status;

(3) types of services including amount, duration and frequency;

(4) equipment required;

(5) prognosis;

(6) rehabilitation potential;

(7) functional limitations;

(8) activities permitted;

(9) nutritional requirements;

(10) medications;

(11) treatments including amount and frequency;

(12) safety measures to protect against injury;

(13) instructions for timely discharge or referral; and

(14) date the recipient was last seen by the physician.

(c) Physician orders for therapy services must include:

(1) the specific procedures and modalities to be used;

(2) the amount, frequency, and duration; and

(3) the therapist who participated in developing the plan of care.

(d) The plan of care must be reviewed by the physician and the home health agency personnel as often as the severity of the patient's condition requires or at least once every 60 days.

(e) Oral physician orders may only be given to persons authorized to receive them under state and federal law. They must be reduced to writing, signed and dated by the registered nurse or qualified therapist responsible for furnishing or supervising the ordered service, and placed in the recipient's chart.

(f) The plan of care shall be initiated by the registered nurse.

**Source Note:** The provisions of this §354.1037 adopted to be effective June 26, 1997, 22 TexReg 5826; transferred effective September 1, 2001, as published in the Texas Register May 24, 2002, 27 TexReg 4561

# Texas Administrative Code

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 354** | MEDICAID HEALTH SERVICES |
| **SUBCHAPTER A** | PURCHASED HEALTH SERVICES |
| **DIVISION 3** | **MEDICAID HOME HEALTH SERVICES** |
| **RULE §354.1039** | **Home Health Services Benefits and Limitations** |

(a) The State determines authorization requirements and limitations for covered home health service benefits. The home health agency is responsible for obtaining prior authorization where specified for the healthcare service, supply, equipment, or appliance. Home health service benefits include the following:

　(1) Skilled nursing. Nursing services provided by a registered nurse (RN) who is currently licensed by the Board of Nurse Examiners for the State of Texas and/or a licensed vocational nurse (LVN) licensed by the Texas Board of Vocational Nurse Examiners provided on a part-time or intermittent basis and furnished through an enrolled home health agency are covered benefits. Billable nursing visits may also include:

　　(A) nursing visits required to teach the recipient, the primary caregiver, a family member and/or neighbor how to administer or assist in a service or activity which is necessary to the care and/or treatment of the recipient in a home setting;

　　(B) RN visits for skilled nursing observation, assessment, and evaluation, provided a physician specifically requests that a nurse visit the recipient for this purpose.

　　　(i) The physician's request must reflect the need for the assessment visit.

　　　(ii) Nursing visits for the primary purpose of assessing a recipient's care needs to develop a plan of care are considered administrative and are not billable; and

　　(C) RN visits for general supervision of nursing care provided by a home health aide and/or others over whom the RN is administratively or professionally responsible.

　(2) Home health aide services. Home health aide services to provide personal care under the supervision of an RN, licensed physical therapist (PT), or occupational therapist (OT) employed by the home health agency are covered benefits.

　　(A) The primary purpose of a home health aide visit must be to provide personal care services.

　　(B) Duties of a home health aide include the performance of simple procedures such as personal care, ambulation, exercise, range of motion, safe transfer, positioning, and household services essential to health care at home, assistance with medications that are ordinarily self-administered, reporting changes in the patient's condition and needs, and completing appropriate records.

　　(C) Written instructions for home health aide services must be prepared by an RN or therapist as appropriate.

(D) The requirements for home health aide supervision are as follows.

(i) When only home health aide services are being furnished to a recipient, an RN must make a supervisory visit to the recipient's residence at least once every 60 days. These supervisory visits must occur when the aide is furnishing patient care.

(ii) When skilled nursing care, PT, or OT are also being furnished to a recipient, an RN must make a supervisory visit to the recipient's residence at least every two weeks.

(iii) When only PT or OT is furnished in addition to the home health aide services, the appropriate skilled therapist may make the supervisory visits in place of an RN.

(E) Visits made primarily for performing housekeeping services are not covered services.

(3) Medical supplies. Medical supplies are covered benefits if they meet the following criteria.

(A) Medical supplies must be:

(i) documented in the recipient's plan of care as medically necessary and used for medical or therapeutic purposes;

(ii) supplied through an enrolled home health agency in compliance with the recipient's plan of care; or

(iii) supplied by an enrolled medical supplier under written, signed, and dated physician's prescription; and

(iv) prior authorized unless otherwise specified by the department.

(B) Items which are not listed in subparagraph (C) of this paragraph may be medically necessary for the treatment or therapy of qualified recipients. If a prior authorization request is received for these items consideration will be given to the request. Approval for reasonable amounts of the requested items may be given if circumstances justify the exception and the need is documented.

(C) Covered items include, but are not limited to:

(i) colostomy and ileostomy care supplies;

(ii) urinary catheters, appliances and related supplies;

(iii) pressure pads including elbow and heel protectors;

(iv) incontinent supplies to include incontinent pads or diapers for clients over the age of four for medical necessity as determined by the physician;

(v) crutch and cane tips;

(vi) irrigation sets;

(vii) supports and abdominal binders (not to include braces, orthotics, or prosthetics);

(viii) medicine chest supplies not requiring a prescription (not to include vitamins or personal care items such as soap or shampoos);

(ix) syringes, needles, IV tubing and/or IV administration setups including IV solutions generally used for hydration or prescriptive additives;

(x) dressing supplies;

(xi) thermometers;

(xii) suction catheters;

(xiii) oxygen and related respiratory care supplies; or

(xiv) feeding related supplies.

(4) Durable medical equipment (DME). Durable Medical Equipment must meet the following requirements to qualify for reimbursement under Medicaid home health services.

(A) DME must:

(i) be medically necessary and the appropriateness of the health care service, supply, equipment, or appliance prescribed by the physician for the treatment of the individual recipient and delivered in his place of residence must be documented in the plan of care and/or the request form.

(ii) be prior authorized unless otherwise specified by the department;

(iii) meet the recipient's existing medical and treatment needs;

(iv) be considered safe for use in the home;

(v) be provided through an enrolled home health agency under a current physician's plan of care; or

(vi) be provided through an enrolled DME supplier under a written, signed and dated physician's prescription.

(B) The department will determine whether DME will be rented, purchased, or repaired based upon the duration and use needs of the recipient.

(i) Periodic rental payments are made only for the lesser of:

(I) the period of time the equipment is medically necessary; or

(II) when the total monthly rental payments equal the reasonable purchase cost for the equipment.

(ii) Purchase is justified when the estimated duration of need multiplied by the rental payments would exceed the reasonable purchase cost of the equipment or it is otherwise more practical to purchase the equipment.

(iii) Repair of durable medical equipment and appliances will be considered based on the age of the

item and the cost to repair the item.

(I) A request for repair of durable medical equipment or appliances must include a statement or medical information from the attending physician substantiating that the medical appliance or equipment continues to serve a specific medical purpose and an itemized estimated cost list of the repairs. Rental equipment may be provided to replace purchased medical equipment or appliances for the period of time it will take to make necessary repairs to purchased medical equipment or appliances.

(II) Repairs will not be authorized in situations where the equipment has been abused or neglected by the patient, patient's family, or caregiver.

(III) Routine maintenance of rental equipment is the responsibility of the provider.

(C) Covered medical appliances and equipment (rental, purchase, or repairs) include, but are not limited to:

(i) manual or powered wheelchairs;

(I) non-customized including medically justified seating, supports and equipment; or

(II) customized, specifically tailored or individualized, powered wheelchairs including appropriate medically justified seating, supports and equipment not to exceed an amount specified by the department.

(ii) canes, crutches, walkers, and trapeze bars;

(iii) bed pans, urinals, bedside commode chairs, elevated commode seats, bath chairs/benches/seats;

(iv) electric and non-electric hospital beds and mattresses;

(v) air flotation or air pressure mattresses and cushions;

(vi) bed side rails and bed trays;

(vii) reasonable and appropriate appliances for measuring blood pressure and blood glucose suitable to the recipient's medical situation to include replacement parts and supplies;

(viii) lifts for assisting recipient to ambulate within residence;

(ix) pumps for feeding tubes and IV administration; and

(x) respiratory or oxygen related equipment.

(D) Medical equipment or appliances not listed in subparagraph (C) of this paragraph may, in exceptional circumstances, be considered for payment when it can be medically substantiated as a part of the treatment plan that such service would serve a specific medical purpose on an individual case basis.

(5) Physical therapy. To be payable as a home health benefit, physical therapy services must:

(A) be provided by a physical therapist who is currently licensed by the Texas Board of Physical Therapy Examiners, or physical therapist assistant who is licensed by the Texas Board of Physical Therapy Examiners who assists and is supervised by a licensed physical therapist;

(B) be for the treatment of an acute musculoskeletal or neuromuscular condition or an acute exacerbation of a chronic musculoskeletal or neuromuscular condition;

(C) be expected to improve the patient's condition in a reasonable and generally predictable period of time, based on the physician's assessment of the patient's restorative potential after any needed consultation with the therapist; and

(D) not be provided when the patient has reached the maximum level of improvement. Repetitive services designed to maintain function once the maximum level of improvement has been reached are not a benefit. Services related to activities for the general good and welfare of patients such as general exercises to promote overall fitness and flexibility and activities to provide diversion or general motivation are not reimbursable.

(6) Occupational therapy. To be payable as a home health benefit, occupational therapy services must be:

(A) provided by one who is currently registered and licensed by the Texas Board of Occupational Therapy Examiners or by an occupational therapist assistant who is licensed to assist in the practice of occupational therapy and is supervised by an occupational therapist;

(B) for the evaluation and function-oriented treatment of individuals whose ability to function in life roles is impaired by recent or current physical illness, injury or condition; and

(C) specific goal directed activities to achieve a functional level of mobility and communication and to prevent further dysfunction within a reasonable length of time based on the therapist's evaluation and physician's assessment and plan of care.

(7) Insulin syringes and needles. Insulin syringes and needles must meet the following requirements to qualify for reimbursement under Medicaid home health services.

(A) Pharmacies enrolled in the Medicaid Vendor Drug Program may dispense insulin syringes and needles to eligible Medicaid recipients with a physician's prescription.

(B) Prior authorization is not required for an eligible recipient to obtain insulin syringes and needles.

(C) Insulin syringes and needles obtained in accordance with this section will be reimbursed through the Medicaid Vendor Drug Program.

(D) A physician's plan of care is not required for an eligible recipient to obtain insulin syringes and needles under this section.

(8) Diabetic supplies and related testing equipment. Diabetic supplies and related testing equipment must meet the following requirements to qualify for reimbursement under Medicaid home health services.

(A) diabetic supplies and related testing equipment must be prescribed by a physician;

(B) prior authorization is required unless otherwise specified by the department; and

(b) Home health service limitations include the following.

(1) Patient supervision.

(A) Patients must be seen by their physician within 30 days prior to the start of home health services. This physician visit may be waived when a diagnosis has already been established by the attending physician and the patient is currently undergoing active medical care and treatment. Such a waiver is based on the physician's statement that an additional evaluation visit is not medically necessary.

(B) Patients receiving home health care services must remain under the care and supervision of a physician who reviews and revises the plan of care at least every 60 days or more frequently as the physician determines necessary.

(2) Time limited prior authorizations.

Cont'd...

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

<<Prev Rule **Texas Administrative Code** Next Rule>>

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 354** | MEDICAID HEALTH SERVICES |
| **SUBCHAPTER A** | PURCHASED HEALTH SERVICES |
| **DIVISION 3** | **MEDICAID HOME HEALTH SERVICES** |
| **RULE §354.1039** | **Home Health Services Benefits and Limitations** |

(A) Prior authorizations for payment of home health services may be issued by the department for a service period not to exceed 60 days on any given authorization. Specific authorizations may be limited to a time period less than the established maximum. When the need for home health services exceeds 60 days, or when there is a change in the service plan, the provider must obtain prior approval and retain the physician's signed and dated orders with the revised plan of care.

(B) The provider shall be notified by the department in writing of the authorization (or denial) of requested services.

(C) Prior authorization requests for covered Medicaid home health services must include the following information:

(i) The Medicaid identification form with the following information:

(I) full name, age, and address;

(II) Medical Assistance Program Identification number;

(III) health insurance claim number (where applicable);

(IV) Medicare number;

(ii) the physician's written, signed and dated plan of care (submitted by the provider if requested);

(iii) the clinical record data (completed and submitted by provider if requested);

(iv) a description of the home or living environment;

(v) a composition of the family/caregiver;

(vi) observations pertinent to the overall plan of care in the home; and

(vii) the type of service the patient is receiving from other community or state agencies.

(D) If inadequate or incomplete information is provided, the provider will be requested to furnish additional documentation as required to make a decision on the request.

(3) Medication administration. Nursing visits for the purpose of administering medications are not covered if:

(A) the medication is not considered medically necessary to the treatment of the individual's illness;

(B) the administration of medication exceeds the therapeutic frequency or duration by accepted standards of medical practice;

(C) there is not a medical reason prohibiting the administration of the medication by mouth; or

(D) the patient, a primary caregiver, a family member and/or neighbor has been taught or can be taught to administer intramuscular (IM) and intravenous (IV) injections.

(4) Prior approval. Services or supplies furnished without prior approval, unless otherwise specified by the department, are not benefits.

(5) Recipient residence. Services, equipment, or supplies furnished to a recipient who is a resident or patient in a hospital, skilled nursing facility, or intermediate care facility are not benefits.

(c) Home health services are subject to utilization review which includes the following:

(1) the physician is responsible for retaining in the client's record a copy of the plan of care and/or a copy of the request form documenting the medical necessity of the health care service, supply, equipment, or appliance and how it meets the recipient's health care needs; and

(2) the home health services provider is responsible for documenting the amount, duration, and scope of services in the recipient's plan of care, the equipment/supply order request, and the client record based on the physician's orders. This information is subject to retrospective review; and

(3) the State or its designated contractor may establish random and targeted utilization review processes to ensure the appropriate utilization of home health benefits and to monitor the cost effectiveness of home health services.

---

**Source Note:** The provisions of this §354.1039 adopted to be effective June 26, 1997, 22 TexReg 5826; amended to be effective July 1, 1999, 24 TexReg 4365; transferred effective September 1, 2001, as published in the Texas Register May 24, 2002, 27 TexReg 4561; amended to be effective November 14, 2002, 27 TexReg 10588

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

**Texas Administrative Code**

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 354 | MEDICAID HEALTH SERVICES |
| SUBCHAPTER A | PURCHASED HEALTH SERVICES |
| DIVISION 3 | MEDICAID HOME HEALTH SERVICES |
| RULE §354.1040 | Requirements for Wheeled Mobility Systems |

(a) Purpose. This section details the requirements for receiving reimbursement for the provision of, or the performance of a major modification to, a wheeled mobility system. This section implements §32.0424 of the Human Resources Code.

(b) Definitions. The following words and terms when used in this section shall have the following meanings, unless the context clearly indicates otherwise.

(1) Occupational therapist (OT)--A person licensed by the Texas Board of Occupational Therapy Examiners to practice occupational therapy, as defined in §454.002(4), of the Texas Occupations Code (relating to Definitions).

(2) Physical therapist (PT)--A person licensed by the Texas Board of Physical Therapy Examiners to practice physical therapy, as defined in §354.1121 of this chapter (relating to Definitions).

(3) Qualified rehabilitation professional (QRP)--A person who holds one or more of the following certifications:

(A) Holds a certification as an assistive technology professional or a rehabilitation engineering technologist issued by, and in good standing with, the Rehabilitation Engineering and Assistive Technology Society of North America (RESNA);

(B) Holds a certification as a seating and mobility specialist issued by, and in good standing with, RESNA; and/or

(C) Holds a certification as a certified rehabilitation technology supplier issued by, and in good standing with, the National Registry of Rehabilitation Technology Suppliers (NRRTS).

(4) Wheeled Mobility System--An item of durable medical equipment (DME) that is a customized powered or manual mobility device or a feature or component of the device, including the following:

(A) Seated positioning components;

(B) Powered or manual seating options;

(C) Specialty driving controls;

(D) Multiple adjustment frame;

(E) Nonstandard performance options; and

(F) Other complex or specialized components.

(c) Roles and responsibilities. The following persons, when referenced in this section, shall have the following roles in the provision of, or the performance of a major modification to, a wheeled mobility system, unless the context clearly indicates otherwise.

(1) Occupational therapist (OT)--The occupational therapist is responsible for completing the clinical assessment of a recipient required for obtaining a wheeled mobility system. The assessment shall include detailed documentation of medical need for specific mobility or seating equipment and all necessary accessories.

(2) Physical therapist (PT)--The physical therapist is responsible for completing the clinical assessment of a recipient required for obtaining a wheeled mobility system. The assessment shall include detailed documentation of medical need for specific mobility or seating equipment and all necessary accessories.

(3) Qualified rehabilitation professional (QRP)--The QRP is required to:

(A) Be present for and involved in the clinical assessment of the recipient;

(B) Be present at the time of delivery of the wheeled mobility system to direct the fitting of the wheeled mobility system to ensure that the system is appropriate for the recipient; and

(C) Verify that the wheeled mobility system functions correctly relative to the recipient.

(4) A person that is licensed as an OT and/or a PT, and is also certified as a QRP, may perform either the role of the therapist or the QRP during the clinical assessment of the client, but cannot serve in both roles at the same time.

(d) Benefit. Wheeled mobility systems are a Medicaid benefit when the following criteria are met.

(1) All the requirements for DME, as detailed in §354.1039 of this chapter (relating to Home Health Services Benefits and Limitations) are met.

(2) Wheeled mobility systems are provided by an enrolled DME supplier that directly employs or contracts with a QRP.

(3) An enrolled DME supplier obtains prior authorization for wheeled mobility systems from the Texas Health and Human Services Commission (HHSC) or its designee.

(e) Prior authorization requirements. The following documentation must be submitted in a manner approved by HHSC or its designee to obtain prior authorization for a wheeled mobility system.

(1) A signed and dated physician's prescription, or other such documentation as directed by HHSC, that details a wheeled mobility system, including all necessary components, needed by the recipient;

(2) A clinical assessment that includes detailed documentation of medical need for specific mobility or seating equipment and all necessary accessories, signed and dated by an OT or PT authorized to perform the assessment;

(3) Documentation in a form or manner directed by HHSC or its designee attesting that a QRP was present for and involved in the clinical assessment of the recipient; and

(4) Any other documentation deemed necessary by HHSC or its designee to adequately explain the medical necessity of the requested equipment.

(f) Requirements for reimbursement. Reimbursement for the provision of, or the performance of a major modification to, a wheeled mobility system will be considered only when:

(1) The system is delivered to a recipient by a Medicaid-enrolled DME provider that directly employs or contracts with, a QRP, and the QRP was present and involved in the clinical assessment of the recipient for the requested wheeled mobility system;

(2) At the time the wheeled mobility system is delivered to the recipient, the QRP is present and responsible for:

(A) directing the fitting to ensure that the system is appropriate for the recipient; and

(B) verifying that the system functions correctly relative to the recipient.

(g) Documentation requirements for reimbursement. The following documentation must be submitted by the enrolled DME supplier with the claim for consideration of reimbursement for a wheeled mobility system in a manner approved by HHSC or its designee.

(1) A signed and dated HHSC DME Certification and Receipt Form as required in §354.1185 of this chapter (relating to Provider Compliance with Durable Medical Equipment (DME) Certification Requirements); and

(2) Documentation in a form and manner as directed by HHSC or its designee attesting that a QRP was present at the time of delivery and:

(A) directed the fitting of the wheeled mobility system to ensure that the system was appropriate for the recipient; and

(B) verified that the wheeled mobility system functions correctly relative to the recipient.

(h) Effective dates for services provided. The provisions of this section apply to the following services:

(1) Wheeled mobility systems delivered on or after September 1, 2011;

(2) A major modification to a wheeled mobility system provided on or after September 1, 2011; and

(3) QRP functions, including participating in a clinical assessment of a client and directing the fitting of a wheeled mobility system, related to the provision of, or a major modification to, a wheeled mobility system when:

(A) the wheeled mobility system is delivered on or after September 1, 2011; and

(B) the QRP functions are performed after the effective date of the associated rates as determined by HHSC.

**Source Note:** The provisions of this §354.1040 adopted to be effective February 3, 2011, 36 TexReg 407

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

**Texas Administrative Code**

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 354** | MEDICAID HEALTH SERVICES |
| **SUBCHAPTER A** | PURCHASED HEALTH SERVICES |
| **DIVISION 3** | **MEDICAID HOME HEALTH SERVICES** |
| **RULE §354.1041** | **Benefits for Medicare/Medicaid Recipients** |

For recipients who are eligible for both Medicare and Medicaid (dual eligible), Medicare is the primary payor.

(1) Medicaid will pay the Medicare deductible and coinsurance subject to the limitations described in §354.1143 of this subchapter (relating to Coordination of Medicaid with Medicare Parts A, B, and C) for qualified recipients of home health services.

(2) Eligible recipients who have exhausted their home health benefits under Medicare are not entitled to receive all home health services under the Medicaid program. Home health aide services, DME, supplies, or appliances may be a covered service if:

(A) an eligible Medicaid recipient enrolled in Medicare does not qualify for home health services under Medicare because skilled nursing care, physical therapy, speech therapy or occupational therapy is not an essential element of the recipient's treatment plan; and/or

(B) the medical supplies, equipment, or appliances for use in the eligible recipient's place of residence are not otherwise available as a Medicare Part B benefit.

**Source Note:** The provisions of this §354.1041 adopted to be effective June 26, 1997, 22 TexReg 5826; transferred effective September 1, 2001, as published in the Texas Register May 24, 2002, 27 TexReg 4561; amended to be effective January 1, 2012, 36 TexReg 9282

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

<<Prev Rule

# Texas Administrative Code

Next Rule>>

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 357** | HEARINGS |
| **SUBCHAPTER A** | UNIFORM FAIR HEARING RULES |
| **RULE §357.5** | **Hearings Officer Responsibilities** |

(a) Fair hearings are conducted by an impartial hearings officer who:

(1) does not have a personal involvement in the case;

(2) was not involved in the initial determination of the action that is being contested; and

(3) was not the agency representative who took the action or the immediate supervisor of that representative.

(b) The hearings officer's supervisor may reassign the fair hearing to another officer.

(c) Responsibilities. The hearings officer conducts the fair hearing as an informal proceeding, not as a formal court hearing, and is not required to follow the Texas Rules of Evidence or the Texas Rules of Civil Procedure.

(1) General duties. The hearings officer:

(A) determines whether a client requested a fair hearing in a timely manner, or had good cause for failing to do so;

(B) schedules a pre-hearing conference to resolve issues of procedure, jurisdiction, or representation, if necessary;

(C) requires the attendance of agency representatives, or witnesses, if necessary;

(D) is prohibited from engaging in ex parte communication, whether oral or written, with a party or the party's representative or witness relating to matters to be adjudicated; and

(E) arranges for reasonable accommodations for disclosed disabilities.

(2) During the hearing, the hearings officer:

(A) makes the official recording of the hearing;

(B) ensures that the appellant's and agency's rights are protected;

(C) determines whether there is a need for an interpreter;

(D) limits the number of persons in attendance at the hearing if space is limited;

(E) controls the use by others of cameras, videos, or other recording devices;

(F) administers oaths and affirmations;

(G) ensures consideration of all relevant points at issue and facts pertinent to the appellant's situation at the time the action was taken;

(H) considers the appellant's changed circumstances, when appropriate and possible;

(I) requests, receives, and makes part of the record all relevant evidence;

(J) regulates the conduct and course of the fair hearing to ensure due process and an orderly hearing;

(K) conducts the hearing in a way that makes the appellant feel most at ease; and

(L) orders, if determined to be necessary, an independent medical assessment or professional evaluation to be paid for by the agency or the agency's designee.

(3) After the hearing, the hearings officer:

(A) makes a decision based on the evidence presented at the hearing;

(B) determines if the agency's or its designee's action is in compliance with statutes, policies, or procedures;

(C) allows the appellant to request and receive a copy of the recording at no charge;

(D) except as provided in subparagraph (E) of this paragraph, issues a timely written decision, and includes findings of fact, conclusions of law, pertinent statutes, and a final order;

(E) issues a decision in THSteps cases containing the purpose of the hearing, the legal authority, procedural history, summary of the evidence, findings of fact, conclusions of law, and relevant authorities; and

(F) to ensure compliance, orders the agency, its representative or designee to implement the order within the time limits specified in the relevant federal regulation, monitors compliance with the order, and notifies program management if the order is not implemented.

**Source Note:** The provisions of this §357.5 adopted to be effective June 29, 2009, 34 TexReg 4292

Next Page        Previous Page

List of Titles        Back to List

**Texas Administrative Code**

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 357 | HEARINGS |
| SUBCHAPTER A | UNIFORM FAIR HEARING RULES |
| RULE §357.7 | **Agency and Designee Responsibilities** |

(a) The agency must:

(1) accept a request for a fair hearing submitted within 90 days from the date on the notice of agency action, or, under the Supplemental Nutrition Assistance Program, at any time during the SNAP certification period;

(2) notify the HHSC Appeals Division within five days of the date the client expresses a desire to appeal; and

(3) allow the client to appeal more than one action at the same time.

(b) The agency or the agency's representative or designee must:

(1) allow the appellant to review the appeal procedures in HHSC's policies;

(2) provide to the hearings officer and the appellant, at no cost, copies of all documentation and evidence to be used in the fair hearing;

(3) appear at the scheduled hearing;

(4) be prepared to explain and defend the decision or action taken against the appellant; and

(5) implement the hearings officer's final order within the time limit specified in the relevant federal regulation.

**Source Note:** The provisions of this §357.7 adopted to be effective June 29, 2009, 34 TexReg 4292

Next Page       Previous Page

<<Prev Rule     **Texas Administrative Code**     Next Rule>>

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 357 | HEARINGS |
| SUBCHAPTER A | UNIFORM FAIR HEARING RULES |
| RULE §357.9 | **Burden of Proof in a Fair Hearing** |

The burden of proof in a fair hearing regarding a specific issue is proof by a preponderance of the evidence. The party that bears the burden of proof meets the burden if the stronger evidence, on the whole, favors that party, as determined by the hearings officer. Depending on the type of hearing, the following apply:

(1) The agency or its designee bears the burden of proof.

(2) The nursing facility bears the burden of proof in transfer and discharge hearings.

**Source Note:** The provisions of this §357.9 adopted to be effective June 29, 2009, 34 TexReg 4292

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

# Texas Administrative Code

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 357** | HEARINGS |
| **SUBCHAPTER A** | UNIFORM FAIR HEARING RULES |
| **RULE §357.11** | **Notice and Continued Benefits** |

(a) The agency must:

(1) follow the notice requirements set forth in the appropriate state or federal law or regulation for the affected program;

(2) give clients timely and adequate notice, as appropriate, of the right to a fair hearing;

(3) explain the right of appeal;

(4) explain the procedures for requesting an appeal;

(5) explain the right to be represented by others, including legal counsel;

(6) provide information about legal services available in the community;

(7) continue benefits if required to do so by state or federal law or regulations of the affected program; and

(8) not reinstate or continue SNAP benefits if a client requests a fair hearing after the date his certification period has ended.

(b) In Medicaid cases, except as specifically provided in federal regulations, the following apply:

(1) The written notice to an individual of the individual's right to a hearing must:

(A) contain an explanation of the circumstances under which Medicaid is continued if a hearing is requested; and

(B) be mailed at least 10 days before the date the individual's Medicaid eligibility or service is scheduled to be terminated, suspended, or reduced, except as provided by federal rules.

(2) If a hearing is requested before the date a Medicaid recipient's service, including a service that requires prior authorization, is scheduled to be terminated, suspended, or reduced, the agency may not take that proposed action before a decision is rendered after the hearing unless:

(A) it is determined at the hearing that the sole issue is one of federal or state law or policy; and

(B) the agency promptly informs the recipient in writing that services are to be terminated, suspended, or reduced pending the hearing decision.

**Source Note:** The provisions of this §357.11 adopted to be effective June 29, 2009, 34 TexReg 4292

| List of Titles | Back to List |
|---|---|

<<Prev Rule

# Texas Administrative Code

Next Rule>>

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 357** | HEARINGS |
| **SUBCHAPTER A** | UNIFORM FAIR HEARING RULES |
| **RULE §357.13** | **Appellant Rights and Responsibilities** |

(a) Requesting an Appeal. Only the appellant or the appellant's authorized representative has the right to appeal an action by an agency.

(b) During the appeal process, the appellant has the right to:

 (1) reapply for assistance;

 (2) receive continued benefits if required by state or federal regulation or statute;

 (3) confer with supervisory staff within the appropriate agency about the case prior to the hearing;

 (4) continue with the fair hearing after a case adjustment or correction is made;

 (5) request that reasonable accommodations due to disability or language comprehension be provided at the hearing at no cost;

 (6) make an audio recording of the fair hearing;

 (7) examine at a reasonable time before the date of the hearing and during the hearing:

  (A) the content of the appellant's case file; and

  (B) all documents and records to be used by the agency or the skilled nursing facility or nursing facility at the hearing;

 (8) review the appeal procedures outlined in agency policy; and

 (9) request a copy of the official recording at no charge after the decision is issued.

(c) An appellant or an authorized representative or legal counsel may send written interrogatories or request a pre-hearing conference to get additional information. The written interrogatories must be clear and concise, contain no more than 30 questions, and be submitted no less than 20 days prior to the hearing.

(d) Procedural Rights. The appellant has the right to:

 (1) present the case personally or with the aid of others, including but not limited to the appellant's representative or legal counsel;

 (2) bring witnesses;

(3) present information about all pertinent facts and circumstances;

(4) present arguments or address anything about the case without undue interference;

(5) confront and cross-examine adverse witnesses; and

(6) submit documentary evidence to the hearings officer before, during, or after the hearing as allowed by the hearings officer. Evidence submitted after the hearing, if accepted, must be entered into the record and shared with all parties.

(e) Appellant's Responsibilities. The appellant or the appellant's authorized representative is responsible for:

(1) participating in the fair hearing; and

(2) informing the hearings officer prior to the fair hearing that the appellant needs an interpreter or other accommodation due to a disability.

---

**Source Note:** The provisions of this §357.13 adopted to be effective June 29, 2009, 34 TexReg 4292

Next Page          Previous Page

# Texas Administrative Code

TITLE 1     ADMINISTRATION

PART 15     TEXAS HEALTH AND HUMAN SERVICES COMMISSION

CHAPTER 357     HEARINGS

SUBCHAPTER A     UNIFORM FAIR HEARING RULES

RULE §357.15     **Scheduling Hearings and Notice Requirements**

(a) Scheduling:

(1) Except as provided by paragraph (2) of this subsection, the hearings officer schedules fair hearings in the order in which the requests are received and determines a reasonable date, time, and place for the fair hearing.

(2) For good cause, the hearings officer may schedule fair hearings other than in the order in which the requests were received.

(3) The hearings officer must expedite hearing requests as provided in §357.17(b) of this subchapter (relating to Types of Hearings).

(b) Notice Requirements. No less than 14 days prior to the fair hearing, the fair hearings office sends all parties notice of the date, time, and place of the scheduled hearing. The notice informs the appellant:

(1) of the basis for the action or intended action taken by the agency or its designee;

(2) of the fair hearing procedures;

(3) of the name, address, and telephone number of the person to notify in the event the appellant cannot attend the hearing;

(4) of legal services that may be available to provide representation at the hearing;

(5) of the requirement to contact the hearings officer before the scheduled hearing to request reasonable accommodations due to disability or language comprehension;

(6) that the fair hearing will be dismissed for failure to appear without good cause;

(7) that documents to be used in the fair hearing are available for appellant's examination at a reasonable time before, during, and after the hearing; and

(8) that the case file is available for review upon request.

**Source Note:** The provisions of this §357.15 adopted to be effective June 29, 2009, 34 TexReg 4292

Next Page     Previous Page

List of Titles     Back to List

**Texas Administrative Code**

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 357** | HEARINGS |
| **SUBCHAPTER A** | UNIFORM FAIR HEARING RULES |
| **RULE §357.19** | **Other Procedures** |

(a) Postponement. The hearings officer considers a postponement for a hearing only if the appellant or his authorized representative contacts the appropriate appeals office before the scheduled hearing is to occur.

(1) SNAP Fair Hearings--The appellant is entitled to receive one postponement of up to 30 days. Additional postponements may be approved if the hearings officer determines that there is good cause.

(2) All other Fair Hearings--The hearings officer may postpone a fair hearing if the hearings officer determines that good cause exists.

(3) The hearings officer must state in writing the decision on the request to postpone and send it to the appellant and agency.

(b) Dismissals.

(1) The hearings officer dismisses the fair hearing if the appellant fails to appear at the scheduled hearing.

(2) The appellant will have 30 days to submit in writing a request to re-open the hearing and the reasons that he failed to appear at the scheduled fair hearing.

(3) The hearings officer will consider the request and determine whether the appellant had good cause for missing the scheduled hearing. If the hearings officer determines the appellant had good cause for failing to appear, the hearings officer will re-open the hearing and set a new hearing date.

(4) The hearings officer documents the dismissal in writing and sends the decision to the parties.

(c) Withdrawals.

(1) Only the appellant or his or her authorized representative can withdraw the request for appeal.

(2) The appellant or his or her authorized representative must make the request to.withdraw in writing to the hearings officer, an agency representative, or designee.

(3) If the appellant or his authorized representative orally requests to withdraw the appeal, he must confirm the request in writing. If a written request is not submitted, the hearings officer must notify the appellant in writing that if the written request is not received within 10 days, the appeal will be withdrawn based upon the original oral request.

(4) An oral request to withdraw during a hearing will be accepted in lieu of a written withdrawal.

(5) If an appellant dies during the appeal process, the hearings officer considers the appeal withdrawn unless the hearings officer is notified that the authorized representative or the appellant's executor intends to pursue the appeal.

(d) Recessed Fair Hearings. Once the hearing has begun, the hearings officer may recess the hearings proceedings if the hearings officer finds good cause for the recess. Following notice to both sides, the hearings officer may reconvene the hearing, if necessary.

(e) Administrative Review. An administrative review of a hearings decision is provided as set forth in §§357.701 - 357.703 of this chapter (relating to Purpose and Application, Definitions and Process and Timeframes).

(f) Procedural Review. A procedural review is available to clients and applicants for hearings decisions relating to programs not covered under Chapter 31 (TANF), Chapter 32 (Medicaid), or Chapter 33 (Nutrition Assistance Programs) Human Resources Code.

(1) An appellant or his or her authorized representative may make a timely request for a review of the decision.

(2) A request for a review of the decision must be postmarked within 30 days of the date of notice of the hearings officer's decision, and must be addressed to the hearings administrator.

(3) The scope of the review is limited to determining whether the hearings officer followed laws, procedures, and program rules introduced in the hearing.

---

**Source Note:** The provisions of this §357.19 adopted to be effective June 29, 2009, 34 TexReg 4292; amended to be effective June 14, 2010, 35 TexReg 5033

Next Page        Previous Page

List of Titles        Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

**Texas Administrative Code**

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 357** | HEARINGS |
| **SUBCHAPTER A** | UNIFORM FAIR HEARING RULES |
| **RULE §357.23** | **Hearings Officer Decision and Actions** |

(a) Time Limits for Issuing Decisions.

(1) SNAP hearings--60 days from the date the appeal request is received by the agency or designee.

(2) Non-SNAP hearings--90 days from the date the appeal request is received by the agency or designee.

(3) The time limit for issuing a decision may be extended by as many days as the fair hearing is postponed or recessed at the request of the appellant.

(b) Decisions by Hearings Officer. The hearings officer issues a decision based exclusively on testimony and evidence introduced at the hearing. The hearings officer must:

(1) issue a written decision in English;

(2) provide the appellant with a copy of the decision; and

(3) provide a translated cover letter in Spanish for hearing decisions where a Spanish interpreter was used. The cover letter instructs the appellant to call the hearings officer if he needs assistance to understand the decision. An appellant who indicates by telephone, in person, or in writing that assistance is needed to understand the decision must receive an explanation of the hearing decision from bilingual personnel within a reasonable period.

(c) Sustained Decisions in THSteps Appeals--If the decision sustains the agency action reducing, suspending, denying, or terminating a requested service:

(1) on the basis that there is no federal financial participation, the decision must contain an explanation of the basis for the hearings officer's decision, applying the state and federal law to the individual's particular request; or

(2) on the basis that the service is not medically necessary, the decision must contain an explanation of the medical basis for the hearings officer's decision, applying the agency's policy or the accepted standards of medical practice to the individual's particular medical circumstances; and

(3) All THSteps decisions must contain legal authority, purpose of the hearing, procedural history, summary of evidence, relevant authorities, findings of fact, and conclusions of law.

(d) Decisions that are Reversed. The hearings officer reverses a decision of the agency or designee if the action or inaction is not supported by the evidence introduced at the hearing, and is not supported by statutes, policies, or procedures applicable at the time the action or inaction occurred. The agency

may be instructed to issue retroactive payments or restored benefits in accordance with applicable rules, regulations, and statutes.

(e) Decisions that are Upheld. The hearings officer upholds a decision of the agency or its designee if the action is in accordance with statutes, policies, and procedures introduced at the hearing.

(f) Reopened Hearings--Appellant. The hearings officer may reopen an appeal and reconsider the decision if, within 12 months of the decision date, the appellant presents evidence that:

 (1) the hearings officer has determined the information would have affected the outcome of the original decision;

 (2) shows the original decision was not valid; and

 (3) was not presented at the hearing by the appellant.

(g) Authority of the Hearing Officer to Re-issue a Decision. The hearings officer has the authority to withdraw, revise, and re-issue a decision. The hearings officer may re-issue the decision within 20 days of the date of the original decision if the hearings officer becomes aware of an error of law or fact that would have affected the outcome of the decision.

**Source Note:** The provisions of this §357.23 adopted to be effective June 29, 2009, 34 TexReg 4292

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

<<Prev Rule **Texas Administrative Code** Next Rule>>

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 357 | HEARINGS |
| SUBCHAPTER R | JUDICIAL AND ADMINISTRATIVE REVIEW OF HEARINGS |
| RULE §357.701 | **Purpose and Application** |

The purpose of this subchapter is to address the process for requesting administrative and judicial review of hearings. This subchapter applies to those hearings provided in this chapter that are related to benefits provided under the public assistance programs of Chapters 31 (TANF), 32 (Medicaid) and 33 (Nutrition Assistance Programs) Human Resources Code.

**Source Note:** The provisions of this §357.701 adopted to be effective September 1, 2007, 32 TexReg 5353; amended to be effective June 14, 2010, 35 TexReg 5033

Next Page     Previous Page

List of Titles     Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

<<Prev Rule     **Texas Administrative Code**     Next Rule>>

| | |
|---|---|
| **TITLE 1** | ADMINISTRATION |
| **PART 15** | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| **CHAPTER 357** | HEARINGS |
| **SUBCHAPTER R** | JUDICIAL AND ADMINISTRATIVE REVIEW OF HEARINGS |
| **RULE §357.703** | **Process and Timeframes** |

(a) The hearing officer makes the final administrative decision in a hearing for the HHS System agency and its designees, unless, in those instances related to benefits provided under the public assistance programs of Chapters 31, 32 and 33, Human Resources Code, the appellant or the appellant's representative files a request for an administrative review of the hearing decision.

(b) The following provisions establish the process and timelines for an administrative review under this subchapter.

(1) An appellant or the appellant's representative may make a timely request for an administrative review of a hearing officer's decision.

(2) To be timely, a request for an administrative review of the hearing officer's decision must be postmarked not later than the 30th day after the date of the notice of the decision and must be addressed to the hearings administrator. A request for administrative review will be considered timely if filed after 30 days, where Appellant demonstrates good cause. Exception: The 30 days does not begin until a new decision is issued if the appellant or appellant's representative is working with the hearing officer to reopen or reschedule the hearing.

(3) Within 10 days of receipt of the request for administrative review, the Commission designates a HHS System attorney to handle the administrative review of the hearing decision on behalf of the HHS System Agency. The assigned attorney reviews the hearing decision and the hearings record upon which it is based for errors of law and errors of fact using the "preponderance of evidence" standard. This standard means that the evidence as a whole shows that the fact sought to be proved is more probable than not.

(4) The attorney completes the administrative review and notifies the appellant in writing of the results not later than the 15th business day after the date the attorney receives the request for review.

(5) When an administrative review is conducted, the attorney makes the final decision for the HHS system agency and its designees.

(c) If the attorney's final decision in the administrative review is adverse to the appellant, judicial review may be obtained by filing for review with a district court in Travis County not later than the 30th day after the date of the notice of the final decision as provided under Government Code Chapter 2001.

**Source Note:** The provisions of this §357.703 adopted to be effective September 1, 2007, 32 TexReg 5353; amended to be effective June 29, 2009, 34 TexReg 4292; amended to be effective June 14, 2010, 35 TexReg 5033

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS | HELP |

# APPENDIX 5



# Texas Medicaid

## Provider Procedures Manual

| Volume 2 | PROVIDER HANDBOOKS |

### Durable Medical Equipment, Medical Supplies, and Nutritional Products Handbook

The Texas Medicaid & Healthcare Partnership (TMHP) is the claims administrator for Texas Medicaid under contract with the Texas Health and Human Services Commission.

# DURABLE MEDICAL EQUIPMENT, MEDICAL SUPPLIES, AND NUTRITIONAL PRODUCTS HANDBOOK



TEXAS
Health and Human
Services Commission

**January 2012**

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# DURABLE MEDICAL EQUIPMENT, MEDICAL SUPPLIES, AND NUTRITIONAL PRODUCTS HANDBOOK

## Table of Contents

1. General Information ................................................................. DM-9
2. Texas Medicaid (Title XIX) Home Health Services ..................................... DM-9
   2.1 Enrollment..................................................................... DM-9
       2.1.1 Change of Address or Telephone Number ................................... DM-10
       2.1.2 Pending Agency Certification ............................................ DM-10
   2.2 Services, Benefits, Limitations and Prior Authorization ........................ DM-10
       2.2.1 Home Health Services..................................................... DM-11
           2.2.1.1 Client Eligibility .............................................. DM-11
           2.2.1.2 Prior Authorization Requests for Clients with Retroactive Eligibility ........ DM-11
           2.2.1.3 Prior Authorization.............................................. DM-12
       2.2.2 Durable Medical Equipment (DME) and Supplies............................. DM-13
           2.2.2.1 Modifications, Adjustments, and Repairs.......................... DM-15
               2.2.2.1.1 Accessories............................................... DM-16
           2.2.2.2 Prior Authorization.............................................. DM-16
       2.2.3 Medical Supplies......................................................... DM-18
           2.2.3.1 Supply Procedure Codes .......................................... DM-19
           2.2.3.2 Prior Authorization.............................................. DM-19
           2.2.3.3 Cancelling a Prior Authorization ................................ DM-20
       2.2.4 Augmentative Communication Device (ACD) System .......................... DM-20
           2.2.4.1 ACD System Accessories........................................... DM-22
               2.2.4.1.1 Carrying Case ............................................ DM-22
               2.2.4.1.2 Nonwarranty Repairs....................................... DM-22
               2.2.4.1.3 Trial Period.............................................. DM-22
               2.2.4.1.4 Rental.................................................... DM-23
               2.2.4.1.5 Purchase .................................................. DM-23
               2.2.4.1.6 Replacement ............................................... DM-23
               2.2.4.1.7 Software ................................................. DM-23
           2.2.4.2 Non-Covered ACD System Items..................................... DM-23
           2.2.4.3 Prior Authorization.............................................. DM-24
       2.2.5 Bath and Bathroom Equipment............................................. DM-25
           2.2.5.1 Hand-Held Shower Wand ........................................... DM-26
           2.2.5.2 Bath Equipment................................................... DM-26
               2.2.5.2.1 Bath or Shower Chairs, Tub Stool or Bench, Tub Transfer Bench......... DM-26
           2.2.5.3 Bathroom Equipment .............................................. DM-27
               2.2.5.3.1 Non-fixed Toilet Rail, Bathtub Rail Attachment, and Raised Toilet Seat.. DM-27
               2.2.5.3.2 Toilet Seat Lifts ......................................... DM-27
               2.2.5.3.3 Commode Chairs and Foot Rests............................. DM-28
               2.2.5.3.4 Portable Sitz Bath ........................................ DM-30
               2.2.5.3.5 Bath Lifts ............................................... DM-30
           2.2.5.4 Prior Authorization.............................................. DM-31
           2.2.5.5 Documentation Requirements....................................... DM-32
               2.2.5.5.1 Toilet Seat Lifts ......................................... DM-32

CPT ONLY · COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

2.2.6   Blood Pressure Devices............................................................DM-32
    2.2.6.1    Prior Authorization..........................................................DM-33
2.2.7   Breast Pumps..................................................................DM-33
    2.2.7.1    Prior Authorization..........................................................DM-34
2.2.8   Cochlear Implants.............................................................DM-34
2.2.9   Continuous Passive Motion (CPM) Device......................................DM-34
    2.2.9.1    Prior Authorization..........................................................DM-34
2.2.10  Diabetic Equipment and Supplies .............................................DM-34
    2.2.10.1   Obtaining Equipment and Supplies Through a Title XIX Form.............DM-35
    2.2.10.2   Obtaining Equipment and Supplies Through a Verbal or Detailed
               Written Order.............................................................DM-35
    2.2.10.3   Glucose Testing Equipment and Other Supplies..........................DM-36
        2.2.10.3.1    Prior Authorization ................................................DM-37
    2.2.10.4   Blood Glucose Monitors ...................................................DM-37
        2.2.10.4.1    Prior Authorization ................................................DM-37
    2.2.10.5   External Insulin Pump and Supplies.......................................DM-37
        2.2.10.5.1    Prior Authorization ................................................DM-38
    2.2.10.6   Insulin and Insulin Syringes...............................................DM-39
2.2.11  Hospital Beds and Equipment .................................................DM-40
    2.2.11.1   Prior Authorization..........................................................DM-40
    2.2.11.2   Documentation Requirements..............................................DM-41
    2.2.11.3   Mattresses and Support Surfaces .........................................DM-41
        2.2.11.3.1    Documentation Requirements.......................................DM-42
        2.2.11.3.2    Group 1 Support Surfaces..........................................DM-42
        2.2.11.3.3    Group 2 Support Surfaces..........................................DM-43
        2.2.11.3.4    Group 3 Support Surfaces..........................................DM-44
    2.2.11.4   Equipment and Other Accessories .........................................DM-45
        2.2.11.4.1    Prior Authorization ................................................DM-45
    2.2.11.5   Decubitus Care Accessories.................................................DM-45
    2.2.11.6   Replacement................................................................DM-46
        2.2.11.6.1    Prior Authorization ................................................DM-46
    2.2.11.7   Non-covered Items.........................................................DM-46
    2.2.11.8   Hospital Beds and Equipment Procedure Code Table.....................DM-46
2.2.12  Incontinence Supplies.........................................................DM-47
    2.2.12.1   Skin Sealants, Protectants, Moisturizers, and Ointments for
               Incontinence-Associated Dermatitis .....................................DM-47
    2.2.12.2   Diapers, Briefs, Pull-ons, and Liners ....................................DM-48
    2.2.12.3   Diaper Wipes ..............................................................DM-48
    2.2.12.4   Underpads..................................................................DM-48
    2.2.12.5   Ostomy Supplies...........................................................DM-49
    2.2.12.6   Indwelling or Intermittent Urine Collection Devices ......................DM-49
        2.2.12.6.1    Indwelling Catheters and Related Insertion Supplies.................DM-49
        2.2.12.6.2    Intermittent Catheters and Related Insertion Supplies..............DM-49
        2.2.12.6.3    External Urinary Collection Devices ...............................DM-50
        2.2.12.6.4    Urinals and Bed Pans .............................................DM-50
    2.2.12.7   Prior Authorization..........................................................DM-50
    2.2.12.8   Documentation Requirements..............................................DM-50
    2.2.12.9   Incontinence Procedure Codes with Limitations..........................DM-50
2.2.13  Intravenous (IV) Therapy Equipment and Supplies ...........................DM-55
    2.2.13.1   Prior Authorization..........................................................DM-56
    2.2.13.2   Documentation Requirements..............................................DM-57

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

2.2.14 Mobility Aids.................................................................DM-58
  2.2.14.1  Canes, Crutches, and Walkers........................................DM-58
  2.2.14.2  Wheelchairs.......................................................DM-58
      2.2.14.2.1   Prior Authorization .............................................DM-58
      2.2.14.2.2   Documentation Requirements....................................DM-58
  2.2.14.3  Manual Wheelchairs-Standard, Standard Hemi, and Standard Reclining....DM-59
      2.2.14.3.1   Prior Authorization .............................................DM-59
  2.2.14.4  Manual Wheelchairs-Lightweight and High-Strength Lightweight .........DM-60
      2.2.14.4.1   Prior Authorization .............................................DM-60
  2.2.14.5  Manual Wheelchairs-Heavy-Duty and Extra Heavy Duty ..................DM-60
      2.2.14.5.1   Prior Authorization .............................................DM-61
  2.2.14.6  Wheeled Mobility Systems ...........................................DM-61
      2.2.14.6.1   Definitions and Responsibilities.................................DM-61
      2.2.14.6.2   Prior Authorization .............................................DM-62
      2.2.14.6.3   Documentation Requirements....................................DM-62
  2.2.14.7  Manual Wheeled Mobility System - Tilt-In-Space .........................DM-63
  2.2.14.8  Manual Wheeled Mobility System- Pediatric Size .........................DM-63
  2.2.14.9  Manual Wheeled Mobility System -Custom (Includes Custom
          Ultra-Lightweight) .................................................DM-63
      2.2.14.9.1   Prior Authorization .............................................DM-64
  2.2.14.10 Seating Assessment for Manual and Power Custom Wheelchairs..........DM-65
      2.2.14.10.1  Prior Authorization .............................................DM-65
      2.2.14.10.2  Documentation Requirements....................................DM-66
  2.2.14.11 Fitting of Custom Wheeled Mobility Systems............................DM-66
      2.2.14.11.1  Prior Authorization .............................................DM-67
      2.2.14.11.2  Documentation Requirements....................................DM-68
  2.2.14.12 Power Wheeled Mobility Systems- Group 1 through Group 5 .............DM-68
      2.2.14.12.1  Prior Authorization .............................................DM-69
      2.2.14.12.2  Group 1 PMDs ................................................DM-69
      2.2.14.12.3  Group 2 PMDs ................................................DM-70
      2.2.14.12.4  Group 3 PMDs ................................................DM-70
      2.2.14.12.5  Group 4 PMDs ................................................DM-71
      2.2.14.12.6  2.2.14.12.6 Additional Requirements - Group 2 through Group 4
             No-Power Option.............................................DM-72
      2.2.14.12.7  Group 2 through Group 4 Single-Power Option.....................DM-72
      2.2.14.12.8  Group 2 through Group 4 Multiple-Power Option ...................DM-72
      2.2.14.12.9  Group 5 PMDs ................................................DM-72
      2.2.14.12.10 Group 5 Multiple-PMDs........................................DM-74
  2.2.14.13 Wheelchair Ramp-Portable and Threshold ...........................DM-74
  2.2.14.14 Power Elevating Leg Lifts............................................DM-74
      2.2.14.14.1  Prior Authorization .............................................DM-74
      2.2.14.14.2  Documentation Requirements....................................DM-75
  2.2.14.15 Power Seat Elevation System .......................................DM-75
      2.2.14.15.1  Prior Authorization .............................................DM-75
      2.2.14.15.2  Documentation Requirements....................................DM-75
  2.2.14.16 Seat Lift Mechanisms...............................................DM-76
      2.2.14.16.1  Prior Authorization .............................................DM-76
      2.2.14.16.2  Documentation Requirements....................................DM-76
  2.2.14.17 Batteries and Battery Charger.......................................DM-76
      2.2.14.17.1  Prior Authorization .............................................DM-77
      2.2.14.17.2  Documentation Requirements....................................DM-77

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

2.2.14.18 Power Wheeled Mobility Systems- Scooter...............................DM-77

   2.2.14.18.1  Prior Authorization......................................DM-77

   2.2.14.18.2  Documentation Requirements...........................DM-78

2.2.14.19 Client Lift........................................................DM-78

   2.2.14.19.1  Prior Authorization......................................DM-78

2.2.14.20 Electric Lift......................................................DM-78

2.2.14.21 Hydraulic Lift.....................................................DM-78

   2.2.14.21.1  Documentation Requirements...........................DM-78

2.2.14.22 Standers..........................................................DM-78

   2.2.14.22.1  Prior Authorization......................................DM-79

   2.2.14.22.2  Documentation Requirements...........................DM-79

2.2.14.23 Gait Trainers......................................................DM-79

   2.2.14.23.1  Prior Authorization......................................DM-79

2.2.14.24 Accessories, Modifications, Adjustments and Repairs.....................DM-79

   2.2.14.24.1  Prior Authorization......................................DM-80

2.2.14.25 Replacement......................................................DM-81

2.2.14.26 Procedure Codes and Limitations for Mobility Aids.......................DM-81

2.2.15 Nutritional (Enteral) Products, Supplies, and Equipment.........................DM-89

  2.2.15.1  Enteral Nutritional Products, Feeding Pumps, and Feeding Supplies .......DM-89

  2.2.15.2  Prior Authorization Requirements ...............................DM-90

   2.2.15.2.1  Enteral Formulas ......................................DM-91

   2.2.15.2.2  Nasogastric, Gastrostomy, or Jejunostomy Feeding Tubes..............DM-91

   2.2.15.2.3  Enteral Feeding Pumps .................................DM-91

   2.2.15.2.4  Enteral Supplies ......................................DM-92

  2.2.15.3  Documentation Requirements...................................DM-92

2.2.16 Osteogenic Stimulation ...............................................DM-92

  2.2.16.1  Ultrasound Osteogenic Stimulator...............................DM-93

  2.2.16.2  Professional Services .........................................DM-93

  2.2.16.3  Prior Authorization...........................................DM-93

   2.2.16.3.1  Noninvasive Electrical Osteogenic Stimulator ...........................DM-93

   2.2.16.3.2  Invasive Electrical Osteogenic Stimulator ............................DM-94

   2.2.16.3.3  Ultrasound Osteogenic Stimulator......................DM-94

  2.2.16.4  Documentation Requirements...................................DM-94

2.2.17 Phototherapy Devices.................................................DM-95

2.2.18 Prothrombin Time/International Normalized Ratio (PT/INR) Home

   Testing Monitor......................................................DM-95

  2.2.18.1  Prior Authorization...........................................DM-95

2.2.19 Respiratory Equipment and Supplies .....................................DM-96

  2.2.19.1  Prior Authorization...........................................DM-96

  2.2.19.2  Nebulizers .................................................DM-96

   2.2.19.2.1  Prior Authorization .....................................DM-97

  2.2.19.3  Vaporizers .................................................DM-97

   2.2.19.3.1  Prior Authorization .....................................DM-97

  2.2.19.4  Humidification Units .........................................DM-97

  2.2.19.5  Secretion Clearance Devices....................................DM-98

   2.2.19.5.1  Incentive Spirometer....................................DM-98

   2.2.19.5.2  Intermittent Positive-Pressure Breathing (IPPB) Devices.................DM-98

   2.2.19.5.3  Mucous Clearance Valve.................................DM-98

   2.2.19.5.4  Prior Authorization .....................................DM-98

  2.2.19.6  Electrical Percussor...........................................DM-99

   2.2.19.6.1  Prior Authorization .....................................DM-99

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

2.2.19.7   Chest Physiotherapy Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-99
    2.2.19.7.1   HFCWCS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-99
    2.2.19.7.2   Cough-Stimulating Device (Cofflator) . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-99
    2.2.19.7.3   Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-100
    2.2.19.7.4   Documentation Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-100
2.2.19.8   Positive Airway Pressure System Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-101
    2.2.19.8.1   Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-101
2.2.19.9   Continuous Positive Airway Pressure (CPAP) System . . . . . . . . . . . . . . . . . . . . . DM-101
    2.2.19.9.1   Adult CPAP (19 years of age and older) . . . . . . . . . . . . . . . . . . . . . . . . . . DM-101
    2.2.19.9.2   Pediatric CPAP Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-102
    2.2.19.9.3   Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-102
2.2.19.10 Bi-level Positive Airway Pressure System (BiPAP S) Without Backup . . . . . . . DM-102
    2.2.19.10.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-103
2.2.19.11 Bi-level Positive Airway Pressure System With Backup (BiPAP ST) . . . . . . . . . DM-103
    2.2.19.11.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-103
2.2.19.12 Home Mechanical Ventilation Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-103
    2.2.19.12.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-104
2.2.19.13 Volume Ventilators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-104
    2.2.19.13.1  Ventilation Modes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-104
    2.2.19.13.2  Breath Types . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-104
    2.2.19.13.3  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-104
2.2.19.14 Negative Pressure Ventilators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-104
    2.2.19.14.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-105
2.2.19.15 Ventilator Service Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-105
    2.2.19.15.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-105
    2.2.19.15.2  Documentation Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-105
2.2.19.16 Oxygen Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-105
2.2.19.17 Oxygen Therapy Home Delivery System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-106
2.2.19.18 Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-106
2.2.19.19 Documentation Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-107
    2.2.19.19.1  Oxygen Therapy Recertification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-107
2.2.19.20 Tracheostomy Tubes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-108
    2.2.19.20.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-108
2.2.19.21 Pulse Oximetry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-108
    2.2.19.21.1  Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-108
2.2.19.22 Procedure Codes and Limitations for Respiratory Equipment
          and Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-108
2.2.20 Special Needs Car Seats and Travel Restraints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-111
2.2.21 Subcutaneous Injection Ports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-111
    2.2.21.1   Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-111
    2.2.21.2   Documentation Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-112
2.2.22 Total Parenteral Nutrition (TPN) Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-113
    2.2.22.1   Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-114
    2.2.22.2   Documentation Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-114
2.2.23 Wound Care Supplies or Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-114
    2.2.23.1   Wound Care Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-116
    2.2.23.2   Wound Care System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-116
        2.2.23.2.1   NPWT System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-116
        2.2.23.2.2   Pulsatile Jet Irrigation Wound Care System . . . . . . . . . . . . . . . . . . . DM-117
    2.2.23.3   Noncovered Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-117
    2.2.23.4   Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DM-117

CPT ONLY · COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

            *2.2.23.4.1   Wound Care Supplies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*DM-117*

            *2.2.23.4.2   Wound Care System* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*DM-118*

         2.2.23.5  Documentation Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-119

            *2.2.23.5.1   Wound Care Supplies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*DM-119*

            *2.2.23.5.2   Wound Care Systems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*DM-119*

         2.2.23.6  Wound Care Procedures and Limitations. . . . . . . . . . . . . . . . . . . . . . . . . .DM-120

      2.2.24  Limitations, Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-123

      2.2.25  Procedure Codes That Do Not Require Prior Authorization . . . . . . . . . . . . . . . . . . . . .DM-124

   **2.3  Other/Special Provisions**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-124**

      2.3.1  Medicaid Relationship to Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-124

         2.3.1.1   Possible Medicare Clients. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-124

         2.3.1.2   Benefits for Medicare/Medicaid Clients . . . . . . . . . . . . . . . . . . . . . . . . . .DM-125

         2.3.1.3   Medicare and Medicaid Prior Authorization . . . . . . . . . . . . . . . . . . . . . . . . .DM-125

   **2.4  Claims Filing and Reimbursement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-126**

      2.4.1  Claims Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-126

         2.4.1.1   Benefit Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-126

      2.4.2  Reimbursement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-126

      2.4.3  Prohibition of Medicaid Payment to Home Health Agencies Based

         on Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-127

**3.  Claims Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-128**

**4.  Contact TMHP** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-129**

**5.  Forms** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-129**

   **DM.1** DME Certification and Receipt Form (4 pages). . . . . . . . . . . . . . . . . . . . . . . . . . .DM-130

   **DM.2** External Insulin Pump . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-134

   **DM.3** Home Health Services (Title XIX) DME/Medical Supplies Physician Order

      Form Instructions (2 pages). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-135

   **DM.4** Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical

      Supplies Physician Order Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-137

   **DM.5** Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician

      Order Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-138

   **DM.6** Home Health Services Plan of Care (POC) Instructions . . . . . . . . . . . . . . . . . . . . . .DM-139

   **DM.7** Home Health Services Plan of Care (POC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-140

   **DM.8** Home Health Services Prior Authorization Checklist . . . . . . . . . . . . . . . . . . . . . . .DM-141

   **DM.9** Medicaid Certificate of Medical Necessity for Chest Physiotherapy Device

      Form—Initial Request. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-142

   **DM.10** Medicaid Certificate of Medical Necessity for Chest Physiotherapy Device

      Form—Extended Request. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-143

   **DM.11** Medicaid Certificate of Medical Necessity for CPAP/BiPAP or Oxygen Therapy . . . . . . .DM-144

   **DM.12** Pulse Oximeter Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-145

   **DM.13** Statement for Initial Wound Therapy System In-Home Use (2 pages) . . . . . . . . . . . . . .DM-146

   **DM.14** Statement for Recertification of Wound Therapy System In-Home Use (2 Pages) . . . . .DM-148

   **DM.15** Ventilator Service Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-150

   **DM.16** Wheelchair/Scooter/Stroller Seating Assessment Form (CCP/Home Health

      Services) (7 pages) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DM-151

**6.  Claim Form Examples** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-158**

   **DM.17** Home Health Services DME/Medical Supplies. . . . . . . . . . . . . . . . . . . . . . . . . . .DM-159

**Index**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DM-160**

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# DURABLE MEDICAL EQUIPMENT, MEDICAL SUPPLIES, AND NUTRITIONAL PRODUCTS HANDBOOK

## 1. GENERAL INFORMATION

The information in this handbook is intended for Texas Medicaid home health durable medical equipment (DME), DME medical supplier, and medical supply company providers. This handbook provides information about the Texas Medicaid benefits, policies, and procedures that are applicable to these providers.

This handbook contains information about Texas Medicaid fee-for-service benefits. For information about managed care benefits, refer to the Texas Medicaid Managed Care Handbook.

Managed care carve-out services are administered as fee-for-service benefits. A list of all carve-out services is available in Section 8, "Carve-Out Services" in the *Medicaid Managed Care Handbook* (*Vol. 2, Provider Handbooks*).

All providers are required to report suspected child abuse or neglect as outlined in subsection 1.5.1.2, "Reporting Child Abuse or Neglect" in Section 1, "Provider Enrollment and Responsibilities" (*Vol 1, General Information*).

**Important:** *All providers are required to read and comply with Section 1: Provider Enrollment and Responsibilities. In addition to required compliance with all requirements specific to Texas Medicaid, it is a violation of Texas Medicaid rules when a provider fails to provide healthcare services or items to Medicaid clients in accordance with accepted medical community standards and standards that govern occupations, as explained in 1 Texas Administrative Code (TAC) §371.1617(a)(6)(A). Accordingly, in addition to being subject to sanctions for failure to comply with the requirements that are specific to Texas Medicaid, providers can also be subject to Texas Medicaid sanctions for failure, at all times, to deliver health-care items and services to Medicaid clients in full accordance with all applicable licensure and certification requirements including, without limitation, those related to documentation and record maintenance.*

**Refer to:** Section 1: Provider Enrollment and Responsibilities (*Vol. I, General Information*) for more information about enrollment procedures.

## 2. TEXAS MEDICAID (TITLE XIX) HOME HEALTH SERVICES

### 2.1 Enrollment

Enrolled providers of DME and medical supplies will be issued a DME-Home Health Services (DMEH) provider identifier that is specific to home health providers. Providers will also be issued a separate DME/Medical Supplier provider identifier that is specific to the Comprehensive Care Program (CCP). All DME providers must be Medicare-certified before applying for enrollment in Texas Medicaid.

Providers that render custom DME wheeled mobility systems to Texas Medicaid clients must enroll in Texas Medicaid as a specialized/custom wheeled mobility group provider and must have at least one qualified rehabilitation professional (QRP) performing provider.

Certified QRP providers must enroll in Texas Medicaid as performing providers under DME provider groups.

CPT ONLY · COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

To enroll in Texas Medicaid as a QRP performing provider, individual professionals must be certified by the National Registry of Rehabilitation Technology Suppliers (NRRTS) or Rehabilitation Engineering and Assistive Technology Society of North America (RESNA) and must enroll as a performing provider under a Specialized /Custom Wheeled Mobility group.

Providers may download the Texas Medicaid Provider Enrollment Application at www.tmhp.com or request a paper application form by contacting TMHP directly at 1-800-925-9126.

Providers may also obtain the paper enrollment application by writing to the following address:

Texas Medicaid & Healthcare Partnership
Provider Enrollment
PO Box 200795
Austin, TX 78720-0795
1-800-925-9126
Fax: (512) 514-4214

Providers may request prior authorization for home health services by contacting:

Texas Medicaid & Healthcare Partnership
Home Health Services
PO Box 202977
Austin, TX 78720-2977
1-800-925-8957
Fax: (512) 514-4209

### 2.1.1 Change of Address or Telephone Number

A current physical and mailing address and telephone number must be on file for the agency or company to receive Remittance & Status (R&S) reports, reimbursement checks, Medicaid provider procedures manuals, the *Texas Medicaid Bulletin* (bimonthly update to the *Texas Medicaid Provider Procedures Manual*), and all other TMHP correspondence. Promptly send all address and telephone number changes to TMHP Provider Enrollment at the address listed above under subsection 2.1, "Enrollment" in this handbook.

### 2.1.2 Pending Agency Certification

DMEH suppliers that submit claims before the enrollment process is complete or without prior authorization for services issued by the TMHP Home Health Services Prior Authorization Department will not be reimbursed. The effective date of enrollment is the date on which all Medicaid provider enrollment forms have been received and approved by TMHP.

Upon the receipt of notice of Medicaid enrollment, the supplier must contact the TMHP Home Health Services Prior Authorization Department before rendering to a Medicaid client services that require a prior authorization number. Prior authorization cannot be issued before Medicaid enrollment has been completed. Regular prior authorization procedures are followed at that time.

Providers must not submit home health services claims for payment until they have received their Medicaid certification and a prior authorization number has been assigned.

*Refer to:* Subsection 2.1.1, "Clinical Laboratory Improvement Amendments (CLIA)" in the *Radiology and Laboratory Services Handbook* (*Vol. 2, Provider Handbooks*).

## 2.2 Services, Benefits, Limitations and Prior Authorization

Home health services include home health skilled nursing (SN), home health aide (HHA), physical therapy (PT), and occupational therapy (OT) services; DME; and expendable medical supplies that are provided to eligible Medicaid clients at their place of residence.

*Note:* *THSteps-eligible clients who qualify for medically necessary services beyond the limits of this Home Health Services benefit may receive those services through CCP.*

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

***Refer to:*** Subsection 5.1.1, "Overview" in the *Children's Services Handbook (Vol. 2, Provider Handbooks)* for more information on clients birth through 20 years of age.

Section 3, "Home Health Nursing and Therapy Services" in the *Nursing and Therapy Services Handbook (Vol. 2, Provider Handbooks)* for more information on nursing and therapy services.

## 2.2.1 Home Health Services

The benefit period for home health professional services is up to 60 days with a current plan of care (POC). For all DME and medical supplies with or without prior authorization requirements, providers must complete a Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form except as outlined in subsection 2.2.10 of this handbook. In chronic and stable situations, the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form is valid for up to, but no more than, 6 months from the date of the physician's signature on the form, unless otherwise noted in this handbook. If necessary, DME and supplies that are ordered on a Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form may be prior authorized for up to 6 months with medical necessity determination. Because Medicaid clients have a one-month eligibility period, providers must bill for a one month supply at a time, even though prior authorization may be granted for up to 6 months. This extended prior authorization period begins on the date that clients receive their first prior-authorized home health service. Texas Medicaid allows additional DME or supplies that have been determined to be medically necessary and have been prior authorized by TMHP Home Health Services Prior Authorization Department. Providers must retain all orders, signed and dated Title XIX forms, delivery slips, and invoices for all supplies provided to a client and must disclose them to HHSC or its designee on request. These records and claims must be retained for a minimum of five years from the date of service (DOS) or until audit questions, appeals, hearings, investigations, or court cases are resolved. Use of these services is subject to retrospective review.

### 2.2.1.1 Client Eligibility

Home health clients do not have to be homebound to qualify for services.

To qualify for home health services, the Medicaid client must be eligible on the DOS and must:

- Have a medical need for home health professional services, DME, or supplies that is documented in the client's POC and considered a benefit under home health services.

- Receive services that meet the client's existing medical needs and can be safely provided in the client's home.

- Receive prior authorization from TMHP for most home health professional services, DME, and supplies.

Unless otherwise noted in this handbook, certain DME/supplies may be obtained without prior authorization although providers must retain a Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form that has been reviewed, signed, and dated by the treating physician for these clients.

***Refer to:*** "Automated Inquiry System (AIS)" in "Preliminary Information" (*Vol. 1, General Information*).

Section 6: Claims Filing in *Children's Services Handbook (Vol. 2, Provider Handbooks)* for more information on clients who are 20 years of age and younger.

### 2.2.1.2 Prior Authorization Requests for Clients with Retroactive Eligibility

Retroactive eligibility occurs when the effective date of a client's Medicaid coverage is before the date on which the client's Medicaid eligibility is added to TMHP's eligibility file, which is called the "add date."

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

For clients with retroactive eligibility, prior authorization requests must be submitted after the client's add date and before a claim is submitted to TMHP.

For services provided to fee-for-service Medicaid clients during the client's retroactive eligibility period (i.e., the period from the effective date to the add date), prior authorization must be obtained within 95 days of the client's add date and before a claim for those services is submitted to TMHP. For services provided on or after the client's add date, the provider must obtain prior authorization within 3 business days of the date of service.

The provider is responsible for verifying eligibility. The provider is strongly encouraged to access the Automated Inquiry System (AIS) or TexMedConnect to verify eligibility frequently while providing services to the client. If services are discontinued before the client's add date, the provider must still obtain prior authorization within 95 days of the add date to be able to submit claims.

*Refer to:* Section 4: Client Eligibility (*Vol. 1, General Information*).

### 2.2.1.3 Prior Authorization

Prior authorization must be obtained for some supplies and most DME from TMHP within three business days of the DOS. Although providers may supply some DME and medical supplies to a client without prior authorization, they must still retain a copy of the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form that has Section B completed, signed, and dated by the client's attending physician, unless otherwise noted in this handbook.

The following prior authorization requests can be submitted on the TMHP website at www.tmhp.com:

- External Insulin Pump
- Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form
- Home Health Services POC
- Medicaid Certificate of Medical Necessity for CPAP/BiPAP or Oxygen Therapy
- Medicaid Certificate of Necessity for Chest Physiotherapy Device Form—Initial Request
- Medicaid Certificate of Necessity for Chest Physiotherapy Device Form—Extended Request
- Statement for Initial Wound Therapy System In-Home Use
- Statement for Recertification of Wound Therapy System In-Home Use
- Wheelchair/Scooter/Stroller Seating Assessment Form (CCP/Home Health Services) (Attachments will be sent separately due to size and detailed information)

*Refer to:* Subsection 5.5.1, "Prior Authorization Requests Through the TMHP Website" in Section 5, "Prior Authorization" (*Vol. 1, General Information*) for more information, including mandatory documentation requirements.

If a client's primary coverage is private insurance and Medicaid is secondary, prior authorization is required for Medicaid reimbursement. If the primary coverage is Medicare, Medicare approves the service, and Medicaid is secondary, prior authorization is not required. TMHP will pay only the coinsurance or deductible. If Medicare denied the service, then Medicaid prior authorization is required. TMHP must receive a prior authorization request within 30 days of the date of Medicare's final disposition. The Medicare Remittance Advice Notice (MRAN) containing Medicare's final disposition must accompany the prior authorization request. If the service is a Medicaid-only service, prior authorization is required within three business days of the DOS. The provider is responsible for determining whether eligibility is effective by using AIS, TexMedConnect, or an electronic eligibility inquiry through the TMHP EDI gateway.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

The provider must contact the TMHP Home Health Services Prior Authorization Department within three business days of the DOS to obtain prior authorization for DME and medical supplies.

If inadequate or incomplete information is provided or medical necessity is lacking, the provider will be asked to furnish any required or additional documentation so that a decision about the request can be made. Because the documentation must often be obtained from the client's physician, providers have two weeks to submit the requested documentation. If the additional documentation is received within the two-week period, prior authorization can be considered for the original date of contact. If the additional documentation is received more than two weeks after the request for the documentation, prior authorization is not considered before the date on which the additional documentation is received. It is the DME supplier's responsibility to contact the physician to obtain the requested additional documentation. The physician must maintain documentation of medical necessity in the client's record.

TMHP Home Health Services toll-free number is 1-800-925-8957.

> **Refer to:** Subsection 2.2.2.2, "Prior Authorization" in this handbook for DME prior authorization information.
>
> Subsection 2.3.1, "Medicaid Relationship to Medicare" in this handbook.

Client eligibility for Medicaid is for one month at a time. Providers should verify their client's eligibility every month. Prior authorization does not guarantee payment.

## 2.2.2 Durable Medical Equipment (DME) and Supplies

Texas Medicaid defines DME as:

*Medical equipment or appliances that are manufactured to withstand repeated use, ordered by a physician for use in the home, and required to correct or ameliorate a client's disability, condition, or illness.*

Since there is no single authority, such as a federal agency, that confers the official status of "DME" on any device or product, HHSC retains the right to make such determinations with regard to DME benefits of Texas Medicaid. DME benefits of Texas Medicaid must have either a well-established history of efficacy or, in the case of novel or unique equipment, valid, peer-reviewed evidence that the equipment corrects or ameliorates a covered medical condition or functional disability.

Requested DME may be a benefit when it meets the Medicaid definition of DME. The majority of DME and expendable supplies are covered home health services. If a service cannot be provided for a client who is 20 years of age or younger through home health services, these services may be covered through CCP if they are determined to be medically necessary.

To be reimbursed as a home health benefit:

- The client must be eligible for home health benefits.
- The criteria listed for the requested equipment or supply must be met.
- The requested equipment or supply must be medically necessary, and Federal Financial Participation (FFP) must be available.
- The client's health status would be compromised without the requested equipment or supply.
- The requested equipment or supplies must be safe for use in the home.
- The client must be seen by a physician within one year of the DOS.

The provider must sign and have the client sign Form DM.1, "DME Certification and Receipt Form (4 pages)" in this handbook for all purchased DME for Medicaid clients before submitting a claim for payment. The client's signature means the DME is the property of the client. The certification form must include the date the client received the DME, the name of the item, and the printed names and signatures of the provider and the client or primary caregiver. This form must be maintained by the DME provider in the client's record.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

The signed and dated DME Certification and Receipt Form must be submitted to TMHP for claims and appeals for DME that meet or exceed a billed amount of $2,500.00. The form must also be submitted when multiple items that meet or exceed a total billed amount of $2,500.00 are billed for the same DOS. The form is required in addition to obtaining prior authorization, when applicable.

If the DME Certification and Receipt Form is not submitted to TMHP, the claim payment or appeal will be reviewed and will be eligible for recoupment. Incomplete forms will be returned to the provider for correction and resubmission.

TMHP will contact clients that received DME that meets or exceeds a billed amount of $2,500.00 to verify that services were rendered. If the delivery of the equipment cannot be verified by the client, the claim payment will be eligible for recoupment.

The provider must keep all Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Forms and Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician Order Forms on file. Providers must retain delivery slips or invoices and the signed and dated DME Certification and Receipt Form documenting the item and date of delivery for all DME provided to a client and must disclose them to HHSC or its designee on request.

- The DME must be used for medical or therapeutic purposes, and supplied through an enrolled DMEH provider in compliance with the client's POC.

- These records and claims must be retained for a minimum of five years from the DOS or until audit questions, appeals, hearings, investigations, or court cases are resolved. Use of these services is subject to retrospective review.

    **Note:** *All purchased equipment must be new upon delivery to client. Used equipment may be utilized for lease, but when purchased, must be replaced with new equipment.*

HHSC/TMHP reserves the right to request the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form or Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician Order Form at any time.

DME must meet the following requirements to qualify for reimbursement under Home Health Services:

- The client received the equipment as prescribed by the physician.

- The equipment has been properly fitted to the client or meets the client's needs.

- The client, the parent or guardian of the client, or the primary caregiver of the client, has received training and instruction regarding the equipment's proper use and maintenance.

DME must:

- Be medically necessary due to illness or injury or to improve the functioning of a body part, as documented by the physician in the client's POC or the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form.

- Be prior authorized by the TMHP Home Health Services Prior Authorization Department for rental or purchase of most equipment. Some equipment does not require prior authorization. Prior authorization for equipment rental can be issued for up to six months based on diagnosis and medical necessity. If an extension is needed, requests can be made up to 60 days before the start of the new prior authorization period with a new Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form.

- Meet the client's existing medical and treatment needs.

- Be considered safe for use in the home.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- Be provided through an enrolled DMEH provider or supplier.

  *Note:* *THSteps-eligible clients who qualify for medically necessary services beyond the limits of this home health benefit will receive those services through CCP.*

DME that has been delivered to the client's home and then found to be inappropriate for the client's condition will not be eligible for an upgrade within the first six months following purchase unless there has been a significant change in the client's condition, as documented by the physician familiar with the client. All adjustments and modifications within the first six months after delivery are considered part of the purchase price.

All DME purchased for a client becomes the Medicaid client's property upon receipt of the item. This property includes equipment delivered which will not be prior authorized or reimbursed in the following instances:

- Equipment delivered to the client before the physician signature date on the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form or Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician Order Form.

- Equipment delivered more than three business days before obtaining prior authorization from the TMHP Home Health Services Prior Authorization Department and meets the criteria for purchase.

Additional criteria:

- A determination as to whether the equipment will be rented, purchased, replaced, repaired, or modified will be made by HHSC or its designee based on the client's needs, duration of use, and age of the equipment.

- Periodic rental payments are made only for the lesser of either the period of time the equipment is medically necessary, or when the total monthly rental payments equal the reasonable purchase cost for the equipment.

- Purchase is justified when the estimated duration of need multiplied by the rental payments would exceed the reasonable purchase cost of the equipment or it is otherwise more practical to purchase the equipment.

- If a DME/medical supply provider is unable to deliver a prior authorized piece of equipment or supply, the provider should allow the client the option of obtaining the equipment or supplies from another provider.

Items or services are reimbursed at the lesser of:

- The provider's billed charges
- The published fee determined by HHSC
- Manual pricing as determined by HHSC based on one of the following:
  - The manufacturer's suggested retail price (MSRP) less 18 percent
  - The provider's documented invoice cost

If an item is manually priced, providers must submit documentation of one of the following for consideration of purchase or rental with the appropriate procedure codes:

- The MSRP or average wholesale price (AWP), whichever is applicable
- The provider's documented invoice cost

### 2.2.2.1 Modifications, Adjustments, and Repairs

Modifications are the replacement of components because of changes in the client's condition, not replacement because the component is no longer functioning as designed. All modifications and adjustments within the first six months after delivery are considered part of the purchase price.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Modifications to custom equipment may be prior authorized should a change occur in the client's needs, capabilities, or physical and mental status which cannot be anticipated.

Documentation must include the following:

- All projected changes in the client's mobility needs
- The date of purchase, and serial number of the current equipment
- The cost of purchasing new equipment versus modifying the current equipment

All modifications within the first six months after delivery are considered part of the purchase price.

Adjustments do not require supplies. Adjustments made within the first six months after delivery will not be prior authorized. Adjustments made within the first six months after delivery are considered part of the purchase price. A maximum of one hour of labor for adjustments may be prior authorized as needed after the first six months following delivery.

Repairs to client-owned equipment may be prior authorized as needed with documentation of medical necessity. Technician fees are considered part of the cost of the repair. Repairs require the replacement of components that are no longer functional. Providers are responsible for maintaining documentation in the client's medical record specifying the repairs and supporting medical necessity.

A DME repair will be considered based on the age of the item and cost to repair it.

A request for repair of DME must include a statement or medical information from the attending physician substantiating that the medical appliance or equipment continues to serve a specific medical purpose and an itemized estimated cost list from the vendor or DME provider of the repairs. Rental equipment may be provided to replace purchased medical equipment for the period of time it will take to make necessary repairs to purchased medical equipment.

Repairs will not be prior authorized in situations where the equipment has been abused or neglected by the client, client's family, or caregiver. Routine maintenance of rental equipment is the provider's responsibility. For clients requiring wheelchair repairs only, the date last seen by physician does not need to be filled in on the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form.

### 2.2.2.1.1 Accessories

Equipment accessories including, but not limited to, pressure support cushions, may be prior authorized with documentation of medical necessity.

### 2.2.2.2 Prior Authorization

Prior authorization is required for most DME and supplies provided through Home Health Services. These services include accessories, modifications, adjustments, and repairs for the equipment.

Providers must submit a completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form to the TMHP Home Health Services Prior Authorization Department.

Unless otherwise noted in this handbook, a completed Home Health Services (Title XIX) Durable Medical Equipment (DME) or Medical Supplies Physician Order Form prescribing the DME or supplies must be signed and dated by a physician and by the representative of the DME/Medical Supply provider familiar with the client before requesting prior authorization for all DME equipment and supplies. All signatures and dates must be current, unaltered, original, and handwritten. Computerized or stamped signatures or dates will not be accepted. A current signature and date is valid for no more than 90 days prior to the date of the requested prior authorization or the initiation of service. The completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form must include the procedure codes and numerical quantities for services requested.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

The completed, signed, and dated form must be maintained by the DME provider and the prescribing physician in the client's medical record. The completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form with the original dated signature must be maintained by the prescribing physician.

To complete the prior authorization process by paper, the provider must fax or mail the completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form to the Home Health Services Prior Authorization Department and retain a copy of the signed and dated form in the client's medical record at the provider's place of business.

To complete the prior authorization process electronically, the provider must submit the prior authorization requirements through any approved electronic methods and retain a copy of the signed and dated Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form in the client's medical record at the provider's place of business.

Retrospective review may be performed to ensure that the documentation included in the client's medical record supports the medical necessity of the requested services.

The date last seen by the physician must be within the past 12 months unless a physician waiver is obtained. The physician's signature on the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form is only valid for 90 days before the initiation of services. The requesting provider may be asked for additional information to clarify or complete the request.

Providers must obtain prior authorization within three business days of providing the service by calling TMHP Home Health Services Prior Authorization Department or faxing the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form.

To facilitate a determination of medical necessity and avoid unnecessary denials when requesting prior authorization, the physician must provide correct and complete information supporting the medical necessity of the equipment or supplies requested, including:

- Accurate diagnostic information pertaining to the underlying diagnosis/condition as well as any other medical diagnoses/conditions, to include the client's overall health status.

- Diagnosis/condition causing the impairment resulting in a need for the equipment or supplies requested.

Purchased DME is anticipated to last a minimum of 5 years, unless otherwise noted, and may be considered for replacement when the time has passed or the equipment is no longer functional or repairable. A copy of the police or fire report, when appropriate, and the measures to be taken to prevent reoccurrence must be submitted.

Prior authorization for equipment replacement is considered within five years of equipment purchase when one of the following occurs:

- There has been a significant change in the client's condition such that the current equipment no longer meets the client's needs.

- The equipment is no longer functional and either cannot be repaired or it is not cost-effective to repair.

Replacement of equipment is also considered when loss or irreparable damage has occurred. The following must be submitted with the prior authorization request:

- A copy of the police or fire report, when appropriate

- A statement about the measures to be taken in order to prevent reoccurrence

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

Payment may be prior authorized for repair of purchased DME. Maintenance of rental equipment (including repairs) is the supplier's responsibility. The toll-free number for the TMHP Home Health Services Prior Authorization Department is 1-800-925-8957. Requests for repairs must include the cost estimate, reasons for repairs, age of equipment, and serial number.

## 2.2.3 Medical Supplies

Medical supplies are benefits of the Home Health Services Program if they meet the following criteria:

- Unless otherwise noted in this handbook, the representative of the DME/medical supply provider and a physician who is familiar with the client must sign and date a completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form that prescribes the DME or supplies before requesting prior authorization for the DME or supplies. All signatures and dates must be current, unaltered, original, and handwritten. Computerized or stamped signatures/dates will not be accepted. A current signature and date is valid for no more than 90 days prior to the date of the requested prior authorization or the initiation of service. The completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form must include the procedure codes and numerical quantities for the services requested.

- The provider must contact TMHP within 3 business days of providing the supplies to the client and obtain prior authorization, if required.

- The requesting provider and ordering physician must keep all Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Forms and Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician Order Forms on file. The physician must maintain the original signed and dated Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form in their records.

- Providers must retain individual delivery slips or invoices for each DOS that document the date of delivery for all supplies provided to a client and must disclose them to HHSC or its designee upon request. Documentation of delivery must include one of the following:

  - Delivery slip or invoice signed and dated by client or caregiver.

  - A dated carrier tracking document with shipping date and delivery date must be printed from the carrier's website as confirmation that the supplies were shipped and delivered. The dated carrier tracking document must be attached to the delivery slip or invoice.

- The dated delivery slip or invoice must include the client's full name, the address to which supplies were delivered, and an itemized list of goods that includes the descriptions and numerical quantities of the supplies delivered to the client. This document could also include prices, shipping weights, shipping charges, or other descriptions.

- All claims submitted for medical supplies must include the same quantities or units that are documented on the delivery slip or invoice and on the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form. They must reflect the number of units by which each product is measured. For example, diapers are measured as individual units. If one package of 300 diapers is delivered, the delivery slip or invoice and the claim must reflect that 300 diapers were delivered and not that one package was delivered. Diaper wipes are measured as boxes/packages. If one box of 200 wipes is delivered, the delivery slip or invoice and the claim must reflect that one box was delivered and not that 200 individual wipes were delivered. There must be one dated delivery slip or invoice for each claim submitted for each client. All claims submitted for medical supplies must reflect the same date as the delivery slip or invoice and the same timeframe

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

covered by the Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form. The DME Certification and Receipt Form is still required for all equipment delivered.

> *Note:* *These records and claims must be retained for a minimum of five years from the DOS or until audit questions, appeals, hearings, investigations, or court cases are resolved. Use of these services is subject to retrospective review.*

- The requesting provider or ordering physician must document medical supplies as medically necessary in the client's POC or on a completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form and Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician Order Form.

HHSC/TMHP reserves the right to request the signed and dated Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form or Addendum to Home Health Services (Title XIX) DME/Medical Supplies Physician Order Form at any time.

> *Note:* *Client eligibility can change monthly. Providers are responsible for verifying eligibility before providing supplies.*

The DOS is the date on which supplies are delivered to the client or shipped by a carrier to the client as evidenced by the dated tracking document attached to the invoice for that date. The provider must maintain the signed and dated records supporting documentation that an item was not billed before delivery. These records are subject to retrospective review.

> *Note:* *THSteps-eligible clients who qualify for medically necessary services beyond the limits of this home health benefit will receive those services through CCP.*

> *Refer to:* Form DM.3, "Home Health Services (Title XIX) DME/Medical Supplies Physician Order Form Instructions (2 pages)" in this handbook.
>
> Form DM.4, "Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form" in this handbook.
>
> Subsection 2.4, "Durable Medical Equipment (DME) Supplier (CCP)" in *Children's Services Handbook* (*Vol. 2, Provider Handbooks*) for specific information about certain DME and medical supplies.
>
> Subsection 2.2.1.1, "Client Eligibility" in this handbook.

### 2.2.3.1 Supply Procedure Codes

When submitting supplies on the CMS-1500 claim form, itemize the supplies, including quantities, and also provide the Healthcare Common Procedure Coding System (HCPCS) national procedure codes.

> *Refer to:* Subsection 6.3.3, "Procedure Coding" in Section 6, "Claims Filing" (*Vol. 1, General Information*) for more information about HCPCS procedure codes.

### 2.2.3.2 Prior Authorization

TMHP must prior authorize most medical supplies. They must be used for medical or therapeutic purposes, and supplied through an enrolled DMEH provider in compliance with the client's POC.

Some medical supplies may be obtained without prior authorization; however, the provider must retain a copy of the completed POC or Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form in the client's file. Unless otherwise noted in this handbook, a completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form for medical supplies not requiring prior authorization may be valid for a maximum of six months, unless the physician indicates the duration of need is less. If the physician

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

indicates the duration of need is less than six months, then a new Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form is required at the end of the determined duration of need.

For a list of DME/medical supplies that do not require prior authorization, providers can refer to Subsection 2.2.25, "Procedure Codes That Do Not Require Prior Authorization" in this handbook.

Clients with ongoing needs may receive up to six months of prior authorizations for some expendable medical supplies under Home Health Services when requested on a Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form. Providers may deliver medical supplies as ordered on a Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form for up to six months from the date of the physician's signature. In these instances, a review of the supplies requested by the physician familiar with the client's condition, and a new Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form is required for each new prior authorization request. Requests for prior authorization can be made up to 60 days before the start of the new prior authorization period. Professional Home Health Services prior authorization requests require a review by the physician familiar with the client's condition and a physician signature every 60 days when requested on a POC.

> **Note:** These records and claims must be retained for a minimum of five years from the DOS or until audit questions, appeals, hearings, investigations, or court cases are resolved. Use of these services is subject to retrospective review.

### 2.2.3.3 Cancelling a Prior Authorization

The client has the right to choose his DME/medical supply provider and change providers. If the client changes providers, TMHP must receive a change of provider letter with a new Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form. The client must sign and date the letter, which must include the name of the previous provider and the effective date for the change. The client is responsible for notifying the original provider of the change and the effective date. Prior authorization for the new provider can only be issued up to three business days before the date TMHP receives the change of provider letter and the new Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form.

## 2.2.4 Augmentative Communication Device (ACD) System

An ACD system, also known as an augmentative and alternative communication (AAC) device system, allows a client with an expressive speech language disorder to electronically represent vocabulary and express thoughts or ideas in order to meet the client's functional speech needs.

Digitized speech devices and synthesized speech devices are benefits of Texas Medicaid Title XIX Home Health Services.

A digitized speech device, sometimes referred to as a "whole message" speech output device, uses words or phrases that have been recorded by someone other than the ACD system user for playback upon command by the ACD system user.

Providers must use procedure codes E2500, E2502, E2504, and E2506 when billing for a digitized speech device.

A synthesized speech device uses technology that translates a user's input into device-generated speech using algorithms representing linguistic rules. Users of synthesized speech ACD systems are not limited to prerecorded messages, but can independently create messages as their communication needs dictate. Some synthesized speech devices require the user to make physical contact with a keyboard, touch screen, or other display containing letters.

Providers must use procedure code E2508 when billing for a synthesized speech device.

CPT ONLY · COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

For more frequent IV tubing or add-on changes, supporting documentation must have evidence that includes, but is not limited to, the following:

- Phlebitis
- IV catheter-related infection
- The administered infusion requires more frequent tubing changes

## 2.2.14 Mobility Aids

Mobility aids and related supplies, including, but not limited to canes, crutches, walkers, wheelchairs, and ramps are a benefit through Title XIX Home Health Services to assist clients to move about in their environment.

> *Note:* *A mobility aid for a client who is birth through 20 years of age is medically necessary when it is required to correct or ameliorate a disability or physical illness or condition.*

### 2.2.14.1 Canes, Crutches, and Walkers

Canes, crutches, and walkers may be prior authorized as a home health service with documentation supporting medical necessity. This documentation must be provided by a physician familiar with the client and must include information on the client's impaired mobility.

### 2.2.14.2 Wheelchairs

A wheelchair is a non-customized chair mounted on four wheels that incorporates a non-adjustable frame, a sling or solid back and seat, and arm rests. Optional items included in this definition include, but are not limited, to the following:

- Handles at the back
- Foot rest
- Seat belt or safety restraint

A wheelchair includes all of the following:

- Standard (manual) wheelchairs
- Standard hemi (manual) wheelchairs
- Standard reclining (manual) wheelchairs
- Lightweight (manual) wheelchairs
- High strength lightweight (manual) wheelchairs

#### 2.2.14.2.1 Prior Authorization

A wheelchair may be prior authorized for short-term rental or for purchase with documentation supporting medical necessity and an assessment of the accessibility of the client's residence to ensure that the wheelchair is usable in the home (i.e., doors and halls wide enough, no obstructions). The wheelchair must be able to accommodate a 20 percent change in the client's height or weight.

#### 2.2.14.2.2 Documentation Requirements

Documentation by a physician familiar with the client must include information on the client's impaired mobility and physical requirements. In addition, the following information must be submitted with documentation of medical necessity:

- Why the client is unable to ambulate a minimum of 10 feet due to their condition (including, but not limited to, AIDS, sickle cell anemia, fractures, a chronic diagnosis, or chemotherapy)
- If the client is able to ambulate further than 10 feet, why a wheelchair is required to meet the client's needs

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION, ALL RIGHTS RESERVED.

### 2.2.14.3 Manual Wheelchairs-Standard, Standard Hemi, and Standard Reclining

A standard manual wheelchair is defined as a manual wheelchair that:

- Weighs more than 36 pounds.
- Does not have features to appropriately accept specialized seating or positioning.
- Has a weight capacity of 250 pounds or less.
- Has a seat depth of between 15 and 19 inches.
- Has a seat width of between 15 and 19 inches.
- Has a seat height of 19 inches or greater.
- Is fixed height only, fixed, swing away, or detachable armrest.
- Is fixed, swing away, or detachable footrest.

A standard hemi (low seat) wheelchair is defined as a manual wheelchair that:

- Has the same features as a standard manual wheelchair.
- Has a seat to floor height of less than 19 inches.

A standard reclining wheelchair is defined as a manual wheelchair that:

- Has the same features as a standard or standard hemi manual wheelchair.
- Has the ability to allow the back of the wheelchair to move independently of the seat to provide a change in orientation by opening the seat-to-back angle and, in combination with leg rests, open the knee angle.

### 2.2.14.3.1 Prior Authorization

A standard manual wheelchair may be considered for prior authorization for short-term rental or purchase when all the following criteria are met:

- The client has impaired mobility and is unable to ambulate more than 10 feet.
- The client does not require specialty seating components.
- The client is not expected to need powered mobility within the next 5-year period.

A standard hemi wheelchair may be considered for prior authorization for short-term rental or purchase when the client meets criteria for a standard manual wheelchair and the following criteria is met:

- The client requires a low seat-to-floor height.
- The client must use their feet to propel the wheelchair.

A standard reclining wheelchair may be considered for prior authorization for short-term rental or purchase when the client meets criteria for a standard manual wheelchair and one or more of the following criteria are met:

- The client develops fatigue with longer periods of sitting upright.
- The client is at increased risk of pressure sores with prolonged upright position.
- The client requires assistance with respirations in a reclining position.
- The client needs to perform mobility related activities of daily living (MRADLs) in a reclining position.
- The client needs to improve venous return from lower extremity in a reclining position.
- The client has severe spasticity.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- The client has excess extensor tone of the trunk muscles.
- The client has quadriplegia.
- The client has a fixed hip angle.
- The client must rest in a reclining position two or more times per day.
- The client has the inability or has great difficulty transferring from wheelchair to bed.
- The client has trunk or lower extremity casts or braces that require the reclining feature for positioning.

### 2.2.14.4 Manual Wheelchairs-Lightweight and High-Strength Lightweight

A lightweight manual wheelchair is defined as a manual wheelchair that:

- Has the same features as a standard or hemi manual wheelchair.
- Weighs 34 to 36 pounds.
- Has available arm styles that are height adjustable.

A high-strength lightweight wheelchair is defined as a manual wheelchair that:

- Has the same features as a lightweight manual wheelchair.
- Weighs 30 to 34 pounds.
- Has a lifetime warranty on side frames and cross braces.

#### 2.2.14.4.1 Prior Authorization

A lightweight manual wheelchair may be considered for prior authorization for rental or purchase when all the following criteria are met:

- The client is unable to propel a standard manual wheelchair at home.
- The client is capable of independently propelling a lightweight wheelchair to meet their MRADLs at home.

A high-strength lightweight wheelchair may be considered for prior authorization for rental or purchase when the client meets all of the criteria for a lightweight manual wheelchair and meets one or more of the following criteria:

- The high-strength lightweight wheelchair will allow the client to self-propel while engaging in frequently performed activities that cannot otherwise be completed in a standard or lightweight wheelchair.
- The client requires frame dimensions (seat width, depth, or height) that cannot be accommodated in a standard, lightweight, or hemi wheelchair and the wheelchair is used at least 2 hours a day.

### 2.2.14.5 Manual Wheelchairs-Heavy-Duty and Extra Heavy Duty

A heavy duty wheelchair is defined as a manual wheelchair that:

- Meets the standard manual wheelchair definition.
- Has a weight capacity greater than 250 pounds.

An extra heavy duty wheelchair is defined as a manual wheelchair that:

- Meets the standard manual wheelchair definition.
- Has a weight capacity greater than 300 pounds.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.5.1 Prior Authorization

A heavy-duty wheelchair may be considered for prior authorization for short-term rental or purchase when the client has severe spasticity or all the following criteria are met:

- The client meets criteria for a standard manual wheelchair.
- The client weighs between 250 and 300 pounds.

An extra heavy duty wheelchair may be considered for prior authorization for short-term rental or purchase when all the following criteria are met:

- The client meets criteria for a standard manual wheelchair.
- The client weighs more than 300 pounds.

### 2.2.14.6 Wheeled Mobility Systems

A wheeled mobility system is a manual or power wheelchair, or scooter that is a customized power or manual mobility device, or a feature or component of the mobility device, including but not limited to, the following:

- Seated positioning components
- Powered or manual seating options
- Specialty driving controls for powered chairs
- Adjustable frame
- Other complex or specialized components

A wheeled mobility system includes all of the following:

- Tilt-in-space (manual) wheelchairs
- Pediatric size (manual) wheelchairs and strollers
- Custom ultra lightweight (manual) wheelchairs
- All power wheelchairs
- All scooters

### 2.2.14.6.1 Definitions and Responsibilities

The following definitions and responsibilities apply to the provision of wheeled mobility systems:

- Major Modification - The addition of, or modification to a custom feature or component of a wheeled mobility system, including, by not limited to, the following:
  - Seated positioning components
  - Powered or manual seating options
  - Specialty driving controls
  - Adjustable frame
  - Other complex or specialized components
- MRADL - An activity of daily living requiring the use of mobility aids (i.e. toileting, feeding, dressing, grooming, and bathing).
- Occupational Therapist - A person who is currently licensed by the Executive Council of Physical Therapy & Occupational Therapy Examiners to practice occupational therapy.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION, ALL RIGHTS RESERVED.

- Physical Therapist - A person who is currently licensed by the Executive Council of Physical Therapy & Occupational Therapy Examiners to practice physical therapy. An occupational or physical therapist is responsible for completing the seating assessment of a client required for obtaining a wheeled mobility system.

- Qualified Rehabilitation Professional (QRP) - A QRP is a person who meets one or more of the following criteria:

  - Holds a certification as an Assistive Technology Professional (ATP) or a Rehabilitation Engineering Technologist (RET) issued by, and in good standing with, the Rehabilitation Engineering and Assistive Technology Society of North America (RESNA);

  - Holds a certification as a Seating and Mobility Specialist (SMS) issued by, and in good standing with, RESNA; and/or

  - Holds a certification as a Certified Rehabilitation Technology Supplier (CRTS) issued by, and in good standing with, the National Registry of Rehabilitation Technology Suppliers (NRRTS).

  - The QRP is responsible for:

    - Being present at and involved in the seating assessment of the client for the rental or purchase of a wheeled mobility system.

    - Being present at the time of delivery of the wheeled mobility system to direct the fitting of the system to ensure that the system functions correctly relative to the client.

### 2.2.14.6.2 Prior Authorization

A wheeled mobility system may be prior authorized for short-term rental or for purchase with documentation supporting medical necessity and an assessment of the accessibility of the client's residence to ensure that the wheelchair is usable in the home (i.e., doors and halls wide enough, no obstructions). The wheelchair must be able to accommodate a 20 percent change in the client's height or weight.

### 2.2.14.6.3 Documentation Requirements

Documentation by a physician familiar with the client must include information on the client's impaired mobility and physical requirements. In addition, the following information must be submitted with documentation of medical necessity:

- Why the client is unable to ambulate a minimum of 10 feet due to their condition (including, but not limited to, AIDS, sickle cell anemia, fractures, a chronic diagnosis, or chemotherapy), or

- If the client is able to ambulate further than 10 feet, why a wheelchair is required to meet the client's needs.

- A completed Wheelchair/Scooter/Stroller Seating Assessment Form with seating measurements that includes documentation supporting medical necessity

- An itemized component list for custom manual or power wheeled mobility systems.

When medically necessary, prior authorization may also be considered for the rental or purchase of an alternative wheelchair on a case-by-case basis, as follows:

- A manual wheelchair will be considered for a client who owns or is requesting a power wheeled mobility system with no custom features.

- A manual wheelchair or a manual wheeled mobility system will be considered for a client who owns or is requesting a power wheeled mobility system with custom features.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.7 Manual Wheeled Mobility System - Tilt-in-Space

A tilt-in-space manual wheeled mobility system is defined as a manual wheelchair that meets the following requirements:

- Has the ability to tilt the frame of the wheelchair greater than or equal to 45 degrees from horizontal while maintaining a constant back to seat angle to provide a change of orientation and redistribute pressure from one area (such as the buttocks and the thighs) to another area (such as the trunk and the head)
- Adult size has a weight capacity of at least 250 pounds
- Pediatric size has a seat width or depth of less than 15 inches

2.2.14.7.1 Prior Authorization

A tilt-in-space wheeled mobility system may be considered for prior authorization for short-term rental or purchase when all the following criteria are met:

- The client meets criteria for a standard manual wheelchair.
- The client has a condition that meets criteria for a tilt-in-space feature, including but not limited to:
  - Severe spasticity
  - Hemodynamic problems
  - Quadriplegia
  - Excess extensor tone
  - Range of motion limitations prohibit a reclining system, such as hip flexors, hamstrings, or even heterotopic ossification
  - The need to rest in a recumbent position two or more times per day and the client has an inability to transfer between bed and wheelchair without assistance
  - Documented weak upper extremity strength or a disease that will lead to weak upper extremities
  - At risk for skin break down because of inability to reposition body in a chair to relieve pressure areas

### 2.2.14.8 Manual Wheeled Mobility System- Pediatric Size

A pediatric sized wheeled mobility system is defined as a manual standard/custom wheelchair (including those optimally configured for propulsion or custom seating) that has a seat width or depth of less than 15 inches.

### 2.2.14.9 Manual Wheeled Mobility System -Custom (Includes Custom Ultra-Lightweight)

Custom manual wheeled mobility systems may be considered for a client who meets criteria for a manual wheelchair, has a condition that requires specialized seating, and cannot safely utilize a standard manual wheelchair.

A custom ultra lightweight wheeled mobility system is defined as an optimally configured wheelchair for independent propulsion which cannot be achieved in a standard, lightweight, or high-strength light-weight wheelchair that:

- Meets the high-strength lightweight definition and weighs less than 30 pounds.
- Has one or more of the following features to appropriately accept specialized seating or positioning:
  - Adjustable seat-to-back angle
  - Adjustable seat depth
  - Independently adjustable front and rear seat-to-floor dimensions

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- Adjustable caster stem hardware
- Adjustable rear axle
- Adjustable wheel camber
- Adjustable center of gravity
- Has a lifetime warranty on side frames and cross braces

### 2.2.14.9.1 Prior Authorization

A custom ultra-lightweight wheeled mobility system may be considered for prior authorization for rental or purchase when the client meets all the criteria for a lightweight manual wheelchair and one or more of the following criteria:

- The client is able to self-propel, will have independent mobility with the use of an optimally configured chair, and meets all of the following criteria:
  - The client uses the wheelchair for a significant portion of their day to complete MRADLs.
  - The client uses the wheelchair in the community to complete MRADLs.
  - Powered mobility is not anticipated within the next 5-year period.
- The client is able to self-propel, will have independent mobility with the use of an optimally configured chair, has a medical condition that cannot be accommodated by the seating available on a standard, lightweight, or high-strength lightweight wheelchair and one or more of the following features needed by the client to ensure optimal independence with MRADLs:
  - Adjustable seat to back angle.
  - Adjustable seat depth.
  - Independently adjustable front and rear seat-to-floor dimensions.
  - Adjustable caster stem hardware.
  - Adjustable rear axle (adjustable center of gravity).
  - Powered mobility is not anticipated within the next 5-year period.
- The client meets all of the following criteria:
  - The client is unable to self-propel.
  - The client has a documented condition that requires custom seating, including, but not limited to:
    - Poor trunk control.
    - Contractures of elbow or shoulders.
    - Muscle spasticity.
    - Tone imbalance through shoulders or back.
    - Kyphosis or Lordosis.
    - Lack of flexibility in pelvis or spine.
    - The client requires custom seating that cannot be accommodated on a standard, light-weight, or hemi-wheelchair.

Prior authorization for labor to create a custom molded seating system is limited to a maximum of 15 hours.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.10 Seating Assessment for Manual and Power Custom Wheelchairs

A seating assessment is required for:

- The rental or purchase of any device meeting the definition of a wheeled mobility system as defined under subsection 2.2.14.6, "Wheeled Mobility Systems" in this handbook.

- The rental or purchase of any device meeting the definition of a wheeled mobility system or a wheelchair as defined under subsection 2.2.14.2, "Wheelchairs" or subsection 2.2.14.6, "Wheeled Mobility Systems" in this handbook for a client with a congenital or neurological condition, myopathy, or skeletal deformity, which requires the use of a wheelchair or wheeled mobility system.

A seating assessment with measurements, including specifications for exact mobility/seating equipment and all necessary accessories, must be completed by a physician, licensed occupational therapist, or licensed physical therapist.

A QRP directly employed or contracted by the DME provider must be present at and participate in all seating assessments, including those provided by a physician.

Upon completion of the seating assessment, the QRP must attest to his or her participation in the assessment by signing the Wheelchair/Scooter/Stroller Seating Assessment Form. This form must be submitted with all requests for wheeled mobility systems.

When the practitioner completing the seating assessment is an occupational or physical therapist, the occupational or physical therapist may perform the seating assessment as the therapist, or as the QRP, but may not perform in both roles at the same time. If the occupational or physical therapist is attending the seating assessment as the QRP, the occupational or physical therapist must meet the credentialing requirements and be enrolled in Texas Medicaid as a QRP.

If the practitioner completing the seating assessment is a physician, the seating assessment is considered part of the evaluation and management service provided.

> Note: If a client who is birth through 20 years of age requires seating support and meets the criteria for a seating system, a stroller may be considered through CCP, or a wheelchair may be considered through Texas Medicaid Title XIX Home Health Services.

### 2.2.14.10.1 Prior Authorization

A seating assessment performed by an occupational therapist, physical therapist, or a physician, with the participation of a QRP, does not require prior authorization. A seating assessment performed by a physician is considered part of the physician evaluation and management service.

The QRP's participation in the seating assessment requires authorization before the service can be reimbursed. Authorization must be requested at the same time and on the same prior authorization request form as the prior authorization request for the QRP fitting and the wheeled mobility system or major modification to the wheeled mobility system.

Prior authorization requests for the QRP's participation in the seating assessment will be returned to the provider if the seating assessment is requested separately from the prior authorization for the QRP fitting and the wheeled mobility system or major modification to the wheeled mobility system.

The QRP participating in the seating assessment must be directly employed by or contracted with the DME provider requesting the wheeled mobility system or major modification to a wheeled mobility system.

An authorization for the QRP's participation in the seating assessment for a wheeled mobility system or major modification to a wheeled mobility system may be issued to the QRP in 15-minute increments, for a time period of up to one hour (4 units).

If the seating assessment is completed by a physician, reimbursement is considered part of the physician office visit and will not be reimbursed separately.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

The practitioner (occupational therapist or physical therapist) completing the assessment must submit procedure code 97001 or 97003 with modifier U1, in order to bill for the seating assessment.

Services for the QRP's participation in the seating assessment must be submitted for reimbursement by the DME provider billing for the wheeled mobility system using procedure code 97542 with modifier U1. The DME provider must include the QRP specialty as the performing provider on the claim for all components of the wheeled mobility system, including the QRP's participation in the seating assessment.

Seating assessment services performed by a QRP is limited to four units (one hour).

### 2.2.14.10.2 Documentation Requirements

The seating assessment must:

- Explain how the client or family will be trained in the use of the equipment.

- Anticipate changes in the client's needs and include anticipated modifications or accessory needs, as well as the growth potential of the wheelchair. A wheelchair must have growth potential that will accommodate a 20 percent change in the client's height and/or weight.

- Include significant medical information pertinent to the client's mobility and how the requested equipment will accommodate these needs, including intellectual, postural, physical, sensory (visual and auditory), and physical status.

- Address trunk and head control, balance, arm and hand function, existence and severity of orthopedic deformities, as well as any recent changes in the client's physical and/or functional status, and any expected or potential surgeries that will improve or further limit mobility.

- Include information on the client's current mobility/seating equipment, how long the client has been in the current equipment and why it no longer meets the client's needs.

- Include the client's height, weight, and a description of where the equipment is to be used.

- Include seating measurements.

- Include the accessibility of client's residence.

- Include manufacturer's information, including the description of the specific base, any attached seating system components, and any attached accessories, as well as the manufacturer's retail pricing information and itemized pricing for manually priced components.

- Include documentation supporting medical necessity for all accessories.

- Be documented on the Wheelchair/Scooter/Stroller Seating Assessment Form, which must be signed and dated by the qualified practitioner completing the assessment (occupational therapist, physical therapist, or physician), and the QRP who was present and participated in the assessment. All signatures and dates must be current, unaltered, original, and handwritten. Computerized or stamped signatures and dates will not be accepted.

- Be submitted with the prior authorization request for the wheeled mobility system. The Form must be completed, signed and dated as outlined above.

### 2.2.14.11 Fitting of Custom Wheeled Mobility Systems

The fitting of a wheeled mobility system is defined as the time the QRP spends with the client fitting the various systems and components of the system to the client. It may also include time spent training the client or caregiver in the use of the wheeled mobility system. Time spent setting up the system, or travel time without the client present, is not included.

A fitting is required for any device meeting the definition of a wheeled mobility system as defined under subsection 2.2.14.6, "Wheeled Mobility Systems" in this handbook.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION, ALL RIGHTS RESERVED.

The fitting of a wheeled mobility system must be:

- Performed by the same QRP that was present for, and participated in, the seating assessment of the client.
- Completed prior to submitting a claim for reimbursement of a wheeled mobility system.

The QRP performing the fitting will:

- Verify the wheeled mobility system has been properly fitted to the client.
- Verify that the wheeled mobility system will meet the client's functional needs for seating, positioning, and mobility.
- Verify that the client, parent, guardian of the client, and/or caregiver of the client has received training and instruction regarding the wheeled mobility system's proper use and maintenance.

The QRP must complete and sign the DME Certification and Receipt form after the wheeled mobility system has been delivered and fitted to the client. Completion of this form by the QRP signifies that all components of the fitting as outlined above have been satisfied. The form must be completed prior to submission of a claim for a wheeled mobility system, and submitted to HHSC's designee according to instructions on the form to allow for proper claims processing.

Services for fitting of a wheeled mobility system by the QRP must be submitted for reimbursement by the DME provider of the wheeled mobility system using procedure code 97542 with modifier U2. The DME provider must list the QRP who participated in the seating assessment as the performing provider on the claim for all components of the wheeled mobility system, including the fitting performed by the QRP.

All adjustments and modifications to the wheeled mobility system, as well as the associated services by the QRP for the seating assessment and fitting, within the first six months after delivery are considered part of the purchase price and will not be separately reimbursed.

Procedure code 97542 with modifier U2 must be billed on the same claim as the procedure code(s) for the wheeled mobility system in order for both services to be reimbursed.

### 2.2.14.11.1 Prior Authorization

Prior authorization is required for the QRP performing the fitting of a wheeled mobility system, and must be included with the request for the wheeled mobility system.

The QRP must be directly employed by or contracted with the DME company providing the system, and must be the same QRP who was present at and participated in the client's seating assessment.

A prior authorization may be issued to the QRP in 15-minute increments, for a time period of up to two hours (8 units), for the fitting of any manual or power wheeled mobility system. Up to one additional hour (4 units) may be authorized to the QRP with documentation of medical necessity demonstrating that fitting of three or more major systems is required, or that additional client training is required for such systems. Major systems can include, but are not limited to, the following:

- Complete complex seating system (planar system with trunk supports and hip supports or abductor or custom contoured seating system such as a molded system) Off-the-shelf seat and back cushions do not constitute a complex seating system.
- Alternative drive controls (such as a head array, mini-proportional system, etc.).
- Additional specialty control features (such as infrared access).
- Power positioning features (such as power tilt, power recline).
- Specific purpose specialty features (such as power seat elevation systems, power elevating leg rests).

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.11.2 Documentation Requirements

When the QRP that participated in the assessment of the client is not available to conduct the fitting of the wheeled mobility system, the DME provider must update the prior authorization for the wheeled mobility system and fitting by submitting all of the following information:

- A letter written on the DME provider's letterhead, signed and dated by a representative of the DME provider other than the new QRP.
- Documentation explaining why the original QRP could not conduct the fitting. Examples may include, but are not limited to, documentation that the QRP:
  - Is no longer associated with the DME provider requesting the wheeled mobility system.
  - Is on an extended leave from the DME provider requesting the wheeled mobility system.

  *Note:* *For purposes of this policy, an extended leave is any leave of more than 30 consecutive calendar days.*
- The name, TPI, and NPI of the original QRP who performed the initial assessment, and the date the assessment was completed.
- The name, TPI, and NPI of the QRP who will be performing the fitting.
- A copy of the original, physician-signed Home Health Services (Title XIX) DME/Medical Supplies Physician Order Form.

A copy of this documentation must be maintained by the provider in the client's medical record and be available upon request by HHSC or its designee.

### 2.2.14.12 Power Wheeled Mobility Systems- Group 1 through Group 5

A power wheeled mobility system or powered mobility device (PMD) is a professionally manufactured device that provides motorized wheeled mobility and body support specifically for individuals with impaired mobility. PMDs are four- or six-wheeled motorized vehicles whose steering is operated by an electronic device or joystick to control direction, turning, and alternative electronic functions, such as seat controls.

Each PMD must include all of the following basic components that may not be billed separately:

- Lap belt or safety belt (This does not include multiple-attachment-point positioning belts or padded belts.)
- Battery charger, single mode
- Batteries (initial)
- Complete set of tires and casters, any type
- Leg rests
- Foot rests or foot platform
- Arm rests
- Any weight-specific components (braces, bars, upholstery, brackets, motors, gears, etc.) as required by client weight capacity
- Controller and input device

The following definitions apply to PMDs:

- No-Power Option - A category of PMDs that cannot accommodate a power tilt, recline, or seat elevation system. A PMD that can accept only power-elevating leg rests is considered to be a no-power option chair.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- Single-Power Option - A category of PMDs that can accept and operate a power tilt, power recline, or a power seat elevation system, but not a combination power tilt and recline seating system. A single-power option PMD might be able to accommodate power elevating leg rests, or seat elevator, in combination with a power tilt or power recline. A PMD does not have to be able to accommodate all features to meet this definition.

- Multiple-Power Option - A category of PMDs that can accept and operate a combination power tilt and recline seating system. A multiple-power option PMD might also be able to accommodate power elevating leg rests, or a power seat elevator. A PMD does not have to accommodate all features to qualify to meet this definition.

### 2.2.14.12.1 Prior Authorization

Prior authorization for a power wheeled mobility system/PMD requires the following documentation in addition to all documentation required for a custom manual wheelchair:

- The client's physical and mental ability to receive and follow instructions related to responsibilities of using equipment. The client must be able to operate a PMD independently. The therapist must provide written documentation that the client is physically and cognitively capable of managing a PMD.

- How the PMD will be operated (i.e., joystick, head pointer, puff-and-go).

- The capability of the client to understand how the PMD operates.

- The capability of the caregiver or client to care for the PMD and accessories.

### 2.2.14.12.2 Group 1 PMDs

All Group 1 PMDs must have all the specified basic components and meet all the following requirements:

- Standard integrated or remote proportional joystick
- Nonexpandable controller
- Incapable of upgrade to expandable controller
- Incapable of upgrade to alternative control devices
- May have cross brace construction
- Accommodates nonpowered options and seating systems (e.g., recline-only backs, manually elevating leg rests [except captains chairs])
- Length - less than or equal to 40 inches
- Width - less than or equal to 24 inches
- Minimum top end speed - 3 mph
- Minimum range - 5 miles
- Minimum obstacle climb - 20 mm
- Dynamic stability incline - 6 degrees

**Prior Authorization Requirements**

A Group 1 PMD may be considered for prior authorization for rental or purchase when all the following criteria are met:

- The client will use the PMD for less than 2 hours per day.
- The client will use the PMD indoors on smooth, hard surfaces.
- The client will not encounter obstacles in excess of 0.75 inch.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.12.3 Group 2 PMDs

All Group 2 PMDs must have all the specified basic components and meet all the following requirements:

- Standard integrated or remote proportional joystick
- May have cross brace construction
- Accommodates seating and positioning items (e.g., seat and back cushions, headrests, lateral trunk supports, lateral hip supports, medical thigh supports [except captains chairs])
- Length - less than or equal to 48 inches
- Width - less than or equal to 34 inches
- Minimum top end speed - 3 mph
- Minimum range - 7 miles
- Minimum obstacle climb - 40 mm
- Dynamic stability incline - 6 degrees

**Prior Authorization Requirements**

A Group 2 PMD may be considered for prior authorization for rental or purchase when the following criteria are met:

- The client will use the PMD for 2 or more hours per day.
- The client will not routinely use the PMD for MRADLs outside the home.
- The client will not encounter obstacles in excess of 1.5 inches.

### 2.2.14.12.4 Group 3 PMDs

All Group 3 PMDs must have all the specified basic components and meet all the following requirements:

- Standard integrated or remote proportional joystick
- Nonexpandable controller
- Capable of upgrade to expandable controller
- Capable of upgrade to alternative control devices
- May not have cross brace construction
- Accommodates seating and positioning items (e.g., seat and back cushions, headrests, lateral trunk supports, lateral hip supports, medial thigh supports [except captains chairs])
- Drive wheel suspension to reduce vibration
- Length - less than or equal to 48 inches
- Width - less than or equal to 34 inches
- Minimum top end speed - 4.5 mph
- Minimum range - 12 miles
- Minimum obstacle climb - 60 mm
- Dynamic stability incline - 7.5 degrees

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

**Prior Authorization Requirements**

A Group 3 PMD may be considered for prior authorization for rental or purchase when the following criteria are met:

- The client's mobility limitation is due to a neurological condition, myopathy, or congenital skeletal deformity.
- The client may routinely use the PMD for MRADLs outside of the home.
- The client will use the PMD primarily on smooth or paved surfaces.
- The client will not encounter obstacles in excess of 2.5 inches.

### 2.2.14.12.5 Group 4 PMDs

All Group 4 PMDs must have all the specified basic components and meet all the following requirements:

- Standard integrated or remote proportional joystick
- Nonexpandable controller
- Capable of upgrade to expandable controller
- Capable of upgrade to alternative control devices
- May not have cross brace construction
- Accommodates seating and positioning items (e.g., seat and back cushions, headrests, lateral trunk supports, lateral hip supports, medial thigh supports [except captains chairs])
- Drive wheel suspension to reduce vibration
- Length - less than or equal to 48 inches
- Width - less than or equal to 34 inches
- Minimum top end speed - 6 mph
- Minimum range - 16 miles
- Minimum obstacle climb - 75 mm
- Dynamic stability incline - 9 degrees

**Prior Authorization Requirements**

A Group 4 PMD may be considered for prior authorization for rental or purchase when all the following criteria are met:

- In addition to using the PMD in the home, the client will routinely use the PMD for MRADLs outside the home.
- The client will routinely use the PMD on rough, unpaved or uneven surfaces.
- The client will encounter obstacles in excess of 2.25 inches.
- The client has a documented medical need for a feature that is not available on a lower level PMD.

**Documentation Requirements**

The submitted documentation for a Group 4 PMD must include a completed assessment that is signed and dated by a physician or a licensed occupational or physical therapist and includes the following:

- A description of the environment where the PMD will be used in the routine performance of MRADLs.
- A listing of the MRADLs that would be possible with the use of a Group 4 PMD that would not be possible without the Group 4 PMD.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- The distance the client is expected to routinely travel on a daily basis with the Group 4 PMD.

> **Note:** *The enhanced features found on a Group 4 PMD must be medically necessary to meet the client's routine MRADL and will not be approved for leisure or recreational activities.*

In addition to meeting criteria for Group 2 through Group 4 PMDs, the submitted documentation of medical necessity must demonstrate that the client requires the requested power option (e.g., the need for a power recline or tilt in space, or a combination power tilt and power recline), the no-power option, single-power option, or multiple-power option as defined in subsection 2.2.14.12, "Power Wheeled Mobility Systems- Group 1 through Group 5" in this handbook.

### 2.2.14.12.6  2.2.14.12.6 Additional Requirements - Group 2 through Group 4 No-Power Option

Group 2 through Group 4 no-power option PMDs must have all the specified basic components and meet all the following requirements:

- Nonexpandable controller
- Incapable of upgrade to expandable controller
- Incapable of upgrade to alternative control devices
- Meets the definition of no-power option
- Accommodates nonpowered options and seating systems (e.g., recline-only backs, manually elevating leg rests [except captains chairs])

### 2.2.14.12.7 Group 2 through Group 4 Single-Power Option

Group 2 through Group 4 single-power option PMDs must have all the specified basic components and meet all the following requirements:

- Nonexpandable controller
- Capable of upgrade to expandable controller
- Capable of upgrade to alternative control devices
- Meets the definition of single-power option

### 2.2.14.12.8 Group 2 through Group 4 Multiple-Power Option

Group 2 through Group 4 multiple-power option PMDs must have all the specified basic components and meet all the following requirements:

- Nonexpandable controller
- Capable of upgrade to expandable controller
- Meets the definition of multiple-power option
- Accommodates a ventilator

### 2.2.14.12.9 Group 5 PMDs

All Group 5 PMDs must have all the specified basic components and meet all the following requirements:

- Standard integrated or remote joystick
- Nonexpandable controller
- Capable of upgrade to expandable controller
- Seat width - minimum of 5 one-inch options
- Seat depth - minimum of 3 one-inch options

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- Seat height - adjustment requirements = 3 inches
- Back height - adjustment requirements minimum of 3 options
- Seat-to-back angle range of adjustment - minimum of 12 degrees
- Accommodates nonpowered options and seating systems
- Accommodates seating and positioning items (e.g., seat and back cushions, headrests, lateral trunk supports, lateral hip supports, medial thigh supports)
- Adjustability for growth (minimum of 3 inches for width, depth, and back height adjustment)
- Special developmental capability (i.e., seat to floor, standing, etc.)
- Drive wheel suspension to reduce vibration
- Length - less than or equal to 48 inches
- Width - less than or equal to 34 inches
- Minimum top end speed - 4 mph
- Minimum range - 12 miles
- Minimum obstacle climb - 60 mm
- Dynamic stability incline - 9 degrees
- Passed crash test

**Prior Authorization Requirements**
A Group 5 pediatric PMD may be considered for prior authorization for rental or purchase when all the following criteria are met:

- The client weighs less than 125 pounds.
- The client is expected to grow in height.
- The client may require growth of up to 5 inches in width.
- The client may require a change in seat to floor height up to 3 inches.
- The client may require a seat to back angle range of adjustment in excess of 12 degrees.
- The client requires special developmental capability (i.e., seat to floor, standing, etc.).

### 2.2.14.12.10 Group 5 Single-PMDs
A group 5 single-power option PMD must have all the specified basic components and have the capability to accept and operate a power tilt or recline or seat elevation system, but not a combination power tilt and recline seating system, and may be able to accommodate power elevating leg rests, or seat elevator, in combination with a power tilt or power recline.

**Prior Authorization Requirements**
A Group 5 pediatric PMD with single power option may be considered for prior authorization for rental or purchase when all the following criteria are met:

- The client meets criteria for a Group 5 PMD.
- The client requires a drive control interface other than a hand or chin-operated standard proportional joystick (examples include but are not limited to head control, sip and puff, or switch control).

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.12.10 Group 5 Multiple-PMDs

Group 5 multiple-power option PMD must have all the specified basic components and meet all the following requirements:

- Has the capability to accept and operate a combination power tilt and recline seating system, and may also be able to accommodate power elevating leg rests, or a power seat elevator.

- Accommodates a ventilator.

**Prior Authorization Requirements**

A Group 5 pediatric PMD with multiple power option may be considered for prior authorization for rental or purchase when the following criteria are met:

- The client meets criteria for a Group 5 PMD.

- The client requires a drive control interface other than a hand or chin-operated standard proportional joystick (examples include but are not limited to head control, sip and puff, switch control).

- The client has a documented medical need for a power tilt and recline seating system and the system is being used on the wheelchair or the client uses a ventilator which is mounted on the wheelchair.

### 2.2.14.13 Wheelchair Ramp-Portable and Threshold

Portable and threshold ramps are a benefit of Texas Medicaid.

A portable ramp is defined as a unit that is able to be carried as needed to access a home, weighs no more than 90 pounds, or measures no more than 10 feet in length. A threshold ramp is defined as a unit that provides access over elevated thresholds.

One portable ramp and one threshold ramp for wheelchair access may be considered for prior authorization when documentation supports medical necessity. The following documentation supporting medical necessity is required:

- The date of purchase and serial number of the client's wheelchair or documentation of a wheelchair request being reviewed for purchase

- Diagnosis with duration of expected need

- A diagram of the house showing the access points with the ground-to-floor elevation and any obstacles

Ramps may be considered for rental for short term disabilities and for purchase for long term disabilities. Mobility aid lifts for vehicles and vehicle modifications are not a benefit of Texas Medicaid.

### 2.2.14.14 Power Elevating Leg Lifts

A power elevation feature involves a dedicated motor and related electronics with or without variable speed programmability, which allows the leg rest to be raised and lowered independently of the recline and/or tilt of the seating system. It includes a switch control which may or may not be integrated with the power tilt and/or recline control(s).

### 2.2.14.14.1 Prior Authorization

Power elevating leg lifts may be prior authorized for clients who have compromised upper extremity function that limits the client's ability to use manual elevating leg rests. The client must meet criteria for a PMD with a reclining back and at least one of the following:

- The client has a musculoskeletal condition such as flexion contractures of the knees and legs, or the placement of a brace that prevents 90-degree flexion at the knee.

- The client has significant edema of the lower extremities that requires elevating the client's legs.

- The client experiences hypotensive episodes that require frequent positioning changes.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- The client needs power tilt-and-recline and is required to maintain anatomically correct positioning and reduce exposure to skin shear.

### 2.2.14.14.2 Documentation Requirements

The submitted documentation must include an assessment completed, signed, and dated by a physician or a licensed occupational or physical therapist that includes the following:

- A description of the client's current level of function without the device
- Documentation that identifies how the power elevating leg lifts will improve the client's function
- A list of MRADLs the client will be able to perform with the power elevating leg lifts that the client is unable to perform without the power elevating leg lifts and how the device will increase independence
- The duration of time the client is alone during the day without assistance
- The client's goals for use of the power elevating leg lifts

### 2.2.14.15 Power Seat Elevation System

A power seat elevation system is used to raise and lower the client in their seated position without changing the seat angles to provide varying amounts of added vertical access.

The use of a power seat elevation system will:

- Facilitate independent transfers, particularly uphill transfers, to and from the wheelchair, and
- Augment the client's reach to facilitate independent performance of MRADLs in the home.

### 2.2.14.15.1 Prior Authorization

A power seat elevation system may be prior authorized to promote independence in a client who meets all of the following criteria:

- The client does not have the ability to stand or pivot transfer independently.
- The client requires assistance only with transfers across unequal seat heights, and as a result of having the power seat elevation system, the client will be able to transfer across unequal seat heights unassisted.
- The client has limited reach and range of motion in the shoulder or hand that prohibits independent performance of MRADLs (such as, dressing, feeding, grooming, hygiene, meal preparation, and toileting).

### 2.2.14.15.2 Documentation Requirements

The submitted documentation must include an assessment completed, signed, and dated by a physician or a licensed occupational or physical therapist that includes the following:

- A description of the client's current level of function without the device
- Documentation that identifies how the power seat elevation system will improve the client's function
- A list of MRADLs the client will be able to perform with the power seat elevation system that the client is unable to perform without the power seat elevation system and how the device will increase independence
- The duration of time the client is alone during the day without assistance
- The client's goals for use of the power seat elevation system

  Note: A power seat elevation system option will not be authorized for the convenience of a caregiver, or if the device will not allow the client to become independent with MRADLs and transfers.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.16 Seat Lift Mechanisms

A medically necessary seat lift mechanism is one that operates smoothly, can be controlled by the client, and effectively assists the client in standing up and sitting down without other assistance.

The payment for a recliner or chair with the incorporated seat lift mechanism is limited to the amount of the seat lift mechanism.

#### 2.2.14.16.1 Prior Authorization

A seat lift mechanism may be prior authorized for clients who meet all the following criteria:

- The client must have severe arthritis of the hip or knee or have a severe neuromuscular disease.
- The seat lift mechanism must be a part of the physician's course of treatment and be prescribed to correct or ameliorate the client's condition.
- Once standing, the client must have the ability to ambulate.
- The client must be completely incapable of standing up from a regular armchair or any chair in their home.

  Note: *The fact that a client has difficulty or is even incapable of getting up from a chair, particularly a low chair, is not sufficient justification for a seat lift mechanism. Almost all clients who are capable of ambulating can get out of an ordinary chair if the seat height is appropriate and the chair has arms.*

Seat lift mechanisms are limited to those types that operate smoothly, can be controlled by the client, and can effectively assist a client in standing up and sitting down without other assistance. A seat lift operated by a spring release mechanism with a sudden, catapult-like motion and jolts the client from a seated to a standing position is not a benefit of Texas Medicaid.

#### 2.2.14.16.2 Documentation Requirements

The submitted documentation must include an assessment completed, signed, and dated by a physician or a licensed occupational or physical therapist that includes the following:

- A description of the client's current level of function without the device
- Documentation that identifies how the seat lift mechanism will improve the client's function
- A list of MRADLs the client will be able to perform with the seat lift mechanism that the client is unable to perform without the seat lift mechanism and how the device will increase independence
- The duration of time the client is alone during the day without assistance
- The client's goals for use of the seat lift mechanism

Supporting documentation must be kept in the client's record that shows that all appropriate therapeutic modalities (such as medication, physical therapy) have been tried and that they failed to enable the client to transfer from a chair to a standing position.

### 2.2.14.17 Batteries and Battery Charger

A battery charger and initial batteries are included as part of the purchase of a PMD. Replacement batteries or a replacement battery charger may be considered for reimbursement if they are no longer under warranty.

A maximum of one hour of labor may be considered to install new batteries. Labor is not reimbursed with the purchase of a new PMD or with replacement battery chargers.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.17.1 Prior Authorization

Batteries and battery chargers will not be prior authorized for replacement within six months of delivery. Batteries and battery chargers within the first six months after delivery are considered part of the purchase price.

A maximum of one hour of labor may be prior authorized to install new batteries. Labor will not be prior authorized for a new power wheelchair or for replacement battery chargers.

### 2.2.14.17.2 Documentation Requirements

To request prior authorization for replacement batteries or a replacement battery charger, the provider must document the date of purchase and serial number of the currently owned wheelchair as well as the reason for the replacement batteries or battery charger.

Documentation required supporting the need to replace the batteries or battery charger must include:

- Why the batteries are no longer meeting the client's needs, or
- Why the battery charger is no longer meeting the client's needs

### 2.2.14.18 Power Wheeled Mobility Systems- Scooter

A scooter is a professionally manufactured three- or four-wheeled motorized base operated by a tiller with a professionally manufactured basic seating system for clients who have little or no positioning needs.

A scooter must meet all the following requirements:

- Length- less than or equal to 48 inches
- Width- less than or equal to 28 inches
- Minimum top end speed- 3 mph
- Minimum range- 5 miles
- Minimum obstacle climb- 20 mm
- Radius pivot turn of less than or equal to 54 inches
- Dynamic stability incline- 6 degrees

Custom seating for scooters is not a benefit of Texas Medicaid Title XIX Home Health Services. Repairs to scooters will be considered only for a scooter purchased by the Texas Medicaid.

### 2.2.14.18.1 Prior Authorization

A scooter may be prior authorized for ambulatory-impaired clients with good head, trunk, and arm/hand control, without a diagnosis of progressive illness (including, but not limited to, progressive neuromuscular diseases such as amyotrophic lateral sclerosis [ALS]).

To request prior authorization for a scooter, the client must not own, or be expected to require, a power wheelchair within five years of the purchase of a scooter.

A scooter may be prior authorized for a short-term rental or an initial three-month trial rental period based on documentation supporting the medical necessity and appropriateness of the device.

Assessment of the accessibility of the client's residence must be completed and included in the prior authorization documentation to ensure that the scooter is usable in the home (i.e., doors and halls wide enough, no obstructions).

A scooter must be able to accommodate a 20 percent change in the client's height and/or weight.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.18.2 Documentation Requirements

Prior authorization for a scooter requires all the documentation required for a standard power wheelchair and meets all the following criteria:

- The client's physical and cognitive ability to receive and follow instructions related to the responsibilities of using the equipment.

- The ability of the client to physically and cognitively operate the scooter independently.

- The capability of the client to care for the scooter and understand how it operates.

### 2.2.14.19 Client Lift

A lift is a portable transfer system used to move a nonambulatory client over a short distance from bed to chair and chair to bed.

A client lift for the convenience of a caregiver is not a benefit of Texas Medicaid.

A hydraulic lift is for a client who is unable to assist in their own transfers and is operated by the weight or pressure of a liquid.

An electric lift is operated by electricity and may be considered when a hydraulic lift will not meet the client's needs.

> Note: Portable lifts that can be used outside the home setting, hydraulic or electric, are not a benefit through Title XIX Home Health Services. For clients who are birth through 20 years of age, portable lifts that can be used outside the home setting may be considered through CCP.

### 2.2.14.19.1 Prior Authorization

A client lift will not be prior authorized for the convenience of a caregiver.

A client limit must be able to accommodate a 20 percent change in the client's height and/or weight.

### 2.2.14.20 Electric Lift

Prior authorization for an electric lift may be considered when the client meets criteria for a hydraulic lift and additional documentation explains why a hydraulic lift will not meet the client's needs.

> Note: Portable lifts that can be used outside the home setting, hydraulic or electric, are not a benefit through Title XIX Home Health Services. For clients who are birth through 20 years of age, portable lifts that can be used outside the home setting may be considered through CCP.

### 2.2.14.21 Hydraulic Lift

Hydraulic lifts require prior authorization.

### 2.2.14.21.1 Documentation Requirements

Prior authorization for a hydraulic lift may be considered with the following documentation:

- The inability of the client to assist in their own transfers

- The weight of the client and the weight capacity of the requested lift

- The availability of a caregiver to operate the lift

- Training by the provider to the client and the caregiver on the safe use of the lift

### 2.2.14.22 Standers

A stander is a device used by a client with neuromuscular conditions who is unable to stand alone. Standers and standing programs can improve digestion, increase muscle strength, decrease contractures, increase bone density, and minimize decalcification (this list is not all inclusive).

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.22.1 Prior Authorization

Standers, including all accessories, require prior authorization. Standers and gait trainers will not be prior authorized for a client within one year of each other.

### 2.2.14.22.2 Documentation Requirements

Prior authorization may be considered for the standers with the following documentation:

- Diagnoses relevant to the requested equipment, including functioning level and ambulatory status
- Anticipated benefits of the equipment
- Frequency and duration of the client's standing program
- Anticipated length of time the client will require this equipment
- Client's height, weight, and age
- Anticipated changes in the client's needs, anticipated modifications, or accessory needs, as well as the growth potential of the stander

### 2.2.14.23 Gait Trainers

Gait trainers are devices with wheels used to train clients with ambulatory potential. They provide the same benefits as the stander, in addition to assisting with gait training.

### 2.2.14.23.1 Prior Authorization

Prior authorization for a gait trainer may be considered with documentation supporting medical necessity and an assessment of the accessibility of the client's residence to ensure that the gait trainer is usable in the home (i.e., doors and halls are wide enough and have no obstructions), when a physician familiar with the client documents that the client has ambulatory potential and will benefit from a gait training program, and when the client meets the criteria for a stander.

### 2.2.14.24 Accessories, Modifications, Adjustments and Repairs

Accessories, modifications, adjustments, and repairs are benefits of Texas Medicaid as outlined below.

- All modifications, adjustments, and repairs to standard mobility aid equipment within the first six months after delivery are considered part of the purchase price.
- All modifications and adjustments to a wheeled mobility system, as well as the associated services by the QRP for the seating assessment and fitting, within the first six months after delivery are considered part of the purchase price.

Mobility aids that have been purchased are anticipated to last a minimum of five years.

A major modification to a wheeled mobility system requires the completion of a new seating assessment by a qualified practitioner (physician, occupational therapist, or physical therapist), with the participation of a QRP.

Prior authorization for equipment replacement is considered within five years of equipment purchase when one of the following occurs:

- There has been a significant change in the client's condition such that the current equipment no longer meets the client's needs.
- The equipment is no longer functional and either cannot be repaired or it is not cost-effective to repair.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

A wheeled mobility system that has been fitted and delivered to the client's home by a QRP and then found to be inappropriate for the client's condition will not be eligible for an upgrade, replacement, or major modification within the first six months following purchase unless there has been a significant change in the client's condition. The significant change in the client's condition must be documented by a physician familiar with the client.

### 2.2.14.24.1 Prior Authorization

**Modifications**

Modifications to custom equipment after the first six months from fitting and delivery may be prior authorized when a change occurs in the client's needs, capabilities, or physical/mental status that cannot be anticipated.

Modifications are the replacement of components due to changes in the client's condition, not replacement due to the component no longer functioning as designed. All modifications within the first six months after delivery are considered part of the purchase price.

Documentation must include:

- All projected changes in the client's mobility needs
- The date of purchase, the serial number of the current equipment, and the cost of purchasing new equipment as opposed to the cost of modifying current equipment

Major modifications to a wheeled mobility system also require a new seating assessment be completed and submitted with the prior authorization request for the major modification. A request for authorization of the QRP's participation in the seating assessment for the major modification must be included with the prior authorization request for the major modification.

A wheeled mobility system that has been fitted and delivered to the client's home by a QRP and then found to be inappropriate for the client's condition will not be eligible for an upgrade, replacement, or major modification within the first six months following purchase unless there has been a significant change in the client's condition. A significant change in the client's condition must be documented by a physician familiar with the client.

**Adjustments**

Adjustments must be prior authorized and do not require supplies.

Adjustments within the first six months after delivery, including adjustments to a wheeled mobility system within the first six months after fitting and delivery by a QRP will not be prior authorized. Adjustments within the first six months after delivery are considered part of the purchase price.

A maximum of one hour of labor for adjustments may be prior authorized as needed after the first six months from delivery.

**Repairs**

Repairs require replacement of components that are no longer functional.

Repairs to client-owned equipment may be prior authorized as needed with documentation of medical necessity. Technician fees are considered part of the cost of the repair.

Providers are responsible for maintaining documentation in the client's medical record specifying the repairs and supporting medical necessity.

Rentals may be prior authorized during the period of repair. Routine maintenance of rental equipment is the provider's responsibility.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 2.2.14.25 Replacement

Replacement of equipment is also considered when loss or irreparable damage has occurred. The following must be submitted with the prior authorization request:

- A copy of the police or fire report, when appropriate.
- A statement about the measures to be taken in order to prevent reoccurrence.
- Replacement equipment for clients who are birth through 20 years of age and do not meet the criteria in this handbook may be considered for prior authorization through CCP.

### 2.2.14.26 Procedure Codes and Limitations for Mobility Aids

| Procedure Code | Maximum Limit |
|---|---|
| **Canes** | |
| E0100 | 1 per 5 years |
| E0105 | 1 per 5 years |
| **Crutches** | |
| A4635 | As needed |
| E0110 | 1 purchase every 5 years |
| E0111 | 1 purchase every 5 years; 1-month rental |
| E0112 | 1 purchase every 5 years; 1-month rental |
| E0113 | 1 purchase every 5 years; 1-month rental |
| E0114 | 1 purchase every 5 years; 1-month rental |
| E0116 | 1 purchase every 5 years; 1-month rental |
| E0153 | 1 purchase every 5 years |
| **Walkers** | |
| A4636 | As needed |
| A4637 | As needed |
| E0130 | 1 purchase every 5 years; 1-month rental |
| E0135 | 1 purchase every 5 years; 1-month rental |
| E0141 | 1 purchase every 5 years; 1-month rental |
| E0143 | 1 purchase every 5 years; 1-month rental |
| E0144 | 1 purchase every 5 years; 1-month rental |
| E0147 | 1 purchase every 5 years; 1-month rental |
| E0148 | 1 purchase every 5 years; 1-month rental |
| E0149 | 1 purchase every 5 years; 1-month rental |
| E0154 | 1 per 5 years |
| E0155 | 1 per 5 years |
| E0157 | 1 per 5 years |
| E0158 | 1 per 5 years |
| E0159 | 1 per 5 years |
| **Gait Trainers** | |
| E8001 | 1 purchase every 5 years |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
|---|---|
| **Seating Assessments** | |
| 97001 | As needed |
| 97003 | As needed |
| **Wheelchairs** | |
| E1050 | 1 purchase every 5 years; 1-month rental |
| E1060 | 1 purchase every 5 years; 1-month rental |
| E1070 | 1 purchase every 5 years; 1-month rental |
| E1083 | 1 purchase every 5 years; 1-month rental |
| E1084 | 1 purchase every 5 years; 1-month rental |
| E1085 | 1 purchase every 5 years; 1-month rental |
| E1086 | 1 purchase every 5 years; 1-month rental |
| E1087 | 1 purchase every 5 years; 1-month rental |
| E1088 | 1 purchase every 5 years; 1-month rental |
| E1089 | 1 purchase every 5 years; 1-month rental |
| E1090 | 1 purchase every 5 years; 1-month rental |
| E1092 | 1 purchase every 5 years |
| E1093 | 1 purchase every 5 years; 1-month rental |
| E1100 | 1 purchase every 5 years; 1-month rental |
| E1110 | 1 purchase every 5 years; 1-month rental |
| E1130 | 1 purchase every 5 years; 1-month rental |
| E1140 | 1 purchase every 5 years; 1-month rental |
| E1150 | 1 purchase every 5 years; 1-month rental |
| E1160 | 1 purchase every 5 years; 1-month rental |
| E1161 | 1 purchase every 5 years; 1-month rental |
| E1170 | 1 purchase every 5 years; 1-month rental |
| E1171 | 1 purchase every 5 years; 1-month rental |
| E1172 | 1 purchase every 5 years; 1-month rental |
| E1180 | 1 purchase every 5 years; 1-month rental |
| E1190 | 1 purchase every 5 years; 1-month rental |
| E1195 | 1 purchase every 5 years; 1-month rental |
| E1200 | 1 purchase every 5 years; 1-month rental |
| E1220 | 1 per 5 years |
| E1229 | 1 per 5 years |
| E1231 | 1 purchase every 5 years; 1-month rental |
| E1232 | 1 purchase every 5 years; 1-month rental |
| E1233 | 1 purchase every 5 years; 1-month rental |
| E1234 | 1 purchase every 5 years; 1-month rental |
| E1235 | 1 purchase every 5 years; 1-month rental |
| E1236 | 1 purchase every 5 years; 1-month rental |
| E1237 | 1 purchase every 5 years; 1-month rental |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
|---|---|
| E1238 | 1 purchase every 5 years; 1-month rental |
| E1239 | 1 per 5 years |
| E1240 | 1 purchase every 5 years; 1-month rental |
| E1250 | 1 purchase every 5 years; 1-month rental |
| E1260 | 1 purchase every 5 years; 1-month rental |
| E1270 | 1 purchase every 5 years; 1-month rental |
| E1280 | 1 purchase every 5 years; 1-month rental |
| E1285 | 1 purchase every 5 years; 1-month rental |
| E1290 | 1 purchase every 5 years; 1-month rental |
| E1295 | 1 purchase every 5 years; 1-month rental |
| **Power Wheelchairs** | |
| K0010 | 1 per 5 years |
| K0011 | 1 per 5 years |
| K0012 | 1 per 5 years |
| K0813 | 1 purchase every 5 years; 1-month rental |
| K0814 | 1 purchase every 5 years; 1-month rental |
| K0815 | 1 purchase every 5 years; 1-month rental |
| K0816 | 1 purchase every 5 years; 1-month rental |
| K0820 | 1 purchase every 5 years; 1-month rental |
| K0821 | 1 purchase every 5 years; 1-month rental |
| K0822 | 1 purchase every 5 years; 1-month rental |
| K0823 | 1 purchase every 5 years; 1-month rental |
| K0824 | 1 purchase every 5 years; 1-month rental |
| K0825 | 1 purchase every 5 years; 1-month rental |
| K0826 | 1 purchase every 5 years; 1-month rental |
| K0827 | 1 purchase every 5 years; 1-month rental |
| K0828 | 1 purchase every 5 years; 1-month rental |
| K0829 | 1 purchase every 5 years; 1-month rental |
| K0835 | 1 purchase every 5 years; 1-month rental |
| K0836 | 1 purchase every 5 years; 1-month rental |
| K0837 | 1 purchase every 5 years; 1-month rental |
| K0838 | 1 purchase every 5 years; 1-month rental |
| K0839 | 1 purchase every 5 years; 1-month rental |
| K0840 | 1 purchase every 5 years; 1-month rental |
| K0841 | 1 purchase every 5 years; 1-month rental |
| K0842 | 1 purchase every 5 years; 1-month rental |
| K0843 | 1 purchase every 5 years; 1-month rental |
| K0848 | 1 purchase every 5 years; 1-month rental |
| K0849 | 1 purchase every 5 years; 1-month rental |
| K0850 | 1 purchase every 5 years; 1-month rental |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
|---|---|
| K0851 | 1 purchase every 5 years; 1-month rental |
| K0852 | 1 purchase every 5 years; 1-month rental |
| K0853 | 1 purchase every 5 years; 1-month rental |
| K0854 | 1 purchase every 5 years; 1-month rental |
| K0855 | 1 purchase every 5 years; 1-month rental |
| K0856 | 1 purchase every 5 years; 1-month rental |
| K0857 | 1 purchase every 5 years; 1-month rental |
| K0858 | 1 purchase every 5 years; 1-month rental |
| K0859 | 1 purchase every 5 years; 1-month rental |
| K0860 | 1 purchase every 5 years; 1-month rental |
| K0861 | 1 purchase every 5 years; 1-month rental |
| K0862 | 1 purchase every 5 years; 1-month rental |
| K0863 | 1 purchase every 5 years; 1-month rental |
| K0864 | 1 purchase every 5 years; 1-month rental |
| K0868 | 1 purchase every 5 years; 1-month rental |
| K0869 | 1 purchase every 5 years; 1-month rental |
| K0870 | 1 purchase every 5 years; 1-month rental |
| K0871 | 1 purchase every 5 years; 1-month rental |
| K0877 | 1 purchase every 5 years; 1-month rental |
| K0878 | 1 purchase every 5 years; 1-month rental |
| K0879 | 1 purchase every 5 years; 1-month rental |
| K0880 | 1 purchase every 5 years; 1-month rental |
| K0884 | 1 purchase every 5 years; 1-month rental |
| K0885 | 1 purchase every 5 years; 1-month rental |
| K0886 | 1 purchase every 5 years; 1-month rental |
| K0890 | 1 purchase every 5 years; 1-month rental |
| K0891 | 1 purchase every 5 years; 1-month rental |
| K0898 | 1 purchase every 5 years; 1-month rental |
| K0899 | 1 purchase every 5 years; 1-month rental |
| **Scooters** | |
| E1230 | 1 per 5 years |
| K0800 | 1 per 5 years |
| K0801 | 1 per 5 years |
| K0802 | 1 per 5 years |
| **Wheelchair Parts** | |
| E0942 | 1 per year |
| E0944 | 2 per year |
| E0945 | 2 per year |
| E0950 | 1 per year |
| E0951 | 2 per year |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
| --- | --- |
| E0952 | 2 per year |
| E0955 | As needed |
| E0957 | As needed |
| E0958 | 1 per year |
| E0960 | As needed |
| E0961 | 2 per year |
| E0969 | 1 per 5 years |
| E0970 | 1 pair per year |
| E0971 | 2 per year |
| E0973 | 2 per year |
| E0974 | 2 per year |
| E0978 | 1 per year |
| E0980 | 1 per year |
| E0981 | As needed |
| E0982 | As needed |
| E0990 | 2 per year |
| E0992 | 1 per year |
| E0994 | 2 per year |
| E0995 | 2 per year |
| E1002 | 1 per 5 years |
| E1003 | 1 per 5 years |
| E1004 | 1 per 5 years |
| E1005 | 1 per 5 years |
| E1006 | 1 per 5 years |
| E1007 | 1 per 5 years |
| E1008 | 1 per 5 years |
| E1009 | 1 per 5 years |
| E1010 | 1 per 5 years |
| E1011 | As needed |
| E1014 | 1 per 5 years |
| E1015 | 2 per year |
| E1016 | 2 per year |
| E1017 | 2 per year |
| E1018 | 2 per year |
| E1020 | 1 per 5 years |
| E1028 | 1 per 5 years |
| E1029 | 1 per 5 years |
| E1296 | 1 per 5 years |
| E1297 | 1 per 5 years |
| E1298 | 1 per 5 years |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
|---|---|
| E2201 | 1 per 5 years |
| E2202 | 1 per 5 years |
| E2203 | 1 per 5 years |
| E2204 | 1 per 5 years |
| E2205 | 1 per 5 years |
| E2206 | 1 per 5 years |
| E2207 | 1 purchase every 5 years |
| E2208 | 1 purchase every 5 years |
| E2209 | 1 purchase every 5 years |
| E2210 | 4 per year |
| E2211 | 2 per year |
| E2212 | 2 per year |
| E2213 | 2 per year |
| E2214 | 2 per year |
| E2215 | 2 per year |
| E2216 | 2 per year |
| E2217 | 2 per year |
| E2218 | 2 per year |
| E2219 | 2 per year |
| E2220 | 2 per year |
| E2221 | 2 per year |
| E2222 | 2 per year |
| E2224 | 2 per year |
| E2225 | 2 per year |
| E2226 | 2 per year |
| E2227 | 1 per 5 years |
| E2228 | 1 per 5 years |
| E2291 | 1 per 5 years |
| E2292 | 1 per 5 years |
| E2293 | 1 per 5 years |
| E2294 | 1 per 5 years |
| E2300 | 1 per 5 years |
| E2310 | 1 per 5 years |
| E2311 | 1 per 5 years |
| E2312 | 1 purchase every 5 years; 1-month rental |
| E2313 | 1 per 5 years |
| E2321 | 1 per 5 years |
| E2323 | 1 per 5 years |
| E2324 | 1 per 5 years |
| E2325 | 1 per 5 years |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
|---|---|
| E2326 | 1 per 5 years |
| E2327 | 1 per 5 years |
| E2328 | 1 per 5 years |
| E2329 | 1 per 5 years |
| E2330 | 1 per 5 years |
| E2340 | 1 per 5 years |
| E2341 | 1 per 5 years |
| E2342 | 1 per 5 years |
| E2343 | 1 per 5 years |
| E2351 | 1 per 5 years |
| E2359 | 1 per 5 years |
| E2368 | 1 per 5 years |
| E2369 | 1 per 5 years |
| E2370 | 1 per 5 years |
| E2373 | 1 per 5 years |
| E2374 | 1 per 5 years |
| E2375 | 1 per 5 years |
| E2376 | 1 per 5 years |
| E2377 | 1 per 5 years |
| E2381 | 2 per year |
| E2382 | 2 per year |
| E2383 | 2 per year |
| E2384 | 2 per year |
| E2385 | 2 per year |
| E2386 | 2 per year |
| E2387 | 2 per year |
| E2388 | 2 per year |
| E2389 | 2 per year |
| E2390 | 2 per year |
| E2391 | 2 per year |
| E2392 | 2 per year |
| E2394 | 1 per 5 years |
| E2395 | 1 per 5 years |
| E2396 | 1 per 5 years |
| **Wheelchair/Pressure/Positioning Cushions** | |
| E0190 | 1 per 3 years |
| E2601 | 1 per year |
| E2602 | 1 per year |
| E2603 | 1 per year |
| E2604 | 1 per year |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

| Procedure Code | Maximum Limit |
|---|---|
| E2605 | 1 per year |
| E2606 | 1 per year |
| E2607 | 1 per year |
| E2608 | 1 per year |
| E2609 | 1 per year |
| E2611 | 1 per year |
| E2612 | 1 per year |
| E2613 | 1 per year |
| E2614 | 1 per year |
| E2615 | 1 per year |
| E2616 | 1 per year |
| E2617 | 1 per year |
| E2619 | 1 per year |
| E2620 | 1 per year |
| E2621 | 1 per year |
| E2622 | 1 per year |
| E2623 | 1 per year |
| E2624 | 1 per year |
| E2625 | 1 per year |
| **Batteries** | |
| E2361 | 1 per 5 years |
| E2363 | 1 per 5 years |
| E2366 | 1 per 5 years |
| E2371 | 1 per 5 years |
| K0733 | 2 per year |
| **Safety Equipment** | |
| E0700 | 2 per year |
| E0705 | 1 per 5 years |
| **Lifts** | |
| E0628 | 1 per 5 years |
| E0629 | 1 per 5 years |
| E0630 | 1 per 5 years |
| E0635 | 1 per 5 years |
| E0638 | 1 per 5 years |
| E0641 | 1 per 5 years |
| **Miscellaneous** | |
| A9900 | As needed |
| E1399 | As needed |
| K0108 | As needed |
| K0739 | As needed |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

The following mobility aids are not a benefit of Home Health Services:

- Feeder seats, floor sitters, corner chairs, and travel chairs are not considered medically necessary devices
- Items including but not limited to tire pumps, a color for a wheelchair, gloves, back packs, and flags are not considered medically necessary
- Mobile standers, power standing system on a wheeled mobility device
- Vehicle lifts and modifications
- Permanent ramps, vehicle ramps, and home modifications
- Stairwell lifts of any type
- Elevators or platform lifts of any type
- Patient lifts requiring attachment to walls, ceilings, or floors
- Chairs with incorporated seat lifts
- An attendant control, for safety, all power chairs are to include a stop switch
- Powered mobility device for use only outside the home

Texas Medicaid does not reimburse separately for associated DME charges, including battery disposal fees or state taxes. Reimbursement for associated charges is included in the reimbursement for the specific piece of equipment. White canes for the blind are considered self help adaptive aids and are not a benefit of Home Health Services.

> **Note:** *THSteps-eligible clients who have a medical need for services beyond the limits of this Home Health Services benefit may be considered under CCP.*

*Refer to:* Subsection 2.2.1.1, "Client Eligibility" in this handbook.

## 2.2.15 Nutritional (Enteral) Products, Supplies, and Equipment

Enteral nutritional products are those food products that are included in an enteral treatment protocol. They serve as a therapeutic agent for health maintenance and are required to treat an identified medical condition. Nutritional products, supplies, and equipment may be a benefit when provided in the home under Home Health Services.

### 2.2.15.1 Enteral Nutritional Products, Feeding Pumps, and Feeding Supplies

Enteral nutritional products and related feeding supplies and equipment are a benefit through Home Health Services for clients who are 21 years of age and older and require tube feeding as their primary source of nutrition. The enteral product, supply, or equipment must be part of the medical POC outlined and maintained by the treating physician.

Enteral nutritional products may be reimbursed with the following procedure codes:

| Procedure Codes | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B4100 | B4104 | B4149 | B4150 | B4152 | B4153 | B4154 | B4155 | B4157 |

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# APPENDIX 6



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Health Care Financing Administration

September 4, 1998

Dear State Medicaid Director:

We have received a number of inquiries regarding coverage of medical equipment (ME) under the Medicaid program in light of the ruling of the United States Court of Appeals for the Second Circuit in DeSario v. Thomas. In that case, the court examined the circumstances under which a State may use a list to determine coverage of ME and offered its interpretation of HCFA's policies. We have concluded that it would be helpful to provide States with interpretive guidance clarifying our policies concerning ME coverage under the Medicaid program and the use of lists in making such coverage determinations. This guidance is applicable only to ME coverage policy.

As you know, the mandatory home health services benefit under the Medicaid program includes coverage of medical supplies, equipment, and appliances suitable for use in the home (42 C.F.R. § 440.70(b)(3)). A State may establish reasonable standards, consistent with the objectives of the Medicaid statute, for determining the extent of such coverage (42 U.S.C. § 1396(a)(17)) based on such criteria as medical necessity or utilization control (42 C.F.R. § 440.230(d)). In doing so, a State must ensure that the amount, duration, and scope of coverage are reasonably sufficient to achieve the purpose of the service (42 C.F.R. § 440.230(b)). Furthermore, a State may not impose arbitrary limitations on mandatory services, such as home health services, based solely on diagnosis, type of illness, or condition (42 C.F.R. § 440.230(c)).

A State may develop a list of pre-approved items of ME as an administrative convenience because such a list eliminates the need to administer an extensive application process for each ME request submitted. An ME policy that provides no reasonable and meaningful procedure for requesting items that do not appear on a State's pre-approved list, is inconsistent with the federal law discussed above. In evaluating a request for an item of ME, a State may not use a "Medicaid population as a whole" test, which requires a beneficiary to demonstrate that, absent coverage of the item requested, the needs of "most" Medicaid recipients will not be met. This test, in the ME context, establishes a standard that virtually no individual item of ME can meet. Requiring a beneficiary to meet this test as a criterion for determining whether an item is covered, therefore, fails to provide a meaningful opportunity for seeking modifications of or exceptions to a State's pre-approved list. Finally, the process for seeking modifications or exceptions must be made available to all beneficiaries and may not be limited to sub-classes of the population (e.g., beneficiaries under the age of 21).

In light of this interpretation of the applicable statute and regulations, a State will be in compliance with federal Medicaid requirements only if, with respect to an individual applicant's request for an item of ME, the following conditions are met:

- The process is timely and employs reasonable and specific criteria by which an individual item of ME will be judged for coverage under the State's home health services benefit. These criteria must be sufficiently specific to permit a determination of whether an item of ME that does not appear on a State's pre-approved list has been arbitrarily excluded from coverage based solely on a diagnosis, type of illness, or condition.

- The State's process and criteria, as well as the State's list of pre-approved items, are made available to beneficiaries and the public.

- Beneficiaries are informed of their right, under 42 C.F.R. Part 431 Subpart E, to a fair hearing to determine whether an adverse decision is contrary to the law cited above.

We encourage you to be cognizant of the approval decisions you make regarding items of ME that do not appear on a pre-approved list, to ensure that the item of ME is covered for all beneficiaries who are similarly situated. In addition, your list of pre-approved items of ME should be viewed as an evolving document that should be updated periodically to reflect available technology.

HCFA's Regional Offices will be monitoring compliance with the statute and regulations that are the subject of this guidance. Any questions concerning this letter or the ME benefit may be referred to Mary Jean Duckett of my staff at (410) 786-3294.

Sincerely,

/s/

Sally K. Richardson

Director

cc:

All HCFA Regional Administrators
All HCFA Associate Regional Administrators for Medicaid and State Operations
Lee Partridge  American Health Services Association
Joy Wilson  National Conference of State Legislatures
bcc: HCFA Press Office CMSO Senior Staff



APPENDIX 7



Slip Copy, 2013 WL 6491075 (S.D.Tex.)
(Cite as: 2013 WL 6491075 (S.D.Tex.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Victoria Division.
Bradley KOENNING, Brian Martin, and Morgan
Ryals, Plaintiffs,
v.
Thomas SUEHS, in his official capacity as Executive Commissioner, Texas Health and Human Services Commission, Defendant.

Civil Action No. V–11–6.
Dec. 9, 2013.

Maureen O'Connell, Southern Disability Law Center, Austin, TX, for Plaintiff.

Drew L. Harris, Office of the Attorney General, Jonathan Franklin Mitchell, Douglas Dean Geyser, Texas Attorney General, Austin, TX, for Defendant.

**OPINION & ORDER**
JOHN D. RAINEY, Senior District Judge.
*1 Pending before the Court is Defendant's Rule 60(b)(5) Motion for Relief from Attorneys' Fees (Dkt. No. 49), filed by Kyle L. Janek,[FN1] Executive Commissioner of the Texas Health and Human Services Commission (THHSC), acting through the Texas Medicaid and Healthcare Partnership (TMHP) (hereinafter "Defendant"). Plaintiffs Bradley Koenning, Brian Martin, and Morgan Ryals ("Plaintiffs") have responded to Defendant's motion. (Dkt. No. 53 .)

FN1. Kyle L. Janek succeeded Thomas Suehs as Executive Commissioner of THHSC on September 1, 2012.

**I. Background**
On September 18, 2012, the Court issued its Memorandum Opinion & Order and Final Judgment, granting in part Plaintiffs' Motion for Summary Judgment and remanding the case to TMHP for further action. (Dkt. Nos. 33 & 34.) On November 14, 2012, the Court entered a second Memorandum Opinion & Order awarding Plaintiffs $158,331.60 in attorneys' fees and $6,847.63 in court costs based on their status as "prevailing parties" on summary judgment. (Dkt. No. 43.) In an October 4, 2013 *per curium* opinion, the United States Court of Appeals for the Fifth Circuit dismissed Plaintiffs' claims on appeal as moot and vacated the Court's September 18, 2012 Opinion and Judgment in "the public interest," finding that the Court's decision "contain[ed] meaningful errors." (Dkt. No. 50 at 3–4.) Defendant now moves the Court to vacate its November 14, 2012 Order awarding Plaintiffs their attorneys' fees and court costs.

**II. Legal Standard**
Federal Rule of Civil Procedure 60(b) provides that a district court may relieve a party from a final judgment or order that is "based on an earlier judgment that has been reversed or vacated." FED. R. CIV. P. 60(b)(5). Numerous courts, including the Fifth Circuit, have "ma[d]e it clear that FED. R. CIV. P. 60(b) (5) is an appropriate method for seeking relief from a judgment of attorney's fees once the underlying judgment has been reversed." *Am. Realty Trust, Inc. v. Matisse Partners, L.L.C.,* 2003 WL 23175440, *3 n. 5 (N.D.Tex. Dec.15, 2003) (citing *Flowers v. S. Reg'l Physician Servs., Inc.,* 286 F.3d 798, 801–02 (5th Cir.2002); *Cal. Med. Ass'n v. Shalala,* 207 F.3d 575, 577–79 (9th Cir.2000), *Mother Goose Nursery Sch., Inc. v. Sendak,* 770 F.2d 668, 676 (7th Cir.1985)).

**III. Analysis**
Despite Plaintiffs' assertions to the contrary, the Fifth Circuit did not vacate the Court's Opinion and Judgment because they were moot. The Fifth Circuit vacated the Court's Opinion and Judgment because they were erroneous.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Because the Court's award of attorneys' fees was based on an erroneous judgment that has since been vacated by the Fifth Circuit, the fee award must be vacated pursuant to Rule 60(b)(5). *See Flowers,* 286 F.3d at 802 (Vacatur of a fee award was appropriate under Rule 60(b)(5) where the "part of the judgment that formed the basis of the granting of attorney's fees was vacated."); *Cal. Med. Ass'n,* 207 F.3d at 577–78 (Where an award of attorneys' fees is based on the merits of the judgment, "reversal of the merits removes the underpinnings of the fee award."); 15B CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. § 3915.6 (If no appeal is taken from an award of attorney's fees, "some means must be found to avoid the unseemly spectacle of enforcing a fee award based on a judgment that has been reversed.").

### IV. Conclusion

**\*2** For the reasons set forth above, Defendant's Rule 60(b)(5) Motion for Relief from Attorneys' Fees (Dkt. No. 49) is **GRANTED,** and the Court's November 14, 2012 Memorandum Opinion & Order awarding Plaintiffs $158,331.60 in attorneys' fees and $6,847.63 in court costs (Dkt. No. 43) is **VACATED.**

It is so **ORDERED.**

S.D.Tex.,2013.
Koenning v. Suehs
Slip Copy, 2013 WL 6491075 (S.D.Tex.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# APPENDIX 8



752 F.3d 627, Med & Med GD (CCH) P 304,943
(Cite as: 752 F.3d 627)

H

United States Court of Appeals,
Fifth Circuit.
Scott **DETGEN**, by His Next Friend, L.C. **DET-GEN**; Juanita Barraza, by Her Next Friend, Yolanda Villareal; Brandon Doyel; Joshua Vargas,
Plaintiffs–Appellants,
v.
Dr. Kyle **JANEK**, in His Official Capacity as Executive Commissioner, Texas Health and Human Services Commission, Defendant–Appellee.

No. 13–10396.
May 16, 2014.

**Background:** Disabled Medicaid recipients filed suit under § 1983 against Texas Health and Human Services Commissioner, challenging categorical denial of their request for benefits for installation of ceiling lift designed to assist them in transfer to and from bed, bath, and other surfaces. The United States District Court for the Northern District of Texas, A. Joe Fish, Senior District Judge, 945 F.Supp.2d 746, granted summary judgment for defendant. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit Judge, held that:
(1) plaintiffs had implied private cause of action under Supremacy Clause and
(2) categorical exclusion on ceiling lifts based on availability of cost-effective alternatives could not mean that state had denied medically necessary device.

Affirmed.

West Headnotes

**[1] States 360 ⊂⊃18.79**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.79 k. Social security and public welfare. Most Cited Cases

Disabled Medicaid recipients had implied private cause of action under Supremacy Clause against Texas Health and Human Services Commissioner to challenging categorical denial of their request for benefits for installation of ceiling lift designed to assist them in transfer to and from bed, bath, and other surfaces. U.S.C.A. Const. Art. 6, cl. 2.

**[2] Action 13 ⊂⊃3**

13 Action
  13I Grounds and Conditions Precedent
    13k3 k. Statutory rights of action. Most Cited Cases

Normally a cause of action must be found in a statute: like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.

**[3] States 360 ⊂⊃18.3**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.3 k. Preemption in general. Most Cited Cases

**United States 393 ⊂⊃82(2)**

393 United States
  393VI Fiscal Matters
    393k82 Disbursements in General
      393k82(2) k. Aid to state and local agencies in general. Most Cited Cases

Supremacy Clause confers an implied private cause of action to enforce all Spending Clause legislation by bringing preemption actions. U.S.C.A. Const. Art. 6, cl. 2.

**[4] Action 13 ⊂⊃3**

13 Action

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

752 F.3d 627, Med & Med GD (CCH) P 304,943
**(Cite as: 752 F.3d 627)**

13I Grounds and Conditions Precedent
    13k3 k. Statutory rights of action. Most Cited
Cases

**Health 198H ☞507**

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;
Medicaid
          198Hk506 Judicial Review; Actions
            198Hk507 k. In general. Most Cited
Cases
    When a state violates the federal requirements
of the Medicaid Act, a private plaintiff can sue the
state to enforce those requirements. Medicaid Act,
§ 1902(a), 42 U.S.C.A. § 1396a(a).

**[5] Health 198H ☞462**

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;
Medicaid
          198Hk462 k. State participation in federal
programs. Most Cited Cases
    Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of
Title XIX. Medicaid Act, § 1902(a), 42 U.S.C.A. §
1396a(a).

**[6] Health 198H ☞478**

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;
Medicaid
          198Hk472 Benefits and Services Covered
            198Hk478 k. Medical equipment;
wheelchairs. Most Cited Cases
    Categorical exclusion on ceiling lifts based on
availability of cost-effective alternatives could not
mean that state had denied medically necessary
device under Medicaid; even if ceiling lifts fell
within state's definition of durable medical equip-

ment and were medically necessary, statutory language did not plainly prohibit categorical exclusions and reasonableness standard in the text likely
supported imposition of reasonable categorical exclusions. Medicaid Act, § 1902(a)(17), 42 U.S.C.A.
§ 1396a(a)(17); 42 C.F.R. § 440.230(b).

**[7] Health 198H ☞473**

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;
Medicaid
          198Hk472 Benefits and Services Covered
            198Hk473 k. In general. Most Cited
Cases
    States have broad discretion to adopt standards
for determining the extent of medical assistance;
the standards only have to be "reasonable" and
"consistent with the objectives" of the Act. Medicaid Act, § 1902(a)(17), 42 U.S.C.A. §
1396a(a)(17); 42 C.F.R. § 440.230(b).

**[8] Health 198H ☞478**

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;
Medicaid
          198Hk472 Benefits and Services Covered
            198Hk478 k. Medical equipment;
wheelchairs. Most Cited Cases
    Medicaid permits a state to adopt a list of preapproved devices for convenience and a list of categorical exclusions if based on reasonable grounds,
such as the availability of more cost-effective alternatives, and permits a beneficiary to demonstrate
need for an item on neither list. Medicaid Act, §
1902(a)(17), 42 U.S.C.A. § 1396a(a)(17); 42 C.F.R.
§ 440.230(b).

**[9] Health 198H ☞473**

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Medicaid
     198Hk472 Benefits and Services Covered
          198Hk473 k. In general. Most Cited
Cases

    Under Medicaid, a state cannot deny a treatment solely based on diagnosis, type of illness, or condition.

**[10] Health 198H** ⟜473

198H Health
    198HIII Government Assistance
        198HIII(B) Medical Assistance in General;
Medicaid
          198Hk472 Benefits and Services Covered
             198Hk473 k. In general. Most Cited
Cases

    Under Medicaid, a state may not limit a treatment that is generally available for non-medical reasons.

**\*629** Maureen A. O'Connell, Southern Disability Law Center, Austin, TX, Lewis Alan Golinker, Esq., Assistive Technology Law Center, Ithaca, NY, for Plaintiffs–Appellants.

Jonathan F. Mitchell, Solicitor General, Douglas D. Geyser, Esq., Office of the Solicitor General, for the State of Texas, Erika M. Kane, Assistant Attorney General, Office of the Attorney General, General Litigation Division, Austin, TX, for Defendant–Appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before JONES, SMITH, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

    The four plaintiffs are Medicaid beneficiaries with near total physical disabilities, requiring constant personal assistance and care. On the advice of professionals, they asked Texas's Health and Human Services Commission to pay for ceiling lifts,

which are classified as durable medical equipment ("DME"). Such lifts are expensive but would allow the disabled beneficiaries to move with straps attached to ceilings. Texas denied coverage under a categorical exclusion in the state's implementing Medicaid regulations. The district court granted summary judgment for the state on the ground that, so long as federal monies were not available to reimburse it, it did not need to provide the lifts.

    The Center for Medicare and Medicaid Services ("CMS") has since offered guidance, however, that federal financial participation would be available. In addition to appealing the judgment, the plaintiffs move this court to vacate it for reconsideration. In the appeal, they maintain that the state's categorical exclusions are preempted by federal law or otherwise violate their procedural due-process rights. Texas responds that categorical exclusions are not preempted and, moreover, that a state can never violate the Medicaid Act and that the plaintiffs do not have a private cause of action to enforce it.

    Under binding precedent, these plaintiffs have an implied private cause of action under the Supremacy Clause to pursue this challenge. We additionally note that the state must comply with the requirements of the Medicaid Act, but the Act does not preempt the state's categorical exclusions. We therefore affirm the summary judgment and deny the motion to vacate.

I.

    [1][2] The plaintiffs assert that they have an implied cause of action to pursue their claims. Normally a cause of action must be found in a statute: "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). The plaintiffs' theory of an implied cause of action does not depend on any rights-creating language in the Medicaid Act; rather, they rely on the **\*630** Supremacy Clause.[FN1] The Supreme Court recently dodged the question—incidentally in a case in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

752 F.3d 627, Med & Med GD (CCH) P 304,943
**(Cite as: 752 F.3d 627)**

volving the Medicaid Act—whether the Supremacy Clause provides a cause of action itself in the absence of a statutory private cause of action. *See Douglas v. Indep. Living Ctr. of S. Cal., Inc.,* —— U.S. ——, 132 S.Ct. 1204, 182 L.Ed.2d 101 (2012)

> FN1. Plaintiffs rely on 42 U.S.C. § 1983 for their due-process claims.

[3] In light of the Court's failure in *Douglas* to hold to the contrary, this appeal is governed by *Planned Parenthood of Houston & Southeast Texas v. Sanchez* ("*PPHST*"), 403 F.3d 324, 330–35 (5th Cir.2005). There this court held that the Supremacy Clause confers an implied private cause of action to enforce all Spending Clause legislation by bringing preemption actions.[FN2] The state is correct that since then, the Supreme Court has held that certain federal statutes contain no private right of action,[FN3] but that was true when *PPHST* was decided. *See, e.g., Sandoval,* 532 U.S. at 288–93, 121 S.Ct. 1511. In *Sandoval, Hope,* and *Brunner,* it appears that the plaintiffs never made the alternative claim that if the statute does not provide a cause of action, the Supremacy Clause does.[FN4]

> FN2. *PPHST,* 403 F.3d at 333 ("While [prior cases] do not directly address the issue of whether a valid cause of action existed [under the Supremacy Clause], we assumed that one did. Today we hold that one does. Other circuits have similarly recognized an implied cause of action to bring preemption claims seeking injunctive and declaratory relief even absent an explicit statutory claim.").

> FN3. *See, e.g., Horne v. Flores,* 557 U.S. 433, 456 n. 6, 129 S.Ct. 2579, 174 L.Ed.2d 406 (finding no private cause of action to enforce the No Child Left Behind Act); *Brunner v. Ohio Republican Party,* 555 U.S. 5, 6, 129 S.Ct. 5, 172 L.Ed.2d 4 (2008) (suggesting no private cause of action to enforce the Help America Vote Act).

> FN4. The Tenth Circuit has only recently come to the opposite conclusion. *See Planned Parenthood of Kan. & Mid–Mo. v. Moser,* 747 F.3d 814 (10th Cir.2014) (holding that the Supremacy Clause does not provide a private cause of action).

## II.

[4] The state makes the alternative argument that even if plaintiffs have a cause of action, it is impossible for a state to violate the Medicaid Act. The state analogizes the Act to legislation tying highway funds to a certain maximum speed limit: A state may lawfully establish a higher limit, but it will forgo funds. Thus, the state claims, here it may lawfully pass nonconforming Medicaid legislation at the risk of losing federal funds, but not at the risk of private lawsuits. It reasons that unlike other legislation that can preempt state law, this federal law does not include language such as "shall," commanding a state to perform a certain function.

[5] The provision on which plaintiffs rely, however, does contain such language: "A State plan for medical assistance *must* ... include reasonable standards ... for determining eligibility...." 42 U.S.C. § 1396a(a) (emphasis added). Additionally, several courts, including the Supreme Court, have held that once a state accepts federal funding, it must conform to the requirements of the relevant federal law, including the Medicaid Act: "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *see also Hope Med. Grp. for Women v. Edwards,* 63 F.3d 418, 421 (5th Cir.1995).

*631 Indeed, a contrary ruling would contradict *PPHST,* which held that there is an implied private cause of action under the Supremacy Clause to enforce all Spending Clause legislation. Under the state's theory, the holding in *PPHST* would have

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

752 F.3d 627, Med & Med GD (CCH) P 304,943
(Cite as: 752 F.3d 627)

been totally unnecessary because it is impossible for a state to violate a Spending Clause statute, so a private cause of action does plaintiffs no good. We agree that if no private cause of action existed, it would be up to the federal government to decide how to enforce compliance, and it could choose to withhold funds. That, indeed, is how at least two Supreme Court Justices would interpret the Medicaid Act.[FN5] But this court in *PPHST*, 403 F.3d at 332 & n. 34, specifically discounted those two views in coming to its conclusion. Although it is quite possible, as Texas maintains, that no state has made such an argument, *PPHST* necessarily (even if implicitly) directs that when a state violates the federal requirements of the Medicaid Act, a private plaintiff can sue the state to enforce those requirements.

> FN5. *See Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 675, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (Scalia, J., concurring in the judgment) ("I would reject petitioner's statutory claim on the ground that the remedy for the State's failure to comply with the obligations it has agreed to undertake under the Medicaid Act is set forth in the Act itself: termination of funding by the Secretary of the Department of Health and Human Services. Petitioner must seek enforcement of the Medicaid conditions by that authority...." (internal citations omitted)); *id.* at 682, 123 S.Ct. 1855 (Thomas, J., concurring in the judgment) ("[T]he Secretary's mandate from Congress is to conduct, with greater expertise and resources than courts, the inquiry into whether [state law] upsets the balance contemplated by the Medicaid Act. Congress' delegation to the agency to perform this complex balancing task precludes federal-court intervention on the basis of obstacle pre-emption—it does not bar the Secretary from performing his duty to adjudge whether [the State's law] upsets the balance the Medicaid Act contemplates

and withhold approval or funding if necessary.").

### III.

[6] Regarding the merits, the basis for this challenge is the requirement that "[a] State plan for medical assistance must ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan ... which are consistent with the objectives of this subchapter," 42 U.S.C. § 1396a(a)(17), and the implementing regulation requiring that each provided service "must be sufficient in amount, duration, and scope to reasonably achieve its purpose," 42 C.F.R. § 440.230(b). The plaintiffs rely on this statutory language, an agency guidance letter, and precedent to contend that the state's categorical exclusion is not a "reasonable standard."

[7] States have broad discretion to implement the Medicaid Act: "This [statutory] language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Beal v. Doe*, 432 U.S. 438, 444, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). In combination with the presumption against preemption and its concomitant clear-statement rule, the discretion conferred in *Doe* leaves little doubt that we must affirm the summary judgment if the statutory language does not plainly prohibit categorical exclusions.

As we have noted, the statute requires that "[a] State plan for medical assistance must ... include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan." Additionally, the Medicaid Act requires a state program to cover "home health services," 42 U.S.C. § 1396a(a)(10)(D), which *632 include "[m]edical supplies, equipment, and appliances suitable for use in the home," 42 C.F.R. § 440.70(b)(3). But, as plaintiffs acknowledge, the Act does not identify the specific equipment that a state must offer, and the scope of offerings is governed by the "reasonableness" standard in the stat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

752 F.3d 627, Med & Med GD (CCH) P 304,943
(Cite as: 752 F.3d 627)

ute. Plaintiffs maintain that the categorical exclusion of ceiling lifts is unreasonable because ceiling lifts fall within the *state's* definition of DME and are medically necessary.

The state categorically excludes such lifts from coverage for a number of reasons. Although the district court specifically relied on the lack of federal financial assistance for its ruling—a ruling that is undermined by subsequent CMS guidance to the contrary—the state also flatly excludes such lifts because they require structural modifications to residences. Texas also excludes from the definition of DME, in the home services category, ramps, elevators, stairwell lifts, and platform lifts. Further, the state explains in its brief that it provides more cost-effective alternatives such as "transfer boards, freestanding track (or 'Niklas') lifts, transfer chair systems for use with the bath or commode, and manually or electronically operated floor lifts (also known as 'Hoyer' lifts)." The ceiling lifts at issue here would cost the state between $15,000 and $20,000, and even the insurers Aetna and Cigna deny coverage for such equipment.

It is hardly unreasonable for a state to exclude—even categorically—any medical device whose purpose can be served by a more cost-effective method. Not only has Texas not violated the plain language of the statute, but also the reasonableness standard in the text likely supports its imposition of *reasonable* categorical exclusions. The plaintiffs' notion that it would be unreasonable for a state not to provide particular equipment *within its definition* of DME sounds plausible, except that the state can choose *by definition* to exclude ceiling lifts.[FN6] Moreover, a categorical exclusion based on the availability of cost-effective alternatives cannot mean that the state has denied a medically necessary device, even if the statute did impose such a standard.

> FN6. The state defines DME at a high level of generality, saying that it includes equipment with a projected term of use of more than one year or if the reimbursement

is over $1,000. 1 Tex. Admin. Code § 354.1031(b)(2). But Texas's Medicaid Provider Procedures Manual explains that not all DME will be considered reimbursable as a home health service; rather, the DME must meet a list of criteria after which it "may" be a covered benefit. Section 2.2.14.27 of the manual specifically excludes many DMEs, including home modifications.

Plaintiffs rely heavily on a 1998 guidance letter from CMS's predecessor (the "*DeSario* letter") to support their assertions. The letter explains that a state may "develop a list of pre-approved items of [medical equipment] as an administrative convenience," but a "policy that provides no reasonable and meaningful procedure for requesting items that do not appear on a State's pre-approved list [ ] is inconsistent with federal law."[FN7]

> FN7. Letter from Sally K. Richardson, Director, Ctr. for Medicaid and State Operations, Dep't of Health & Human Servs. to State Medicaid Directors (Sept. 4, 1998), *available at* http:// downloads. cms. gov/ cmsgov/ archived- downloads/ SMDL/ downloads/ SMD 090498. pdf.

[8] Deference to the guidance letter is not an issue, because the state has not violated its requirements: The letter says only that if a state has a pre-approved list, there must be some way to prove need for items not on it. This letter says nothing about the possibility of a state's deciding that some items shall be on a "never approved*633 list," that is, that some items may be categorically excluded. It would be perfectly consistent with federal law and this letter to adopt a list of pre-approved devices for convenience and a list of categorical exclusions if based on reasonable grounds, such as the availability of more cost-effective alternatives, and to permit a beneficiary to demonstrate need for an item on neither list. In short, nothing in the *DeSario* letter prohibits categorical exclusions, which might even be eminently reasonable and thus consistent

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the statutory language.

[9][10] Contrary to the plaintiffs' assertions, no decision of this court prohibits categorical exclusions, and none of the cases they cite is on point. Our decision in *Rush v. Parham*, 625 F.2d 1150, 1157 n. 12 (5th Cir.1980), merely stands for the proposition that a state cannot deny a treatment solely based on "diagnosis, type of illness, or condition," which is an explicit requirement of the Code of Federal Regulations. As for *Hope Medical Group*, an important distinction is that there the treatment in question was generally available, but the state had limited its availability for non-medical reasons. *See Hope Med. Grp.*, 63 F.3d at 427. That situation is thus distinguishable from a categorical exclusion of an item, which might be based on a reasonable ground such as the availability of more cost-effective alternatives.

The plaintiffs rely most heavily on *Fred C. v. Texas Health & Human Services Commission*, 988 F.Supp. 1032 (W.D.Tex.1997), *aff'd*, 167 F.3d 537 (5th Cir.1998). Plaintiffs aver that that case stands for the proposition that if the state's Medicaid program provides a medical service or device for an individual under age twenty-one, it must also provide that service, if medically necessary, to a person over that age. Such an outcome would benefit the plaintiffs because the state provides ceiling lifts to those younger than twenty-one.

As the state contends here, however, even if *Fred C.* could be read for that proposition, it would be absurd: The states are *required* by federal law to provide any and all services to individuals under twenty-one if medically necessary, "whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5). But if states do so and therefore must also so provide for anyone over twenty-one, the special federal rule for the provision of more expansive benefits to children would be unnecessary because the standards for children and the standards for adults would be collapsed into the same standard. The plaintiffs' reading would render superfluous the language "whether or not such ser-

vices are covered under the State plan," which suggests that the states must be able to offer *some* benefits to children that they do not have to offer adults.

We need not read *Fred C.* as plaintiffs wish. There the district court had held that a device provided for children under twenty-one must also be provided to adults as medically necessary. On the second appeal, we affirmed because the district court was governed by the "law of the case" as established by a previous short per curiam opinion, *Fred C. v. Texas Health & Human Services Commission*, 117 F.3d 1416 (5th Cir.1997). In that first appeal the court had remanded for a determination of whether the plaintiff was even eligible for home services; we implied that if that requirement was met, he would be eligible. The court never actually addressed the merits of the district court's age-based reasoning, and it never *held* (although it may have assumed) as the district court did that because the device was provided for children under twenty-one, it must also be provided to adults.

Moreover, we later noted that, although a state must provide certain benefits to children under twenty-one, it need not provide those same benefits to adults:

> *634 Further, the § 1396d(a)(7) category of home health care services is an optional, not a mandatory, category of medical assistance. § 1396a(a)(10)(A). Thus, the state was not required to provide this category of care and services to individuals over the age of twenty-one at all.... CMS's approval of the effective exclusion indicates only that the exclusion may be an appropriate limitation on the scope of the home health care benefit as it applies to recipients over twenty-one years of age. It does not express or imply that CMS has approved an exclusion applicable to EPSDT benefits [for children].

*S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 597 (5th Cir.2004). Therefore, plaintiffs' reading of *Fred C.* is not how this court has subsequently in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

752 F.3d 627, Med & Med GD (CCH) P 304,943
(Cite as: 752 F.3d 627)

terpreted the law respecting Medicaid, and it is not how we construe it now.

Because plaintiffs have not shown an entitlement to the ceiling lifts, their due process claims fail as well. The summary judgment is AFFIRMED, and the motion to vacate is DENIED.

C.A.5 (Tex.),2014.
Detgen ex rel. Detgen v. Janek
752 F.3d 627, Med & Med GD (CCH) P 304,943

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# APPENDIX 9

Filed in The District Court
of Travis County, Texas

NOV 14 2014

At_____10:40____A.M.
Amalia Rodriguez-Mendoza, Clerk

No. D-1-GN-14-000381

| | | |
|---|---|---|
| LINDA PUGLISI,<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§<br>§ | OF TRAVIS COUNTY, TEXAS |
| TEXAS HEALTH AND HUMAN<br>SERVICES COMMISSION,<br>Defendant. | §<br>§<br>§<br>§ | 200th JUDICIAL DISTRICT |

## ORDER DENYING MOTION TO DISMISS

Defendant's Motion to Dismiss Plaintiff's Petition for Judicial Review came before the Court on November 12, 2014. Upon consideration of the pleadings and the argument of counsel, this Court has determined that the motion should be denied.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss is herein DENIED.

Signed on this 14th day of November, 2014.

_____
Gisela D. Triana
Judge Presiding

APPENDIX 10



COPY

No. D-1-GN-14-000381

Filed In The District Court of Travis County, Texas
on ____ 1-15-15 ____
at ____ 3:15 ____ P.M.
Valva L. Price, District Clerk

| | | |
|---|---|---|
| LINDA PUGLISI,<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§ | OF TRAVIS COUNTY, TEXAS |
| TEXAS HEALTH AND HUMAN<br>SERVICES COMMISSION,<br>Defendant. | §<br>§<br>§<br>§ | 53rd JUDICIAL DISTRICT |

## FINAL JUDGMENT

On November 12, 2014, the Court heard oral argument on the merits of Plaintiff's appeal of an administrative hearing decision issued by the Texas Health and Human Services Commission ("the Commission") in on Durable Medical Equipment ("DME") in Appeal No. 1639469, issued on November 22, 2013, and the agency's administrative review of the fair hearing decision, issued on January 14, 2014. Plaintiff is a 27 year old Medicaid beneficiary who sustained quadriplegia as the result of a C1-4 spinal cord injury during a surgical procedure in 2011, and it is undisputed that she now suffers from severe limitations and related health issues for which her treating medical providers have sought to address with the DME.

The Court has considered the administrative record, the briefing, the arguments of counsel and applicable law, and now finds that Plaintiff's appeal is meritorious and Defendant's administrative decision should be reversed. The Court finds that the Commission's decision fails to comply with the controlling and applicable federal and state law, and thus is arbitrary, capricious, and unreasonable. The Court further finds that the Commission's decision to deny Medicaid coverage for the DME custom power wheelchair with an integrated standing feature as recommended by her treating medical providers, because Plaintiff has not demonstrated medical necessity, is also not supported by substantial evidence and Plaintiff has established her entitlement based on medical necessity under that applicable law. Because this DME item must receive prior authorized from Texas Medicaid, the Court reverses the administrative decision of the Texas Health and Human Services Commission on prior authorization presented.

IT IS THEREFORE ORDERED that this matter is hereby REVERSED and REMANDED back to the Texas Health and Human Services Commission for further proceedings consistent with decision, including any other required determinations related to Medicare and Medicaid issues not currently before the Court.

All taxable court costs are assessed against the party who incurred them. This judgment finally disposes of all parties and all claims in the entire suit and is appealable.

Signed this 15th day of January, 2015.

Gisela D. Triana
Judge Presiding
200th District Court

# APPENDIX 11

# DME MAC
## Jurisdiction C





# SUPPLIER MANUAL


CGS
A CELERIAN GROUP COMPANY

© 2014 Copyright, CGS Administrators, LLC


CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

EXHIBIT 2

## Table of Contents

**DME MAC Jurisdiction C Supplier Manual**

**Table of Contents**

**1. Introduction**

*Welcome*
- CGS's Role as a DME MAC
- What is Medicare?
- What is DME?
- Deductible and Coinsurance
- Eligibility
- Medicare Health Insurance Claim Number (HICN)
- The Medicare Card
- Termination of Enrollment
- Medicare Advantage Plans
- Other Government Insurance Plans
- Privacy Act of 1974 and HIPPA Privacy Rules
- Freedom of Information Act (FOIA)

**2. Supplier Enrollment**

*Overview*
- National Provider Identifier (NPI)
- National Supplier Clearinghouse (NSC)
- Supplier Standards
- Reenrollment
- Change of Information
- Participating/Nonparticipating
- Site Visits
- Do Not Forward
- Directory of Medicare Suppliers
- Change of Ownership
- NSC Resources
- Supplier Audit and Compliance Unit (SACU)

**3. Supplier Documentation**

- General Information
- Definition of Physician
- Prescription (Orders) Requirements
- Documentation in the Patient's Medical Record
- Signature Requirements
- Refills of DMEPOS Items Provided on a Recurring Basis

# Table of Contents

- Beneficiary Authorization
- Proof of Delivery (POD)
- Advance Beneficiary Notice (ABN)
- Miscellaneous Documentation Issues
- Evidence of Medical Necessity: Power Mobility Devices (PMD)
- Comprehensive Error Rate Testing (CERT)

4.  **Certificates of Medical Necessity (CMNs)**

- Certificates of Medical Necessity (CMNs) and DME MAC Information Forms (DIFs)
- CMN and DIF Completion Instructions
- CMNs as Orders and Claim Submission
- Oxygen CMNs
- CMN Common Scenarios

5.  **DMEPOS Fee Schedule Categories**

*Introduction*
- Inexpensive or Other Routinely Purchased DME (IRP)
- Items Requiring Frequent and Substantial Servicing
- Certain Customized Items
- Other Prosthetic and Orthotic Devices
- Capped Rental Items
- Oxygen
- Medicare Advantage Plan Beneficiaries Transferring to Fee-For-Service Medicare
- Supplies and Accessories Used with Beneficiary-Owned Equipment
- Repairs, Maintenance, and Replacement
- DMEPOS Competitive Bidding

6.  **Claim Submission**

*Introduction*
- Mandatory Claim Filing
- Assignment Agreement
- Administrative Simplification Compliance Act (ASCA)
- CMS-1500 Claim Form
- Guidelines for Filing Paper Claims
- Claim Completion Instructions
- Claim Filing Jurisdiction
- Time Limit for Filing Claims
- Clean Claims – Payment Floor and Ceiling
- Electronic Funds Transfer (EFT)
- Place of Service
- Consolidated Billing

# Table of Contents

- DMEPOS and an Inpatient Stay
- DMEPOS and Hospice
- Upgrades
- PWK (Paperwork) Segment
- Electronic Submission of Medical Documentation (esMD)

## 7. Crossover Claims

*Introduction*
- Coordination of Benefits Agreement
- Medigap

## 8. Electronic Data Interchange (EDI)

*Introduction*
- Benefits of EDI
- ASCA
- Transmitting Claims to Other DME MACs
- Additional Electronic Options (CSI/BE and ERNs)
- Additional Information

## 9. Coverage and Medical Policy

*Introduction*
- DMEPOS Benefit Categories
- Medical Review Program
- Medical Policies
- Advance Determination of Medicare Coverage (ADMC) for Wheelchairs
- Prior Authorization of Power Mobility Devices (PMD)

## 10. Pricing

*Introduction*
- Fee Schedules
- Reasonable Charges
- Drug Pricing
- Single Payment Amount
- Individual Consideration

## 11. Medicare Secondary Payer (MSP)

*Introduction*
- Employer Sponsored Group Health Plan Coverage
- Accident/Injury Insurance
- Other Government-Sponsored Health Plans
- Electronic Billing of MSP Claims

# Table of Contents

- Medicare Secondary Claim Filing Tips
- MSP on Capped Rental Items
- MSP Payment Calculation
- MSP Overpayment Refunds
- Benefits Coordination & Recovery Center (BCRC)

## 12.  Overpayments

- Overpayments and Refunds
- Overpayment Offsets
- Referral of Delinquent Debt
- Extended Repayment Plan
- Overpayment Appeals

## 13.  Inquiries, Reopenings, and Appeals

- Telephone Inquiries
- Written Inquiries
- myCGS—The Jurisdiction C Web Portal
- Provider Outreach and Education (POE) Department
- Reopenings for Minor Errors and Omissions
- Appeals
- Redeterminations
- Reconsiderations
- Administrative Law Judge (ALJ)
- Departmental Appeals Board Review
- Federal Court Review
- Documentation in the Appeals Process

## 14.  Fraud and Abuse

*Introduction*
- Zone Program Integrity Contractors (ZPICs)
- Defining Fraud and Abuse
- Procedures for Handling Fraud and Abuse Situations
- Protect Yourself from Fraud
- ZPIC Contact Information

## 15.  Resources

*Introduction*
- Durable Medical Equipment Medicare Administrative Contractors (DME MACs)
- Jurisdiction C Resources
- Additional Resources
- Web Resources

# Table of Contents

**16.    Coding**

- The Pricing, Data Analysis and Coding (PDAC) Contractor
- Level II HCPCS Codes
- Coding Jurisdiction
- Modifiers

**17.    System Outputs**

- Claim Development Procedures
- Medicare Summary Notice (MSN)
- Medicare Remittance Notice (MRN)
- Biller Purged Claim Report
- ANSI Codes

**18.    Acronyms and Abbreviations**


**Appendix A – Level II HCPCS Codes**

## Chapter 1 Contents

*Welcome*
1. CGS's Role as a DME MAC
2. What is Medicare?
3. What is DME?
4. Deductible and Coinsurance
5. Eligibility
6. Medicare Health Insurance Claim Number (HICN)
7. The Medicare Card
8. Termination of Enrollment
9. Medicare Advantage Plans
10. Other Government Insurance Plans
11. Privacy Act of 1974 and HIPAA Privacy Rules
12. Freedom of Information Act (FOIA)

## Welcome

Welcome to the Durable Medical Equipment Medicare Administrative Contractor (DME MAC) Jurisdiction C Supplier Manual. This manual is provided for suppliers of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) who serve beneficiaries in Jurisdiction C. This manual contains an overview of important and useful information for DMEPOS suppliers regarding the Medicare program. It is the first resource that you should use for Medicare billing questions.

The *Supplier Manual* is updated on a quarterly basis. If you have billed a claim to Jurisdiction C in the past 12 months, then you will automatically receive a CD-ROM containing our quarterly *Supplier Manual* updates, as well as the most recent issue of our quarterly newsletter, the DME MAC Insider.

In every quarterly *Supplier Manual* revision, all text that has been added or revised from the previous quarter's version of the manual is shown in red text. All unchanged text is shown in black text. Please note that additions/revisions do not necessarily denote a change in policy. Some additions/revisions are added solely to provide greater clarity and understanding.

To stay up-to-date on the most recent Medicare news, you should be sure to subscribe to our ListServ, the CGS electronic mailing list. ListServ gives you immediate access to the latest Medicare information, including: Medicare publications, important updates, educational workshops, and medical review information. To join the ListServ, visit our website at http://www.cgsmedicare.com.

### Internet-only Manual (IOM) References

Most of the information in this manual is derived from the Centers for Medicare and Medicaid Services' (CMS) Internet-only Manuals (IOMs). The IOMs are a replica of the CMS official record copy. They are CMS' program issuances, day-to-day operating instructions, policies, and procedures that are based on statutes, regulations, guidelines, models, and directives. The CMS program components, providers, contractors, Medicare Advantage organizations, and state survey agencies use the IOMs to administer CMS programs. They are also a good source of Medicare and Medicaid information for the general public.

In order to give you an easy way to cross-reference the information in the IOM with the information in the *DME MAC Jurisdiction C Supplier Manual*, you will find references to the applicable IOM sections throughout each chapter of the *Supplier Manual*. The references are listed beneath title headings in the following format:

**CMS Manual System, Publication Number, *Publication Name*, Chapter, §Section**

You can access the IOMs at the following website: http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html (refer to Chapter 15 in this manual for more information about the CMS Manual System).

## 1. CGS's Role as a DME MAC

The Centers for Medicare & Medicaid Services (CMS), the government agency which oversees the Medicare program, selected four companies to process DMEPOS claims for the Medicare program. These companies function as DME MACs. Each DME MAC is responsible for processing DMEPOS claims for beneficiaries residing in their specific jurisdiction.

CGS is the DME MAC for Jurisdiction C. Jurisdiction C includes Alabama, Arkansas, Colorado, Florida, Georgia, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas, U.S. Virgin Islands, Virginia, and West Virginia.

Our role is strictly that of processing and paying Medicare claims in accordance to the Social Security Act, Medicare Modernization Act, health insurance regulations and laws, and the Centers for Medicare & Medicaid Services rulings.

For the administration of the DME MAC Jurisdiction C contract, our offices are located in Nashville, Tennessee.

## 2. What Is Medicare?
**CMS Manual System, Pub. 100-01, *Medicare General Information, Eligibility and Entitlement Manual*, Chapter 1, §§10-10.1 & 10.3**

The Medicare program is a federal health insurance program for:

- People age 65 or older,

- People under age 65 with certain disabilities, and

- People of all ages with End-Stage Renal Disease (permanent kidney failure requiring dialysis or a kidney transplant).

Medicare is run by the Centers for Medicare & Medicaid Services (CMS) of the United States Department of Health and Human Services (DHHS).

Medicare is divided into several different parts which pay for certain types of services or situations. Hospital insurance (Medicare Part A) helps pay for inpatient hospital care, inpatient care in a skilled nursing facility, home health care, and hospice care. Medical insurance (Medicare Part B) helps pay for medically necessary services by a physician, outpatient hospital services, home health care, and a number of other medical services and supplies that are not covered by Part A, including durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) for home use.

Prescription Drug Coverage (Medicare Part D), effective January 1, 2006, pays for prescription drugs for Medicare-eligible beneficiaries who are enrolled in a Medicare prescription drug plan. Medicare prescription drug plans are available in every part of the country and all plans cover both brand name and generic drugs.

All topics covered in this manual refer to Medicare Part B DMEPOS.

## 3. What Is DME?
CMS Manual System, Pub. 100-2, Medicare Benefit Policy Manual, Chapter 15, §110.1

Durable medical equipment is equipment which:

- Can withstand repeated use,
- Is primarily and customarily used to serve a medical purpose,
- Generally is not useful to a person in the absence of an illness or injury, and
- Is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be durable medical equipment.

## 4. Deductible and Coinsurance
CMS Manual System, Pub. 100-01, _Medicare General Information, Eligibility and Entitlement Manual_, Chapter 3, §§20.1-2

Medicare beneficiaries must meet a deductible each calendar year before payment can be made by Medicare Part B. The beneficiary may be billed for any amount applied to the deductible on both assigned and nonassigned claims. The deductible is applied to approved charges only (the deductible is not applied to any non-covered charge). The Medicare Part B deductible for 2014 is $147. The deductible is subject to change every calendar year.

In order for Medicare Part B to reimburse for covered medical services, a beneficiary must satisfy the annual deductible regardless of when during the calendar year he or she became eligible.

**NOTE**: Expenses are allocated to the deductible in the order in which claims are received and processed by Medicare, not necessarily in order of date of service.

Our Interactive Voice Response (IVR) Unit (which can be reached at 866-238-9650) is available to determine current deductible status for a beneficiary. Please see Chapter 13 of this manual for more information about the IVR.

After the Medicare Part B deductible has been satisfied for the calendar year, Medicare reimburses 80 percent of the amount allowed by Medicare for an item/service. The remaining 20 percent of the allowed amount is the responsibility of the beneficiary. This amount is referred to as the coinsurance.

## 5. Eligibility

CMS Manual System, Pub. 100-01, *Medicare General Information, Eligibility and Entitlement Manual*, Chapter 2

Medicare eligibility is determined by the Social Security Administration (SSA). An individual may become entitled through Social Security based on his or her own earnings or that of a spouse, parent, or child. Anyone who becomes entitled to premium-free hospital insurance (Medicare Part A) is automatically enrolled in medical insurance (Medicare Part B), except in Puerto Rico. Medicare Part B is a voluntary program for which the insured must pay a monthly premium; therefore, individuals who do not want coverage may refuse Medicare Part B enrollment. The effective date of Medicare Part B coverage depends on the month in which enrollment takes place. An individual's Medicare Part B coverage ends when the individual requests disenrollment, does not pay premiums, dies, or, for individuals less than 65 years of age, when hospital insurance entitlement ends. Beneficiaries who have Medicare Part A (Hospital Insurance) and/or Medicare Part B (Medical Insurance) are also eligible for Medicare Part D (Prescription Drug Coverage).

You should check the Medicare cards of your beneficiaries at least once every year because the Health Insurance Claim Numbers (HICNs) and suffixes can change according to the beneficiary's record of entitlement. This is especially important in the case of female beneficiaries, since their name and HICN can change according to marital status.

You may contact the DME MAC Jurisdiction C IVR at 1.866.238.9650 to determine eligibility. Please see Chapter 13 of this manual for more information about the IVR.

### Aged Insureds (65 years of age)

An aged insured is a person 65 years of age or older who is eligible for monthly Social Security or Railroad Retirement cash benefits or equivalent federal government benefits. Premium-free hospital insurance becomes effective on the first of the month in which the individual reaches age 65 if he or she applies for the benefit within six months of his/her birth month. Age 65 is considered to be reached on the day before the 65th birthday. For instance, an individual born on August 1st reaches age 65 on July 31st, and thus hospital insurance would be effective July 1st.

Some aged individuals do not qualify for premium-free hospital insurance due to insufficient Social Security Quarters of Coverage but may purchase Medicare Part A coverage. The individual must be a United States resident and either a citizen or an alien lawfully admitted for permanent residence who has lived in the United States continuously for five years or more. This person must also enroll (or already be enrolled) in Supplementary Medical Insurance (SMI). This type of enrollee must pay a monthly premium for both Medicare Part A and Medicare Part B coverage. If the premium is not paid within a specified period, then coverage is terminated.

### Under Age 65 with Permanent Kidney Failure (End Stage Renal Disease)

Eligibility for coverage of a permanent kidney failure patient begins the third month after the month in which a course of renal dialysis begins, unless the individual receives a kidney transplant on or before the third month. In that case, eligibility begins the month the individual is admitted as an inpatient to a hospital for procedures in preparation for, or in anticipation of, a kidney transplant, provided that the transplant surgery takes place within the following two months. When the transplant is delayed more than two months after the preparatory hospitalization, eligibility begins with the second month prior to the month of transplant.

Also, Medicare entitlement can begin in the first month of a course of dialysis if the individual participates in a self-dialysis training program in a Medicare-approved facility prior to the third month after the course of dialysis. The individual is expected to complete the training and self-dialyze thereafter. If a beneficiary is entitled to Medicare only because of permanent kidney failure, Medicare

protection will end 12 months after dialysis ends or 36 months after the month of a kidney transplant. If the transplant fails during or after that 36-month period and the beneficiary again resumes maintenance dialysis or receives another transplant, Medicare coverage will continue or be reinstated immediately without any waiting period.

### Under Age 65 and Permanently Disabled

Medicare entitlement for the disabled begins with the 25th month after an individual has been eligible for Social Security Disability benefits. Subsequently, if the beneficiary is no longer entitled to Social Security disability payments, then his or her Medicare coverage will generally continue for one more calendar month after he/she is sent notice of the termination of the disability payments.

## 6. Medicare Health Insurance Claim Number (HICN)
**CMS Manual System, Pub. 100-01,** *Medicare General Information, Eligibility and Entitlement Manual,* **Chapter 2, §§50.2-50.4.2**

The Health Insurance Claim Number (HICN), also known as the Medicare number, serves as the beneficiary's identification number for Medicare entitlement. The HICN is shown on the beneficiary's Medicare card.

The general format of the Medicare number is 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 preceded or followed by a suffix. Some Railroad Retirement Board (RRB) beneficiaries may have a number with a different format (see "Other Government Insurance Plans" below for additional information).

**NOTE:** The HICN may be different than the beneficiary's Social Security number.

The HICN is probably the most important piece of information you can have about your Medicare patient. Claims cannot be paid if the HICN is missing or incorrect.

Additional information about the HICN, including valid HICN prefixes and suffixes, can be found in the CMS Internet-Only Manual (IOM), Pub. 100-01, *Medicare General Information, Eligibility and Entitlement Manual*, Chapter 2, Section 50.2 – 50.4.2. You can find the IOM on the CMS website at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

## 7. The Medicare Card

A Medicare card is issued to every person who is entitled to Medicare benefits. This card identifies the Medicare beneficiary and includes the following information:

- Name (exactly as it appears on the Social Security records)
- Medicare Health Insurance Claim Number (HICN)
- Beginning date of Medicare entitlement for hospital (Part A) and/or medical (Part B) insurance
- Sex
- A place for the beneficiary's signature

The following is an example of a Medicare card:

The patient's name and health insurance claim number must be shown on all Medicare claims exactly as they are shown on the patient's card - including the letter.

The protection your patient has is shown here. NOTE: If your patient's health insurance card shows that he/she has "hospital insurance benefits only" your services CANNOT be paid for by Medicare.



Effective date(s)

**Note:** More recent cards issued by CMS show the 1-800-Medicare number (see example below). If the beneficiary has a card that shows something different (such as the example above), it is still valid and can be used to get medical care.



We recommend that you obtain a copy of the Medicare card and incorporate it in the beneficiary's file for accuracy of claim submissions.

## 8. Termination of Enrollment

There are times when a beneficiary's enrollment in Medicare may terminate for various reasons. This may not be reflected on the Medicare card. If you receive a denial from Medicare indicating no entitlement for the dates of service on the claim, there are several items you can check:

1. Did you copy the correct and complete HICN from the Medicare card?

2. Is this the correct date of service? Be sure to check the year.

3. Has the beneficiary's enrollment been terminated? Check with the beneficiary to verify this possibility. The DME MAC generally does not have any details regarding the reason of termination of a beneficiary's enrollment.

## 9. Medicare Advantage Plans
CMS Manual System, Pub. 100-01, _Medicare General Information, Eligibility and Entitlement Manual_, Chapter 2, §60

As an alternative to the traditional fee-for-service Medicare plan, beneficiaries have the option of enrolling in a Medicare Advantage Plan. Medicare Advantage Plans include Medicare Health Maintenance Organizations (HMOs), Preferred Provider Organizations (PPOs), Medicare Special Needs Plans, and Medicare Private Fee-for-Service Plans. Claims for these plans must be filed with the contractor administering that particular plan. **Do not** file claims for Medicare Advantage Plans to CGS.

## 10. Other Government Insurance Plans

### Railroad Retirement Board (RRB)

Claims for DMEPOS items for beneficiaries eligible for Railroad Retirement Board (RRB) benefits are also processed by CGS for beneficiaries in Jurisdiction C. It is easy to recognize a beneficiary covered by RRB by looking at the HICN. The RRB HICN will have one or more letters in front of the numbers. For all other Medicare numbers, the letter(s) follow the numbers.

Example: A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 = RRB or WA123456 = RRB; 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A = Medicare

### United Mine Workers Association (UMWA)

There is no easily recognizable number for beneficiaries with coverage by the United Mine Workers Association (UMWA). The beneficiary should be able to advise if his/her coverage is through UMWA. In the event a claim is filed to our office for UMWA, the claim will be returned to you to resubmit to the UMWA for processing. A statement to that effect will be printed on your Medicare Remittance Advice. A statement will also be printed on the beneficiary's Medicare Summary Notice (MSN). These notices will let you and the beneficiary know that future claims should be filed with the appropriate office. Contact Information for the UMWA can be found in Chapter 15 of this Supplier Manual.

## 11. Privacy Act of 1974 and HIPAA Privacy Rules
CMS Manual System, Pub. 100-01, _Medicare General Information, Eligibility and Entitlement Manual_, Chapter 6, §§10 & 190

The purpose of the Privacy Act and HIPAA Privacy Rules is to provide safeguards for individuals against an invasion of privacy. Federal agencies are required to permit individuals to:

1. Determine what records pertaining to him/her are collected, used, or disseminated by such agencies.

2. Prevent records pertaining to him/her from being used for another purpose without their consent.

3. Gain access to information pertaining to him/her in federal agency records, and to correct such records when appropriate.

Disclosure of information about a beneficiary to any party other than the beneficiary (or his/her legal guardian) him/herself is prohibited without the beneficiary's (or legal guardian's) explicit written authorization. This authorization may be in any form, but it must:

- Include the beneficiary's name, and HICN;

- Specify the individual, organizational unit, class of individuals or organizational units who may make the disclosure;

- Specify the individual, organizational unit, class of individuals or organizational units to which the information may be disclosed;

- Specify the records, information, or types of information that may be disclosed;

- A description of the purpose of the requested use or disclosure (if the beneficiary does not want to provide a statement of the purpose, he/she can describe the use as "at the request of the individual");

- Indicate whether the authorization is for a one-time disclosure, or give an expiration date or event that relates to the individual or the purpose of the use or disclosure (e.g., for the duration of the beneficiary's enrollment in the health plan);

- Be signed and dated by the beneficiary or his/her authorized representative. If signed by the representative, a description of the representative's authority to act for the individual must also be provided;

- A statement describing the individual's right to revoke the authorization along with a description of the process to revoke the authorization;

- A statement describing the inability to condition treatment, payment, enrollment, or eligibility for benefits on whether or not the beneficiary signs the authorization;

- A statement informing the beneficiary that information disclosed pursuant to the authorization may be redisclosed by the recipient and may no longer be protected.

Blanket consents to disclose all of the beneficiary's records to unspecified individuals or organizations will not be honored. The consent must specify the item/service for which the disclosure is requested and should only include those items/services prescribed by the beneficiary's physician.

## 12. Freedom of Information Act (FOIA)

The Freedom of Information Act (FOIA) requires that most records in custody of CMS (and its contractors) be made available to the general public when requested. The FOIA does not apply to materials specifically prepared for public distribution or sale, e.g., press releases, speeches, fact sheets, listings (names and business addresses) of Medicaid and/or Medicare providers, information brochures, and any publication which has been assigned a CMS, Health and Human Services, Government Printing Office, or National Technical Information Service (NTIS) publication number, etc.

The FOIA covers records (paper or electronic/tape) only. It does not cover information which may be requested and imparted orally or in writing. For example, requests for dates, addresses, figures such as the Medicare enrollment for a state, which need not be responded to with the production of a document are not FOIA requests. Such requests should be directed to the proper public inquiries office.

## FOIA examples:

- Existing records (handwritten, printed, or electronic)
- Excerpts from the Medicare manuals, Code of Federal Regulations, supplier manuals, and newsletters
- Supplier name lists
- Fee schedules
- Coding reports and letters
- Claim data reports

## Non-FOIA examples:

- Requests for dates
- Addresses
- Figures (i.e., Medicare enrollment for a state)
- General questions about coverage or policy interpretation
- HCPCS coding information

All FOIA requests are subject to fees for search, review, and copy/duplication. Before submitting your request, you may want to see if the information can be obtained from our website, http://www.cgsmedicare.com. FOIA requests must be submitted in writing and should provide details that will help us identify and find the records being requested. If there is insufficient information, we will ask you for more. Include your name and telephone number(s) to help us reach you if we have questions.

Please send FOIA requests to the following address:

**CGS**
Attn: DME MAC Freedom of Information Coordinator
2 Vantage Way
Nashville, TN 37228

## Chapter 9 Contents

*Introduction*
1. DMEPOS Benefit Categories
2. Medical Review Program
3. Medical Policies
4. Advance Determination of Medicare Coverage (ADMC) for Wheelchairs
5. Prior Authorization of Power Mobility Equipment (PMD)

## Introduction

In this chapter, you will find information regarding DMEPOS benefit categories, the DME MAC Medical Review Department, medical policies, Advance Determination of Medicare Coverage (ADMC) process, and Prior Authorization of Power Mobility Equipment. In order for any item to be covered by the DME MAC, it must fall into one of the benefit categories defined below. The medical policies used by the DME MAC to make coverage determinations may be either national or local. The national policies can be found on the CMS website in the *Medicare National Coverage Determinations Manual* and in the *Medicare Benefit Policy Manual*. Both of these manuals can be viewed at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html. The local policies can be found in Local Coverage Determinations (LCDs), which are available at http://www.cgsmedicare.com/jc/coverage/LCDinfo.html. See the "Medical Policies" section below for more specific information.

## 1. DMEPOS Benefit Categories
**CMS Manual System, Pub. 100-02,** *Medicare Benefit Policy Manual,* **Chapter 15, §§50.5.1-50.6 &110-140**
**CMS Manual System, Pub. 100-03,** *Medicare National Determinations Manual,* **Chapter 1, §180**

All Medicare Part B covered services processed by the DME MAC fall into one of the following benefit categories specified in the Social Security Act (§1861(s)):

1. Durable medical equipment (DME)

2. Prosthetic devices (including nutrition)

3. Leg, arm, back and neck braces (orthoses) and artificial leg, arm and eyes, including replacement (prostheses)

4. Surgical dressings

5. Immunosuppressive drugs

6. Therapeutic shoes for diabetics

7. Oral anticancer drugs

8. Oral antiemetic drugs (replacement for intravenous antiemetics)

9. Intravenous immune globulin

General definitions and coverage issues relating to the preceding categories are listed below.

## Durable Medical Equipment (DME)

Durable medical equipment is equipment which (a) can withstand repeated use, (b) is primarily and customarily used to serve a medical purpose, (c) generally is not useful to a person in the absence of an illness or injury, and (d) is appropriate for use in the home.

Supplies and accessories that are necessary for the effective use of medically necessary DME are covered. Supplies may include drugs and biologicals that must be put directly into the equipment in order to achieve the therapeutic benefit of the DME or to assure the proper functioning of the equipment.

Repairs, skilled maintenance, and replacement of medically necessary DME are covered.

## Prosthetic Devices

Prosthetic devices are items which replace all or part of an internal body organ or replace all or part of the function of a permanently inoperative or malfunctioning internal body organ. The test of permanence is considered met if the medical record, including the judgment of the attending physician, indicates that the condition is of long and indefinite duration.

In addition to artificial arms and legs, coverage under this benefit includes, but is not limited to, breast prostheses, eye prostheses, parenteral and enteral nutrition, ostomy supplies, urological supplies in patients with permanent urinary incontinence, and glasses or contact lenses in patients with aphakia or pseudophakia.

**Enteral and Parenteral Nutrition** therapy is covered under the prosthetic device benefit provision, which requires that the patient must have a permanently inoperative internal body organ or function thereof.

Supplies that are necessary for the effective use of a medically necessary prosthetic device are covered. Equipment, accessories, and supplies (including nutrients) which are used directly with an enteral or parenteral nutrition device to achieve the therapeutic benefit of the prosthesis or to assure the proper functioning of the device are covered.

Repairs, adjustments, and replacement of medically necessary prosthetic devices are covered.

Dental prostheses (i.e., dentures) are excluded from coverage. Claims for internal prostheses (e.g., intraocular lens, joint implants, etc.) are not processed by the DME MAC.

## Braces (Orthotics)

A brace is a rigid or semi-rigid device that is used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body.

Repairs, adjustments, and replacement of medically necessary braces are covered.

## Surgical Dressings

Surgical dressings are therapeutic and protective coverings applied to surgical wounds or debrided wounds. Surgical dressings include primary and secondary dressings.

### Immunosuppressive Drugs

Immunosuppressive drugs used in patients who have received a Medicare-covered organ transplant are covered. Immunosuppressive drugs used for indications other than transplantation do not fall into the DME MAC's jurisdiction.

Supplies used in conjunction with parenterally administered immunosuppressive drugs are not covered under this benefit category.

### Therapeutic Shoes for Diabetics

Custom molded or extra-depth shoes and inserts for use by patients with diabetes are covered under this benefit.

### Oral Anticancer Drugs

Certain oral cancer drugs are covered if they have the same chemical composition and indications as the parenteral form of the drug.

### Oral Antiemetics (used as full replacement for IV form)

Certain oral antiemetic drugs are covered when used as full replacement for the intravenous (IV) form of the same drug during chemotherapy treatment.

### Intravenous Immune Globulin

Intravenous immune globulin is covered when it is administered in the home to treat primary immunodeficiency. Infusion pumps and other administration supplies are not covered under this benefit.

## 2. Medical Review Program
CMS Manual System, Pub. 100-08, *Medicare Program Integrity Manual*, Chapter 1, §1.3.8

The goal of the medical review program is to reduce payment errors by identifying and addressing billing errors concerning coverage and coding made by providers. The medical review staff at CGS consists of a medical director (physician), clinical staff (registered nurses and other allied health professionals), and experienced support personnel.

### Medical Review Responsibilities

- Develop Local Coverage Determinations (coverage policies)
- Analyze claim data
- Perform probe reviews and audits to validate if problems exist
- Perform corrective actions to reduce errors, including prepay review of claims with clinical staff
- Advance Determination of Medicare Coverage (ADMC)
- Prior Authorization of Power Mobility Equipment

- Develop an annual Medical Review Strategy, based on data analysis, that details the problems and interventions in the jurisdiction

- Partner with the Communications Department to offer provider outreach and education

## 3. Medical Policies
**CMS Manual System, Pub. 100-03,** *Medicare National Coverage Determinations Manual*
**CMS Manual System, Pub. 100-08,** *Medicare Program Integrity Manual,* **Chapter 13**

### General Information

Medical policies may be either national or local.

National medical policies are established by the Centers for Medicare and Medicaid Services (CMS). These policies are found on the CMS website in the *Medicare National Coverage Determinations Manual* and in the *Medicare Benefit Policy Manual*. Both manuals can be viewed at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html. You can search for National Coverage Determinations (NCDs) using the Medicare Coverage Database at http://www.cms.gov/medicare-coverage-database/overview-and-quick-search.aspx. The DME MACs, CERT, Zone Program Integrity Contractors (ZPICs), and Administrative Law Judges (ALJ) follow national policy when it exists.

Local medical policies are developed by the DME MACs. The DME MACs have the authority and responsibility to establish local policies when there is no national policy on a subject or when there is a need to further define a national policy. The DME MACs' medical directors jointly develop local medical policies. The medical policies are identical for all DME MACs.

Local medical policies consist of two separate, though closely related, documents: a Local Coverage Determination (LCD) and a Policy Article. A link to the CMS Medicare Coverage Database can be found on the home page of CGS's DME MAC Jurisdiction C website, listed under Coverage & Pricing. The LCDs can be viewed at http://www.cgsmedicare.com/jc/coverage/LCDinfo.html.

### Major Sections of an LCD

*Coverage Indications, Limitations, and/or Medical Necessity*

> Defines coverage criteria based on a determination of whether an item is eligible for a defined Medicare benefit category, reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and meets all other applicable Medicare statutory and regulatory requirements. Items addressed in this section are based on Social Security Act §1862(a)(1)(A) provisions. When an item does not meet these criteria, it will be denied as "not medically necessary."

*HCPCS Codes and Modifiers*

> A list of the HCPCS codes and modifiers that are applicable to the LCD. The presence of a code in this section does not necessarily indicate coverage.

*ICD-9 Codes and Diagnoses that Support Medical Necessity*

> A list of the ICD-9 codes that relate to coverage criteria described in the *Indications and Limitations of Coverage* and/or *Medical Necessity* section.

*Documentation Requirements*

> States the necessary documentation requirements that you must have on file and/or submit with your claim.

*Revision History*

*Attachments*

> CMN or DIF (if applicable)

> Other suggested forms (if applicable)

## Major Sections of a Policy Article

*Non-Medical Necessity Coverage and Payment Rules*

> Identifies situations in which an item does not meet the statutory definition of a benefit category (e.g., durable medical equipment, prosthetic devices, etc.) or when it doesn't meet other requirements specified in regulations. It also identifies situations in which an item is statutorily excluded from coverage for reasons other than medical necessity. In these situations, the term used to describe the denial is "noncovered." This section may also include statements defining when an item will be denied as "not separately payable" or situations in which claim processing for the item is not within the DME MAC's jurisdiction.

*Coding Guidelines*

*ICD-9 Codes that are covered*

> A list of the ICD-9 codes that relate to statutory or regulatory coverage issues, as described in the Non-Medical Necessity Coverage and Payment Rules section.

*Revision History*

At the end of each LCD, there is a link to the related Policy Article and at the end of each Policy Article there is a link to the related LCD. New or revised policies are generally released on a quarterly basis: March, June, September, and December. Posting of new and revised policies will be announced in a ListServ message from CGS and on our website at http://www.cgsmedicare.com/jc.

Most new or revised policies have a future effective date at the time of posting. The LCD page on our website includes links to current/active LCDs and Policy Articles, Future LCDs and Policy Articles, Draft LCDs, and Retired LCDs and Policy Articles. This page can be viewed at http://www.cgsmedicare.com/jc/coverage/LCDinfo.html.

## Development of Local Coverage Determinations

The development of Local Coverage Determinations (LCDs) is a collaborative effort led by the medical directors of the DME MACs. The intent of the policy development process is to provide the opportunity for input from the supplier and medical community to assure that the final policy is consistent with sound medical practice.

The initial stage of the process is the development of a draft policy. This stage is based on a review of the medical literature and the contractor's knowledge of medical practice relating to the item. The medical directors seek input from various individuals and groups during the drafting phase of policy development.

Drafts of new medical policies or revised policies that propose more restrictive medical necessity coverage criteria are sent for comment to a wide spectrum of national and regional organizations representing manufacturers, suppliers, physicians, and other healthcare professionals. These draft medical policies are announced in a ListServ message from CGS and a posting on the CGS website at http://www.cgsmedicare.com/jc/coverage/LCDinfo.html. The DME MAC website lists both a mail address and an email address to which comments may be sent. There are 45 days allowed for comments to draft policies. The website lists the start date and end date of the comment period.

The DME MAC encourages written comments to its draft policies. If commentators disagree with any aspects of the policy, they should offer specific alternative wording and support their suggestions with references from the published medical literature.

The DME MAC also holds an open meeting to hear public comments on each draft policy that is sent for comment. The meeting is scheduled during the comment period for a draft policy. Notice of the meeting is placed on the DME MAC website. The notice includes the date, time, and location of the meeting and instructions for those who wish to make a presentation at the meeting. Interested parties may present scientific, evidence-based information, professional consensus opinions, or any other relevant information. The meeting is led by the DME MAC Medical Director.

After the close of the comment period, the DME MAC medical directors review all of the comments that have been received and revise the policy as appropriate. The medical directors summarize the comments and provide a response to each indicating whether or not they agree with the suggestion. If they do not agree, they give reasons for the decision. This "Response to Comments" document is found as an LCD attachment link at the end of the LCD. Following adoption, final medical policies are posted on the DME MAC website.

## LCD Reconsideration Process

There is a formal process for requesting revision of a LCD. Information can be found on the Medical Policy page of the DME MAC Jurisdiction C home page:
http://www.cgsmedicare.com/jc/coverage/LCDinfo.html.

### Claim Determination in the Absence of Medical Policy

The DME MACs and ZPICs have the authority to review any claim even if there is no formal national or local policy. In those situations, the contractor first determines whether the item falls within a statutory benefit category that is within its jurisdiction. If it is, then the reviewer determines whether the item is reasonable and necessary for the individual patient. This may include a review of pertinent medical literature. It also includes review of detailed documentation from the ordering physician/practitioner and supplier supporting the medical necessity of the item.

## 4. Advance Determination of Medicare Coverage (ADMC) for Wheelchairs
CMS Manual System, Pub. 100-08, _Medicare Program Integrity Manual_, Chapter 5, §5.16

Advance Determination of Medicare Coverage (ADMC) is an optional process by which the DME MAC provides you and the beneficiary with a coverage decision prior to delivery of an item.

An ADMC is available only for the following wheelchair base HCPCS codes and related options and accessories:

**Manual Wheelchairs**

**E1161**

**E1231–E1234**

**K0005**

**K0008**

**K0009**

**Power Wheelchairs**

**Group 2:**    K0835-K0843

**Group 3:**    K0848-K0855 [only if an alternative drive control interface (E2321-E2322, E2325, E2327-E2330) will be provided at the time of initial issue]
**K0856-K0864**

**Group 5:**    K0890-K0891

**Custom Motorized/Power Wheelchair: K0013**

When a particular wheelchair base is eligible for ADMC, all wheelchair options and accessories ordered by the physician/practitioner for that beneficiary along with the base HCPCS code will be eligible for ADMC.

The ADMC request should include the wheelchair base and each option and accessory that is to be provided. Do not submit an ADMC request for options and/or accessories without a wheelchair base.

All requests for Advance Determination of Medicare Coverage should be submitted to CGS. **Clearly indicate "ADMC" on the first page of all requests.** For your convenience, an ADMC request form is provided on the DME MAC Jurisdiction C website. You can access and fill out the form online at http://www.cgsmedicare.com/jc/forms/pdf/JC_ADMC_request_form.pdf.

ADMC requests may be faxed to (615) 782-4647 or mailed to the following address. ADMC request cannot be submitted electronically.

CGS
Attn: ADMC
P.O. Box 20010
Nashville, TN 37202

The first page of the ADMC request must contain all of the following demographic information:

- **Beneficiary information**
    - Name
    - HICN
    - Address
    - Date of birth
- **Place of service**

- **ICD-9 diagnosis code** (narrative description is not sufficient)
- **Supplier information**
  - Company Name with a contact name
  - NSC number
  - Address
  - Phone number
- **Physician's information**
  - Name
  - NPI
  - Address
  - Phone number

**If the information listed above is not present, the request will be rejected.** You will receive written notification of the rejection.

## Rejections

ADMC requests are reviewed to determine whether or not they meet the requirements for ADMC requests. **Reasons to reject an ADMC request include:**

1. The item being submitted is not one of the ADMC eligible wheelchair bases
2. The request exceeds the limit of two within six months.
3. The beneficiary does not live in Jurisdiction C.
4. The request is missing demographic information (i.e., beneficiary's name, current address, date of birth, Medicare identification number [HICN], the supplier's National Supplier Clearinghouse [NSC] number and/or the provider's National Provider Identification [NPI] number).
5. It is the 2nd request, but no new information was submitted.
6. The place of service is a hospital or skilled nursing facility.
7. Two different wheelchair base item codes (HCPCS) are listed on the request and it cannot be determined which base is to be reviewed for medical necessity.
8. A faxing error has occurred which resulted in missing, blackened, partial and/or incomplete documentation.
9. A duplicate request is submitted.
10. A request is submitted for an advance determination on previously denied accessories and/or additional accessories when the base was previously approved.

11. The item that is being submitted for advanced determination is NOT a wheelchair.

12. The base is covered under the prior authorization demonstration for PMD (see section 5 below).

### Power Wheelchair Documentation

Include **all** of the following items with the ADMC request:

1. The **written order** (also referred to as the 7-element order) that you received within 45 days following the completion of the in-person examination. This order must be written by the treating physician/practitioner and contain the following elements:

    i.    Beneficiary name

    ii.   Description of the item. This may be general – e.g., "power wheelchair" or "power mobility device" – or may be more specific.

    iii.  Date of the in-person examination. If the evaluation involved multiple visits, enter the date of the last visit. Refer to the Power Wheelchairs policy for additional information.

    iv.   Pertinent diagnoses/conditions that relate to the need for the power wheelchair.

    v.    Length of need

    vi.   Physician's/practitioner's signature (refer to Chapter 3 of this manual for signature requirements)

    vii.  Date of physician/practitioner signature (refer to Chapter 3 of this manual for signature requirements)

    You must document the date in which you received the physician's/practitioner's order – there must be a clear date stamp or equivalent.

    You may provide a template order listing the seven required elements, but you are prohibited from completing any part of it. It is a statutory requirement that the treating physician/practitioner who conducted the face-to-face requirements write the 7-element order. The 7-element order may only be written after the completion of the face-to-face exam requirements. Refer to the Power Mobility Devices (PMD) Policy Article, Nonmedical Necessity Coverage and Payment Rules section for information regarding the statutory requirements for PMDs.

    If you do not receive a written order containing all of these required elements within 45 days after completion of the face-to-face examination, an EY modifier must be added to the HCPCS codes for the PMD and all accessories. The order must be available on request.

2. A **detailed product description**. Once you have determined the specific power mobility device that is appropriate for the patient based on the physician's/practitioner's 7-element order, you must prepare a written document (termed a detailed product description). **This detailed product description (DPD) must comply with the requirements for a detailed written order as outlined in Chapter 3 of this manual** and the CMS Program Integrity Manual (CMS Manual System, Pub. 100-8), Chapter 5. Regardless of the form of the description, there must be sufficient detail to identify the item(s) in order to determine that the item(s) dispensed is properly coded.

The physician/practitioner must sign and date the detailed product description and you must receive it prior to delivery of the power wheelchair or power operated vehicle. A date stamp or equivalent must be used to document the supplier receipt date. The detailed product description must be available on request.

3. A report of the **in-person examination**. The treating physician/practitioner must conduct an in-person examination of the beneficiary before writing the order. Refer to the Power Mobility Devices Policy Article for guidance about the type of information to be included in the in-person examination and specialty evaluation.

4. **Attestation of "no financial involvement."** The PMD LCD requires a signed and dated affirmation from the supplier that the licensed/certified medical professional (LCMP) performing the specialty evaluation has no financial relationship with the supplier. CGS will also accept an attestation of no financial relationship from the LCMP conducting the specialty evaluation.

5. **Evidence of RESNA certification by the supplier's Assistive Technology Professional (ATP).** This can be documented by providing a copy of the RESNA certificate or a printout from the RESNA website showing that the individual's ATP credentials are current. The RESNA website is www.resna.org.

6. **Evidence of "direct, in-person involvement" in the selection of the product.** Documentation of direct in-person interaction with the patient by the ATP in the wheelchair selection process must be complete and detailed enough so a third party can understand the nature of the ATP involvement. Just "signing off" on a form completed by another individual does not adequately document direct, in-person involvement. Also, merely signing a statement such as, "I am a RESNA-certified professional specializing in wheelchairs and had direct, in-person involvement in the wheelchair selection for this patient" does not sufficiently verify that this policy requirement was met. Finally, a home assessment completed by a supplier-employed ATP does not meet the requirement unless the documentation shows how the ATP applied the assessments and measurements to the wheelchair selection process.

7. A report of the **on-site home assessment** which establishes that the beneficiary is able to use the wheelchair ordered to assist with Activities of Daily Living (ADLs) in the home.

## Manual Wheelchair Documentation

Include **all** of the following items with the ADMC request:

1. Detailed written order that lists the specific wheelchair base that is to be provided and each option/accessory that will be separately billed. This information may be entered by the supplier but the order must be signed and dated by the physician/practitioner (refer to Chapter 3 of this manual for signature requirements).

2. Information from the beneficiary's medical record that documents that the coverage criteria defined in the LCD on Manual Wheelchairs have been met.

3. A home assessment which establishes that the beneficiary or caregiver is able to use the wheelchair ordered to assist with ADLs in the home.

## Additional Guidance on Documentation

Any information that is provided that explains the medical necessity for separately-billed options and accessories must use the same short description for the item that is used in the detailed product description or detailed written order.

If the beneficiary's weight and/or height are needed to support the medical necessity for items that are ordered, that information should be included on the first page of the ADMC request.

Even if the majority of the in-person examination for a power wheelchair (PWC) is performed by an LCMP, the ADMC request must also include the report of the in-person examination with the physician.

For wheelchair cushions, include the manufacturer, product name, model number, and the width of the wheelchair cushion(s) that is provided. Make certain that the product is listed on the Pricing, Data Analysis and Coding (PDAC) Contractor Product Classification List and that the HCPCS code on the ADMC is the one specified by the PDAC (consult the PDAC website at https://www.dmepdac.com/). See Chapter 16 of this manual for information about the PDAC.

If the beneficiary currently has a wheelchair or a power operated vehicle (POV), the ADMC request must indicate the reason why it is being replaced.

### ADMC Process

Upon receipt of an ADMC request, the DME MAC will make a determination within 30 calendar days. The DME MAC will provide you and beneficiary with its determination, either affirmative or negative, in writing. If it is a negative determination, the letter will indicate why the request was denied - e.g., not medically necessary, insufficient information submitted to determine coverage, statutorily non-covered.

If a wheelchair base receives a negative determination, all accessories will also receive a negative determination. If a wheelchair base receives an affirmative determination, each accessory will receive an individual determination.

An affirmative determination only relates to whether the item is reasonable and necessary based on the information submitted. An affirmative determination does not provide assurance that the beneficiary meets Medicare eligibility requirements nor does it provide assurance that any other Medicare requirements (e.g., place of service, Medicare Secondary Payer) have been met. Only upon submission of a complete claim can the DME MAC make a full and complete determination. An affirmative determination does not extend to the price that Medicare will pay for the item.

An affirmative ADMC is only valid for items delivered within six months following the date of the determination. If the wheelchair is not delivered within that time, you have the option of either submitting a new ADMC request (prior to providing the item) or filing a claim (after providing the item).

When submitting a claim with HCPCS code K0108 for the ADMC approved options/accessories, the narrative description on the claim must be the same description used in the ADMC request.

A negative ADMC may not be appealed because it does not meet the regulatory definition of an initial determination since no request for payment is being made. However, If the ADMC request for the wheelchair base is denied and if you obtain additional medical documentation, an ADMC request may be resubmitted. ADMC requests may only be resubmitted once during the six-month period following a negative determination. If the wheelchair base is approved, but one or more accessories are denied, an ADMC request may not be resubmitted for those accessories. If you provide a wheelchair and/or accessories following a negative determination, a claim for the item should be submitted. If new information is provided with the claim, coverage will be considered. If the claim is denied, it may be appealed through the usual process (see Chapter 13 of this manual for information about appeals).

Finally, the DME MAC may review selected claims on a pre-payment or post-payment basis and may deny a claim or request an overpayment if it determines that an affirmative determination was made based on incorrect information.

## 5. Prior Authorization of Power Mobility Devices (PMD)

On September 1, 2012, the Medicare Fee-for-Service Program began a prior authorization demonstration for certain PMDs. The new prior authorization process is for orders written on or after September 1, 2012, and applies to beneficiaries who permanently reside the Jurisdiction C states of **North Carolina, Florida, and Texas**.

On October 1, 2014, the demonstration was expanded to include beneficiaries permanently residing in the states of **Georgia, Louisiana, and Tennessee** and is available for orders written on or after October 1, 2014.

The prior authorization process under this demonstration is available for the following HCPCS codes for Medicare payment:

- Group 1 Power Operated Vehicles (K0800–K0802 and K0812)

- All standard power wheelchairs (K0813–K0829)

- All Group 2 complex rehabilitative power wheelchairs (K0835–K0843)

- All Group 3 complex rehabilitative power wheelchairs without power options (K0848–K0855)

- Pediatric power wheelchairs (K0890–K0891)

- Miscellaneous power wheelchairs (K0898)

  Note: Group 3 complex rehabilitative power wheelchairs with power options (K0856–K0864) are excluded.

The goal of this program is to develop and demonstrate improved methods for the investigation and prosecution of fraud in the provision of PMDs. The CMS plans to test this process and compare the results to traditional pre-payment review in order to evaluate whether, and to what extent, the two processes are effective in investigating and prosecuting fraud. Letters have been sent to suppliers and physicians/practitioners who have provided a PMD for a Medicare beneficiary residing in one of the demonstration states within the past three years.

It is important to keep in mind that the prior authorization demonstration does not create new documentation requirements for physicians/practitioners or suppliers—it simply requires them to provide the information earlier in the claims process. The prior authorization request can be submitted by either the physician/practitioner or the supplier (referred to as a "submitter").

For beneficiaries residing in GA, FL, LA, NC, TN, or TX, mail or fax the prior authorization request with accompanying documentation to the address or fax number below.

CGS – DME Medical Review – Prior Authorization
PO Box 24890
Nashville, TN 37202-4890
Fax: 615.664.5960

A Prior Authorization Request (PAR) coversheet is available on our website at http://www.cgsmedicare.com/jc/forms/pdf/prior_authorization_coversheet.pdf. Use of the coversheet will help to ensure that you have included all relevant documentation with your request.

The submitter of a prior authorization request must include **all relevant documentation to support Medicare coverage of the PMD item.** This includes:

1. The seven element written order for the PMD,

2. Documentation of the face-to-face examination where the physician/practitioner evaluated the patient's need for the PMD, and

3. The detailed product description.

The Local Coverage Determination requires physicians/practitioners to originate the seven element order, face-to-face encounter documentation, and any other clinical documentation such as progress notes that are necessary to support the medical necessity of the item. In addition, you (the supplier) are required to complete the detailed product description.

After receipt of all relevant documentation from the submitter, the DME MAC will review and communicate a decision within 10 business days on whether the PMD meets all Medicare coverage requirements. In rare cases the physician/practitioner may seek an expedited review of the prior authorization request—under an emergency situation we will attempt to review and communicate within 48 hours a decision on the prior authorization request. The DME MAC will send the decision letter regarding prior authorization (affirmative or non-affirmative) to the physician/practitioner, the supplier, and the Medicare beneficiary. The decision letter will also contain information about why the prior authorization request is non-affirmative. In addition a prior authorization tracking number will be provided when a decision is made. This number should be submitted on the claim for the PMD.

If the prior authorization is non-affirmed by the DME MAC, you may send subsequent prior authorization requests. The DME MAC will make every effort to conduct a review and communicate a decision within 20 business days on each subsequent prior authorization request. If a claim, with a non-affirmative decision, is still submitted to the DME MAC for payment, it will be denied. The supplier and/or beneficiary can use the claim appeal process for a claim denial but not a non-affirmative prior authorization decision from the DME MAC.

Starting on December 1, 2012, CMS will assess a 25 percent payment reduction on your payable claim when the first claim was not preceded by a prior authorization request. To avoid the payment reduction, you must include the prior authorization tracking number on the claim. This 25 percent reduction in the Medicare payment is for each covered claim not preceded by a prior authorization request, with one important exception: If a competitive bidding contract supplier submits a payable claim for a beneficiary with a permanent residence in a competitive bidding area, the competitive bid supplier will receive the contractual single payment amount under their contract. You must still adhere to all other requirements of the demonstration.

Additional information about the demonstration is available on our website at http://www.cgsmedicare.com/jc/coverage/mr/prior_auth.html and on the CMS website at http://go.cms.gov/PADemo.

# Prior Authorization Request (PAR) Coversheet

**JURISDICTION C**

**Power Mobility Demonstration**

| | |
|---|---|
| Request Date _____ | Number of Pages (including coversheet) _____ |
| For HCPCS _____ | Initial Request _____ OR Subsequent Request _____ |
| Entity Submitting Supplier ___ Physician/Treating Practitioner (TP) ___ | |
| Supplier Name _____ | Physician/TP Name _____ |
| Supplier Address _____ | Physician/TP Name _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| Supplier Phone _____ | Physician/TP Phone _____ |
| Supplier Contact Name _____ | Physician/TP Fax _____ |
| Supplier Fax _____ | Physician/TP NPI _____ |
| Supplier NPI _____ | |
| Supplier NSC _____ | |

| | |
|---|---|
| Beneficiary Name _____ | Beneficiary HICN _____ |
| Beneficiary State of Residence _____ | Beneficiary Date of Birth _____ |

Expedited Request?    Yes _____    No _____

**Note:** Expedited requests require justification to meet expedited requirements.

Expedited Request Justification _____

_____

_____

_____

_____

**Checklist of PAR information to include:**

- Completed coversheet
- 7-element order
- Face-to-Face assessment
- Detailed product description
- Specialty evaluation (if required by policy)
- Other relevant medical documentation

**For additional information, such as the medical policy, please visit our website at:** http://www.cgsmedicare.com/jc/coverage/mr/power_mobility_resources.html

**Fax the PAR to:** 1.615.664.5960
**OR**
**Mail the PAR to:**    CGS
DME Medical Review - Prior Authorization
PO Box 24890
Nashville, TN 37202-4890

Revised February 11, 2014
© 2014 Copyright, CGS Administrators, LLC.



CGS
A CELERIAN GROUP COMPANY



CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES



APPENDIX 12


**H**

United States District Court,
N.D. Texas,
Dallas Division.
Scott **DETGEN** by his next friend L.C. **DETGEN**,
et al., Plaintiffs,
v.
Dr. Kyle JANEK, in his official capacity as Execut-
ive Commissioner, Texas Health and Human Ser-
vices Commission, Defendant.

Civil Action No. 3:11–CV–2974–G.
March 13, 2013.

**Background:** Disabled Medicaid recipients filed
suit under § 1983 against Texas Health and Human
Services Commissioner, challenging categorical
denial of their request for benefits for installation of
ceiling lift designed to assist them in transfer to and
from bed, bath, and other surfaces.

**Holdings:** On cross-motions for summary judg-
ment, the District Court, A. Joe Fish, Senior Dis-
trict Judge, held that:
(1) right to sue government actor under § 1983 for
"deprivation of any rights, privileges, or immunit-
ies," did not mean that cause of action was limited
to alleged violation of official's legal obligations;
(2) statutory right under federal Medicaid Act to
fair hearing before state agency "to any individual
whose claim for medical assistance under plan is
denied" conferred private individual rights on re-
cipients that was enforceable in action under §
1983;
(3) whether Texas Medicaid statute and rules were
preempted by federal Act presented question under
Supremacy Clause, which provided recipients with
implied cause of action for declaratory and injunct-
ive relief;
(4) Texas Medicaid Act's characterization of ceiling
lift as home modification, and not durable medical
equipment (DME), for purposes of eligibility for
benefits, was not preempted by federal Act;

(5) categorical denial of requests under Texas
Medicaid Act did not violate procedural due pro-
cess; and
(6) recipients were not denied fair hearing follow-
ing denial, in alleged violation of due process.

Recipients' motion denied; Commissioner's
motion granted.

West Headnotes

**[1] Civil Rights 78 ⚖1027**

78 Civil Rights
  78I Rights Protected and Discrimination Prohib-
ited in General
    78k1026 Rights Protected
      78k1027 k. In general. Most Cited Cases
  Right to sue government actor under § 1983,
for "deprivation of any rights, privileges, or im-
munities," did not mean that cause of action was
limited to alleged violation of official's legal oblig-
ations; rather, inquiry was whether official's action
violated right conferred on plaintiff by law. 42
U.S.C.A. § 1983.

**[2] Civil Rights 78 ⚖1028**

78 Civil Rights
  78I Rights Protected and Discrimination Prohib-
ited in General
    78k1026 Rights Protected
      78k1028 k. Due process of law and equal
protection. Most Cited Cases
  The Fourteenth Amendment right of due pro-
cess confers an individual right enforceable in a §
1983 suit. U.S.C.A. Const.Amend. 14; 42 U.S.C.A.
§ 1983.

**[3] Civil Rights 78 ⚖1052**

78 Civil Rights
  78I Rights Protected and Discrimination Prohib-
ited in General
    78k1051 Public Services, Programs, and Be-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

nefits

78k1052 k. In general. Most Cited Cases

Statutory right under Title XIX of Social Security Act to fair hearing before state agency "to any individual whose claim for medical assistance under plan is denied" conferred private individual rights on disabled Medicaid recipients that was enforceable in action under § 1983; Congress clearly intended that any individual whose claim for Medicaid benefits was denied would be benefited by "fair hearing" provision, right to fair hearing was not so vague and amorphous such enforcement strained judicial competence, and statute imposed mandatory obligation on states to conduct such hearing. Medicaid Act, § 1902(a)(3), 42 U.S.C.A. § 1396a(a)(3); 42 U.S.C.A. § 1983.

**[4] Declaratory Judgment 118A ⬦⟿204**

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
      118AII(K) Public Officers and Agencies
         118Ak204 k. State officers and boards. Most Cited Cases

**Injunction 212 ⬦⟿1289**

212 Injunction
   212IV Particular Subjects of Relief
      212IV(G) Social Security, Welfare, and Other Public Payments
         212k1289 k. Health care; Medicare and Medicaid. Most Cited Cases

Whether rules, policies, and practices of Texas Health and Human Services Commission in categorically denying requests for ceiling lifts designed to assist disabled Medicaid recipients in transferring to and from bed, bath, wheelchair, and other surfaces, conflicted with goals of federal Medicaid Act regarding coverage for medical equipment, and therefore, were preempted by Medicaid Act, presented question under Supremacy Clause, which provided recipients with implied cause of action for declaratory and injunctive relief. U.S.C.A. Const. Art. 1, § 8, cl. 1; Medicaid Act, § 1901 et seq., 42 U.S.C.A. § 1396 et seq.; 42

U.S.C.A. § 1983.

**[5] Federal Courts 170B ⬦⟿2233**

170B Federal Courts
   170BIV Cases "Arising Under" Federal Law; Federal-Question Jurisdiction
      170BIV(B) Particular Cases, Contexts, and Questions
         170Bk2232 Matters of Procedure in General
            170Bk2233 k. In general. Most Cited Cases
   (Formerly 170Bk192)

**Federal Courts 170B ⬦⟿2234**

170B Federal Courts
   170BIV Cases "Arising Under" Federal Law; Federal-Question Jurisdiction
      170BIV(B) Particular Cases, Contexts, and Questions
         170Bk2232 Matters of Procedure in General
            170Bk2234 k. Declaratory relief in general. Most Cited Cases
   (Formerly 170Bk192)

The federal courts have jurisdiction over a preemption claim seeking injunctive and declaratory relief. 28 U.S.C.A. § 1331.

**[6] Health 198H ⬦⟿457**

198H Health
   198HIII Government Assistance
      198HIII(A) In General
         198Hk457 k. Preemption. Most Cited Cases

**States 360 ⬦⟿18.79**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.79 k. Social security and public welfare. Most Cited Cases

Texas Medicaid Act's characterization of ceil-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

ing lift designed to assist disabled Medicaid recipients in transferring to and from bed, bath, wheelchair, and other surfaces, as home modification, and not durable medical equipment (DME), did not conflict with federal Medicaid Act's requirement that state plan include "reasonable standards for determining eligibility for and extent of medical assistance, regulation requiring that service be sufficient in "amount, duration, and scope to achieve its purpose," or *DeSario* letter criteria, and thus, federal Medicaid Act did not preempt Texas Medicaid Act; Center for Medicare & Medicaid Services (CMS), which was charged with administration of Medicaid statute, expressed in its guidance to Texas Health and Human Services Commission its view that federal funding was unavailable for certain items of DME, including ceiling lifts, and Texas was not required to shoulder entire burden of cost of ceiling lift under its own Medicaid plan. Medicaid Act, § 1902(a)(10)(D), (a)(17),42 U.S.C.A. § 1396a(a)(10)(D), (a)(17); 42 C.F.R. §§ 440.230(b, c), 440.70; 1 TAC §§ 354.1035, 354.1039(a)(4).

**[7] Health 198H ☞478**

198H Health
  198HIII Government Assistance
    198HIII(B) Medical Assistance in General; Medicaid
      198Hk472 Benefits and Services Covered
        198Hk478 k. Medical equipment; wheelchairs. Most Cited Cases
    Where a State has explicit guidance from Center for Medicare & Medicaid Services (CMS) that Federal Financial Participation (FFP) will not be available for an item of durable medical equipment (DME), that State acts reasonably when it categorically excludes such an item from coverage in its Medicaid policies, because the Medicaid Act never requires States to shoulder the full burden of the cost of services provided under the State's Medicaid plan. Medicaid Act, § 1901, 42 U.S.C.A. § 1396.

**[8] Constitutional Law 92 ☞4126**

92 Constitutional Law

  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)5 Social Security, Welfare, and Other Public Payments
        92k4124 Medical Assistance
          92k4126 k. Medicaid. Most Cited Cases

**Health 198H ☞478**

198H Health
  198HIII Government Assistance
    198HIII(B) Medical Assistance in General; Medicaid
      198Hk472 Benefits and Services Covered
        198Hk478 k. Medical equipment; wheelchairs. Most Cited Cases
    Disabled Medicaid recipients did not have legitimate claim of entitlement under Title XIX of Social Security Act to installation of ceiling lifts designed to assist in transfer to and from bed, bath, wheelchair, and other surfaces, and thus, Texas Health and Human Services Commission's categorical denial of requests under Texas Medicaid Act did not violate procedural due process; Center for Medicare & Medicaid Services (CMS), which was charged with administration of Medicaid statute, expressed in its guidance to Commission its view that federal funding was unavailable for certain items of DME, including ceiling lifts, and therefore, ceiling lifts did not fall within scope of services provided by statute. U.S.C.A. Const.Amend. 14; Medicaid Act, § 1901 et seq., 42 U.S.C.A. § 1396 et seq.

**[9] Constitutional Law 92 ☞3874(3)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(B) Protections Provided and Deprivations Prohibited in General
      92k3868 Rights, Interests, Benefits, or Privileges Involved in General
        92k3874 Property Rights and Interests
          92k3874(3) k. Benefits, rights and

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

interests in. Most Cited Cases

To have a property interest in a benefit protected under the Due Process Clause, a person clearly must have more than an abstract need or desire for it, or a unilateral expectation of it; he must, instead, have a legitimate claim of entitlement to it. U.S.C.A. Const.Amend. 14.

**[10] Health 198H ☞502**

198H Health
198HIII Government Assistance
198HIII(B) Medical Assistance in General; Medicaid
198Hk499 Administrative Proceedings
198Hk502 k. Notice and hearing. Most Cited Cases

Disabled Medicaid recipients were not denied fair hearing following denial by Texas Health and Human Services Commission of request for installation of ceiling lift designed to assist in transfer to and from bed, bath, and other surfaces, in alleged violation of due process; recipients were given notice, hearings were conducted, and Commission's hearing officer was not required to consider evidence of exceptional circumstances that warranted departure from Texas Medicaid policy. U.S.C.A. Const.Amend. 14; Medicaid Act, § 1902(a)(3), 42 U.S.C.A. § 1396a(a)(3).

**[11] Constitutional Law 92 ☞3879**

92 Constitutional Law
92XXVII Due Process
92XXVII(B) Protections Provided and Deprivations Prohibited in General
92k3878 Notice and Hearing
92k3879 k. In general. Most Cited Cases

Due process requires both notice and a meaningful opportunity to be heard. U.S.C.A. Const.Amend. 14.

**[12] Health 198H ☞460**

198H Health

198HIII Government Assistance
198HIII(B) Medical Assistance in General; Medicaid
198Hk460 k. In general. Most Cited Cases

Potential plaintiffs have a property interest in Medicaid benefits that fall within the ambit of the statute. Medicaid Act, § 1901 et seq., 42 U.S.C.A. § 1396 et seq.

**[13] Constitutional Law 92 ☞3875**

92 Constitutional Law
92XXVII Due Process
92XXVII(B) Protections Provided and Deprivations Prohibited in General
92k3875 k. Factors considered; flexibility and balancing. Most Cited Cases

What process is due depends on the circumstances of each case. U.S.C.A. Const.Amend. 14.

**\*748** Maureen Colette O'Connell, Southern Disability Law Center, Austin, TX, Lewis Golinker, Law Offices of Lewis Golinker, Ithaca, NY, Susan D. Motley, Disability Rights Texas, Dallas, TX, for Plaintiffs.

Erika M. Kane, Office of the Texas Attorney General, Austin, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER*
A. JOE FISH, Senior District Judge.

Before the court are the cross-motions for summary judgment of the plaintiffs and the defendant (docket entries 37 and 39). For the reasons stated below, the plaintiffs' motion is denied and the defendant's motion is granted.

### I. BACKGROUND
#### A. *Factual Background*
Scott **Detgen** (" **Detgen** "), Juanita Barazza ("Barazza"), Brandon Doyel ("Doyel"), and Joshua Vargas ("Vargas") (collectively, the "plaintiffs") bring this suit because the defendant, Dr. Kyle Janek ("Janek"), acting in his official capacity as the Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

his agents, the Texas Medicaid and Healthcare Partnership ("TMHP") and Superior Health Plan, denied the plaintiffs' claims for Medicaid benefits for a particular type of ceiling lift, an item of medical equipment used to transfer a patient to and from bed, bath, wheelchair, and other surfaces.

### *749 1. *Scott Detgen*

**Detgen** is a 28 year old resident of Rockwall County, Texas. *See* Second Amended Complaint ("Complaint") ¶ 11 (docket entry 25); Plaintiffs' Sealed Appendix in Support of Motion for Summary Judgment ("Plaintiffs' Sealed Appendix 1"), Ex. 27 **Detgen** Affidavit ("Aff.") ¶ 5 at 83 (docket entry 42). He receives Supplemental Security Income ("SSI") due to his disability and is categorically-eligible for the Texas Medicaid program. *See* Complaint ¶ 11. **Detgen** was diagnosed with cerebral palsy at birth and has numerous medical conditions including quadriplegia, legal blindness, seizure disorder, severe contractures, and a history of hip dislocation. Plaintiffs' Sealed Appendix 1, Ex. 27 **Detgen** Aff. ¶ 2 at 83. He is incontinent of bowel and bladder and is dependent upon his caregivers to meet his personal care needs. *Id.* ¶¶ 3–4 at 83. He is 5 feet 2 inches tall and weighs approximately 95 pounds. *Id.* ¶ 5 at 83. **Detgen** is unable to walk, bear weight, sit independently, or assist with repositioning or transferring, and he must be manually transferred by one or both of his parents from his bed to the floor, to and from the bathtub, and to a stair lift that is used to move him between the first and second floors of his house. *Id.* ¶¶ 4, 6 at 83. These transfers are necessary for **Detgen** to maintain his hygiene and to prevent skin breakdown. *Id.* ¶ 3 at 83.

To assist with the process of transfers, **Detgen's** mother contacted a lifting specialist with a Medicaid-enrolled equipment provider to find a patient lift that would best alleviate **Detgen's** total dependence on caregivers for transfers. *Id.* ¶ 9 at 84. A ceiling lift was identified as the type of lift that could meet Scott's transfer needs in the three locations of his home for which transfers were required

(bedroom, bathroom, and stairway). *Id.* The provider specifically identified a ceiling lift known as the "Roomer 5200," which moves along a track that runs across the ceiling and allows the user to move from bedroom to bathroom or other designated locations in the home without additional transfers. *Id.* ¶ 10 at 84.

On October 26, 2010, United Rehab Specialists, Inc., the provider of the Roomer 5200, submitted a request for prior authorization of the recommended ceiling lift to TMHP. *Id.* Exhibit 28 at 86–92. On October 29, 2010, TMHP issued a denial notice that stated, in relevant part:

> You have asked for an overhead lift system for your home. An overhead lift must be attached to the ceilings in your home. Attaching the lift to a ceiling is a structural change to your home. Equipment that requires a structural change to the home is a home modification. Texas Medicaid does not receive federal financial participation for home modifications because home modifications are not listed as Medicaid benefits under Section 1905a of the Social Security Act. Because Texas Medicaid does not get federal financial participation for home modifications your request cannot be approved.

> *Id.* Exhibit 29 at 93–94.

A Medicaid fair hearing was requested on **Detgen's** behalf on November 15, 2010, to challenge TMHP's application of this policy exclusion to **Detgen's** request. *Id.* Ex. 27, **Detgen** Aff. ¶ 15 at 84. The hearing was held on April 13, 2011, before an HHSC hearing officer. The hearing decision was issued by HHSC on August 25, 2011, and concluded that "TMHP correctly denied Appellant's request for an overhead lift system" in accordance with agency policy. *Id.* Ex. 30 at 95–111.

### *750 2. *Juanita Barraza*

**Barraza** is a 45 year old Medicaid recipient in the state of Texas. *Id.* Ex. 31, Villareal Aff. ¶ 3 at 112. She has a history of long-standing medical

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

conditions and disabilities, beginning at age 2 when she contracted measles and sustained brain damage. *Id.* As a result of this, Barraza lost the ability to walk and talk and was later diagnosed with a significant intellectual disability. *Id.* Several years later, she regained the ability to walk and continued to be ambulatory, albeit with a somewhat impaired gait. *Id.* In 2010,[FN1] Barraza experienced a number of ischemic strokes that left her completely non-ambulatory; she was subsequently diagnosed with paralysis due to cerebral atrophy. *Id.* ¶ 4 at 112.

> FN1. The affidavit appears to contain a typographical error that states Barraza's strokes occurred in 2012. However, given the timeline implied by the rest of the affidavit, the court will assume that the plaintiffs' summary judgment motion identifies the correct year of the strokes as 2010. *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Motion") at 7 (docket entry 40).

Barraza lives at home with her mother who is her primary caregiver. *Id.* ¶ 2 at 112. Following Barraza's return home from hospitalization in late 2010, and after Villareal's assessment that the floor lift the hospital had ordered could not be used safely, a lifting specialist with a Medicaid-enrolled provider met with Barraza and her mother. *Id.* ¶¶ 7–8 at 112. The purpose of the meeting was to determine a lifting solution that would best address Barraza's transfer needs, given her complete dependence on her caregiver during transfers to and from her bed and bath and the physical limitations of her living space. *Id.* ¶ 8 at 112. A ceiling lift was identified as an appropriate solution for safely transferring Barraza both in and out of bed and bath. *Id.*

In February 2011, a request for prior authorization of a ceiling lift was submitted to TMHP on Barraza's behalf. *Id.* Ex. 32 at 114–123. On February 11, 2011, TMHP denied Barraza's request for a ceiling lift, using precisely the same language

quoted above from its letter to **Detgen**. *Id.* Ex. 33 at 127. A Medicaid fair hearing was requested on Barraza's behalf in March 2011 to challenge the application of HHSC's policy to Barraza's prior authorization request for a ceiling lift. *Id.* Ex. 31 Villareal Aff. ¶ 11. The hearing was held on July 11, 2011, and a decision was issued on August 31, 2011. *Id.* ¶¶ 11–12. The hearing officer issued a single conclusion of law, stating that:

> The Texas Medicaid Provider Procedure Manual instructs home health providers to obtain prior authorization for all durable medical equipment; moreover, as a state-contracted provider of home health services United Rehab Services must follow the most current instructions issued by the TMHP regarding requests for durable medical equipment. In this instance, United Rehab Services failed to follow the most current instructions issued in *Texas Medicaid Bulletin 232* which specifically stated that "patient lifts requiring attachment to walls, ceilings, and floors" were *not* a covered item of Texas Medicaid benefits; therefore, the TMHP denial was correct.

*Id.* Ex. 34 at 143 (emphasis in original).

### 3. *Brandon Doyel*

Doyel is a 35 year old Texas resident and Medicaid recipient, born prematurely and, at 18 years old, diagnosed with quadriplegia, secondary to cerebral palsy. *Id.* Ex. 35, Doyel Aff. ¶ 2 at 145. As a result of his medical condition, Doyel is unable to walk and has used a power wheelchair for mobility since he was 4 years old. *Id.* *751 Doyel is 5 feet 10 inches tall and weighs approximately 170 pounds. *Id.* ¶ 3.

Doyel lives alone and requires assistance with activities of daily living from personal care providers, including physical assistance with all transfers throughout the day. *Id.* ¶ 4. Doyel's daily transfer needs include transfers from bed to wheelchair, wheelchair to toilet, wheelchair to bathtub, and wheelchair to standing frame. *Id.* These numerous transfers are performed manually by Doyel's per-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

sonal care providers. *Id.* Doyel has taken steps to reduce his daily number of transfers, including the use of a catheter to avoid transfers to the toilet. *Id.* ¶ 7. He also has foregone the use of a "stander" on a daily basis, because his care providers cannot safely transfer him into the device. *Id.*

In December 2010, a lifting specialist with a Medicaid-enrolled provider met with Doyel to determine a lifting solution that would best address his transfer needs. *Id.* ¶ 8. A ceiling lift was identified as an appropriate solution for transferring Doyel throughout the day. *Id.* In early February 2011, a request for prior authorization of a ceiling lift was submitted to TMHP on Doyel's behalf. *Id.* ¶ 10 at 146. On February 9, 2011, TMHP denied Doyel's request, using precisely the same language as in its denial of **Detgen's** request, quoted above. *Id.* Ex. 37 at 160. On April 11, 2011, a Medicaid fair hearing was requested on Doyel's behalf, to challenge TMHP's denial of the request for a ceiling lift. *Id.* Ex. 35 ¶ 11 at 146. The hearing was held on July 20, 2011. *Id.* On March 7, 2012, the hearing officer issued a decision upholding TMHP's denial, finding the ceiling lift was an "expense that is not a benefit of Home Health services." *Id.* Ex. 38 at 164–65. The hearing officer relied on TMHP's policy exclusion of lifts requiring attachment to walls, ceilings, or floors. *Id.*

#### 4. *Joshua Vargas*

Vargas is a 21 year old Texas resident and Medicaid recipient diagnosed with Duschenne Muscular Dystrophy at age 6. *Id.* Ex. 39 at 168–170, 176–78; *see also* Plaintiffs' Motion at 11. Due to the progressive nature of this condition, Vargas uses a custom power wheelchair for mobility and relies on a ventilator to assist with breathing. Plaintiffs' Appendix 1 Ex. 39 at 168–170, 176–78. In addition, Vargas has severe scoliosis and contractures in his upper and lower extremities. *Id.* This complicates the process of manual transfers in and out of his bed and wheelchair and into the bathtub. *Id.* Vargas has a history of decubiti, which puts him at high risk for ongoing skin breakdown.

*Id.* Vargas is 5 feet 6 inches tall and weighs approximately 140 pounds. *Id.* His mother or father manually transfer him when necessary, because space limitations in his bedroom and bathroom prevent use of a floor lift. *Id.* He has apparently previously been injured during transfers. *Id.* After an extended hospitalization in the summer of 2011, a home health agency met with Vargas and his mother to discuss his daily nursing and personal care needs. *Id.*; *see also* Plaintiffs' Motion at 12. The agency referred the Vargases to a Medicaid-enrolled provider to assist with determining an appropriate lifting solution for Vargas. *Id.* A ceiling lift was identified as the only patient lift that would effectively meet Vargas's transfer needs. *Id.*

In October 2011, a request for prior authorization for a ceiling lift was submitted on Vargas's behalf. Plaintiffs' Appendix 1 Ex. 39 at 167. On October 21, 2011, the request was denied on the basis of the same policy under which **Detgen's**, Barraza's, and Doyel's requests had been denied. *Id.* Ex. 40 at 179–81. On November 30, 2011, Vargas was added as a plaintiff in this suit. *See* First Amended Complaint *752 ¶ 1 (docket entry 15). His request for a ceiling lift was subsequently granted, not under Medicaid's home health benefit provisions but under the home and community-based waiver services provisions discussed below. *See* Plaintiffs' Motion at 13. These waiver services are subject to annual and lifetime cost caps; thus, the inclusion of the ceiling lift in Vargas's budget for these services may in the future prevent him from receiving other benefits under the waiver provisions. *Id.*

#### B. *Procedural Background*

The plaintiffs **Detgen** and Barraza filed a complaint against Thomas Suehs (at that time the Executive Commissioner of HHSC) on October 31, 2011, alleging that Texas Medicaid's policies are in violation of the Medicaid Act and the Americans with Disabilities Act ("ADA") and that they ( **Detgen** and Barraza) were denied due process in violation of the Fourteenth Amendment and the fair hearing provisions of the Medicaid Act. *See* Com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaint ¶¶ 61–71 (docket entry 1). On November 30, 2011, the plaintiff Vargas was added to the litigation in the plaintiffs' amended complaint. *See* First Amended Complaint. On April 13, 2012, the plaintiff Doyel was added to the litigation in a second amended complaint. *See* Second Amended Complaint. In all other relevant respects, particularly with regard to the claims alleged against Texas Medicaid's executive commissioner, this second amended complaint mirrors the initial complaint. The defendant filed an answer to the second amended complaint on April 26, 2012. *See* Defendant's Answer to Second Amended Complaint (docket entry 28). On October 1, 2012, the parties filed the instant motions for summary judgment.

## II. *ANALYSIS*
### A. *Summary Judgment Standard*

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1).[FN2] A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.;* see also *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir.2001) ("An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham."). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (citing *First National Bank of Arizona v. Cities Ser-*

*vice Company,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

> FN2. Disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company,* 780 F.2d 1190, 1197 (5th Cir.1986).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving **\*753** party. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact. See *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir.2003). The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts. *Celotex Corporation v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara,* 353 F.3d at 405.

### B. *Evidentiary Objections*

HHSC [FN3] raises several objections to the evidence on which the plaintiffs rely to support their motion for summary judgment. It objects to some of the testimony offered through the affidavit of Curtis Merring, on the grounds that such testimony is either unreliable opinion testimony or hearsay. *See* Defendant's Brief in Support of Response in Opposition to Plaintiffs' Motion for Summary Judgment at 1–4 (docket entry 47). The defendant also objects on hearsay grounds to statements in the affidavits of L.C. **Detgen**, Yolanda Villareal, and Brandon Doyel. *Id.* at 4. Because the court did not find it necessary to rely on this evid-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

ence in support of its decision, these objections are overruled as moot. See *Continental Casualty Company v. St. Paul Fire & Marine Insurance Company,* 2006 WL 984690 at *1 n. 6 (N.D.Tex. Apr. 14, 2006) (Fitzwater, J.) (overruling as moot objections to evidence not relied on by the court in its summary judgment decision).

> FN3. Though Dr. Kyle Janek is the named defendant, because the suit is against him in his official capacity as the executive commissioner of HHSC, the court will refer to the defendant throughout as "HHSC." See, *e.g., Koenning v. Suehs,* 897 F.Supp.2d 528, 531 n. 1 (S.D.Tex.2012).

### C. *Section 1983*

42 U.S.C. § 1983 states that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

[1] The statute by its terms authorizes private suits against government officials for the "deprivation of any rights, privileges, or immunities." *Id.* HHSC makes the creative suggestion that "a section 1983 lawsuit cannot get off the ground unless a litigant first shows that a state officer has violated a federal legal obligation." *See* Defendant's Brief in Support of Motion for Summary Judgment ("Defendant's Motion") at 13 (docket entry 37–1). It cites *Wright v. City of Roanoke* for this suggestion, which states that " *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), held that § 1983 was available to enforce violations of federal statutes by agents of the State." *See*

*Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).

First, the court notes that there is no mention in the statute of a potential defendant's "violation" of his or her legal obligations.**\*754** Rather, the statute on its face sets up a liability scheme for the "deprivation of any rights ..." of a potential plaintiff, whether such a deprivation constitutes a "violation" of the defendant's legal obligations or not. 42 U.S.C. § 1983. Second, the *Wright* case does not address the novel argument HHSC advances in this litigation. Despite the language quoted by HHSC, it is not at all clear that the Court intended to fashion an initial threshold requirement that the plaintiff in a § 1983 suit show that the defendant "violated" one (or more) of the defendant's legal obligations. It is true that in many cases it will be natural to speak of a defendant's deprivation of the plaintiff's rights as such a "violation." But HHSC cites no authority that would support this court imposing a threshold requirement in § 1983 suits of showing that a defendant's actions can be characterized as the "violation of a [defendant's] legal obligation." Rather, the inquiry courts generally pursue is whether the defendant's actions have deprived the plaintiff of a right conferred on the plaintiff by law. See, *e.g., Wright,* 479 U.S. at 423–32, 107 S.Ct. 766 (examining whether the Housing Act and the Brooke Amendment evince congressional intent to foreclose a § 1983 remedy and create individual rights enforceable in a § 1983 action).

HHSC also relies on the Supreme Court's *Gonzaga* decision for its argument, *see* Defendant's Motion at 15–16, but all that *Gonzaga* held was that where a federal statute does not unambiguously create an individual "right" in a plaintiff, no Section 1983 suit can be maintained. See *Gonzaga University v. Doe,* 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). The Court in *Gonzaga* focused on whether certain provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA") contain "rights-creating language" and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

whether those provisions have an "aggregate" or an "individual" focus. *Id.* at 287–90, 122 S.Ct. 2268.

[2][3] Here, the only claims the plaintiffs bring that are rooted in § 1983 are claims of violations of due process under the Fourteenth Amendment and the Medicaid Act. *See* Complaint ¶¶ 91, 94. Clearly, the Fourteenth Amendment confers an individual right enforceable in a § 1983 suit. See, *e.g., Arnaud v. Odom,* 870 F.2d 304, 307 (5th Cir.), *cert. denied,* 493 U.S. 855, 110 S.Ct. 159, 107 L.Ed.2d 117 (1989). The language of the fair hearing provision of the Medicaid Act also unambiguously confers individual rights. 42 U.S.C. § 1396a(a)(3) states that

> [a] State plan for medical assistance *must* ... provide for granting an opportunity for a fair hearing before the State agency to *any individual* whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness....

(emphasis added). The language is mandatory, the provision contains rights-creating language, and there is an individual focus. This is enough to show that, in conformity with *Gonzaga,* the statute unambiguously confers a private individual right that may be enforced under § 1983.

The court also notes that the fair-hearing provision easily satisfies the three-factor *Blessing* test, namely, (1) whether Congress intended that the provision in question benefit the plaintiff; (2) whether the right protected by the statute is so "vague and amorphous" that its enforcement would strain judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on the States. See *Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Congress clearly intended that any individual whose claim for Medicaid benefits was denied would be benefitted by the fair hearing provision. The right to a *755 fair hearing that is protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. This is particularly true where the Medicaid regulations clarify that the right is coextensive with the right articulated in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). 42 C.F.R. § 431.205(d). Courts have vast experience in applying the *Goldberg* test of due process. And finally, the statute imposes a mandatory obligation on the states, since they "must" provide a fair hearing. 42 U.S.C. § 1396a(a)(3). The Medicaid fair hearing provision thus meets all three of the *Blessing* factors.

HHSC's threshold argument that all of the plaintiffs' claims can be disposed of on a finding that the defendant violated "no legal obligation" fails.

### D. *Supremacy Clause*

[4][5] The plaintiffs rely on the Supremacy Clause to support their claim that HHSC's rules, policies, and practices conflict with the "reasonable standards" and "amount, duration, and scope" provisions and regulations of the Medicaid Act and are thus preempted. *See* Complaint ¶ 88. The court notes as an initial matter that it is clear from the case law that "the federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief." *Planned Parenthood of Houston and Southeast Texas v. Sanchez,* 403 F.3d 324, 331 (5th Cir.2005). In addition, the Fifth Circuit has held that the Supremacy Clause provides plaintiffs with a valid implied cause of action. *Id.* at 333. Thus, none of HHSC's threshold arguments will prevent the court from considering the merits of the plaintiffs' Supremacy Clause claim. The question the court must proceed to answer is whether there is conflict between the Medicaid Act's provisions (and regulations implementing those provisions) and HHSC's rules, policies, and practices with respect to the ceiling lift at issue in this case, such that HHSC's rules and policies are preempted.

### E. *Medicaid Act and HHSC's policies*
#### 1. *Legal framework*
Medicaid is a cooperative federal-state program

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
**(Cite as: 945 F.Supp.2d 746)**

that provides medically necessary health care to low income families and individual with disabilities. *See* 42 U.S.C. § 1396 *et seq.* The Centers for Medicare & Medicaid Services ("CMS") administers the federal program, and participating states are required to designate a single state agency to administer their Medicaid program. *See* 42 U.S.C. § 1396a(a)(5). HHSC is the single state agency responsible for administering Texas's Medicaid program. *See* Defendant's Appendix in Support of its Motion for Summary Judgment ("Defendant's App. 1"), Declaration of Robert Perez ("Perez Decl.") ¶ 3 at 1–2 (docket entry 38).

Title XIX of the Social Security Act identifies a set of services that all states that participate in Medicaid must provide to eligible persons, including but not limited to inpatient and outpatient hospital services, Early Periodic Screening, Diagnosis, and Treatment ("EPSDT") services for persons under age 21, physician services, home health care, and pregnancy-related services. *See* 42 U.S.C. § 1396a *et seq.* Title XIX also requires that services provided under a Medicaid state plan be: (1) available statewide; (2) the same or comparable for all individuals eligible for the program; and (3) available to individuals determined financially eligible through a single standard for determining income and resource eligibility. *Id.* If a state elects to participate in Medicaid, it creates and submits for federal approval a State Medicaid Plan ("the State plan"). *Id.* In order to be eligible for continuing federal **\*756** financial support for its Medicaid program, a state must comply with the State plan as approved by CMS. 42 U.S.C. § 1396c. A state's discretion in the administration of its plan is further limited by the requirement, set forth in § 1396a(a)(17), that its plan "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan." By regulation, each service "must be sufficient in amount, duration and scope to reasonably achieve its purpose," and a state "may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... solely because of the diagnosis,

type of illness, or condition." 42 C.F.R. § 440.230(b)-(c).

The State plan must, among other things, specify the categories of services available to eligible beneficiaries. 42 U.S.C. § 1396a(a). One such category is home health services, which includes items known as durable medical equipment ("DME"). 42 U.S.C. § 1396a(a)(10)(D); 42 C.F.R. § 440.70. Federal statutes do not define DME, but individual state plans often provide specific guidelines for what constitutes covered DME. Some states, including Texas, identify a list of pre-approved DME items. See, *e.g.,* 1 Tex. Admin. Code § 354.1039(a)(4). In response to a Second Circuit opinion, *DeSario v. Thomas,* 139 F.3d 80 (2d Cir.1998), *cert. granted, judgment vacated* by *Slekis v. Thomas,* 525 U.S. 1098, 119 S.Ct. 864, 142 L.Ed.2d 767 (1999), addressing the required extent of DME coverage, CMS's predecessor agency (the Health Care Financing Administration) wrote a September 4, 1998 letter providing guidance clarifying its position on DME coverage under Medicaid (the " *DeSario* letter"). *Letter from Sally K. Richardson, Director of Centers for Medicaid and State Operations,* September 4, 1998, available at http:// downloads. cms. gov/ cmsgov/ archived-downloads/ SMDL/ downloads/ SMD 090498. pdf (last visited Jan. 29, 2012). The letter advised that states limiting DME coverage must meet three conditions:

(1) The process for deciding coverage must use reasonable and specific criteria that do not arbitrarily exclude items based solely on a type of illness or condition;

(2) The State's process and criteria, as well as its list of pre-approved DME items, must be publicly available; and

(3) Beneficiaries must be informed of their right to a fair hearing to determine whether an adverse decision is contrary to law. *Id.*

Texas Medicaid provides guidance as to the ex-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tent of its DME coverage. The Texas Medicaid Provider Procedures Manual ("TMPPM") states:

> Texas Medicaid defines DME as: Medical equipment or appliances that are manufactured to withstand repeated use, ordered by a physician for use in the home, and required to correct or ameliorate a client's disability, condition, or illness ... To be reimbursed as a home health benefit: ... The requested equipment or supply must be medically necessary, and Federal Financial Participation (FFP) must be available.

*Texas Medicaid Provider Procedures Manual* § 2.2.2.

Section 2.2.24 of the TMPPM further states that Texas Medicaid cannot reimburse a beneficiary "for any service, supply or equipment for which FFP is not available." *Id.* at § 2.2.24. Because of this, Texas Medicaid Home Health Services coverage under the State Plan does not include, among other things, "[s]tructural changes to homes, domiciles, or other living arrangements," as those items are not eligible for FFP. *Id.* Furthermore, section 2.2.14.26 of the TMPPM states that "[p]atient lifts requiring attachment to walls, *757 ceilings, or floors ... are not a benefit of Home Health Services" under Texas Medicaid. *Id.* at § 2.2.14.26. The plaintiffs' requests for the particular ceiling lift at issue in this case were denied based on this policy.

Texas Medicaid requires claimants to obtain "prior authorization" for most DME items in order to be reimbursed through Medicaid. See 1 Tex. Admin. Code §§ 354.1035(b)(1) and 354.1039(a). The Texas Medicaid and Healthcare Partnership ("TMHP") is an agency with whom HHSC contracts to administer aspects of the Medicaid program, including the prior authorization process. See, *e.g., Koenning v. Suehs,* 897 F.Supp.2d 528, 533–34 (S.D.Tex.2012). TMHP makes an initial prior authorization determination in response to a request for an item of DME. When a request is denied, TMHP must send a notice of denial to the claimant. 1 Tex. Admin. Code § 357.11(b). HHSC

also provides administrative hearings to claimants who are denied items of DME, and the regulations governing these hearings require hearing officers to sustain TMHP's denial if it is supported by agency policy. *Id.* § 357.23(e).

### 2. *Application*

[6] The plaintiffs argue that the ceiling lift at issue in this case clearly meets Texas Medicaid's definition of DME. *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Response") at 11–13 (docket entry 48). Consequently, they argue, HHSC's categorical exclusion of the lift violates the *DeSario* letter's guidance, because the *DeSario* letter's criteria (referenced above) are supposed to be applied to any individual request for an item of DME. *Id.* at 9. A categorical exclusion thus violates the individualized inquiry the letter requires. *Id.* Furthermore, the plaintiffs argue, in prior case law, states' categorical exclusions of items of DME have never been upheld as consistent with the Medicaid Act or the *DeSario* letter's requirements. *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Motion") at 2 (docket entry 40).

HHSC argues that the *DeSario* letter's requirements do not apply to ceiling lifts, because both State and Federal Medicaid guidance and policies show that ceiling lifts are considered to be "home modifications" and not DME. *See* Defendant's Motion at 20. Furthermore HHSC argues that, even if ceiling lifts are considered DME, the Texas policies sufficiently comply with the *DeSario* letter. *Id.* at 20–21.

HHSC also contends that it cannot be in violation of the Medicaid Act's requirements where its categorical exclusion of a purported benefit (DME or not) is in accord with explicit and implicit guidance from CMS that FFP will not be available for that purported benefit. *Id.* at 9, 18. HHSC points out that the most recent explicit guidance it has received from CMS about ceiling lifts is that FFP is unavailable for them. *Id.* It also points out that CMS has implicitly accepted recent Texas plans

that: (1) categorically exclude ceiling lifts from the "home health benefit" portion of its Medicaid program, but (2) provide ceiling lifts to patients under 21 via the EPSDT program and to patients over 21 via Medicaid's waiver services provisions. *Id.* at 2–6.

To this argument, the plaintiffs respond that HHSC is improperly imposing an "FFP assurance" standard on claimants in the prior authorization process. *See* Plaintiffs' Response at 14. In other words, the plaintiffs maintain, HHSC's argument means a claimant will have the burden to assure HHSC that, for any requested item of DME, FFP is available. *Id.* This, the plaintiffs argue, is too great a burden for *758 any claimant to meet in the prior authorization process. *Id.*

The court agrees that claimants ought not to be required to assure HHSC during the prior authorization process that FFP will be available for items they request. However, the court is of the opinion that this "FFP assurance standard" is not a necessary result of accepting HHSC's argument with respect to FFP availability for ceiling lifts. Rather, the court understands HHSC to be arguing that, where the state has explicit guidance that FFP will not be available for a particular item (DME or not), the state is not required by the Medicaid Act to provide such an item. Furthermore, since the state is not required to provide the item, a categorical exclusion is perfectly appropriate and consistent with the efficient administration of the state's Medicaid program.

In none of the "categorical exclusion" cases cited by the plaintiffs does a court address the argument being advanced by HHSC here. See, *e.g., Koenning v. Suehs,* 897 F.Supp.2d 528, 549–50 (S.D.Tex.2012) (declaring that HHSC's categorical exclusion of powered wheelchairs with "standers" violated the Medicaid Act's "reasonable standards" provision); *Fred C. v. Texas Health and Human Services Commission,* 167 F.3d 537 (5th Cir.1998) (upholding a district court's summary judgment in favor of a Medicaid claimant who argued that he

must be provided with an augmentative communicative device, because Texas Medicaid provided such devices for patients under 21 years of age); *Hope Medical Group For Women v. Edwards,* 63 F.3d 418 (5th Cir.1995), *cert. denied,* 517 U.S. 1104, 116 S.Ct. 1319, 134 L.Ed.2d 471 (1996) (holding that Louisiana's Medicaid restrictions on abortion funding, which would not allow for Medicaid funding of abortions in cases of rape or incest, violated Title XIX); *Mitchell v. Johnston,* 701 F.2d 337, 340–41 (5th Cir.1983) (affirming the district court's finding that Texas's cutbacks in Medicaid dental benefits for children violated Title XIX); *Rush v. Parham,* 625 F.2d 1150 (5th Cir.1980) (holding that a Georgia Medicaid policy excluding funding for transsexual surgery would be appropriate if the policy was meant to exclude experimental procedures and if transsexual surgery was determined to be such an experimental procedure). In none of these cases did a state claim that it had explicit guidance that FFP would not be available for the benefit in question. In that respect, this case appears to present a question of first impression, at least in this circuit.

Neither party cites it, but this court finds the rule articulated in *Harris v. McRae* to be dispositive with regard to this question. See generally *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). There the Court considered whether Title XIX required a participating state to pay for medically necessary abortions for which federal reimbursement was unavailable under the Hyde Amendment. *Id.* at 301, 100 S.Ct. 2671. The Court determined that the scheme of cooperative federalism Congress enacted in the Medicaid Act evinced no intent to require a participating state to shoulder the full costs of any health service provided in a state Medicaid plan. *Id.* at 308, 100 S.Ct. 2671. In addition, the Court found that the Hyde Amendment's legislative history contained no indication that Congress intended to shift the entire cost of certain medically necessary abortions to participating states. *Id.* at 310, 100 S.Ct. 2671. As the Court stated:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The cornerstone of Medicaid is financial contribution by both the Federal Government*759 and the participating State. Nothing in Title XIX as originally enacted, or in its legislative history, suggests that Congress intended to require a participating State to assume the full costs of providing any health services in its Medicaid plan. Quite the contrary, the purpose of Congress in enacting Title XIX was to provide federal financial assistance for all legitimate state expenditures under an approved Medicaid plan.

*Id.* at 308, 100 S.Ct. 2671.

The most apparent difference between that case and this is that congressional intent not to provide funding for certain abortions via the Medicaid program was clearly expressed in the legislation at issue in *Harris, i.e.,* the Hyde Amendment. *Id.* at 310, 100 S.Ct. 2671. Here, CMS, the agency charged with administration of the Medicaid statute, has expressed in its guidance to HHSC the view that funding is unavailable for certain items of DME (including ceiling lifts) via the Medicaid program.[FN4] *See* Defendant's App. 1 at 7, 13, 26, 27–28. Whether or not that view of congressional intent is correct is, of course, open to question. It is reasonable, however, for HHSC to rely upon the guidance of CMS as a correct expression of congressional intent to limit funding for certain items of equipment that might otherwise meet the State's definition of DME. The plaintiffs' dispute is thus not properly with HHSC, whose reliance on CMS guidance is reasonable. *See* Defendant's Motion at 17–18. The dispute is with CMS, over whether or not its guidance offers a reasonable interpretation of the extent of the Medicaid Act's coverage of certain items of DME.

> FN4. The guidance Texas Medicaid has received comes from a regional office of CMS that is apparently based in Dallas and serves Texas Medicaid. *See* Defendant's App. 1 at 7, 27–28. In their response to the defendant's summary judgment motion, the plaintiffs point to a communication the plaintiffs themselves solicited from a "senior CMS Central Office official" that indicates that FFP might be available for items such as ceiling lifts. *See* Plaintiffs' Response at 16, and Plaintiffs' Appendix in Opposition to Defendant's Motion for Summary Judgment at 51–53 (docket entry 50). At most, this communication reveals some internal disagreement at CMS on the extent of DME coverage under Title XIX. Texas Medicaid, however, ought not to be required to search out the opinion of every CMS officer with respect to the availability of FFP for contested items of medical equipment. It is entitled to rely on the guidance provided from its regional office, since—from the briefs presented to the court—that appears to be one of the normal procedures for obtaining opinions regarding the State plan's compliance with the Medicaid statute.

[7] The rule the court employs is this: where a State has explicit guidance from CMS that FFP will not be available for an item of DME, that State acts reasonably when it categorically excludes such an item from coverage in its Medicaid policies. This is because, as the Supreme Court has held, the Medicaid Act never requires States to shoulder the full burden of the cost of services provided under the State's Medicaid plan. See *Harris,* 448 U.S. at 308, 100 S.Ct. 2671.

The court finds that Texas Medicaid's policy categorically excluding ceiling lifts from coverage does not conflict with the Medicaid Act's "reasonable standards" requirement, the "amount, duration, and scope" regulation, or the *DeSario* letter's guidance. It is therefore not preempted by the Supremacy Clause.

### F. *Due Process*

[8][9] The Fourteenth Amendment prevents States from depriving citizens of property without due process of law. U.S. Const. Amend. XIV § 1. This has been termed "procedural due process."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372
(Cite as: 945 F.Supp.2d 746)

See, *e.g., Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). **\*760** As an initial matter, the plaintiff bringing a procedural due process claim in a benefits case like this one must show he or she has a property interest in the benefit that has been denied. See *id.* "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The plaintiffs here cannot make out a procedural due process claim, for the simple reason that they cannot show "a legitimate claim of entitlement" to the ceiling lift which was denied them by HHSC. The contours of the plaintiffs' property interests under the Medicaid Act are clarified by CMS in its guidance to HHSC that FFP is not available for ceiling lifts. This guidance shows that ceiling lifts do not fall within the scope of the services provided by the statute. There can be no "legitimate claim of entitlement" to a benefit that the agency charged with administration of a benefit statute has determined is not within the ambit of that statute.

[10] For the same reason, the plaintiffs' due process claims under the Medicaid Act's "fair hearing" provision fail. That provision, by its terms, applies only to an individual "whose claim for medical assistance under the plan is denied." Here, the plaintiffs' claims for ceiling lifts are not claims "under the plan." Indeed, CMS has provided guidance to HHSC that suggests that ceiling lifts are outside the plan. Thus, the plaintiffs in this case have no claim to which the Medicaid Act's fair hearing provision applies.

[11][12] Even were the court to conclude that these plaintiffs did have a property interest,[FN5] it would also conclude that these plaintiffs have received all the process that was due, consistent with *Goldberg v. Kelly'* s mandate. *Goldberg* requires both notice and a meaningful opportunity to be heard. *Goldberg,* 397 U.S. at 267–68, 90 S.Ct. 1011. The plaintiffs here do not dispute that they were given notice of the denial of their claim for benefits. Rather, they claim they had no meaningful opportunity to be heard, because HHSC's hearing officer was not required to consider evidence of exceptional circumstances that would warrant a departure from Texas Medicaid policy for their individual requests. What the plaintiffs fail to point out is that Texas provides for state judicial review of the lawfulness of a policy as applied to a Medicaid beneficiary whose claim has been denied in accord with such policy. *See* Defendant's Motion at 24; 1 Tex. Admin. Code § 357.703; Tex. Gov't. Code § 2001.174(2)(D).

> FN5. It is of course true that potential plaintiffs have a property interest in Medicaid benefits that fall within the ambit of the statute. See, *e.g., Ladd v. Thomas,* 962 F.Supp. 284, 289 (D.Conn.1997).

[13] What process is due depends on the circumstances of each case. See *Mathews,* 424 U.S. at 334, 96 S.Ct. 893. In *Goldberg,* the fact that a welfare recipient depends for his or her continued existence on the uninterrupted provision of benefits weighed in favor of the Court demanding a robust pre-termination hearing. See *Goldberg,* 397 U.S. at 264, 90 S.Ct. 1011. Here, the plaintiffs' current benefits have not in any sense been terminated or reduced by TMHP's decision to deny their claim based on the policy that the ceiling lift is not a benefit of Texas Medicaid. Rather, the plaintiffs' claims for this extra benefit were denied consistent with HHSC's reasonable policy. The plaintiffs were provided notice of the denial and **\*761** their right to a hearing, and a hearing was held. Moreover, if the plaintiffs were dissatisfied with Texas Medicaid's policy as applied to them, they had the opportunity to challenge its lawfulness using the mechanism of state judicial review. Under the circumstances, the plaintiffs have been provided with all the process that was due them.

### III. *CONCLUSION*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the reasons stated above, the defendant's motion for summary judgment is **GRANTED.** The plaintiffs' motion for summary judgment is **DENIED.**

Judgment will be entered for the defendant.

**SO ORDERED.**

N.D.Tex.,2013.
Detgen ex rel. Detgen v. Janek
945 F.Supp.2d 746, Med & Med GD (CCH) P 304,372

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.